# 24-3296-cv

## United States Court of Appeals
### for the
## Second Circuit

SANDRA YOUSEFZADEH, *et al.*,

*Plaintiffs-Appellants,*

(For Continuation of Caption See Inside Cover)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFFS-APPELLANTS

JONATHAN D. SELBIN
LIEFF CABRASER HEIMANN
   & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013
(212) 355-9500
jselbin@lchb.com

– and –

ADAM J. LEVITT
DICELLO LEVITT LLP
Ten North Dearborn Street, 6th Floor
Chicago, Illinois 60602
(312) 214-7900
alevitt@dicellolevitt.com

SAMUEL ISSACHAROFF
*Counsel of Record*
40 Washington Square South 411J
New York, New York 10012
(212) 998-6580
sil3@nyu.edu

– and –

ELIZABETH A. FEGAN
FEGAN SCOTT LLC
150 South Wacker Drive, 24th Floor
Chicago, Illinois 60606
(630) 273-2625
beth@feganscott.com

*Attorneys for Plaintiffs-Appellants (Please See Inside Cover
for Full List of Plaintiffs-Appellants)*

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS (800) 4-APPEAL • (376921)

GWEN THOMAS, RHONDA NITTO,

*Plaintiffs,*

– v. –

JOHNSON & JOHNSON CONSUMER INC., RB HEALTH (US) LLC, TARGET CORPORATION, BAYER HEALTHCARE, LLC, a Delaware limited liability corporation, WALMART INC., a Delaware corporation, CVS PHARMACY, INC., a Delaware corporation, WALGREEN CO., an Illinois corporation, THE PROCTER & GAMBLE COMPANY, HALEON US HOLDINGS LLC, PUBLIX SUPER MARKETS, INC., AMAZON.COM, INC., AMAZON.COM SERVICES LLC, KENVUE, INC., GLAXOSMITHKLINE LLC, RITE AID CORPORATION, ALBERTSONS COMPANIES, INC. COSTCO WHOLESALE CORP.,

*Defendants-Appellees,*

DOES 1-200, GLAXOSMITHKLINE CONSUMER HEALTHCARE HOLDINGS (US) LLC, RECKITT BENCKISER LLC, MERCK, MCNEIL CONSUMER HEALTHCARE, SANOFI-AVENTIS U.S. LLC, CHURCH & DWIGHT CO. INC., ASSOCIATED WHOLESALE GROCERS INC, VALU MERCHANDISERS CO., PFIZER INC., PERRIGO COMPANY PLC, HELEN OF TROY LIMITED, DIERBERGS MARKETS, INC., RECKITT BENCKISER PHARMACEUTICALS INC., THE KROGER CO., HARRIS TEETER, LLC, HARRIS TEETER SUPERMARKETS, INC., DOLGENCORP, INC., FAMILY DOLLAR, LLC,

*Defendants.*

*(Continued from Cover Page 1)*

JAMES E. CECCHI
CARELLA, BYRNE, CECCHI, BRODY
   & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700
jcecchi@carellabyrne.com

   – and –

KILEY L. GROMBACHER
BRADLEY/GROMBACHER LLP
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
(866) 881-0403
kgrombacher@bradleygrombacher.com

CHRISTOPHER A. SEEGER
SEEGER WEISS LLP
55 Challenger Road
Ridgefield Park, New Jersey 07660
(973) 639-9100
cseeger@seegerweiss.com

   – and –

JASON P. SULTZER
SULTZER & LIPARI, PLLC
85 Civic Center Plaza, Suite 200
Poughkeepsie, New York 12601
(845) 483-7100
sultzerj@thesultzerlawgroup.com

– and –

LINDSEY N. SCARCELLO
WAGSTAFF & CARTMELL
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
(816) 701-1100
lscarcello@wcllp.com

*Plaintiffs' Interim Class Counsel and Executive Committee*

*Attorneys for Plaintiffs-Appellants Sandra Yousefzadeh, Kaycie Coppock, Cody Morgan, Erin Barton, Hannah De Preist, Anthony DeRosa, John Coyle, individually and on behalf of all others similarly situated, Kimberly Buscaglia, Kamonica McWhite, Michael Walker, Eduardo Flores, Anntwanette Jones, Daniel Calzado, Keith Mortuiccio, Pedro Urena, Robyn Cronin, Timothy Butler 309172, Archanatep Boonparn, Chioma Ozuzu, Kenneth Levi Pack, Min Ji Jung, Steve Audelo, Natalie Juneau, Robert Fichera, Francis W. Catanese, Samuel Gallo, Kristin DePaola, Cathy Kleiman, Richard Scoffier, Annette Striegel, Martha A. Page, Emily Cohen, Janet Jones, Lateef Murdock, Gwen Lewi, Marcel Perez Pirio, Lane Barter, Jose Cortez Hernandez, Robert Lundin, Jaedon Daniels, Mychael Willon, Amy Weinberg, Dimitri Lamdon, Elie El Rai, Tatyana Dekhtyar, Olivia Rodesta, Lauren DeBeliso, Lorette Kenney, Daniel Heaghney, Amanda Thorns, Scott Collier, Andrew Isom, John Jeffrey Bader, Brian Lloyd Fireng, Carrie Diane Huff, Joseph Samuel Sorge, Joshua Edward Sorge, Christine Ann Waters, Christopher McPhee, Justin Vorise, Krista Wright, Jordan Nelson, Regina Peralta, Randall Sygal, Regina Brookshier, Erzen Krica, Allison Sammarco, Hollie Verdi, Tiffany Travis, Millard Adkins, Rosalyn Anderson, Eli Erlick, Donna Bailey, Rosalie Jackson, Recoa Russell, Frank Anderson, Tina Haluszka, Heather Fong, Tatiana Benjamin, Christine Contreras, Natasha Freeman, Robin Glauser, Anthony Rogers, Jamieka Holmes, Mari Jones, Michele Kasparie, Kimberly James, Greg Enriquez, Rachel Parker, Darrell Wayne Grimsley, Jr., Krystal Rampalli, Daryl Means, Jacob Reinkraut, Michael Lee, Toni Heuchan, Jonathan Brandman, Michelle Garza, Cece Davenport, Claudette Sanes, Daniel Flick, Janis Zimmerman, Rose Riccio, Andrea Wilson, Richard Chavez, Kathleen Emmons, Nathan Jackson, James Hsieh, Dominic Rio, Mohanad Abdelkarim, Steven Checchia, Tamula Chamberlain, Stacy Rankin, Harold Nyanjom, Frizell Johnson, Ruben Varela, Joy Taylor, Anthony Coleman, Natasha Hernandez, Jessica Thompson, Emily Hansen, Sommer Milous, Andrew Gutierrez, Rebecca Lynn Reyes, Sierra Vent, Hector Valdes, Joanne Silva, Shelby Noviskis, James Carrigan, Shawn L. Thomas, Charles Geoffrey Woods, John Jeffrey Ward, Ruta Taito, Dr. Karen Schwartz, Thomas Lewis, Dena Fichot, Pamela Joyner, Sharon Rourk, Izabel Pena-Venegas, Beverly Ward, Abby Jergins, Bill Jergins, Archi Hipkins, Christine Harrison, Viva Cohen, Joey Cohen, William Bryan, Jack Hinsberger, Nancy Welharticky, Robert Housman, Jay Valinsky, Rethea Morris, Robert Haid, Michael Folks, Sharon Manier, Stan Szrajer, Achorea Tisdale, Marisol Scharon, Haley Hadden, Bonnie Van Noy, John Boswell, Mohamad Tlaib, Donald Krist, Tina Tuominen, Paul Mateer, William Mitchell and Bethany Childers*

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF ISSUES FOR REVIEW ........................................1

INTRODUCTION ...............................................................................1

STATEMENT OF THE CASE.............................................................6

I.     FACTUAL BACKGROUND......................................................6

    A.     The FDA Permits Oral PE Sales Despite Doubtful Efficacy...............6

    B.     The CHPA Attempts to Conceal the Truth of Oral PE's
        Inefficacy ...............................................................................7

    C.     New Science Confirms the Inefficacy of Oral PE ..............................9

    D.     FDA Concludes Oral PE Has No Efficacy .........................................9

    E.     The FDA Announces Its Proposed Rule ...........................................10

II.    PROCEDURAL BACKGROUND ............................................10

STANDARD OF REVIEW ................................................................13

SUMMARY OF ARGUMENT ..........................................................13

ARGUMENT .....................................................................................14

I.     PLAINTIFFS' CLAIMS ARE NOT PREEMPTED...................14

    A.     There Is No Express Preemption.......................................................15

    B.     Federal Law Mandates Honest Labeling...........................................21

    C.     The Statutory Savings Clause Covers Plaintiffs' New York
        Claims.................................................................................23

    D.     *Critcher* Does Not Mandate Preemption..........................................25

    E.     The District Court Improperly Relied on a Form of Field
        Preemption..........................................................................27

II.    The District Court Erred by Dismissing the RICO Claim............................37

    A.     The Indirect Purchaser Rule Does Not Apply to RICO Claims ........38

    B.     Ordinary Canons of Statutory Construction Require Reversal.........43

    C.     The Scope of RICO Proximate Cause Is Determined by the
        Direct Relation Between the Alleged Predicate Acts and the
        Harm Asserted, Not Privity.................................................46

D.    There Are No Current Circuit Conflicts in RICO Proximate Cause Jurisprudence ........................................................... 49

E.    The RICO Claims Are Not Precluded by the FDCA ........................ 51

CONCLUSION ................................................................................................... 57

CERTIFICATE OF COMPLIANCE .................................................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alix v. McKinsey & Co.*,
23 F.4th 196 (2d Cir. 2022) ............................................................... 5, 48

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) ............................................................................ 45, 47

*Apple Inc. v. Pepper*,
587 U.S. 273 (2019) ...................................................................... 39, 41, 42

*Art & Antique Dealers League of Am., Inc. v. Seggos*,
121 F.4th 423 (2d Cir. 2024) ..................................................................13

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005) ............................................................................ 18, 33

*Bell v. Publix Super Markets, Inc.*,
982 F.3d 468 (7th Cir. 2020) ............................................................ 36, 37

*Biden v. Nebraska*,
600 U.S. 477 (2023) ....................................................................................19

*Booker v. E.T. Browne Drug Co.*,
2021 WL 4340489 (S.D.N.Y. Sept. 23, 2021) ................................. 20, 28

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008) ....................................................................... *passim*

*Canale v. Colgate-Palmolive Co.*,
258 F. Supp. 3d 312 (S.D.N.Y 2017) ....................................................20

*Carter v. Berger*,
777 F.2d 1173 (7th Cir. 1985) ................................................................50

*Castro v. QVC Network, Inc.*,
139 F.3d 114 ..............................................................................................24

*Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH*,
843 F.3d 48 (2d Cir. 2016).............................................................. 55, 56

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992).................................................................................27

*Critcher v. L'Oreal USA, Inc.*,
959 F.3d 31 (2d Cir. 2020)................................................................. 25, 26

*Croyle v. Moses*,
90 Pa. 250 (1879) ................................................................................2

*CSX Transp., Inc. v. Easterwood*,
507 U.S. 658 (1993)...........................................................................19

*Davis v. The Kroger Co.*,
2023 WL 9511156 (C.D. Cal. Sept. 22, 2023) ...................................36

*Dayan v. Swiss-Am. Prods., Inc.*,
2017 WL 9485702 (E.D.N.Y. Jan. 3, 2017) ......................................28

*Denny v. Ford Motor Co.*,
87 N.Y.2d 248 (1995) ........................................................................24

*Diaz v. Little Remedies Co.*,
81 A.D.3d 1419 (N.Y. App. Div. 2011) .............................................24

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)...........................................................................52

*Fenner v. General Motors, LLC*,
113 F.4th 585 (6th Cir. 2024) ...................................................... 50, 51

*Gibson v. Albertsons Companies, Inc.*,
2024 WL 4514041 (N.D. Ill. Oct. 17, 2024) ......................................36

*Gonzalez Rodriguez v. Walmart Inc.*,
2023 WL 2664134 (S.D.N.Y. Mar. 28, 2023) ....................................36

*Gross v. FBL Fin. Servs., Inc.*,
557 U.S. 167 (2009)...........................................................................43

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968)...........................................................................40

*Harris et al. v. Supervalu, Inc.*,
No. 1:22-cv-02863 (N.D. Ill. July 16, 2024) ......................................36

*Hartford Courant Co. v. Pellegrino*,
380 F.3d 83 (2d Cir. 2004).................................................................52

*Hemi Grp., LLC v. City of New York, N.Y.*,
559 U.S. 1 (2010) ........................................................................ 40, 47

*Holmes v. Sec. Inv. Prot. Corp.*,
 503 U.S. 258 (1992) ........................................................ 39, 45, 47, 48

*Horn v. Med. Marijuana, Inc.*,
 80 F.4th 130 (2d Cir. 2023), *cert. granted*,
 144 S. Ct. 1454 (2024) ................................................ 44, 46, 49, 54

*Illinois Brick Co. v. Illinois*,
 431 U.S. 720 (1977) ................................................................ *passim*

*In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*,
 2022 WL 17348351 (S.D.N.Y. Nov. 14, 2022) ............................ 31

*In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*,
 702 F. Supp. 3d 692 (N.D. Ill. 2023) ........................................ 26

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
 725 F.3d 65 (2d Cir. 2013) ........................................................ 33

*Jovel v. Boiron Inc.*,
 2013 WL 12164622 (C.D. Cal. Aug. 16, 2013) .......................... 31

*Kansas v. Utilicorp United, Inc.*,
 497 U.S. 199 (1990) .................................................................. 40

*Kordel v. United States*,
 335 U.S. 345 (1948) .................................................................. 31

*Leboeuf v. Edgewell Pers. Care Co.*,
 2023 WL 5432265 (N.D.N.Y. Aug. 23, 2023) .......................... 36

*Lemus v. Rite Aid Corp.*,
 613 F. Supp. 3d 1269 (C.D. Cal. 2022) .................................... 36

*Lerner v. Fleet Bank, N.A.*,
 318 F.3d 113 (2d Cir. 2003), *abrogated on other grounds by Am. Psych.
 Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352 (2d Cir. 2016) .............. 38, 39

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
 572 U.S. 118 (2014) .................................................................. 41

*Loper Bright Enterprises v. Raimondo*,
 603 U.S. 369 (2024) ................................................................ *passim*

*Matrixx Initiatives, Inc. v. Siracusano*,
 563 U.S. 27 (2011) .................................................................... 30

*McCarthy v. Recordex Serv., Inc.*,
  80 F.3d 842 (3d Cir. 1996)..................................................50

*MD Mall Assocs., LLC v. CSX Transp., Inc.*,
  715 F.3d 479 (3d Cir. 2013)...............................................32

*Medtronic, Inc v. Lohr*,
  518 U.S. 470 (1996) ............................................... 5, 18, 28

*Merck Sharp & Dohme Corp. v. Albrecht*,
  587 U.S. 299 (2019) ...........................................................21

*Mut. Pharm. Co. v. Bartlett*,
  570 U.S. 472 (2013) ................................................ 21, 22, 31, 32

*Nancy Calchi v. TopCo Assocs., LLC*,
  2024 WL 4346420 (N.D. Ill. Sept. 30, 2024) ....................36

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*,
  710 F.3d 71 (2d Cir. 2013) ................................................30

*New York State Telecomms. Ass'n, Inc. v. James*,
  101 F.4th 135 (2d Cir. 2024) ............................................27

*PLIVA, Inc. v. Mensing*,
  564 U.S. 604 (2011) ................................................... 29, 30

*POM Wonderful LLC v. Coca-Cola Co.*,
  573 U.S. 102 (2014) ....................................................... *passim*

*Prescott v. Ricola USA, Inc.*,
  2024 WL 1892290 (N.D. Cal. Apr. 30, 2024) ...................28

*Reid v. GMC Skin Care USA Inc.*,
  2016 WL 403497 (N.D.N.Y. Jan. 15, 2016)............... 20, 28, 30

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947) ......................................................... 5, 18

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985) .............................................. 44, 45, 54

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ..........................................................19

*Souter v. Edgewell Pers. Care Co.*,
  542 F. Supp. 3d 1083 (S.D. Cal. 2021).................... 28, 31, 32

*Stephens v. Target Corp.*,
   694 F. Supp. 3d 1136 (D. Minn. 2023) .................................................. 28, 29, 36

*Stevens v. Walgreen Co.*,
   623 F. Supp. 3d 298 (S.D.N.Y. 2022) .................................................36

*Trollinger v. Tyson Foods, Inc.*,
   370 F.3d 602 (6th Cir. 2004) .................................................50

*United States v. Flu Fighter Corp*,
   2009 WL 10668958 (S.D. Fla. Feb. 11, 2009) .................................................31

*United States v. Innovative Biodefense, Inc.*,
   2019 WL 2428670 (C.D. Cal. Feb. 22, 2019) .................................................31

*Voss v. Black & Decker Mfg. Co.*,
   59 N.Y.2d 102 (1983) .................................................24

*Washington v. Geo Grp., Inc.*,
   283 F. Supp. 3d 967 (W.D. Wash. 2017).................................................32

*Wayman v. Southard*,
   10 Wheat. 1, 6 L. Ed. 253 (1825).................................................19

*Williamson v. Mazda Motor of America, Inc.*,
   562 U.S. 323 (2011).................................................33

*Wyeth v. Levine*,
   555 U.S. 555 (2009).................................................*passim*

*Yeend v. Akima Glob. Servs., LLC*,
   2022 WL 794852 (N.D.N.Y. Mar. 16, 2022) .................................................32


**Statutes & Other Authorities:**

5 U.S.C. § 706.................................................18

15 U.S.C. § 379r.................................................24, 27

18 U.S.C. § 1341 .................................................43, 54

18 U.S.C. § 1343 .................................................43, 54

18 U.S.C. § 1961 .................................................42

18 U.S.C. § 1962 .................................................1, 38

18 U.S.C. § 1964 ............................................................... 5, 38, 39

21 U.S.C. § 331 .................................................................. 16, 20, 21

21 U.S.C. § 352 ............................................................................ *passim*

21 U.S.C. § 379r ......................................................................... *passim*

21 U.S.C. § 379s ...................................................................................26

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 1331 ....................................................................................1

28 U.S.C. § 1332 ....................................................................................1

28 U.S.C. § 1407 ..................................................................................10

21 C.F.R. § 314.70 ..............................................................................30

21 C.F.R. § 314.170 ........................................................................ 4, 28

21 C.F.R. § 330.1 ...................................................................... 14, 27, 29

21 C.F.R. § 341.80 ........................................................................ 6, 29

21 C.F.R. § 701.1 .................................................................................27

72A C.J.S. Products Liability § 1 .......................................................23

143 Cong. Rec. S9755-02, 1997 WL 586331 (Sept. 23, 1997) ...................... 24, 25

143 Cong. Rec. S9811-04, 1997 WL 588716 (Sept. 24, 1997) ...............................25

Black's Law Dictionary (12th ed. 2024) ..........................................23

Blackstone's Commentaries, Book IV, Ch. 12 ...................................2

N.Y. Educ. Law § 6815 .....................................................................30

N.Y. Gen. Bus. Law § 349 ........................................................... 30, 34

N.Y. Gen. Bus. Law § 350 .................................................................34

Restatement (Second) of Torts § 435A ............................................46

W. Page Keeton, "Fraud—Concealment and Nondisclosure," 15 Tex. L. Rev. 1
    (1936) ..............................................................................................2

Food & Drug Admin., OTC Monograph M012: Cold, Cough, Allergy,
    Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter
    Human Use, Final Administrative Order ........................................14

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 because Appellants' claims arise under 18 U.S.C. § 1962, and under 28 U.S.C. § 1332(d)(2) because this is a class action where (a) there are at least 100 class members, (b) the amount in controversy exceeds $5 million, and (c) at least one class member is a citizen of a different state than at least one defendant. The District Court entered final judgment on November 12, 2024. (SPA-18).[1] Appellants filed a notice of appeal on December 9, 2025. (A-1156). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES FOR REVIEW

1.     Did the District Court err in finding preemption without independently examining the entire statutory framework of the Food Drug and Cosmetic Act?

2.     Did the District Court err by applying the direct purchase requirement from antitrust law as a prerequisite to standing under RICO?

## INTRODUCTION

This is a case about the sale of an over-the-counter nasal decongestant that everyone now agrees—but only the Defendant-manufacturers long have known—does not work. For as long as there has been commercial trade, there have been

---

[1] As used herein, "SPA-" refers to the Special Appendix, and "A-" refers to the Joint Appendix.

purveyors of magical elixirs claiming to cure all manner of human maladies. And for at least as long as there has been a common law, combatting this fraud has been central to ordering the rules of commerce. Blackstone's Commentaries speaks of "cheating" as an offense "against public trade" carried out by "any deceitful artifice, in cozening another by artful means, whether in matters of trade or otherwise." Book IV, Ch. 12, pp. 157–58. The common law, reaching back many centuries at this point, accordingly provided "general punishment for all frauds of this kind." "It needs no citation of authorities to prove that the wil[l]ful misrepresentation or concealment of a material fact by the vendor constitutes a fraud" and that "fraudulent [mis]representations may be as well by arts or artifices calculated to deceive, as by positive assertions." *Croyle v. Moses*, 90 Pa. 250, 252 (1879), *cited in* W. Page Keeton, "*Fraud—Concealment and Nondisclosure*," 15 Tex. L. Rev. 1 (1936).

Plaintiffs below—New York consumers who purchased Oral Phenylephrine ("Oral PE")—alleged that the claim by manufacturers that medications containing Oral PE are effective as decongestants is, in the language of Blackstone, a deceitful artifice. As pleaded below, the sale of Oral PE represented to be effective as a decongestant violated New York state consumer protection and warranty law and the organized campaign by the manufacturers violated the federal RICO statute.

The District Court granted a motion to dismiss all claims. According to the District Court, because the FDA decades earlier approved Oral PE as "effective," no amount of (undisputed) scientific evidence to the contrary obligated the manufacturers to do anything to cure their misrepresentations. For the court below, the FDA's earlier approval alone preempted *all* claims under *all* state law, notwithstanding the statutory mandate against misbranding and the statutory savings clause that "[n]othing in this section shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State." 21 U.S.C. § 379r(e). The preemption ruling even reached claims based on the manufacturers' misrepresentations and nondisclosures made entirely outside the FDA-approved label. That was clear error.

Allowing agency conduct of its own force to preempt state law not only violates the obligation to assess independently the *statutory* command as set out in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), but, in particular, the congressional mandate in the Food, Drug, and Cosmetic Act ("FDCA") that "[a] drug or device shall be deemed to be misbranded . . . if its labeling is false or misleading in any particular." 21 U.S.C. § 352(a)(1) (as relevant, sometimes referred to as the "Anti-Misbranding statute"). The District Court invoked a contrived distinction between safety and efficacy found nowhere in the FDCA to

determine that efficacy (but not safety) is exclusively controlled by agency determinations and that all conflicting state law must yield.

The District Court erred even as to the regulatory commands. Under 21 C.F.R. § 314.170, "[a]ll drugs, including those the Food and Drug Administration approves . . . are subject to" the federal Anti-Misbranding provisions of the FDCA. The court below acknowledged that the applicable regulations "give manufacturers some flexibility in describing the indications of a PE product." (SPA-7). But, ruling on a motion to dismiss, it did not resolve the potential preemptive force of such regulations, i.e. whether or not they actually conflict with state law remedies. That is a question of fact, not amenable to resolution on a motion to dismiss.

As for the RICO claim, the District Court imported the bright-line *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) indirect purchaser rule from antitrust law found nowhere in the statutory text, substituting it for the direct relation proximate cause test mandated by the Supreme Court in *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). It thereby limited RICO standing only to the uninjured direct purchasers (such as retailers) who were neither the targets nor the intended (or actual) victims of the misconduct. This removed from RICO protection the consumers whose injury (payment for a worthless product) directly related to the manufacturers' misconduct (fraud), and who were the direct targets and intended— and only—victims of the manufacturers' coordinated marketing scheme.

The District Court disregarded the express statutory language extending RICO's protection to "*any person* injured . . . by . . . [the] violation." 18 U.S.C. § 1964(c) (emphasis added). It imposed *an indirect purchaser* rule of standing, bereft of any support from the Supreme Court or this Court. This Court, by contrast, following controlling Supreme Court precedent, applies a *direct relation test* for RICO proximate cause irrespective of any formal contractual privity as a predicate for RICO liability, which looks to the connection between the alleged misconduct and the alleged injury, not privity of contract. *See Alix v. McKinsey & Co.*, 23 F.4th 196, 206 (2d Cir. 2022) (applying *Bridge*).

Ultimately, the District Court's ruling left consumers with no remedy for the manufacturers' fraud, and no one with any incentive or ability to seek redress for it. Supreme Court authority is to the contrary. "In all pre-emption cases, and particularly in those in which Congress has 'legislated [. . . ] in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Medtronic, Inc v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947)). Neither the FDCA nor RICO sought to immunize basic fraud from centuries-old common law vigilance.

The District Court should be reversed.

# STATEMENT OF THE CASE

## I. FACTUAL BACKGROUND

Defendants are manufacturers of over-the-counter oral medications containing "phenylephrine" as the active ingredient ("Oral PE"). Despite express marketing claims to the contrary on every box sold and in all of their marketing and advertising, the manufacturers indisputably knew since at least 2016 that Oral PE is no more effective at decongesting than a placebo, a material fact they never disclosed.

### A. The FDA Permits Oral PE Sales Despite Doubtful Efficacy

That it took some time for the science on Oral PE to emerge into the public domain is unsurprising given the product's history. Since 1972, there have existed two mechanisms to regulate over-the-counter ("OTC") drugs like PE products: the monograph system that describes the scientific bases for the medication, found in 21 C.F.R. Part 330,[2] and the New Drug Application system found in 21 C.F.R. Part 314. Both regulatory systems were promulgated by the FDA pursuant to the Federal Food, Drug, and Cosmetic Act ("FDCA"), which, among other things, prohibits the sale of drugs with false information in their labels. Per 21 U.S.C. § 352(a)(1), a "drug or device shall be deemed to be misbranded . . . if its labeling is

---

[2] OTC decongestants are also specifically governed by 21 C.F.R. § 341.80.

false or misleading in any particular." Once in place, the "monograph" is the primary regulatory oversight mechanism.

In 1976, the FDA's Cold-Cough Panel reviewed Oral PE as part of its consideration of OTC drugs. The panel found that data presented to it were "not strongly indicative of efficacy," (A-144), but, in absence of a safety concern, recommended that Oral PE be approved as "safe and effective" at a dose of 10mg. *Id.* Oral PE was included in the Temporary Final Monograph for nasal decongestants in 1985, and incorporated into the Final Monograph in 1994. *Id.* No significant studies of Oral PE's efficacy were published in that interval, (*id.*), and, in any event, oral decongestants were largely formulated around two other products—phenylpropanolamine and pseudoephedrine. *Id.* However, in 2000 it was revealed that phenylpropanolamine may contribute to hemorrhagic stroke in some women, and OTC use of it was subsequently banned. (A-145). In 2006, the Combat Methamphetamine Act of 2005 moved pseudoephedrine behind-the-counter, making it highly inconvenient to purchase. *Id.* PE products accordingly became the only OTC drug approved for treatment of nasal congestion conveniently available for consumer purchase. *Id.*

**B.    The CHPA Attempts to Conceal the Truth of Oral PE's Inefficacy**

At the same time that Oral PE took command of the flu and cold pharmacy shelves open to consumers, manufacturers became aware that Oral PE was

completely ineffective for its intended and marketed purpose. In short, it did not decongest. As set out in the operative complaint, the manufacturers turned to the Consumer Health Products Association ("CHPA"), an otherwise legitimate industry organization, to obfuscate the inefficacy of their widely-sold product. (A-155-A-170). Beginning in late 2005, a "Phenylephrine Task Group" within CHPA used that platform to issue press releases and submissions designed to mislead consumers and the public, and to delay the FDA's review process in the face of citizen petitions raising questions about Oral PE efficacy. (A-155-A-170).

After the FDA called for more study, in 2007 the CHPA represented to the FDA that its members had come together to "critically assess all studies . . . on the efficacy and safety of phenylephrine in adults." (A-157). The FDA would later characterize these studies as suffering from "significant methodological and statistical issues, as well as potential data integrity issues," that did not "critically assess" anything. (A-157-A-158). In the meantime, the CHPA bought time by exploiting the inability of a government regulator to do its own studies. Just as the manufacturers intended, the FDA threw up its hands, finding that "due to the limitations of the data" available, "additional clinical data would be necessary, including new studies that should evaluate the decongestant effect . . . of oral PE." (A-158-A-159). The CHPA similarly misrepresented the scientific evidence when another Citizen's Petition was filed in 2015. (A-159-A-162). And the CHPA

repeated these false and misleading claims in press releases aimed directly at consumers. (A-156, A-162-A-164, A-166-A-168).

### C.    New Science Confirms the Inefficacy of Oral PE

By 2016, there was no hiding from the science. Multiple studies, including a number published in peer-reviewed journals, proved that Oral PE was ineffective. (A-148-A-150). The manufacturers were aware of the content of those studies, some of which they sponsored (e.g., Johnson & Johnson). (A-150). No manufacturer sought to update its label or marketing in light of this new scientific consensus, and multiple manufacturers, individually and through the CHPA, made false statements to regulators and the public regarding Oral PE's purported efficacy. (A-237-A-252). Since 2016 these manufacturers have sold at least $12 billion in PE Products nationwide. (A-136).

### D.    FDA Concludes Oral PE Has No Efficacy

In 2023 FDA scientists concluded based upon review of the scientific studies going back to at least 2016 that "orally administered PE is not effective" at up to four times the recommended dose, (A-153), and that the scientific data did not support Oral PE as an effective oral decongestant. (A-154). Shortly following that announcement, these lawsuits were filed. Notably for the issues presented here, Johnson & Johnson then acted *without FDA approval*—albeit belatedly and inadequately—noting on one of its websites that federal regulators "discussed new

data on the effectiveness of oral phenylephrine and concluded that the current scientific data *do not support* that the recommended dosage of orally administered phenylephrine is effective as a nasal decongestant." (A-155).

### E. The FDA Announces Its Proposed Rule

On November 7, 2024 (after the District Court ruling here), the FDA announced that it was proposing to remove Oral PE as an active ingredient that can be used in OTC monograph drug products. Joint Ltr. re Recent FDA Announcement, *In re: Oral Phenylephrine Mktg. & Sales Pracs. Litig.*, No. 23-md-3089 (E.D.N.Y. Nov. 8, 2024), ECF No. 251.

## II.     PROCEDURAL BACKGROUND

The Oral PE lawsuits were all consolidated by the Judicial Panel on Multidistrict Litigation in the Eastern District of New York under 28 U.S.C. § 1407. The District Court ordered the parties to engage in a "bellwether" process, (A-131-A-133), by which Plaintiffs filed an initial streamlined complaint, alleging claims under New York law, (A-221-A-237), along with a federal claim under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, to test claims and defenses common across the consolidated cases. (A-237-252).

On October 29, 2024, the District Court dismissed Plaintiffs' initial streamlined complaint on the New York state and federal RICO claims. (SPA-1-SPA-17). It ruled that Plaintiffs' state-law claims—all premised on the allegations

that the manufacturers knowingly misrepresented and failed to disclose the truth about the efficacy of Oral PE both on their labels *and* in all of their marketing and advertising—were preempted by FDA approval of the monograph. It additionally dismissed Plaintiffs' RICO claim on the basis that Plaintiffs lacked standing because they were "indirect" rather than "direct" purchasers of the Oral PE products.

*Preemption.* In ruling on the motion to dismiss, the District Court necessarily had to accept as true the allegations in the operative complaint that the manufacturers purposefully lied on their labels and in their advertising and marketing. Despite the clear allegations in the complaint that the manufacturers knew since at least 2016 that Oral PE was useless for its intended purposes, the District Court ruled that: (1) the notion of whether a drug is "effective" is a "term of art"; (2) only the FDA, and not drug manufacturers, can determine whether a drug is effective; and (3) nothing on the labels (or in the marketing and advertising) could be false or misleading as a matter of law because the labels reflect the FDA's administrative determination in the monograph. (SPA-3-SPA-14). As such, it held all of Plaintiffs' state law claims preempted. The District Court did not discuss statutory text or otherwise consider how a regulator could authorize a manufacturer to make knowingly false statements on a label—much less in non-label marketing and advertising—given the statutory prohibition

against misbranding, an independent inquiry mandated by the Supreme Court's decision in *Loper Bright*, 603 U.S. 369.

*RICO.* With respect to RICO, the District Court acknowledged that neither the Supreme Court nor the Second Circuit has ever endorsed a direct purchaser requirement for RICO standing, but nevertheless relied on the broad principle that, because RICO and the Clayton Act contain similar language, the two should be read in tandem. (SPA-14-SPA-17). The District Court pointed to no statutory language compelling such a result, nor did it address the fact that RICO was written a decade before the direct purchaser requirement was incorporated into antitrust law and could not possibly have incorporated that doctrine as a matter of statutory design or purpose. Instead, the District Court simply held: "[w]here an antitrust standing requirement is easily intelligible in the civil RICO context, such as with the bright-line rule at issue here, the identical language of the statutes dictates that courts apply the same requirement in both contexts." (SPA-15-SPA-16). It cited no authority for this proposition of statutory construction. Also presented below was a claim by Defendants that the FDCA precluded any liability under RICO. The District Court did not reach the issue, (SPA-14), but subsequently ruled that the FDCA precluded Lanham Act claims by a pharmacy plaintiff, an appeal that has been consolidated with this one. (SPA-22). The court entered judgment on November 12, 2024. (SPA-18-SPA-20).

This appeal followed.

## STANDARD OF REVIEW

As pure questions of law, this Court reviews both the District Court's finding that Plaintiffs' claims are preempted, and its dismissal of the civil RICO claims for want of standing, de novo. *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 428 (2d Cir. 2024).

## SUMMARY OF ARGUMENT

This appeal turns on two errors of statutory interpretation by the District Court. First, the court found sweeping preemption of all state law claims for the FDA's aged and, in light of undisputed science since at least 2016, incorrect finding of Oral PE effectiveness despite the express statutory prohibition on misbranding and despite the express savings clause for product liability claims. The preemption ruling was predicated on FDA regulations, not the statutory language, and was imposed without any factual findings of actual conflict between state and federal law. In reality, both state consumer protection and warranty law and the federal Anti-Misbranding statute impose parallel—if not identical—obligations on manufacturers to make truthful representations about, and meaningful disclosures of, material facts like efficacy.

Second, the District Court dismissed the RICO claim by applying the antitrust indirect purchaser rule for standing, rather than the well-established RICO

proximate cause requirement of a direct relation between unlawful conduct and injury. This has no support in the statutory text nor any case from the Supreme Court or this Court. Should this Court reverse on RICO standing, it should also reject the argument raised below that the FDCA somehow precludes RICO notwithstanding that the two statutes have co-existed for decades and Congress plainly did not intend the FDCA to preclude requirements arising from other federal false advertising statutes, including RICO, when the false labeling falls within the purview of the mail or wire fraud statutes.

## ARGUMENT

## I.  PLAINTIFFS' CLAIMS ARE NOT PREEMPTED

The monograph for Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-The-Counter Human Use, states that oral phenylephrine is "generally recognized as safe and effective and is not misbranded" so long as it meets the "conditions in this OTC monograph and each of the general conditions established in 21 CFR 330.1"[3] For the District Court, so long as Oral PE is in the monograph, even if the manufacturers know that the

---

[3] Food & Drug Admin., OTC Monograph M012: Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use, Final Administrative Order (OTC000026) (2022) § M012.1 Scope, https://dps-admin.fda.gov/omuf/omuf/sites/omuf/files/primary-documents/2022-10/OTC%20Monograph_M012-Cough%20Cold%20Allergy%20Bronchodilator%20and%20Antiasthmatic%20Drug%20Products%20for%20OTC%20Human%20Use%2010.14.2022_0.pdf.

statements on their drug labels and in their marketing and advertising are literally false, those statements are "constructively true" because a statement regarding drug efficacy cannot be "false" so long as it appears in the monograph. This defies common sense and both state and federal law.

## A.    There Is No Express Preemption

*Statutory Interpretation.* Bereft of any textual support, the District Court found state law preempted because "Congress allowed states to layer additional state protections atop federal ones, *but only when those protections relate to safety*; whether a drug remains effective remains the exclusive purview of the FDA." (SPA-12) (emphasis added). This is clear legal error.

Preemption is a question of statutory interpretation. Here, twin textual commands are operative. First, states cannot "establish or continue in effect any requirement . . . that is different from or in addition to, or that is otherwise not identical with, a requirement under" the FDCA. 21 U.S.C. § 379r(a)(2). But a savings clause provides that this does not "modify or otherwise affect any action or the liability of any person under the product liability law of any State." 21 U.S.C. § 379r(e).[4] Second, under the federal Anti-Misbranding statute, "[a] drug or device

_____

[4] The District Court did not reach this issue, claiming that it had been waived. (SPA-5). This is not correct. Plaintiffs specifically invoked the savings provision in their Opposition to the Motion to Dismiss. Mem. in Opp'n re: Mot. to Dismiss at 13–14, *In re: Oral Phenylephrine Mktg. & Sales Pracs. Litig.*, No. 23-md-3089 (E.D.N.Y. July 15, 2024), ECF No. 225.

shall be deemed to be misbranded . . . [i]f its labeling is false or misleading in any particular." 21 U.S.C. § 352(a)(1). And a "misbranded" drug cannot be sold legally. *See* 21 U.S.C. § 331.

The District Court found preemption notwithstanding the savings clause and the Anti-Misbranding statute. Nothing in the text of 21 U.S.C. § 352(a)(1) distinguishes between statements that are false respecting "safety" and false respecting "effectiveness." Simply put, the statute defines a drug as "misbranded" if its label is "false or misleading in *any* particular." 21 U.S.C. § 352(a)(1) (emphasis added). "False" is false, and "any" is any. The District Court's ruling would give the FDA preemptive power directly to the contrary of the statutory text.

As is often the case in complicated regulatory schemes, the statutory commands have three aims that are in some tension with each other: nationwide consistency, preservation of state law, *and* the continued responsibility of drug manufacturers for the accuracy of their representations. What *is* clear on the face of the statutes is two-fold: (1) there is no field preemption; and (2) drug manufacturers have an obligation to be truthful even outside of the formal administrative process. *See* 21 U.S.C. § 331(a) (barring sale of "drug[s]" that are "misbranded").

The District Court erred further by locating the "express" condition for "express preemption" in the administrative regulations promulgated under the FDCA, even when contrary to the actual text of the statute. In finding express preemption, the District Court based its opinion on the following premise:

> Most obviously, whether a drug is "effective" is a term of art under the FDCA, and the statute empowers the FDA, not manufacturers, to make that determination. . . . So, even taking plaintiffs' allegations [that oral phenylephrine does not work as a decongestant] as true, nothing on the labels was false or misleading[.]

(SPA-9) (internal citation omitted). Thus, it concluded, "unless and until the FDA amends the monograph in response to the NDAC's [Nonprescription Drugs Advisory Committee] findings, it is not misleading to state that PE is an effective nasal decongestant." (SPA-9).

*Failure to Conduct Independent Review.* If the District Court's preemption analysis were ever the law, certainly it no longer can be following *Loper Bright*. There, the Supreme Court held that courts must exercise their *independent* judgment to determine whether an agency like the FDA has acted within its statutory authority. 603 U.S. at 395 (courts must "independently interpret the statute"). To the extent FDA approvals of drugs or monographs can be read to permit false statements, following *Loper Bright*, a court must exercise its independent judgment to determine whether the FDA exceeded its statutory authority.

Nor is this new law.[5] The Supreme Court has long recognized that preemption implicates deep federalism concerns and requires, in the first instance, clear direction from Congress. Federal and state authority overlap and preemption law draws on a respect for appropriate boundaries. *Cf. Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ("[W]e start with the assumption that the historic police powers of the State were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."); *Medtronic, Inc.*, 518 U.S. at 485 (presumption of preservation of state authority in traditional areas of state police powers).

In *Wyeth*, the Supreme Court explained that "agencies have no special authority to pronounce on pre-emption absent delegation by Congress," noting that the Court had never "deferred to an agency's conclusion that state law is pre-empted." 555 U.S. at 576–77 (emphasis omitted). Rather, where "Congress has not authorized the FDA to pre-empt state law directly," "the weight [the court] accord[s] the agency's explanation of state law's impact on the federal scheme

---

[5] Plaintiffs' brief below was filed just after *Loper Bright* issued, and neither party invoked it in the briefing below, although it came up in passing at oral argument. Plaintiffs' brief instead relied on *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005) and *Wyeth v. Levine*, 555 U.S. 555 (2009) to make the same point about the obligation of courts independently to assess the scope of preemption based upon congressional direction. As Chief Justice Roberts noted in *Loper Bright*, it is hardly a novel position that, under the APA, "'the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.'" 603 U.S. at 391 (quoting 5 U.S.C. § 706).

depends on its thoroughness, consistency, and persuasiveness"; that is, the agency's decision is entitled only to *Skidmore* deference. *Id*. (*citing Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)) (citation omitted).

*Loper Bright* is all the more compelling here because the District Court not only failed to root its express preemption finding in statutory language, but impermissibly turned to the implementing regulations of the FDA to define the boundaries of preemption.[6] With regard to "whether a drug is 'effective,'" the District Court found that "the statute empowers the FDA, not manufacturers, to make that determination," notwithstanding the statutory misbranding prohibition. (SPA-9). The preemption that follows is premised entirely on regulations whose preemptive authority is *presumed*, not examined. The District Court thus blurred the boundaries between statute and regulations and did so on the "major question" of preemption, even before *Loper Bright*. As Justice Barrett observed regarding the boundaries of delegated statutory authority under the major questions doctrine, "in a system of separated powers, a reasonably informed interpreter would expect Congress to legislate on 'important subjects' while delegating away only 'the details.'" *Biden v. Nebraska*, 600 U.S. 477, 515 (2023) (Barrett, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 6 L. Ed. 253 (1825)).

_____

[6] *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 679 (1993) (Thomas, J., concurring in part and dissenting in part, joined by Souter, J.) ("Respect for the presumptive sanctity of state law should be no less when federal pre-emption occurs by administrative fiat rather than by congressional edict.").

Moreover, had the District Court engaged in its own independent review, rather than simply accepting decades-old FDA approval as binding, it could never have concluded, as it did, that so long as a drug has obtained regulatory approval, it cannot be "misbranded," no matter how much time has passed since FDA approval or what subsequent science may have established. The operative complaint plainly alleges that the Oral PE labels and marketing and advertising are clearly, obviously, and objectively "false," as that term is used in 21 U.S.C. § 352(a)(1), and Congress has commanded that drugs with false labels are "misbranded" and cannot be sold. 21 U.S.C. § 331. (A-218-A-221).

In sum, the Anti-Misbranding statute is an integral source of law in determining the boundaries of FDCA preemption, as district courts in this Circuit have long recognized when examining the requirements of the FDCA. *See, e.g.*, *Canale v. Colgate-Palmolive Co.*, 258 F. Supp. 3d 312, 318–23 (S.D.N.Y 2017) (state law claims regarding toothpaste product held parallel to 21 U.S.C. § 352(a)(1) and accordingly not preempted); *Booker v. E.T. Browne Drug Co.*, 2021 WL 4340489, at *3–7 (S.D.N.Y. Sept. 23, 2021) (state law economic injury claim against manufacturer of lotion not preempted where decision based purely on statutory scheme); *Reid v. GMC Skin Care USA Inc.*, 2016 WL 403497, at *8–10 (N.D.N.Y. Jan. 15, 2016) (misbranding claim based on alleged ineffective nature of product not preempted).

## B. Federal Law Mandates Honest Labeling

The District Court erroneously concluded that, when it comes to drug *efficacy* (as opposed to *safety*), federal law does not require drug makers to act when new scientific information renders the drug misbranded. That is incorrect.

The "central premise" of federal drug law is that "the manufacturer bears responsibility for the content of its label at all times." *Wyeth*, 555 U.S. at 570–71. Misbranded drugs cannot be sold. 21 U.S.C. § 331. And a drug may be *rendered* misbranded where "liability is based on new and scientifically significant information that was not before the FDA." *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 487 n.4 (2013). Information "may change over time, and that new information may require changes to the drug label." *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 304 (2019); *see also Bartlett*, 570 U.S. at 477 n.4.

The District Court read these cases—and the Anti-Misbranding statute—as limited to *safety* and purported to tether its reading to the statute itself:

> [T]he misbranding statute requires a manufacturer to "pull even an FDA-approved drug" from the market when the drug "is 'dangerous to health' even if 'used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof.'" *Bartlett*, 570 U.S. at 477 n.4 (quoting 21 U.S.C. § 352(j)). There is no similar provision in § 352 for ineffective drugs.

(SPA-11). But the District Court ignored the actual language of the statute in finding that manufacturer remedial obligations exist only with regard to safety.

The statute provides that "[a] drug or device shall be deemed to be misbranded" if it falls under *any* of several subsections. 21 U.S.C. § 352. *First* on that list is 21 U.S.C. § 352(a)(1), which states that a drug is misbranded "[i]f its labeling is false or misleading in *any* particular" (emphasis added). By its terms, this is *not* limited to safety. To be sure, also on the list is § 352(j)—the subsection the District Court cited—which states that a drug or device shall be deemed misbranded "[i]f it is dangerous to health . . . ". *That* section involves safety. But the statute does not define a label as false only in the context of safety—they are parallel provisions, and the District Court erred in limiting misbranding to safety.

The District Court may have been confused by *Bartlett* because it arose in the context of safety, and thus understandably focused on § 352(j). *Bartlett* acknowledged that "[t]he misbranding statute requires a manufacturer to pull even an FDA-approved drug from the market when it is 'dangerous to health[.]'" 570 U.S. at 487 n.4.[7] But as with the statute itself, nothing in *Bartlett* purports to limit application of the Anti-Misbranding statute to the safety context.

---

[7] Because the issue of new scientific evidence and whether it rendered the drug there misbranded under the statute had not been presented below, the Court held the misbranding statute inapplicable. *Id.* No such problem exists here: Plaintiffs expressly pled new scientific evidence—it is the central theme of the entire complaint—and squarely presented the misbranding issue below.

## C. The Statutory Savings Clause Covers Plaintiffs' New York Claims

Plaintiffs' complaint contains six counts under New York law: violation of New York Deceptive Acts and Practices Act (Count 1); violation of the New York False Advertising Act (Count 2); Breach of Express Warranty (Count 3); Breach of Implied Warranty of Merchantability (Count 4); Unjust Enrichment (Count 5); and Fraudulent Concealment (Count 6). (A-221-A-237). At bottom, the basis for each claim is that the manufacturers sold a *defective* product: they sell Oral PE as a decongestant, and Oral PE does not in fact decongest, and thus does not work for the purpose for which it is sold.

As the Corpus Juris Secundum explains:

> The term "products liability," in a broad sense, relates to liability arising from injury or damages resulting from the use of a product. A product liability claim includes any claim or action brought for harm caused by the manufacture, construction, fabrication, production, design, *or marketing* of a particular product.

72A C.J.S. Products Liability § 1 (emphasis added). Black's Law Dictionary (12th ed. 2024) likewise explains that the term "products liability" refers, quite broadly, to "[t]he legal theory by which liability is imposed on the manufacturer or seller of a defective product." Under New York warranty law, a product is *defective* if the product in question is not "'fit for the ordinary purposes for which such goods are

23

used.'" *Castro v. QVC Network, Inc.*, 139 F.3d 114, 116 n. 4 (2d Cir. 1998) (quoting *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258 (1995)).[8]

Further, New York state courts are explicit that claims for implied and express warranty—Counts 3 and 4 of the dismissed complaint—are two species of "product liability." *See Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106 (1983) ("[A] plaintiff injured by an allegedly defective product . . . may state a cause of action in contract, express or implied.") (citation omitted) (cleaned up); *Diaz v. Little Remedies Co.*, 81 A.D.3d 1419, 1421 (N.Y. App. Div. 2011) (plaintiffs' products liability claim for pecuniary damages fell under "the exception to preemption contained in 15 USC § 379r (e)"). So, at the very least, those two claims are exempt from express preemption under 21 U.S.C. § 379r(e).

Preservation of consumer protection claims like the ones here is consistent with the legislative design of the FDCA. The sponsors of the 1997 FDCA amendments that codified § 379r were clear that the statute did not disrupt traditional state authority over unfounded health claims. *See* 143 Cong. Rec.

---

[8] As the New York Court of Appeals in *Denny* recognized, on a certified question from this Court, different forms of liability for defective products have their respective origins in tort or contract law. Nonetheless they are joined in modern products liability law by a common "risk/utility balance." *Denny*, 87 N.Y.2d at 257. As a result, "the distinction between the defect concepts in tort law and in implied warranty theory may have little or no effect in most cases." *Id.* at 262. In practice, as under the facts presented in *Denny*, the different branches of product liability law can coexist in the same case.

S9755-02, 1997 WL 586331, at \*38 (Sept. 23,1997) (Sen. Jeffords: "The national uniformity provisions would not affect traditional drug advertising laws. . . . State laws that prohibit false and misleading advertising or to prohibit unsubstantiated claims for nonprescription drugs, for example, would not be affected."); *see also* 143 Cong. Rec. S9811-04, 1997 WL 588716, at \*90 (Sept. 24, 1997) (Sen. Feinstein: "I appreciate the colloquy of my colleague and the bill manager, Senator JEFFORDS, that clarifies the extent of preemption intended by the authors of the bill. . . . On advertising, he stated that it is not the intent of the bill to affect State laws that prohibit false and misleading advertising or to prohibit unsubstantiated claims for nonprescription drugs.").

### D.    *Critcher* Does Not Mandate Preemption

The District Court also misapplied this Court's decision in *Critcher v. L'Oreal USA, Inc.*, 959 F.3d 31 (2d Cir. 2020), a case that did not involve misbranding or new scientific evidence, and addressed neither the safety nor efficacy of a product, but rather whether the bottle used for a cosmetics lotion did not allow the full contents to be accessed. As this Court stated at the outset of *Critcher*, "Plaintiffs did not bring this suit because they take issue with the effectiveness of such products." *Id.* at 33. The bottle's label accurately described, as required by the FDCA, the total amount of the product contained in the bottle and what the product does, but did not disclose that consumers would not be able

to *access* all the product. *Id.* at 36. Plaintiffs there asked the court to impose a new labeling requirement to disclose the amount of lotion that could be extracted, an additional requirement found nowhere in the statute and not subject to federal regulation. *Id.* at 37–38.

Unlike *Critcher*, the allegations here are precisely that the claims on the labels are false. Additionally, because there was no savings clause at issue, *Critcher* did not consider whether plaintiffs' claim in that case could be construed as a species of product liability and thus exempt from express preemption pursuant to 21 U.S.C. § 379s(d). *See In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*, 702 F. Supp. 3d 692, 700 & n.4 (N.D. Ill. 2023) (finding plaintiffs' economic loss claims represented a species of product liability and noting that the *Critcher* court "did not analyze whether plaintiffs' claims were exempt under Section 379s(d)").[9]

*Critcher*, of course, predates *Loper Bright*, and its heavy reliance on agency determinations of the scope of preemption might not survive intervening Supreme Court law. But even before *Loper Bright,* there was no necessary obstacle preemption in the OTC context. Whereas the *Critcher* plaintiffs admitted that L'Oréal followed the implementing regulations, 959 F.3d at 36, Plaintiffs here do

---

[9] 21 U.S.C. § 379s is the statutory preemption provision for "labeling or packaging of cosmetics." Subsection 379s(d) provides "[n]othing in this section shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State."

not, since, as explained below, the implementing regulations for OTC drugs explicitly prohibit knowing false statements, irrespective of the contents in a monograph. 21 C.F.R. § 330.1(c)(2) (emphasizing that all "indications" for use on OTC labels are "subject to the provisions" of the Anti-Misbranding statute).[10]

### E. The District Court Improperly Relied on a Form of Field Preemption

The heart of the District Court's ruling is that any regulation of OTC medications that does not come from the FDA is effectively preempted, essentially a form of field preemption. This is not what Congress intended, as is evident in the preservation of state product liability law in 21 U.S.C. § 379r(e) and the express retention of state regulatory authority to pursue the same ends as federal regulation, such that nothing "shall prevent a State . . . from enforcing . . . a requirement that is identical to a requirement of this chapter." *See* § 379r(f). Where such a provision enumerates the limits of Congressional regulation, the "pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *New York State Telecomms. Ass'n, Inc. v. James*, 101 F.4th 135, 152–53 (2d Cir. 2024) (citing *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992)).

---

[10] 21 C.F.R. § 701.1, the equivalent provision respecting cosmetics, contains no such repeated reference to the Anti-Misbranding statute.

Independent of the *Loper Bright* issues concerning the scope of regulatory preemption, the District Court also erred in finding conflict where none exists and in extending preemption to labeling claims that are not subject to any regulatory review whatsoever.

### 1. Both State and Federal Law Prohibit False Labeling

Nothing prohibits state law from imposing requirements that "parallel federal requirements." *Medtronic*, 518 U.S. at 495.[11] Like federal law, New York law prohibits the sale of falsely represented and misbranded drugs. S*ee Reid*, 2016 WL 403497, at *10 (state law "require[s] Defendant to truthfully state . . . efficacy . . . or not sell its products," consistent with federal law). Plaintiffs' state law claims center on a manufacturer's duty to tell consumers the truth about a material fact, here Oral PE efficacy. Nothing about that claim conflicts with the duties imposed by federal law.

As 21 C.F.R. § 314.170 states, "[a]ll drugs, including those the Food and Drug Administration approves under section 505 of the act and this part, are subject to" the Anti-Misbranding Statute. *See also Stephens v. Target Corp.*, 694 F.

---

[11] Courts routinely so hold. *See, e.g.*, *Prescott v. Ricola USA, Inc.*, 2024 WL 1892290, at *2–3 (N.D. Cal. Apr. 30, 2024); *Booker*, 2021 WL 4340489, at *7; *Dayan v. Swiss-Am. Prods., Inc.*, 2017 WL 9485702, at *3–5 (E.D.N.Y. Jan. 3, 2017); *Souter v. Edgewell Pers. Care Co.*, 542 F. Supp. 3d 1083, 1096–98 (S.D. Cal. 2021).

Supp. 3d 1136, 1141 (D. Minn. 2023) ("This prohibition on false or misleading labeling is one of the FDA's general conditions that apply to all OTC drugs.").[12] In other words, the Anti-Misbranding requirement is incorporated into the federal scheme on at least three levels: by statute, 21 U.S.C. § 352(a)(1), by a General Regulation regarding OTC drugs, 21 C.F.R. § 330.1, and by a specific regulation respecting oral decongestants, 21 C.F.R. § 341.80(b).

### 2. Impossibility Preemption Requires Fact Finding and Cannot Be Resolved on a Motion to Dismiss

On their face, the NY consumer claims impose no requirements that conflict with the Anti-Misbranding statute's requirements. To be sure, a claim may be impliedly preempted where, even if not expressly preempted by statute, it would be *in fact* impossible to follow both state and federal law simultaneously. But such "[i]mpossibility pre-emption is a demanding defense," *Wyeth*, 555 U.S. at 573, and the "'mere possibility of impossibility' [is] 'not enough.'" *PLIVA, Inc. v. Mensing*,

---

[12] Indeed, § 330.1, the "General conditions for general recognition as safe, effective and not misbranded**"** for OTC monograph drugs, even appears to foresee the possibility that a "monograph" may, inadvertently, contain false information, in which case the false information must be excised. The regulation refers to what must be contained in the "Uses" section of the label of any OTC drug. Referring directly to the Anti-Misbranding statute, the General Regulation states that "[t]he 'Uses' section of the label . . . shall contain the labeling describing the 'Indications' that have been established in an applicable OTC drug monograph or alternative truthful and nonmisleading statements . . . *subject to the provisions of section 502 of the act relating to misbranding*." 21 C.F.R. § 330.1(c)(2) (emphasis added) (§ 502 contains the Anti-Misbranding statute). The specific monograph for PE drugs contains the same language, making clear that all statements on a label are subject to "the provisions of section 502 of the [FDCA (i.e., the Anti-Misbranding statute)]." 21 C.F.R. § 341.80(b).

564 U.S. 604, 624 n.8 (2011) (citation omitted). As the Supreme Court explained, in such a circumstance, absent "*clear evidence*" that the FDA would reject a proposed label change, it is certainly possible for Defendants to comply with both state and federal labeling requirements. *See Wyeth*, 555 U.S. at 571 (emphasis added).[13]

Here, NDA holders like Defendant Haleon can update their drug labels through the CBE process based on "newly acquired information," 21 C.F.R. § 314.70(c)(6)(iii), and the other manufacturers of monographed PE Products can bypass individualized review by the FDA entirely. *See, e.g.*, *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 75 (2d Cir. 2013). *All* "[m]anufacturers of over-the-counter drugs," including these Defendants, are required "to revise their labeling" when faced with new evidence. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 42 (2011). In a recent MDL involving another OTC monograph drug, the court faced the question, "could the manufacturer have unilaterally changed the label . . . without violating . . . [the

---

[13] The District Court did not address this as applied argument even though it was presented in Plaintiffs' Opposition to the Motion to Dismiss:

> Both federal law (*e.g.*, 21 U.S.C. § 352(a)(1)) and New York law (e.g., N.Y. Educ. Law § 6815(2)(a), N.Y. Gen. Bus. Law § 349, *et seq.*) prohibit the sale of misbranded drugs. *See Reid v. GMC Skin Care USA Inc.*, 2016 WL 403497, at *10 (N.D.N.Y. Jan. 15, 2016) (state law "require[s] Defendant to truthfully state [ . . . ] efficacy [. . .]or not sell its products," consistent with federal law).

Mem. in Opp'n re: Mot. to Dismiss at 7, *In re: Oral Phenylephrine Mktg. & Sales Pracs. Litig.*, No. 23-md-3089 (E.D.N.Y. July 15, 2024), ECF No. 225.

monograph] and otherapplicable regulations?" *In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 2022 WL 17348351, at *7 (S.D.N.Y. Nov. 14, 2022). There, as here, "[t]he answer is yes." *Id*.

That the manufacturers *could have* updated their labels without FDA approval is further evidenced by the fact that one did. On one of its websites, Johnson & Johnson disclosed the FDA's recent conclusion that "the current scientific data *do not support* that the recommended dosage of orally administered phenylephrine is effective as a nasal decongestant." (A-154-A-155). Courts have consistently ruled that such website disclosures are, in fact, statements on drugs' "labels." *See*, *e.g.*, *Kordel v. United States*, 335 U.S. 345 (1948); *United States v. Flu Fighter Corp*, 2009 WL 10668958, at *4 n.2 (S.D. Fla. Feb. 11, 2009) (products' websites constitute "labeling" under the FDCA); *United States v. Innovative Biodefense, Inc.*, 2019 WL 2428670, at *4 (C.D. Cal. Feb. 22, 2019) ("[S]tatements on a drug product's website generally constitute part of the product's labeling."). While Johnson & Johnson's belated disclosure was inadequate, it shows that such corrections are *possible*.[14] And, of course, nothing

---

[14] *Bartlett* suggested that noncompliance with federal law can require a manufacturer to stop selling under certain circumstances. 570 U.S. at 477 n.4. Where state law requirements parallel federal ones, "stop selling" is a permissible option. Some courts have followed this option and found that, even if a label change were somehow not "possible," manufacturers could also take other steps including not selling the Oral PE products at all. *See, e.g.*, *Jovel v. Boiron Inc.*, 2013 WL 12164622, at *11 (C.D. Cal. Aug. 16, 2013); *Souter*, 542 F. Supp. at

*Footnote continued on next page*

prevented the manufacturers from ceasing to make false representations about efficacy in marketing and advertising their Oral PE products as decongestants, or making adequate disclosures, as soon as they knew Oral PE did not work.

Apart from being incorrect, any finding of "impossibility preemption" here is premature. Courts recognize that impossibility preemption is a fact question that turns on whether or not state law remedies would actually interfere with federal requirements. *See*, *e.g.*, *MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 496 (3d Cir. 2013) ("We do not know, because the District Court made no findings of fact, whether and to what extent, if any, [the State's] law stands as an obstacle to the accomplishment and execution of [the statute's] . . . purpose."); *Washington v. Geo Grp., Inc.*, 283 F. Supp. 3d 967, 978 (W.D. Wash. 2017) ("[C]onflict/obstacle preemption issues may become ripe at summary judgment or at trial, but at present factual issues abound that preclude a decision based on the pleadings, and before discovery."); *accord Yeend v. Akima Glob. Servs., LLC*, 2022 WL 794852, at *10 (N.D.N.Y. Mar. 16, 2022) (denying motion to strike an affirmative defense of conflict preemption, explaining that "[t]he Court needs more factual detail to

---

1098 (S.D. Cal. 20210. While cases like *Bartlett* rejected the use of state law to require a federally authorized manufacturer to stop selling, 570 U.S. at 488, such cases involved alleged failures to warn where, at least in part, a judgment could be made that there existed some benefit to having the drug on the market; i.e., a potential benefit weighed against the need for a warning. Here, there is no social value to be gained from the sale of an ineffective drug.

determine the interplay between state law, the wages that the contract obligated Defendant to pay, and the structure and purpose of federal immigration law"). This Court has similarly relied on factual determinations to assess whether state law would actually conflict with federal requirements. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 103–04 (2d Cir. 2013) (analyzing what precise "tortious conduct" the "claims . . . required the jury to find").

At bottom, Congress did not create a federal private cause of action "for consumers harmed by unsafe or ineffective drugs" because "[e]vidently, it determined that widely available state rights of action provided appropriate relief for injured consumers," *Wyeth*, 555 U.S. at 574, as safeguarded in § 379r(f). Because the regulatory scheme incorporates state law, the District Court erred in finding state law to lie outside the field of permissible legal oversight. *Cf. Bates*, 544 U.S. at 451 ("Private remedies that enforce federal misbranding requirements would seem to aid, rather than hinder, the functioning of" federal statutes). Ultimately, Plaintiffs' claims in no way threaten federal uniformity because they parallel federal requirements, *Williamson v. Mazda Motor of America, Inc.*, 562 U.S. 323, 336 (2011), and any claimed impossibility of dual regulation must be established as a matter of fact.

### 3. Claims Based on Language Outside the Monograph Are Certainly Not Preempted

Nowhere is the District Court's error more apparent than in its extension of preemption to state law claims based on manufacturer representations that fall entirely *outside* the monograph and thus were *never* approved by the FDA. There are two categories of such claims: (1) claims based on the manufacturers' uniform *failure to disclose* the truth that Oral PE does not decongest in *any* of their marketing and advertising of the Oral PE products; and (2) the "Max Strength" claims which relate to manufacturers' representations about the relative *strength* of decongestant in their products and/or that they are suitable for "severe" symptoms.

*"Failure to Disclose" Claims.* First, the complaint alleges that the manufacturers failed to disclose the truth about Oral PE "on the product packaging, at pharmacies, in stores, on [their] websites, in radio, television, or other online advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews." *See, e.g.*, (A-239).[15] Nothing about that claim

---

[15] *See also, e.g.*, (A-155) ("Plaintiffs purchased those products, based on . . . Defendants'[] failure to disclose the true nature of phenylephrine[.]"; (A-221-A-224) (Count 1, N.Y. Gen. Bus. Law § 349) (among other allegations that Defendants "knowingly and intentionally misrepresent[ed], omitt[ed], conceal[ed], and fail[ed] to disclose material facts regarding the PE Products, including that such products inherently lacked efficacy, were no more effective than placebo, and were (and are) not fit to be used for their intended purpose[.]"); (A-224-A-225) (Count 2, N.Y. Gen. Bus. Law § 350) ("Defendants caused to be made or disseminated through New York and the United States, through advertising, marketing, and/or other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have

*Footnote continued on next page*

implicates the monograph, nothing about it implicates FDA-approved language, and nothing "prevented any [manufacturer] from disclosing on its website, in stores, or on product packaging, the scientific consensus that phenylephrine is ineffective." (A-236).

*"Max Strength" Claims.* Second, the "Max Strength" claims allege that the manufacturers made representations that their Oral PE products are "maximum strength" and/or suitable for treating "severe" symptoms. (A-138-A-141); (A-256-A-1151) (listing products). The complaint alleges that the Oral PE products were not the maximum strength oral nasal decongestants available for purchase because "other non-prescription pseudoephedrine oral decongestants exist—*i.e., products that unequivocally work better*." (A-152) (emphasis added). These allegations clearly challenge the representation that the PE Products are the "maximum strength" available—a claim of comparative strength between the manufacturers' oral nasal decongestants products sold to Plaintiffs and other oral nasal decongestants available in the market.

These "Max Strength" claims fall outside the purview of the monograph, which does not discuss the individualized or comparative "strength" of Oral PE and other nasal decongestant products, nor state that Oral PE is an effective treatment for "severe" nasal congestion. In turn, such claims are wholly outside the

_____

been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs and other Class members.").

scope of federal regulations. *See Leboeuf v. Edgewell Pers. Care Co.*, 2023 WL 5432265, at *9 (N.D.N.Y. Aug. 23, 2023) ("[T]he fact that Plaintiff's claims may 'touch on an area regulated by the FDA' does not warrant preemption of false advertising claims."). It is for this reason that courts have previously rejected preemption in similar "maximum strength" cases. *See, e.g.*, *Stevens v. Walgreen Co.*, 623 F. Supp. 3d 298, 305–06 (S.D.N.Y. 2022) (lidocaine patches were not "maximum strength" where they did not offer more pain relief than non-maximum strength patches); *Gonzalez Rodriguez v. Walmart Inc.*, 2023 WL 2664134, at *3–4 (S.D.N.Y. Mar. 28, 2023) (same).[16]

Simply put, there is no preemption where a plaintiff merely seeks "to stop Defendant from adding deceptive language to [otherwise] federally permitted labels," *Gibson*, 2024 WL 4514041, at *8, and the Seventh Circuit has held squarely that states "may prevent sellers from voluntarily adding deceptive content that is not required by federal law." *Bell v. Publix Super Markets, Inc.*, 982 F.3d

---

[16] Courts also reject preemption in cases involving cold medicines with the active ingredient dextromethorphan, which defendants expressly labeled as "non-drowsy." These too are claims outside any regulatory approval process. *See Gibson v. Albertsons Companies, Inc.*, 2024 WL 4514041, at *7–9 (N.D. Ill. Oct. 17, 2024); *see also* Order on Mot. to Dismiss at 5–14, *Harris et al. v. Supervalu, Inc.*, No. 1:22-cv-02863 (N.D. Ill. July 16, 2024), ECF No. 35; *Nancy Calchi v. TopCo Assocs., LLC*, 2024 WL 4346420, at *10 (N.D. Ill. Sept. 30, 2024); *Stephens*, 694 F. Supp. 3d at 1146; *Davis v. The Kroger Co.*, 2023 WL 9511156, at *5–8 (C.D. Cal. Sept. 22, 2023); *Lemus v. Rite Aid Corp.*, 613 F. Supp. 3d 1269, 1275–76 (C.D. Cal. 2022).

468, 485 (7th Cir. 2020).[17] But the District Court ignored the distinction between the "Max Strength" allegations and allegations involving the label, and dismissed the "Max Strength" claims in a footnote. (SPA-9).

The District Court's treatment of the "Max Strength" claims—and Plaintiffs' outside the monograph nondisclosure claims—reveals the improper breadth of the District Court's holding based on its view that agency action pre-empted the entire field. That holding is error.

## II. The District Court Erred by Dismissing the RICO Claim

The District Court did not address any substantive element of the RICO claim. Instead, it grafted onto RICO standing an additional element found nowhere in the statute itself or any of the controlling case law from the Supreme Court or this Court. It imported a bright line, judicially-created barrier to federal *antitrust* standing—the indirect purchaser rule—based on an unfounded application of antitrust policy to the very different setting here and one frequently found in RICO cases where the only injured party does not have direct contractual privity, or in many instances any contractual privity, with the defendant. The Supreme Court has

---

[17] Further, Monograph M012 § M012.80(b), provides that "[o]ther truthful and nonmisleading statements, describing only the indications for use that have been established and listed in §§ M012.80(b)(1) and (b)(2), may also be used[.]" Put differently, the monograph recognizes that when a drug manufacturer adds additional language to its label, such claims are subject to the Anti-Misbranding provisions of the FDCA.

rejected each part of that reasoning, and it finds no support in any case from this Court either.

## A. The Indirect Purchaser Rule Does Not Apply to RICO Claims

Civil RICO grants a private right of action to "[a]ny *person* injured in his business or property by reasons of a violation of" prohibited activities. 18 U.S.C. §1964(c) (emphasis added). To establish standing, a plaintiff must plead "(1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation. . . . This third requirement is satisfied if the defendant's injurious conduct is both the factual and the proximate cause of the injury alleged." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003), *abrogated on other grounds by Am. Psych. Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352 (2d Cir. 2016) (citation omitted). According to the District Court, the statutory term "any person" does not include the consumers here because "[a]s indirect purchasers of the PE products, they lack standing to bring a RICO claim." (SPA-14). It reached its conclusion because in *Illinois Brick*, the Supreme Court held that the federal *antitrust* laws barred indirect purchaser claims. 431 U.S. at 736–48. In the District Court's view, "the same standing requirements established in antitrust cases apply to RICO cases." (SPA-15).

### 1.    Neither the Statute Nor Controlling Authority Require Direct Privity

A requirement of direct contractual privity to assert a RICO claim has no foundation in the text of the RICO statute nor in any controlling law from this Court or the Supreme Court. RICO turns on a factual showing of *proximate cause* that leads directly to injury. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992); *Lerner*, 318 F.3d at 120. The statutory definition of a protected party does not turn on whether someone is a direct or indirect purchaser but on whether they are "any person injured by the violation." 18 U.S.C. § 1964(c). Proximate cause under RICO is a "direct-relation requirement," *not* an indirect purchaser rule, and the relevant relationship is "between the *injury* asserted and the injurious *conduct* alleged." *Bridge*, 553 U.S. at 654 (emphasis added) (citation omitted) (cleaned up).

Direct purchaser standing requirements turn on the particulars of antitrust cases: "*Illinois Brick* sought to ensure an effective and efficient litigation scheme in antitrust cases. . . . The *Illinois Brick* bright-line rule is grounded on the belief that simplified administration improves antitrust enforcement." *Apple Inc. v. Pepper*, 587 U.S. 273, 282 (2019) (citation omitted) (cleaned up). These rationales are inapplicable in RICO cases generally, and on these facts specifically, where the

target of the scheme and the only harmed party was the ultimate consumer.[18] In

*Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1 (2010), for example, the

City of New York asserted RICO injury over the failure to pay State cigarette taxes

that might have in turn alerted the City to the ability to collect more tax revenues.

The Court found the City's claim too causally attenuated to state a claim, not that

the City did not have standing. *Id.* at 10–11. Simply put, "[t]he direct victim" of a

RICO violation is the appropriate plaintiff. *Id.* at 10 (citation omitted) (cleaned up).

### 2. Antitrust Policy Concerns are Inapposite

The nature of antitrust injury points to policy considerations not present

under RICO. *Illinois Brick* addresses buyers in a market restrained by an antitrust

violation re-selling a product into an unrestrained market. In that situation, the

Clayton Act allows the first buyers to recover all of the antitrust overcharge—even

the portion they passed on—out of concern that forcing plaintiffs to figure out how

much the overcharge determined downstream prices would be a significant barrier

to antitrust enforcement. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392

U.S. 481, 493 (1968) ("Since establishing the applicability of the passing-on

defense would require a convincing showing of each of these virtually

unascertainable figures, the task would normally prove insurmountable."). Vesting

---

[18] Indeed, the indirect purchaser rule does not even apply uniformly in antitrust cases. *See Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 217 (1990) (noting an exception "when an indirect purchaser buys under a pre-existing cost-plus contract" that reduces the complexity of damages calculations)

enforcement power in direct purchasers, downstream buyers lost standing for three policy reasons: "(1) facilitating more effective enforcement of antitrust laws; (2) avoiding complicated damages calculations; and (3) eliminating duplicative damages against antitrust defendants." *Apple*, 587 U.S. at 280, 285. Where these considerations do not apply, *Illinois Brick* has no bearing.

The Supreme Court has rejected the wholesale importation of antitrust standing requirements into a statutory scheme very similar to that in RICO, i.e., the Lanham Act. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135 (2014) ("[P]otential difficulty in ascertaining and apportioning damages is not . . . an *independent* basis for denying standing[.]"). Unlike in the antitrust context, there are no conflicts or concerns under either the Lanham Act or RICO over who is best situated to enforce the law.

This case also does not require any determination of how a change in upstream markets would have altered the price paid by intermediaries (e.g., retailers), and then calculating how that change would have translated into prices paid downstream by consumers. Following the allegations in the complaint, this is not a world in which otherwise beneficial transactions occurred at inflated monopolistic prices. These are claims of conspiracy to commit fraud. In the but-for world these transactions would not have *happened*. The damages are simply the consumers' purchase price (or, for multi-symptom products, a portion of it). And,

not only did the intermediaries incur no damages, they benefited (albeit innocently) from the scheme by earning margin on products that otherwise never would have sold.

Most (perhaps all) antitrust cases will manifest in injury to an immediate "purchaser"—that is the nature of a restraint of trade. So when an indirect purchaser cannot sue, the direct victim still can, which serves to hold the conspirator accountable, compensates the direct victim, and avoids duplicative damages or problems of apportionment. *Apple*, 587 U.S. at 279 ("Our decision in *Illinois Brick* established a bright-line rule that authorizes suits by direct purchasers but bars suits by indirect purchasers."). The direct purchaser, by paying an overcharge, is a victim just as much as the indirect purchaser, and is well-situated to hold the antitrust conspirator accountable for all inflated transactions that ensue. Not so here, where end-user consumers were the only, direct, and intended victims of the manufacturers' fraud, and they are the ones who suffered the damages: paying for a product based on false representations of its efficacy. The District Court created a rule that ensures that only *uninjured* parties—the direct-purchaser intermediaries who were not the intended recipients of the fraudulent statements and were not injured by them—have standing to sue.

Unlike antitrust cases, RICO claims come in different flavors, because they can be based on different predicate acts. *See* 18 U.S.C. § 1961(1) (listing 35

offenses). Many will involve no "purchasers" at all. This case, like many civil RICO cases, is a fraud case based on violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

*Bridge* is instructive. There, the district court, echoing the concerns animating the indirect purchaser rule, tried to identify the most efficient RICO enforcer and landed, as in *Illinois Brick*, on those in privity with the defendant. In that district court's view, the plaintiffs in *Bridge*, because they were not the "recipients of the alleged misrepresentations" lacked standing to assert claims under the mail and wire fraud statutes. 553 U.S. at 645 (cleaned up). The Supreme Court rejected this false parallel, not only as a textual matter, but also as inconsistent with the nature of the claim: "[A] person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *Id.* at 649.

### B. Ordinary Canons of Statutory Construction Require Reversal

"When conducting statutory interpretation, we 'must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (citation omitted). The Supreme Court has made these points repeatedly, and specifically with respect to RICO.

In *Bridge*, a unanimous Court held that RICO claims premised on mail and wire fraud violations did not include a first-party reliance requirement. Courts "are not at liberty to rewrite RICO to reflect their—or our—views of good policy. We have repeatedly refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe." *Bridge*, 553 U.S. at 660; *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 (1985) (declining to import concept of "antitrust injury" into RICO as "racketeering injury" in absence of statutory language requiring it); *Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023), *cert. granted*, 144 S. Ct. 1454 (2024) (overturning an "atextual restrictive interpretation" of statutory standing rather than follow "plain and ordinary meaning").

Indeed, the lower court in *Bridge*, echoing the opinion below, rejected a RICO claim because only "'recipients of the alleged misrepresentations'" had standing. 553 U.S. at 645. The Court reversed: "Nothing on the face of the relevant statutory provisions imposes such a requirement." *Id.* at 648. To the contrary, "the statute provides a right of action to '*any person*' injured by the violation, suggesting a breadth of coverage not easily reconciled with an implicit requirement that the plaintiff show reliance in addition to injury in his business or property." *Id.* at 649 (cleaned up) (emphasis added).

Rather than following the "plain and ordinary meaning" of the statute, the District Court here thought its holding compelled by the Supreme Court's statement in *Holmes* that because RICO "used the same words" as the antitrust statutes, Congress "intended them to have the same meaning that courts had already given them." 503 U.S. at 268. But the Supreme Court has never held this interpretive tool means that every antitrust rule sweeps into RICO. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 477 (2006) (explaining that *Holmes*'s conclusion that RICO requires proximate cause was also supported by general rules of statutory interpretation). Quite the opposite: in *Sedima* the Court rejected the argument that because antitrust requires "antitrust injury," RICO requires "racketeering injury." 473 U.S. at 485.

RICO became law in 1970, a full seven years before *Illinois Brick*. The District Court's view that *Holmes* mandates application of the indirect purchaser rule to RICO fundamentally misunderstands why *Holmes* read proximate cause to be the background common law against which *both* the antitrust and RICO statutes were enacted by Congress. *Holmes*, 503 U.S. at 267–68. For many decades before RICO's enactment, the "federal courts had read [the Sherman Act] to incorporate common-law principles of proximate causation" and had also determined that Congress meant to incorporate those same principles into the Clayton Act. *Id.* at 267 & 268 n.14. The common law at the time that RICO was enacted "specifically

recognizes 'a cause of action' in favor of the injured party where the defendant 'defrauds another for the purpose of causing pecuniary harm to a third person.'" *Bridge*, 553 U.S. at 657 (quoting Restatement (Second) of Torts § 435A, Comment *a*) (cleaned up).

Not so the indirect purchaser rule, which is a creation of judicial policy-making adopted long after the enactment of the two statutes, and crafted to further goals specific to the federal antitrust context. Just as "there is no general common-law principle holding that a fraudulent misrepresentation can cause legal injury only to those who rely on it," *Bridge*, 553 U.S. at 656, there is no general common-law principle holding that a fraudulent misrepresentation can cause legal injury only to those in contractual privity.

### C. The Scope of RICO Proximate Cause Is Determined by the Direct Relation Between the Alleged Predicate Acts and the Harm Asserted, Not Privity

As this Court recently noted, "by enacting a proximate-cause limitation on RICO standing, Congress made a judgment concerning the permissible degree of attenuation between a predicate act and a redressable RICO injury." *Horn*, 80 F.4th at 138. Direct purchaser standing is a gatekeeping device responsive to the suppression of market competition in the antitrust context. Proximate cause is an alternative and more flexible definition of the boundaries for compensable injury.

In *Bridge,* for example, the Court found proximate cause satisfied by plaintiffs who did not rely on the fraudulent misrepresentations because of their "direct financial injury":

> [Plaintiffs'] alleged injury—the loss of valuable liens—is the direct result of [defendants'] fraud. It was a foreseeable and natural consequence of [defendants'] scheme to obtain more liens for themselves that other bidders would obtain fewer liens. And here, unlike in *Holmes* and *Anza*, there are no independent factors that account for [plaintiffs'] injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue. Indeed, . . . [plaintiffs] and other losing bidders were the only parties injured by [defendants'] misrepresentations.

553 U.S. at 658 (emphasis omitted). Here, too, the consumers suffered a direct financial injury as a result of the manufacturers' fraud, and it was the foreseeable and natural (indeed, intended) consequence of that fraud. Here, too, there are no independent factors that account for their injury, and no risk of duplicative recoveries or any more immediate victim better situated to sue.

*Bridge*'s rejection of a rigid first-party reliance barrier to RICO standing, and broad interpretation of the "any person" language, is entirely consistent with *Holmes*, which pre-dated it, as well as *Hemi*, which post-dated both. In all three, the Court reiterated that the RICO standing test *is* proximate cause, and that what is required is "'*some* direct relation between the *injury* asserted and the injurious *conduct* alleged.'" *Bridge*, 553 U.S. at 654 (quoting *Holmes*, 503 U.S. at 268) (emphasis added); *Hemi*, 559 U.S. at 9 (same). The "term 'direct' should merely be

understood as a reference to the proximate-cause enquiry," nothing more. *Holmes*, 503 U.S. at 272 n.20. Here, there is no question that the consumers allege a direct connection between the manufacturers' fraud constituting the RICO violation and the injury suffered by consumers.[19]

Importantly, the "direct-relation" proximate cause standard from *Holmes*— "some direct relation between the injury asserted and the injurious conduct alleged"—does much of the work of the indirect purchaser rule without importing its inflexibility. *Id.* at 268. As *Bridge* explains:

> The direct-relation requirement avoids the difficulties associated with attempting to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors . . .; prevents courts from having to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries . . .; and recognizes the fact that directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely[.]

553 U.S. at 654–55 (citation omitted) (cleaned up).

Most recently, this Court followed the logic of *Bridge* closely in *Alix*, wherein Alix alleged AlixPartners[20] had been harmed by untruthful disclosures by McKinsey to the New York Bankruptcy Court. 23 F.4th at 199–200. There was no

---

[19] Indeed, the District Court acknowledged—and the manufacturers all but conceded—that proximate cause is established here at least at the pleading stage. 9/23/2024 Tr. at 41:19–23, 50:1–13, *In re: Oral Phenylephrine Mktg. & Sales Pracs. Litig.*, No. 23-md-3089 (E.D.N.Y. Sept. 23, 2024).

[20] Plaintiff Jay Alix was the assignee of the AlixPartners LLP claims.

contractual relation between AlixPartners and McKinsey. *Id.* at 201. Quite the

contrary, Alix alleged that if McKinsey had been truthful in its disclosures to the

Bankruptcy Court, AlixPartners would have obtained more bankruptcy

assignments instead of McKinsey. *Id.* The corrupt conspiracy was aimed at the

Bankruptcy Court and not at the plaintiff, very much like the use of straw bidders

at issue in *Bridge*. *Id.* Nonetheless this Court reversed the lower court's dismissal

on the grounds that "the unsuccessful participants in that process are directly

harmed." *Id.* at 204. The operative question is not contractual privity or any

indirect purchaser rule of standing, but whether the claimed loss "is plausibly

alleged to flow directly" from the underlying fraud. *Id.* at 205–06. Following

*Bridge,* this Court concluded that, "[a]lthough the existence of an intervening

decision-maker 'may in some cases tend to show that an injury was not sufficiently

direct to satisfy [the] proximate-cause requirement, . . . it is not in and of itself

dispositive.'" *Id.* at 206 (quoting *Bridge*, 553 U.S. at 659); *see also Horn*, 80 F.4th

at 138 ("proximate cause 'is generous enough to include' . . . harms that flow from,

or are derivative of, each other.") (citation omitted).

### D. There Are No Current Circuit Conflicts in RICO Proximate Cause Jurisprudence

Though some aging appellate cases do hold that the indirect purchaser rule

applies in RICO, all pre-date *Bridge* and involved (or hypothetically discussed)

plaintiffs with purely derivative damages where other more directly injured parties

were present and/or better-situated to sue. *See McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 854–55 & n.19 (3d Cir. 1996) (plaintiffs conceded that if they lacked antitrust standing, they also lacked RICO standing, and plaintiffs' attorneys were the ones directly injured, not plaintiffs); *Carter v. Berger*, 777 F.2d 1173, 1174, 1177–78 (7th Cir. 1985) (holding injuries too attenuated because plaintiffs alleged higher tax bills—an impossible calculation—and their injury was derivative of the county's, which sued).

The lone exception, *Fenner v. General Motors, LLC*, 113 F.4th 585, 604 (6th Cir. 2024), was compelled by a prior same-Circuit holding in *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 612–14 (6th Cir. 2004) that "[t]he indirect-purchaser rule was initially developed in the anti-trust realm but applies to civil RICO claims with equal force." Despite being bound by precedent, the Sixth Circuit acknowledged that the rule makes little sense as a policy matter in the modern economy:

> We would be remiss not to note the consequences of such a bright-line rule that mixes law and economics but does not necessarily reflect economic reality today. Under this rule, major manufacturers can insulate themselves from all antitrust and RICO liability, simply by selling their products through intermediaries. . . . In a world with interdependent vertical economic structures, a bright-line indirect-purchaser rule does not facilitate effective enforcement of RICO and antitrust laws nor eliminate duplicative damages—this rule, instead, immunizes major manufacturers from any RICO or antitrust liability

> and hurts consumers. . . . A bright-line indirect-purchaser
> rule is, accordingly, unsupported by sensible principles.

*Fenner*, 113 F.4th at 604 n.6 (citation omitted).

Whether the indirect purchaser rule may or may not remain "good policy" in the antitrust context—a question not before this Court—such policy questions have *no* role in interpreting Congress' intent in enacting RICO: "Whatever the merits of petitioners' arguments as a policy matter, we are not at liberty to rewrite RICO to reflect their—or our—views of good policy." *Bridge*, 553 U.S. at 660. But if policy is to be considered, the policy views articulated—and the sweeping immunity enacted—by the District Court here is *bad* policy, especially since it is mandated by neither the statute nor Supreme Court precedent.[21]

### E. The RICO Claims Are Not Precluded by the FDCA

Because the District Court dismissed the RICO claims for lack of plaintiff standing, it never reached Defendants' preclusion arguments. (SPA-14). Should this Court reverse on RICO standing, the preclusion argument remains and this Court may then use its discretion to decide the issue because it was "'raised, briefed, and argued in the District Court'" and is a "matter of law suitable for

---

[21] The District Court *began* its analysis of the RICO claim expressing its apparent dim policy view of such claims, characterizing them as "'the litigation equivalent of a thermonuclear device'" carrying "'an almost inevitable stigmatizing effect on those named as defendants.'" (SPA-14) (citation omitted).

determination by an appellate tribunal in the first instance." *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 90–91 (2d Cir. 2004) (citation omitted).

Remand to the District Court to decide the question in the first instance would only "occasion" pointless "delay," *id.* at 91, because the District Court's views on the matter are already known. Subsequent to the ruling on appeal here, the District Court ruled in a case filed by a pharmacy, whose appeal was subsequently consolidated with this one, that the FDCA precluded the Lanham Act claim asserted there, and by implication *all* federal claims arising from Oral PE marketing and sales that rest upon the contention that it was "'false' to state that oral phenylephrine is an effective nasal decongestant." (SPA-21-SPA-22). That conclusion is consistent with the District Court's preemption ruling and is also incorrect. To allow this Court to resolve this issue as part of this appeal, we summarize the arguments against preclusion.

### 1. Nothing in the FDCA Expressly Precludes RICO

As a basic matter of statutory construction, courts must read federal statutes in harmony absent "a clearly expressed congressional intention" for one to control, and a finding of preclusion is a "stout uphill climb." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (citation omitted)(cleaned up). At its most simple, RICO and the FDCA have co-existed since RICO was enacted in 1970.[22] There is *no* express

---

[22] *See* 84 Stat. 922 (1970) (RICO); ch. 675, 52 Stat. 1040 (1938) (FDCA);

language in the FDCA precluding RICO claims. Indeed, when Congress amended the FDCA in 1990 to address conflicting *state* law, it "did *not* enact a provision addressing the preclusion of other *federal* laws[.]" *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 114 (2014) (emphasis added). In 1990, Congress did add the preemption and savings clauses under § 379r(e), meaning that the question of FDCA exclusivity was squarely teed up for congressional consideration. Congress thus "*did not* intend the FDCA to preclude requirements arising from other sources," including federal false advertising like the Lanham Act claims at issue in *POM Wonderful* and the RICO claims at issue here. *POM Wonderful*, 573 U.S. at 114 (emphasis added).

As the Supreme Court explained, "[w]hen two statutes complement each other, it would show disregard for the congressional design to hold that Congress nonetheless intended one federal statute to preclude the operation of the other." *Id.* at 115. Here, as in *POM Wonderful*, "the structures of the [two statutes] reinforce the conclusion drawn from the text." *Id.* The FDCA and RICO regulate separate spheres of conduct and complement, rather than conflict with, one another. "Congress did not intend FDA oversight"—and by necessary implication, the FDCA—"to be the *exclusive* means of ensuring drug safety and effectiveness." *Wyeth*, 555 U.S. at 575 (emphasis added). "[T]he FDCA protects public health and safety," *POM Wonderful*, 573 U.S. at 115, but it is not a false advertising or

consumer protection statute, and it provides consumers no private right of action or ability to recover damages. *Id.* at 108.

By contrast, the Lanham Act is a false advertising law that "creates a cause of action for unfair competition through misleading advertising or labeling," albeit one for *competitors*, and not consumers. *Id.* at 107. So too RICO, which creates a private right of action for false or misleading advertising or labeling for *consumers* where the false or misleading advertising or labeling is alleged to fall within the purview of the mail or wire fraud statutes. 18 U.S.C. §§ 1341, 1343. Indeed, it "has become a tool for everyday fraud cases brought against [even] respected and legitimate enterprises" because "Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises[,]" neither of which "enjoy immunity from [the] consequences" of their misconduct. *Sedima*, 473 U.S. at 499 (citations omitted) (cleaned up); *see also Horn*, 80 F.4th at 141 ("While an expansive view of RICO might allow private litigants to use RICO in ways not previously anticipated (such as a 'tool for everyday fraud cases' . . .), that 'defect—if defect it is—is inherent in the statute as written'" and ""[i]ts correction must lie with Congress,' not the judiciary.") (citation omitted). Though the Lanham Act and RICO statutes may "touch on the same subject matter as the FDCA," they "serv[e] a distinct compensatory function that may motivate injured persons to come forward," and "provide incentives for manufacturers to behave well." *POM*

*Wonderful*, 573 U.S. at 115 (citation omitted)(cleaned up). Permitting a RICO

consumer claim to proceed alongside the FDCA "is quite consistent with the

congressional design to enact two different statutes, each with its own mechanisms

to enhance the protection of competitors and consumers." *Id.* at 115–16.

### 2. No Court Previously Found That the FDCA—Much Less Agency Action—Precludes RICO Claims

This Court has already held that where the FDA acts "pursuant to its more

proactive, extensive, and focused role in drug regulation," as here, its

"requirements are a floor, not a ceiling," and neither the FDCA nor FDA

regulations preclude federal false advertising claims. *Church & Dwight Co., Inc. v.*

*SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 64 (2d Cir. 2016) (citing

*POM Wonderful*, 573 U.S. at 109).

In *POM Wonderful*, a unanimous Supreme Court *reversed* the Ninth

Circuit's ruling that the FDA's comprehensive regulation of juice labeling barred a

federal false advertising claim (there brought under the Lanham Act) challenging

the label. 573 U.S. at 118–21.[23] The Court also deemed meritless the Government's

narrower position that the suit was precluded "to the extent the FDCA or FDA

regulations specifically require or authorize the challenged aspects of the label." *Id.*

(cleaned up).

---

[23] Lanham Act competitor claims, like these claims, are premised on a deceptive
scheme to mislead the consumer. *Id.* at 107.

In *Church & Dwight*, this Court followed *POM Wonderful* to reach precisely the same conclusion with respect to *drug* labels. 843 F.3d at 64. There, defendant argued that plaintiff's claim was "precluded by Congress's provision for intensive regulation of Defendant's Product by the FDA," and that therefore "it cannot be held liable for its labeling and promotional materials because those materials were under FDA 'control,' having been reviewed and approved by the FDA[.]" *Id.* at 62. This Court found no merit in the defendant's efforts to distinguish *POM Wonderful* just because "the FDA did not preapprove the juice labels at issue," holding that "[w]e see no reason why the subjugation of Defendant's Product labeling to FDA regulation through the [regulatory] process should categorically immunize it from [federal false advertising] claims . . . regarding the regulated labeling." *Id.* at 63–64. Doing so "would distort Congress's intent to allow the Lanham Act and the FDCA to exist in tandem to serve the distinct interests each statute protects." *Id.* at 63 (citation omitted).[24]

In short, this Court expressly rejected the District Court's core notion that following a monograph immunizes manufacturers from liability under other federal laws. Together with *POM Wonderful*, *Church & Dwight* mandates the same result here: the FDCA does not preclude Plaintiffs' RICO claims.

---

[24] This Court also rejected defendant's argument in *Church & Dwight* like that asserted by the manufacturers below that it "cannot comply . . . without violating the FDA's instructions" because it "cannot change the Product's name without the FDA's approval." *Church & Dwight*, 843 F.3d at 65 n.6.

For reasons that anticipate *Loper Bright*, courts may not "preclude private parties from availing themselves of a well-established federal remedy because an agency enacted regulations that touch on similar subject matter but do not purport to displace that remedy or even implement the statute that is its source." *POM Wonderful*, 573 U.S. at 120. Simply put, "[a]n agency may not reorder federal statutory rights without congressional authorization." *Id.*

## CONCLUSION

For the foregoing reasons, this Court should reverse the dismissal of both the New York state law claims and the ruling on RICO standing. This Court should also reject the argument that RICO liability is precluded by the FDCA.

Dated:  March 26, 2025                      Respectfully submitted,

                                             /s/ *Samuel Issacharoff*
                                            SAMUEL ISSACHAROFF
                                            *Counsel of Record*
                                            40 Washington Square South 411J
                                            New York, New York 10012
                                            (212) 998-6580
                                            sil3@nyu.edu

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. 32(a)(7)(B) because, excluding the parts of the documents exempted by Fed. R. App. P. 32(f), it contains 13,837 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2016 in 14-point Times New Roman.

 /s/ *Jonathan D. Selbin*
Jonathan D. Selbin

# SPECIAL APPENDIX

**i**

## TABLE OF CONTENTS

**Page**

Memorandum Decision and Order (Document
    Relates to All Actions), dated October 29, 2024 ...   SPA-1

Order Entering Judgment (Document Relates to All
    Actions), dated November 12, 2024 ......................  SPA-18

Memorandum Decision and Order (Document
    Relates to *Newtown's Pharmacy, Inc. v. Proctor
    & Gamble Co., et al.*, 23-cv-9307 Action), dated
    December 13, 2024 ................................................  SPA-21

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                               :
                                                               :
                                                               :
IN RE: ORAL PHENYLEPHRINE MARKETING     :
AND SALES PRACTICES LITIGATION          :
                                                               :    23-md-3089-BMC
_____   :
                                                               :
THIS DOCUMENT APPLIES TO:               :    **MEMORANDUM DECISION AND**
                                                               :    **ORDER**
ALL CASES                               :
                                                               :
------------------------------------------------------------- X

**COGAN**, District Judge.

        Before the Court is defendants' motion to dismiss plaintiffs' Initial Streamlined

Consolidated New York Bellwether Class Action complaint.  Plaintiffs bring nearly one hundred

cases, consolidated in this multidistrict litigation, against defendant retailers and manufacturers

of over the counter ("OTC") cough and cold medicines containing the drug phenylephrine

("PE").  Plaintiffs, purchasers of these medicines, allege that defendants knew that PE was

ineffective as a nasal and sinus decongestant but produced, marketed, and sold products

containing PE to consumers anyway.

        The parties agreed that plaintiffs would file this streamlined complaint, and defendants

would move to dismiss it, to test claims and defenses common across the consolidated cases.  As

its title suggests, the complaint brings various claims under New York state law, as well as a

civil Racketeer Influenced and Corrupt Organizations Act ("RICO") claim.  Defendants contend

that the state claims are preempted by the Federal Food, Drug, and Cosmetic Act (the "FDCA"),

that plaintiffs lack standing to assert the RICO claim, and that the RICO claim is precluded by

the FDCA.  For the reasons set forth below, defendants' motion is granted.

**SUMMARY OF STREAMLINED COMPLAINT**

The Food and Drug Administration (the "FDA") has approved PE as a "safe and effective" nasal decongestant since 1985.  In 2007, three individuals petitioned the FDA to increase the allowed maximum dose of PE because a meta-analysis of existing studies indicated that, at the current dosage level, PE was likely no better than a placebo.  The FDA's Nonprescription Drug Advisory Committee ("NDAC") reviewed the petition but, finding further study was needed, did not recommend that the FDA declassify PE as "safe and effective" or change any regulations governing the labeling and dosage of PE products.

Around this time, plaintiffs allege, a group of manufacturers – Bayer Healthcare LLC, Haleon PLC, Haleon U.S. Holdings L.L.C., Perrigo Company, Proctor & Gamble Co., RB Health LLC, Kenvue, Inc., and Johnson & Johnson (the "RICO defendants") – began to associate with one another, including through the Phenylephrine Task Group of the Consumer Healthcare Products Association, to defend the effectiveness of PE.  Plaintiffs allege that the task group provided deliberately misleading submissions to the NDAC on multiple occasions and disseminated similarly misleading information to the public in the form of press releases, studies, and surveys.

Based on studies conducted after 2007, plaintiffs assert that "by 2016, there was no doubt that oral phenylephrine is no better than placebo at relieving congestion," and defendants knew it.  Indeed, in 2023, the NDAC found that scientific data did not support the use of PE as a decongestant.  Despite these developments, with one exception, defendants have continued to manufacture, market, and sell PE products without change.  Defendant Johnson & Johnson added a message on its website next to pictures of all its PE products stating that the NDAC had

reviewed the efficacy of PE and linking the FDA's statement.  Yet Johnson & Johnson, like the

other defendants, continues to market and sell PE products.

Plaintiffs allege that they relied on defendants' representations regarding the products'

efficacy and would have paid significantly less, or would not have purchased the products at all,

had they been aware of PE's ineffectiveness.  Plaintiffs also seek to represent several different

classes made up of individuals who, between 2016 and the present, purchased an oral nasal

decongestant containing PE manufactured by defendants.

## DISCUSSION

### I.    Standard of Review

 "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A

plaintiff must allege "factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."  Id. (cleaned up).

### II.    State Law Claims

The streamlined complaint asserts state claims under New York's consumer-protection

and false-advertising statutes, the New York commercial code, and New York common law.

Because the claims are all expressly preempted, I need not reach defendants' implied- and

obstacle-preemption arguments.

#### A.    Legal Framework

##### i.  Preemption

The Supremacy Clause dictates that "the Laws of the United States . . . shall be the

supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary

3

notwithstanding." U.S. Const. Art. VI, cl. 2. As a corollary, when "state and federal law directly conflict," federal law preempts state law. PLIVA, Inc. v. Mensing, 564 U.S. 604, 617 (2011). The Supreme Court has recognized various types of preemption, but "all of them work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." N.J. Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n, 584 U.S. 453, 477 (2018).

Whether a federal law preempts a state law is a question of Congressional intent. If Congress is silent, courts presume that Congress did not intend to displace state law, and litigants can rebut that presumption in only limited circumstances. Wyeth v. Levine, 555 U.S. 555, 575 (575). For instance, a litigant can demonstrate "impossibility" preemption by showing that it is impossible to comply with both state and federal law. See PLIVA, 564 U.S. at 617. Sometimes, though, Congress explicitly states its intention for certain federal law to preempt state law. In these cases of "express preemption," there is no presumption against preemption because Congress has spoken clearly. Puerto Rico v. Franklin Cal. Tax-Free Tr., 579 U.S. 115, 125 (2016). An express preemption clause often preempts state law that extends beyond federal law in any respect, meaning that federal law acts as a floor and a ceiling for state requirements. See Riegel v. Medtronic, 552 U.S. 312, 316 (2008).

The FDCA selectively employs this form of express preemption. Generally, state law may supplement the FDCA so long as there is no direct conflict between the state and federal regulations. But, in certain areas, Congress sought to create a "uniform – and federally-led – regulatory scheme." Critcher v. L'Oreal USA, Inc., 959 F.3d 31, 38 (2d Cir. 2020). To do so, it inserted various preemption clauses throughout the statute. See, e.g., Riegel, 552 U.S. at 316.

4

OTC drug labeling is one such area.  The applicable preemption clause, aptly titled "National uniformity for nonprescription drugs," provides that "no State or political subdivision of a State may establish or continue in effect any requirement . . . that is different from or in addition to, or that is otherwise not identical with, a requirement under" the FDCA's OTC drug provisions.  21 U.S.C. § 379r.  The parties do not dispute the import of § 379r: that outside of some enumerated exceptions, a state OTC drug labeling requirement is preempted if it expands upon or dilutes federal law – or, in short, that state law must parallel federal law.  Plaintiffs also do not argue that their claims fall within § 379r's "savings clause," which exempts from the express preemption "any action or the liability of any person under the product liability law of any State."  Id. § 379r(e).  Whether the state claims are preempted therefore turns on whether they would enforce a requirement different the federal OTC drug labelling requirements.

*ii.  Federal OTC Drug Regulations*

Congress enacted the FDCA in the early twentieth century to address "concern[s] about unsafe drugs and fraudulent marketing."  Wyeth v. Levine, 555 U.S. 555, 556 (2009).  The FDCA empowers the FDA to carry out this task, requiring that "[n]o drug can enter interstate commerce 'unless [the] FDA determines that it is generally recognized as safe and effective . . . for the particular use described in its product labeling.'"  In re Acetaminophen - ASD-ADHD Prod. Liab. Litig., No. 22-md-3042, 2022 WL 17348351, at *3 (S.D.N.Y. Nov. 14, 2022) (quoting Nat. Res. Def. Council, Inc. v. FDA, 710 F.3d 71, 75 (2d Cir. 2013)).

The FDA uses two systems to determine whether OTC drugs are safe and effective: the New Drug Application ("NDA") system, and the monograph system.  The NDA system operates precisely how it sounds.  A drug manufacturer submits an NDA to the FDA; the FDA reviews

the application; and if the FDA is satisfied that the new drug is safe and effective for the uses on the label, it approves the drug.

The monograph system provides a more streamlined route.  For certain OTC drugs, the FDA issues a regulation – a monograph – detailing "the FDA-approved active ingredients . . . and . . . the conditions under which each active ingredient is" safe and effective.  Nat. Res. Def. Council, 710 F.3d at 75.  A manufacturer can sell an OTC drug without individualized FDA review when the drug and its label conform to the monograph.  An OTC drug distributed under a monograph "is generally recognized as safe and effective and is not misbranded if it meets each of the conditions contained" in the general regulation applicable to all OTC drug monographs, 21 C.F.R. § 330.1, "and each of the conditions contained in any applicable monograph."  Id.  Each monograph regulates four types of information – the statement of identity, which describes "the general pharmacological category(ies) of the drug or the principal intended action(s) of the drug," id. § 201.61(b); indications for use, which explain the effects of the drug; warnings; and directions – and provides sample language for each.

### B.    Mislabeling Claims

To determine whether plaintiffs' claims are preempted, I must first determine the scope of the state duties plaintiffs seek to enforce.  See Mut. Pharm. Co. v. Bartlett, 570 U.S. 472, 480 (2013).  I begin with the claims plaintiffs admit are predicated entirely on defendants' labels before addressing what remains.

The complaint contains broad allegations that defendants misled consumers by labelling their PE products as nasal decongestants despite knowing that PE was no more than a placebo, but plaintiffs' brief drastically cabins their labeling claims.  Plaintiffs target only the "indications" section of the labels, which state that PE was an effective nasal decongestant.

They argue that defendants should have updated their indications to "truthfully describ[e] PE products' efficacy," although they never clarify whether that means simply removing the indications, or updating the indications to state that PE is an ineffective decongestant. Regardless, this circumscribed duty has no coordinate in federal law.

Both the PE monograph and the general monograph regulation give manufacturers some flexibility in describing the indications of a PE product. The PE monograph allows manufacturers to use a "phrase listed in paragraph (b)(1) of this section," – either "For the temporary relief of nasal congestion" or "Temporarily relieves nasal congestion." – "as appropriate."[1] Id. § 341.80(b). But it also allows manufacturers to use alternative language instead:

> Other truthful and nonmisleading statements, *describing only the indications for use that have been established and listed in paragraphs (b)(1) and (b)(2) of this section*, may also be used, as provided in § 330.1(c)(2) of this chapter, subject to the provisions of section 502 of the Federal Food, Drug, and Cosmetic Act (the act) relating to misbranding and the prohibition in section 301(d) of the act against the introduction or delivery for introduction into interstate commerce of unapproved new drugs in violation of section 505(a) of the act.

Id. § 341.80(b) (emphasis added). The general monograph regulation is structured similarly. In addition to requiring that "[t]he product is labeled in compliance with chapter V" of the FDCA, id. § 330.1(c)(1), it provides that

> [t]he "Uses" section of the label and labeling of the product shall contain the labeling describing the "Indications" that have been established in an applicable OTC drug monograph *or alternative truthful and nonmisleading statements describing only those indications for use that have been established in an applicable monograph*, subject to the provisions of section 502 of the act relating to misbranding . . . .

Id. § 330.1(c)(2) (emphasis added).

---

[1] Manufacturers may add additional phrases listed in subsection (b)(2), such as "for the temporary relief of nasal stuffiness." Id. 341.80(b)(2).

The text's plain meaning is clear that manufacturers must include "indications" on their labels, and they may do so in one of two ways: either by using the monograph language or using truthful and non-misleading statements describing the monograph language. Nothing in the PE monograph or the general monograph suggests that manufacturers have a freestanding duty to update their indications in response to new scientific information. Indeed, it's unclear if manufacturers could do so here without misbranding the product: if they updated the "Uses" section to indicate that PE is not an effective nasal decongestant, they would be using "alternative language describing" exactly the opposite of "those indications for use that have been established in the applicable OTC drug monograph."

If the text was not enough, this interpretation is confirmed by the 1986 Final Rule adding the relevant sections of the general monograph regulation. Before the Rule, the FDA followed an "exclusivity policy" for OTC drug labeling, under which "any OTC drug product containing labeling with claims or representations other than those established in the monograph, or using differing terminology, would have been a new drug and/or misbranded." Labeling of Drug Products for Over-the-Counter Human Use, 51 Fed. Reg. 16258-01, 16258. The 1986 amendments discarded this practice in favor of the current "flexibility policy." Id. The new policy, the Rule stated, "allow[s] manufacturers the opportunity to change label information without complying with unnecessary FDA procedures; . . . provide[s] for regional differences in the way people refer to the same condition, e.g., acid stomach versus upset stomach; and . . . provide[s] greater flexibility." Id.

The Rule does not suggest that the new language imposes some *obligation* on manufacturers to update efficacy claims on OTC drug labels; instead, the FDA merely touted the efficiency gained by allowing manufacturers to tweak the monograph language. And the Rule

even sheds light on the phrase "subject to section 502 of the act relating to misbranding." Throughout the notice-and-comment process, many interested parties criticized the flexibility policy as "a license for manufacturers of OTC drug products to use words that are misleading and confusing." Id. at 16259. The FDA seemingly included the "subject to . . ." proviso to allay these fears, not to impose on manufacturers a duty to update their drugs' indications.

As they must, plaintiffs oppose this reading of the text. They first point out that, crediting their allegations, PE is no more effective than a placebo. Thus, to the extent that defendants used alternative language describing the monograph indications, they violated the monograph because that language was not "truthful and nonmisleading." 21 C.F.R. 330.1(c)(2). Plaintiffs even claim that labels using the monograph language itself were misbranded because the FDCA's misbranding provision prohibits labels that are "false or misleading in any particular," 21 U.S.C. § 352(a), and the general monograph regulation requires that a label comply with chapter V of the FDCA, which includes § 352. See 21 C.F.R. § 330.1(c)(1).

This interpretation is strained. Most obviously, whether a drug is "effective" is a term of art under the FDCA, and the statute empowers the FDA, not manufacturers, to make that determination. See Nat. Res. Def. Council, 710 F.3d at 75. So, even taking plaintiffs' allegations as true, nothing on the labels was false or misleading – unless and until the FDA amends the monograph in response to the NDAC's findings, it is not misleading to state that PE is an effective nasal decongestant.[2] Plaintiffs also do not explain why federal law would require defendants to update only the indications section. Indeed, such a result would be nonsensical. As plaintiffs recognize, the FDA regulations straightforwardly require a manufacturer to use the "statement of identity" listed in the monograph, meaning a manufacturer must label a PE product

---

[2] The same applies to the statements on some labels that the products were "maximum strength" or suited for "severe" symptoms. Those statements are only false and misleading if PE is ineffective.

as a "nasal decongestant."  21 C.F.R. § 341.80(a) ("The labeling of the product . . . identifies the

product as a 'nasal decongestant.'"); see also id. § 330.1 ("[T]he statement of identity of the

product *shall* be the term or phrase used in the applicable OTC drug monograph established in

this part." (emphasis added)).  Under plaintiffs' reading of the regulations, PE manufacturers

would still be allowed to sell products labelled as "nasal decongestants," so long as the products'

labels do not state that the products are effective.

Further still, the Second Circuit already rejected a near-identical argument in Critcher v

L'Oreal USA Inc., 959 F.3d 31 (2d Cir. 2020).  The court there dismissed state claims alleging

that a manufacturer mislabeled one of its liquid cosmetics products by failing to disclose that

consumers could not dispense all the liquid.  The plaintiffs admitted that an express preemption

clause applied and that the cosmetic's label complied with the FDA's specific labelling

requirements, but they argued that the manufacturer violated § 352(a) because the net weight on

the label was misleading.  The Second Circuit rejected the proposition that § 352 was a vehicle

through which states could impose additional labeling requirements on products regulated by the

FDCA.  It recognized that because "[t]he [FDA] regulations have . . . stated, with specificity,

what information is necessary to avoid misleading consumers," a cosmetic in compliance with

the FDA labeling regulations cannot be misbranded.

Critcher rests on a straightforward application of administrative law.  The FDCA

generally commands that a drug's label cannot be false or misleading and, in turn, vests authority

in the FDA to determine whether a label is false or misleading.  And, so long as there is an

applicable preemption clause, that authority is exclusive.  Here, by promulgating the monograph

regulation, the FDA determined that it is neither false nor misleading to represent that PE is an

effective decongestant.  Cf. Booker v. E.T. Browne Drug Co., No. 20-cv-03166, 2021 WL

4340489, at *7 (S.D.N.Y. Sept. 23, 2021) (finding no preemption where the drugs were not deemed effective by the FDA).

Yet plaintiffs attempt to do exactly what <u>Critcher</u> prohibited. They attempt to circumvent the Second Circuit's holding by arguing that, unlike the labeling regulations in <u>Critcher</u>, the PE monograph expressly incorporates the rule they seek to enforce. But, as explained above, their argument is completely divorced from the text of the regulations, which does not reference any duty to revise indications based on newly discovered scientific information. And for good reason. The FDCA empowers the FDA, not drug manufacturers, to determine whether a drug is effective.[3]

Of course, the FDCA imposes some duties on drug manufacturers that depend on newly acquired scientific information. For instance, the misbranding statute requires a manufacturer to "pull even an FDA-approved drug" from the market when the drug "is 'dangerous to health' even if 'used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof.'" <u>Bartlett</u>, 570 U.S. at 477 n.4 (quoting 21 U.S.C. § 352(j)). There is no similar provision in § 352 for ineffective drugs.

Similarly, the savings clause in § 379r(e) imposes limited state labeling obligations on manufacturers. For this reason, the cases cited by plaintiff that allow state law challenges to OTC drug labels are inapposite. <u>See, e.g.</u>, <u>Wyeth v. Levine</u>, 555 U.S. 555 (2009); <u>In re Acetaminophen</u>, 2022 WL 17348351. In both cases, the plaintiffs alleged that the label misrepresented whether a drug was safe for use and asserted state tort claims against the manufacturers. Because § 379r(e) exempts product liability law from the preemption clause, the

---

[3] This same rationale applies to drugs approved under an NDA, like Haleon's PE product. The FDA determined that the drug was not misbranded, and there is no apparent federal duty to update labels. Indeed, plaintiffs even admit that Haleon "can," not must, update its products' indications through the Changes Being Effected regulation. <u>See</u> 21 C.F.R. § 314.70(c)(6)(iii)(D).

plaintiffs' claims were preempted only if compliance with both state and federal law was impossible.  Wyeth, 555 U.S. at 563; In re Acetaminophen, 2022 WL 1734835, at *6-7.  And it was not – the FDCA contains many provisions allowing manufacturers to "strengthen" the warnings on their label.  See, e.g., 21 C.F.R. §§ 314.70(c)(6)(iii)(A), (C) (applicable to the OTC drugs approved under an NDA in Wyeth) and § 201.63 (applicable to the OTC drugs approved under a monograph in In re Acetaminophen).[4]  This distinction between safety- and efficacy-focused state law was an intentional legislative choice.  By excepting state product-liability law from express preemption in § 379r(e), Congress allowed states to layer additional state protections atop federal ones, but only when those protections relate to safety; whether a drug is effective remains within the exclusive purview of the FDA.  This division reflects a balance between twin aims of the FDCA: safety and uniformity.

Plaintiffs' final alternative argument fails for this same reason.  Plaintiffs argue that, even if defendants' drugs were otherwise properly labeled, the FDCA imposes "an independent obligation to update their labels to reflect new scientific information."  In support, they cite passages from three Supreme Court cases – Wyeth, Albrecht, and Bartlett.  See Merck Sharp & Dohme Corp. v. Albrecht, 587 U.S. 299, 303 (2019); Bartlett, 570 U.S. at 487; Wyeth, 555 U.S. at 571.  In those cases, the Court dealt with safety challenges, not efficacy challenges, and therefore was determining whether a manufacturer *could* update their labels to reflect new scientific information under federal law, not whether they *had to* update their labels.  Indeed,

---

[4] Nor do I find merit in plaintiffs' appeal to In re Zantac (Ranitidine) Prod. Liab. Litig., 546 F. Supp. 3d 1284 (S.D. Fla. 2021).  To plaintiffs' credit, the court in In re Zantac, unlike in Wyeth and In re Acetaminophen, held that certain misbranding claims were parallel to federal law not preempted by § 379r.  Id. at 1305.  But the claims there were focused on the warnings of an OTC drug, not the indications, and therefore do not run into the same structural and textual problems as plaintiffs' claims.  See id.  Further, the ruling was preliminary – the court held that defendants could later demonstrate preemption after argument on "state-specific matters."  Id. at 1309.  Perhaps most importantly, though, the court did not have to grapple with circuit precedent like Critcher; if it did, I do not see how it could have reached the same conclusion.

plaintiffs reveal their hand by cobbling together quotations from <u>Wyeth</u> to argue that a manufacturer must update its label to reflect new scientific information so the drug's labelling "remain[s] adequate as long as the drug is on the market."  <u>Wyeth</u>, 555 U.S. at 571.  <u>Wyeth</u> in fact says that the FDCA charges manufacturers "both with crafting an adequate label and ensuring that its *warnings* remain adequate as long as the drug is on the market."  <u>Id.</u> (emphasis added).  The full passage reaffirms the key flaw with plaintiffs' claims: because the state claims focus on efficacy, not safety, they run headlong into § 379r.

### C.    Remaining Claims

Plaintiffs attempt to save their false-advertising, false-concealment, and express-warranty claims claims from § 379r by arguing that they do not implicate federal labeling requirements.  Like with the mislabeling claims, I must first determine the scope of the state duties plaintiffs seek to enforce.  <u>See Bartlett</u>, 570 U.S. at 480.  Because each duty would have required defendants to update the labels of their PE products or stop selling the products altogether, the claims are preempted.

Crediting plaintiffs' allegations, defendants could not have advertised their products truthfully without updating the labels to disclaim PE's effectiveness.  <u>See Smith v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC</u>, 660 F. Supp. 3d 863, 873-74 (N.D. Cal. 2023); <u>Kuiper v. American Cyanamid Co.</u>, 131 F.3d 656, 662 (7th Cir. 1997).  The same is true for the false-concealment and express-warranty claims.  Although plaintiffs point to omissions outside of the label which they claim constitute false concealments and statements outside of the label which they claim constitute express warranties, defendants would have had to update their label to avoid liability under either theory.  And, despite plaintiffs' arguments to the contrary, New York considers purely economic express-warranty claims to arise out of

13

contract law, not product-liability law.  See Goldstein v. Walmart, Inc., 637 F. Supp. 3d 95, 113 n.7 (S.D.N.Y. 2022); Restatement (Third) of Torts: Prod. Liab. § 21 (1998).  Accordingly, plaintiffs' state claims are preempted in their entirety.

## III.  RICO Claim

In addition to their state law claims, plaintiffs allege that the RICO defendants violated RICO by engaging in numerous acts of mail and wire fraud in furtherance of a scheme to defraud the public and mislead the FDA into believing that PE is an effective decongestant.  Defendants move to dismiss plaintiffs' civil RICO claim for lack of statutory standing and preclusion by the FDCA.

"Courts have described civil RICO as an unusually potent weapon – the litigation equivalent of a thermonuclear device."  Moss v. BMO Harris Bank, N.A., 258 F. Supp. 3d 289, 297 (E.D.N.Y. 2017) (internal quotation marks and quotation omitted).  The "mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants," yet "plaintiffs wielding RICO almost always miss the mark."  Id. (cleaned up).  Plaintiffs here are no exception.  As indirect purchasers of the PE products, they lack standing to bring a RICO claim.[5]

The Supreme Court, in interpreting federal antitrust law, has applied a "direct purchaser" rule: a standing doctrine that bars downstream indirect purchasers from bringing an antitrust claim.  See Ill. Brick Co. v. Illinois, 431 U.S. 720 (1977).  "[I]ndirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue.  By contrast, direct purchasers – that is, those who are 'the immediate buyers from the alleged antitrust violators' – may sue."  Apple Inc. v. Pepper, 587 U.S. 273, 280 (2019) (quoting Kansas v. UtiliCorp United Inc., 497 U.S. 199, 207 (1990)).  Plaintiffs do not dispute that they are indirect

---

[5] Because plaintiffs lack standing, I need not reach preclusion.

purchasers; the question for this Court is whether the direct-purchaser rule applies to civil RICO claims.

Although the Supreme Court and Second Circuit have not directly addressed the issue, the Supreme Court has explained that Congress, in enacting the RICO statute with the same language used in antitrust legislation, "intended [the words in the RICO statute] to have the same meaning that courts had already given them" in the antitrust context. Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268 (1992). Thus, the same standing requirements established in antitrust cases apply to RICO cases. See id.; McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 855 (3d Cir. 1996) ("[A]ntitrust standing principles apply equally to allegations of RICO violations." (citing Holmes, 503 U.S. at 270)). This is no less true for the direct-purchaser requirement. The direct-purchaser requirement applies in the civil RICO context and bars plaintiffs' RICO claim.[6]

The Supreme Court's analysis in Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985), does not change the application of the direct-purchaser requirement in the context of civil RICO claims. Sedima did not apply the "antitrust injury" rule to a civil RICO case, but that was "because 'RICO injury' would be an unintelligible requirement, not because there is no parallel between the two statutes." Carter, 777 F.2d at 1176 (citing Sedima, 473 U.S. at 489 & n.8). Where an antitrust standing requirement is easily intelligible in the civil RICO context, such as

---

[6] "Every circuit to have considered the issue has held that the [direct purchaser] rule also applies to civil RICO actions, and that indirect purchasers therefore do not have standing to assert RICO claims." Humana, Inc. v. Biogen, Inc., 666 F. Supp. 3d 135, 141 (D. Mass. 2023), reconsideration denied, No. 21-cv-11578, 2023 WL 8374584 (D. Mass. Dec. 4, 2023). The Sixth, Third, and Seventh Circuit Courts of Appeals have all applied the direct-purchaser rule to civil RICO claims. See Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 616 (6th Cir. 2004) ("[I]ndirect purchasers lack standing under RICO and the antitrust laws to sue for overcharges passed on to them by middlemen." (citations omitted)); McCarthy, 80 F.3d at 855 (3d Cir. 1996) ("The precepts taught by Illinois Brick and Utilicorp apply to RICO claims, thereby denying RICO standing to indirect victims." (citations omitted)); Carter v. Berger, 777 F.2d 1173 (7th Cir. 1985) ("The Hanover Shoe-Illinois Brick [direct purchaser] rule promotes enforcement and therefore applies to RICO, too.").

with the bright-line rule at issue here, the identical language of the statutes dictates that courts apply the same requirement in both contexts.

The proximate-cause requirement for a plaintiff to proceed with a civil RICO claim, recognized by the Supreme Court and the Second Circuit, does not conflict with the direct-purchaser requirement. These requirements "address two analytically distinct aspects" of standing. McCarthy, 80 F.3d at 851 n.14.[7] Proximate-cause analysis concerns whether a plaintiff's injury is too far removed from the defendant's violation of the statute at issue to warrant a remedy. Id. By contrast, the direct-purchaser rule concerns whether a plaintiff, having satisfied the proximate-cause requirement, "falls within the group of private attorneys general that Congress created to enforce" the statute. Id. (internal quotation marks and quotation omitted). Many cases only address the proximate-cause requirement, and not the direct-purchaser requirement, because there is no purchasing relationship at issue between the parties. See, e.g., Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008) (competitors sued petitioner for violating the rules of an auction; no buyer-seller relationship); Empire Merchs., LLC v. Reliable Churchill LLLP, 902 F.3d 132 (2d Cir. 2018) (alcohol distributor sued other distributors for conspiring with retail liquor stores to smuggle liquor from Maryland to New York; no buyer-seller relationship). Other cases do not address the direct-purchaser requirement because the plaintiff is clearly a direct purchaser, vitiating the need for such analysis. See, e.g., Horn v. Med. Marijuana, Inc., 80 F. 4th 130, 133 (2d Cir. 2023) (plaintiff purchased a product undisputedly "produced, marketed, and sold by [defendants]"), cert. granted, 144 S. Ct. 1454

---

[7] Alternatively, some courts have explained that proximate cause analysis is completely separate from the question of standing. See, e.g., Trollinger, 370 F.3d at 612 (6th Cir. 2004) ("Like the antitrust laws, RICO's civil-suit provision imposes two distinct but overlapping limitations on claimants – standing and proximate cause. . . . Proximate cause poses a merits question involving common-law and prudential limitations on the consequences for which the law will hold a defendant accountable, regardless of the plaintiff's standing to sue." (citation omitted)). The role of proximate cause in relation to the question of standing does not affect the analysis here.

(2024).  Plaintiffs' argument that the direct-purchaser requirement would usurp the proximate

cause standard is not supported by the caselaw.  Applying the direct-purchaser rule to plaintiffs'

civil RICO claim, I dismiss plaintiffs' claim for lack of standing.

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the streamlined complaint is

GRANTED.

**SO ORDERED.**

*Brian M. Cogan*

_____

U.S.D.J.

Dated: Brooklyn, New York
       October 29, 2024

17

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Oral Phenylephrine Marketing and Sales Practices Litigation<br><br>This document relates to:<br><br>All actions. | Case No. 1:23-md-03089-BMC<br><br>Hon. Brian M. Cogan |

## ORDER ENTERING JUDGMENT

**WHEREAS,** on May 3, 2024, Interim Class Counsel filed "an Initial Streamlined Consolidated Complaint under New York law alleging representative examples of the conduct and claims they allege to be at issue in this Multidistrict Litigation relating, among other things, to the marketing and labeling of oral phenylephrine products." ECF No. 197 at 1.

**WHEREAS,** the parties agreed and the Court ordered "that to the extent the Court grants or denies Defendants' motion to dismiss based on preemption and/or primary jurisdiction and/or any initial RICO argument(s) raised, the order will apply to all cases in this multidistrict litigation or otherwise subject to transfer into this multidistrict litigation." ECF No. 204 at 2.

**WHEREAS,** Plaintiffs also "represent[ed] that they have filed sufficient representative examples of the conduct and claims that they allege to be wrongful that a motion to dismiss based on preemption and/or primary jurisdiction and/or initial RICO arguments will, if such arguments prevail, resolve this litigation in its entirety, regardless of additional specific examples of wrongful conduct, additional products named, additional Plaintiff-related allegations, or additional state-law claims that are pled or could be pled in a future Full Master Consolidated Complaint." ECF No. 204 at 3.

**WHEREAS,** on June 3, 2024, Defendants moved to dismiss Plaintiffs' Initial Streamlined Consolidated Class Action Complaint based on arguments that (i) Plaintiffs' state claims are

1

preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA"), (ii) Plaintiffs lack standing to assert the RICO claim, and (iii) Plaintiffs' RICO claim is precluded by the FDCA. ECF No. 212.

**WHEREAS,** on July 15, 2024, Plaintiffs filed their Opposition to Defendants' Motion to Dismiss. ECF No. 225.

**WHEREAS,** on August 5, 2024, Defendants filed their Reply Memorandum in support of their Motion to Dismiss. ECF No. 232.

**WHEREAS,** on September 23, 2024, the Court held oral argument on Defendants' Motion to Dismiss.  9/26/24 Minute Entry.

**WHEREAS,** on October 29, 2024, the Court issued a Memorandum Decision and Order, granting Defendants' Motion to Dismiss the Streamlined Complaint. ECF No. 249.

**THEREFORE, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:**

1.      All claims in the complaints transferred into the above-captioned master docket are dismissed with prejudice.

2.      The Clerk is instructed to enter JUDGMENT dismissing all claims in any complaint in this multidistrict litigation.

3.      This is a final, appealable judgment that resolves all of the claims in all of the cases in this multidistrict litigation.[1]

4.      The in-person Status Conference currently scheduled for 1:00 p.m. ET on November 21, 2024, is hereby adjourned.

---

[1]     The Court has not decided, and Defendants have expressly preserved, any issues related to "any Defendants' personal jurisdiction defense."  ECF No. 204 at 3.

**SO ORDERED.**

Brooklyn, NY
Dated: November 12, 2024

*Brian M. Cogan*
THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
                                    :

IN RE: ORAL PHENYLEPHRINE MARKETING  :
AND SALES PRACTICES LITIGATION         :

_____ :  23-md-3089-BMC

THIS DOCUMENT APPLIES TO:           :  **MEMORANDUM DECISION AND**
                                     :  **ORDER**
Newton's Pharmacy, Inc. v. Proctor & Gamble Co., :
_et al._, 23-cv-9307                       :
                                       :
                                       :
--------------------------------------------------------------- X

**COGAN**, District Judge.

      Plaintiff Newton's Pharmacy, Inc., ("NPI") has moved for reconsideration of the Court's

dismissal of its Lanham Act claim.  Reasoning that the Court's order dismissing the initial

streamlined complaint does not apply to federal false-advertising claims, NPI seeks a remand of

its claim to the Southern District of Ohio.

      NPI's motion, however, misses the mark.  Of course its claim was not included in

streamlined complaint – most claims in the consolidated action weren't.  But, as stipulated by the

Plaintiff's Executive Committee, the selected claims in the complaint turned on threshold issues

common to the entire action, such that its dismissal would "resolve this litigation in its entirety,

regardless of additional specific examples of wrongful conduct."  Trademark infringement

arising out of the same facts as alleged in the streamlined complaint is quintessentially an

"additional specific example of wrongful conduct."  And NPI does not contest the Committee's

authority to propose such a disposition.

      Nor could it.  An April 2024 text order empowered the Committee to "enter into

stipulations with Defendants' counsel[,] . . . [n]egotiat[e] settlement with Defendants' counsel,"

and "[p]erform such other duties as are necessary in connection with the prosecution of" the litigation. As a result, the order granted the Committee the ability to make stipulations relating to each claim in the consolidated action, including NPI's Lanham Act claim. The Committee therefore acted well within when its authority when it stipulated on behalf of all plaintiffs that any claim *not* included in the complaint, like NPI's Lanham Act claim, would nevertheless fall if the Court granted defendants' motion to dismiss.

NPI's reconsideration motion is, in effect, a far too belated challenge to this stipulation. But Rule 60(b) is not a vehicle for raising arguments or issues that could have been raised before judgment. See Levitant v. Workers Comp. Bd. of N.Y., No. 16-cv-6990, 2019 WL 5853438, at *1 (S.D.N.Y. Nov. 8, 2019). If NPI thought its federal claim should survive a dismissal of the streamlined complaint, it should have told the Committee, or even the Court, much earlier.[1] NPI's argument that its claim is immune from the Court's reasoning reveals only NPI's failure to communicate with the Committee.

It's not like the streamlined complaint was a product of some clandestine scheme; the complaint's purpose was repeatedly discussed at status conferences and on the public docket. For instance, in its Order Governing Plaintiffs' Initial Streamlined Consolidated Complaint and Defendants' Motion To Dismiss In Response, the Court explicitly provided that the complaint should include

---

[1] Even if the Lanham Act claim was included in the Streamlined Complaint, it likely would not have survived a motion to dismiss. The Supreme Court has made clear that a Lanham Act suit is precluded when it is "inconsistent" with an agency's "policy judgment." POM Wonderful LLC v. Coca-Cola Co., 573 U.S. 102, 120 (2014); see also Geier v. Am. Honda Motor Co., 529 U.S. 861 (2000). Like the plaintiff's suit in Geier, NPI's suit attacks an agency's policy determination – the FDA's determination that phenylephrine is an effective nasal decongestant. Although the Second Circuit has held that a Lanham Act false-advertising claim can challenge information on a drug's label that "renders [an] advertisement literally or implicitly false," even when the FDA has approved the label, see Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH, 843 F.3d 48, 73 n.13 (2d Cir. 2016) (quoting Apotex Inc. v. Acorda Therapeutics, Inc., 823 F.3d 51, 64 n.10 (2d Cir. 2016), Congress straightforwardly delegated the exclusive authority to determine whether a drug is effective to the FDA, and it was therefore not "false" to state that oral phenylephrine is an effective nasal decongestant.

> sufficient representative examples of the conduct and claims that [plaintiffs]
> allege to be wrongful that *a motion to dismiss based on preemption . . . will, if*
> *such arguments prevail, resolve this litigation in its entirety, regardless of*
> *additional specific examples of wrongful conduct*, additional products named,
> additional Plaintiff-related allegations, or additional state-law claims that are pled
> or could be pled in a future Full Master Consolidated Complaint.

(emphasis added).

There is no discernible reason why NPI did not raise this objection until after the Court entered the proposed judgment. It sat idly by while the parties moved for, and the Court ultimately appointed, lead counsel for the plaintiffs. It stayed silent as the parties discussed their plan for the streamlined complaint and as the Court entered a public order reflecting those discussions. Then, when the Committee opted not to include a Lanham Act claim in the streamlined complaint, it did not bring up the issue with the Court or with the Committee. And it remained silent still thorough the entire two-week period between the Court's dismissal of the complaint and the filing of the proposed judgment. Even the filing of the proposed judgment did not prompt NPI to object. It waited another week, four days after the Court entered the judgment, to finally speak up.

NPI had numerous opportunities to object, to seek a carve-out for its claim, or to at least attempt to reserve its rights to assert that claim. If it had, and its position had any merit, either the committee would have changed its tack, or the Court would have heard NPI's position prior to ruling on the motion. Because it did not, NPI has not shown that it is entitled to the extraordinary relief afforded by Rule 60(b). Accordingly, its motion is denied.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
       December 13, 2024

3