SAMUEL ISSACHAROFF
40 WASHINGTON SQUARE SOUTH
SUITE 411J
NEW YORK, N.Y. 10012
212-998-6580
SI13@NYU.EDU


May 22, 2025


Catherine O'Hagan Wolfe, Clerk of the Court
U.S. Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007


RE: *In Re: Oral Phenylephrine Marketing and Sales Practice Litig.*, No. 24-3296,
Plaintiffs-Appellants' Rule 28(j) Letter

Dear Ms. O'Hagan Wolfe:

We write to bring to the Court's attention today's Supreme Court opinion in *Kousisis et al. v. United States*, No. 23–909 (May 22, 2025), attached. *Kousisis* again rejects reading non-textual restrictions into federal statutory fraud claims. We raise *Kousisis* now to provide Appellees a full opportunity to address it.

*Kousisis* arose in the context of a criminal prosecution for wire fraud under 18 U. S. C. §1343, rather than civil liability as here. Yet even in the more exacting context of criminal liability, the Supreme Court declined to narrow the reach of the statute based on policy arguments found nowhere in its language.

The Court "[s]tart[ed] with the statute." *Kousisis*, at 7. There, the Court found that "[n]o matter how long we stare at it, the broad, generic language of § 1343 leaves us struggling to see any basis for excluding a fraudulent-inducement scheme" even absent economic loss. *Id.* Just so here: "the broad, generic language" at issue here—"[a]ny person injured," 18 U.S.C. § 1964(c)— provides no basis for excluding indirect purchaser victims from RICO's ambit. Just as "the [wire fraud] statute does not so much as mention loss, let alone require it," RICO does not so much as mention a direct purchase, much less require it. *Kousisis*, at 8.[1]

*Kousisis* notes that concerns about any overbreadth of its statutory reading are ameliorated by "[t]he 'demanding' materiality requirement [which] substantially narrows the universe of actionable misrepresentations." *Id.* at 19. Here, the need to establish a pattern of

---

[1] The Court also declined to read restrictive requirements into the statute based on the common law, noting the "expansive reach" of such claims historically. *Id.* at 9, 13.

racketeering activity and predicate acts narrows that universe, and the direct-relation test polices the limits of proximate cause.

Finally, *Kousisis* reiterates that "Congress enacted the wire fraud statute, and it is up to Congress . . . to change it." *Id*. So too, RICO.

Respectfully submitted,

Samuel Issacharoff

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KOUSISIS ET AL. *v.* UNITED STATES

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 23–909.  Argued December 9, 2024—Decided May 22, 2025

The Pennsylvania Department of Transportation (PennDOT) awarded petitioners Stamatios Kousisis and Alpha Painting and Construction Co. two contracts for painting projects in Philadelphia.  Federal regulations required contract awardees to subcontract a portion of every contract to a disadvantaged business enterprise.  So as part of the bidding process, Kousisis falsely represented that Alpha would obtain its paint supplies from Markias, Inc., a prequalified disadvantaged business.  This was a lie.  Unbeknownst to PennDOT, Kousisis arranged for Markias to function as a mere "pass-through" entity.  As a pass-through, Markias did not provide any paint supplies.  To the contrary, its only role was that of a paper pusher, funneling checks and invoices to and from Alpha's actual suppliers.  Not only did this arrangement contradict Kousisis's prior representations, it also violated the requirement that disadvantaged businesses perform a "commercially useful function."  49 CFR §26.55(c).  In the end, however, Alpha performed the painting projects to PennDOT's satisfaction and pocketed over $20 million in gross profit.

  The Government charged Alpha and Kousisis with wire fraud and conspiracy to commit the same.  18 U. S. C. §§1343, 1349.  The charges were premised on the fraudulent-inducement theory—in other words, that petitioners had induced PennDOT to award them the painting contracts under materially false pretenses.  After a jury convicted Alpha and Kousisis of wire fraud, they moved for acquittal.  In their view, despite the lack of disadvantaged-business participation, PennDOT had received the full economic benefit of its bargain.  So, petitioners contended, the Government could not prove that they had schemed to defraud PennDOT of "money or property" as §1343 requires.  The

Syllabus

Third Circuit rejected this argument, deepening the division over the validity of a federal fraud conviction when the defendant did not seek to cause the victim net pecuniary loss.

*Held*: A defendant who induces a victim to enter into a transaction under materially false pretenses may be convicted of federal fraud even if the defendant did not seek to cause the victim economic loss. Pp. 5–20.

(a) To convict Alpha and Kousisis, the Government needed to prove that they used the wires to execute a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." §1343. Under this Court's precedent, a defendant commits wire fraud only if he both engaged in deception and had money or property as an object of his fraud. See *Ciminelli* v. *United States*, 598 U. S. 306, 312. It follows from this rule, Alpha and Kousisis say, that a federal fraud conviction cannot stand unless the defendant sought to cause the victim net pecuniary loss. Not so. The fraudulent-inducement theory is consistent with both the text of §1343 and this Court's precedent. Pp. 5–20.

(1) The text of §1343 does not mention economic loss, let alone require it. In fact, Alpha and Kousisis's conduct satisfied each element of §1343: They devised a scheme to "obtai[n] money" (tens of millions) from PennDOT through false representations about their compliance with the disadvantaged-business requirement. And while petitioners argue otherwise, a scheme may still constitute wire fraud even if the defendant provides something of value in return. To "obtain" means "to gain or attain possession," Webster's Third International Dictionary 1559, and money or property is no less "obtained" simply because something else is given in return. Pp. 7–8.

(2) Petitioners argue that economic loss is inherent to the common-law understanding of fraud, a term that appears twice in the wire fraud statute. But when Congress uses a common-law term, the presumption that the term "brings [its] old soil with it" applies only to the extent that the term has a settled meaning. *Sekhar* v. *United States*, 570 U. S. 729, 733. At common law, the term "fraud" had an expansive reach; its elements and remedies depended on the plaintiff's alleged injury. In contract-rescission actions or prosecutions for false pretenses, for example, most courts did not require the victim to show economic loss. Instead, it was sufficient that the victim had "received property of a different character or condition than [it] was promised," even if of equal value. W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts §110, p. 766 (Prosser & Keeton). Stated otherwise, it was the deception-induced deprivation of property—not economic loss—that common-law courts generally deemed injurious. See *Stillwell* v. *Rankin*, 55 Mont. 130, 135, 174 P. 186, 187. Contrast the tort of deceit: To have a complete cause of action, the

plaintiff must have suffered economic loss. See Prosser & Keeton §110, at 765. In sum, then, the common law did not establish a general rule requiring economic loss in all fraud cases, so the Court will not read such a requirement into §1343. Pp. 8–13.

(3) Petitioners concede that the common law did not require economic loss in every case. But their purported exception—cases in which either the plaintiff received "something different from what was promised" or the bargain "involv[ed] an item with unique qualities," Reply Brief 15—lacks a driving principle. At the right level of specificity, anything can be described as "unique" or "different from" something else. Indeed, the common law has long embraced a different standard—namely, materiality—as the principled basis for distinguishing everyday misstatements from actionable fraud. Today, the Court reiterates "that materiality of falsehood is an element of," and thus a limit on, the federal fraud statutes. *Neder* v. *United States*, 527 U. S. 1, 25. But because Alpha and Kousisis have not contested the materiality of their representations, the Court does not resolve the parties' debate about the proper standard for materiality under §1343. Pp. 14–16.

(b) The fraudulent-inducement theory is neither foreclosed by, nor inconsistent with, the Court's precedent. The Court has twice *rejected* the argument that a fraud conviction depends on economic loss, first in *Carpenter* v. *United States*, 484 U. S. 19, and then in *Shaw* v. *United States*, 580 U. S. 63. And despite Alpha and Kousisis's contrary arguments, the fraudulent-inducement theory does not permit a fraud conviction premised on mere interference with the State's power to regulate. No matter the underlying theory of fraud, §1343 requires that "money or property" have been an object of the fraudster's scheme. The money-or-property requirement also explains why the fraudulent-inducement theory does not, as petitioners maintain, collapse the distinction between the wire fraud statute and the statutes that prohibit conspiracies to defraud the United States, see 18 U. S. C. §371, and false or fraudulent statements in federal matters, see §1001. Nor does the theory undermine this Court's precedent holding that, aside from the honest-services exception, §1343 does not "protect intangible interests unconnected to traditional property rights." *Ciminelli*, 598 U. S., at 312. If a scheme instead targets some kind of intangible interest— for example, a citizen's interest in "impartial government"—the fraudulent-inducement theory is inapplicable. *McNally* v. *United States*, 483 U. S. 350, 355. Finally, the fraudulent-inducement theory does not "repackage" the right-to-control theory rejected in *Ciminelli*. Unlike the right-to-control theory, fraudulent inducement does not treat "mere information as the protected interest." 598 U. S., at 315. Rather, it protects money and property. Pp. 16–19.

Syllabus

(c) The fraudulent-inducement theory does not risk turning every misrepresentation designed to induce a transaction into property fraud. Instead, the theory criminalizes a particular species of fraud, and the "demanding" materiality requirement substantially narrows the universe of actionable misrepresentations. *Universal Health Services, Inc.* v. *United States ex rel. Escobar*, 579 U. S. 176, 194. And while the wire fraud statute is broad, it is up to Congress, if it so chooses, to change it. P. 19.

82 F. 4th 230, affirmed.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, KAGAN, KAVANAUGH, and JACKSON, JJ., joined. THOMAS, J., filed a concurring opinion. GORSUCH, J., filed an opinion concurring in part and concurring in the judgment. SOTOMAYOR, J., filed an opinion concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 23–909

―――――――

## STAMATIOS KOUSISIS, ET AL., PETITIONERS v. UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[May 22, 2025]

JUSTICE BARRETT delivered the opinion of the Court.

Stamatios Kousisis and the industrial-painting company
he helped manage, Alpha Painting and Construction Co.,
secured two government contracts for painting projects in
Philadelphia. Both contracts required the participation of
a disadvantaged business—and in its bids for the projects,
Alpha represented to the Pennsylvania Department of
Transportation (PennDOT) that it would obtain its materi-
als from a qualifying supplier. See 49 CFR §§26.21(a), 26.5
(2024). This promise turned out to be an empty one: In ad-
dition to using the supplier solely as a pass-through entity,
Alpha and Kousisis submitted multiple false certifications
to cover up their scheme. So although Alpha's paint work
met expectations, its adherence to the disadvantaged-
business requirement did not.

The Government charged Alpha and Kousisis with wire
fraud, asserting that they had fraudulently induced Penn-
DOT to award them the painting contracts. See 18 U. S. C.
§1343. Under the fraudulent-inducement theory, a defend-
ant commits federal fraud whenever he uses a material mis-
statement to trick a victim into a contract that requires
handing over her money or property—regardless of whether

the fraudster, who often provides something in return,
seeks to cause the victim *net* pecuniary loss.  We must de-
cide whether this theory is consistent with §1343, which
reaches only those schemes that target traditional money
or property interests.  See *Ciminelli* v. *United States*, 598
U. S. 306, 316 (2023).  It is, so we affirm.

                          I

   When two Philadelphia landmarks, the Girard Point
Bridge and the 30th Street Station, fell into disrepair,
PennDOT began soliciting bids for their restoration.  Kou-
sisis, Alpha's project manager, submitted a bid for each pro-
ject.  His bidding proved successful: With respect to the
Girard Point project, PennDOT awarded a $70.3 million
contract to a joint venture comprising Alpha and two other
companies.  And with respect to the 30th Street project, Al-
pha and another company (again operating as a joint ven-
ture) secured a $15 million subcontract, which represented
nearly a third of the $50.8 million total winning bid.
   Federal grants from the U. S. Department of Transporta-
tion (DOT) accounted for a large portion of the funding for
each project.  As a result, both the State and Federal Gov-
ernments had a say in how the projects were completed.
Relevant here, DOT requires that grant recipients
like PennDOT establish and "actively implemen[t]" a
disadvantaged-business program.  49 CFR §§26.21,
26.39(c); see also 112 Stat. 113–115.  A "[d]isadvantaged
[b]usiness [e]nterprise," according to DOT, is "a for-profit
small business" that is majority owned and controlled by
"one or more individuals who are both socially and econom-
ically disadvantaged."  §26.5 (italics omitted).  Because
DOT aspires to devote at least 10 percent of federal grant
funding to such businesses, grant recipients must set "over-
all goal[s]" for disadvantaged-business participation in
their "DOT-assisted contracts."  §§26.41, 26.45(a)(1).

Consistent with this rule, PennDOT required that bidders for the Girard Point and 30th Street projects commit to subcontracting a percentage of the total contract amount—six and seven percent, respectively—to a disadvantaged business. Failing to comply with this requirement would constitute "a material breach" and could "result in [contract] termination." App. 114, 175. Accordingly, as part of the bidding process, Kousisis represented that Alpha would acquire approximately $6.4 million in painting supplies from Markias, Inc., a prequalified disadvantaged business.

This was a lie. As later memorialized in a commitment letter, Alpha and Kousisis concocted a scheme in which Markias would function as a mere "pass-through" entity. The scheme operated as follows: Kousisis arranged for Alpha's actual paint suppliers, with whom he negotiated directly, to "generate purchase orders . . . billed to Markias." *Id.*, at 193. When Markias received an invoice, it tacked on a few-percent fee and then forwarded the inflated invoice to Kousisis. He, in turn, issued two checks: one paid Markias for its mark up, and the other covered the actual cost of the supplies. In short, Markias was no more than a paper pusher, funneling checks and invoices to and from Alpha's actual suppliers. Not only did this arrangement contradict Kousisis's prior representations, it also contravened DOT's rule that a contributing disadvantaged business must "perfor[m] a commercially useful function." §26.55(c).[1]

Kousisis's scheme initially went undetected. As the projects progressed, he falsely reported qualifying payments to Markias. PennDOT, satisfied with Alpha's paint and repair work, paid it accordingly. By the time the last coat of paint

_____

[1] At least on these facts, DOT left no room for ambiguity: A disadvantaged business "does not perform a commercially useful function if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed to obtain the appearance" of disadvantaged-business "participation." §26.55(c)(2).

had dried, Alpha had turned a gross profit of over $20 million. And Markias, for its "pass-through" services, had pocketed a total of about $170,000.

Once the deception came to light, a grand jury indicted Alpha and Kousisis for wire fraud and conspiracy to commit the same. See 18 U. S. C. §§1343, 1349. After a trial, the jury found them guilty of three counts of wire fraud and one count of conspiracy. Alpha and Kousisis moved for a judgment of acquittal, arguing that because their paintwork met PennDOT's expectations, PennDOT had received the full economic benefit of its bargain. Thus, notwithstanding the lack of disadvantaged-business participation, the Government could not prove that they had schemed to defraud PennDOT of "money or property" as the federal wire fraud statute requires. §1343.

The District Court rejected this argument, and the Third Circuit affirmed the convictions. As both courts explained, "obtaining the [G]overnment's money or property was *precisely* the object" of Alpha and Kousisis's "fraudulent scheme." 82 F. 4th 230, 240 (2023); see also 2019 WL 4126484, *13 (ED Pa., June 17, 2019) ("[T]he scheme targeted PennDOT's money, because the agency paid for services—construction performed with materials supplied by a [disadvantaged business]—which it did not receive"). "Put simply," Alpha and Kousisis "set out to obtain millions of dollars that they would not have received but for their fraudulent misrepresentations." 82 F. 4th, at 240.

The circuits are divided over the validity of a federal fraud conviction when the defendant did not seek to cause the victim net pecuniary loss. Several circuits, now including the Third, hold that such convictions may stand. See, *e.g.*, *id.*, at 240–244; *United States* v. *Leahy*, 464 F. 3d 773, 787–789 (CA7 2006); *United States* v. *Granberry*, 908 F. 2d 278, 280 (CA8 1990); *United States* v. *Richter*, 796 F. 3d 1173, 1192 (CA10 2015). Others disagree. See, *e.g.*, *United States* v. *Shellef*, 507 F. 3d 82, 108–109 (CA2 2007); *United*

*States* v. *Sadlar*, 750 F. 3d 585, 590–592 (CA6 2014); *United States* v. *Bruchhausen*, 977 F. 2d 464, 467–468 (CA9 1992); *United States* v. *Takhalov*, 827 F. 3d 1307, 1312–1314 (CA11 2016); *United States* v. *Guertin*, 67 F. 4th 445, 450–452 (CADC 2023). We granted certiorari to resolve the split. 602 U. S. ___ (2024).

## II

To convict Alpha and Kousisis, the Government needed to prove that they used the wires to execute a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U. S. C. §1343. Despite the use of the disjunctive "or," we have declined to interpret §1343 as establishing alternative pathways to a conviction. Instead, reading the two clauses together, we have held that "the money-or-property requirement of the latter phrase" operates as a limitation on the former. *McNally* v. *United States*, 483 U. S. 350, 358–360 (1987).[2] A defendant commits federal wire fraud, in other words, only if he both "'engaged in deception'" and had "'money or property'" as "'an object'" of his fraud. *Ciminelli*, 598 U. S., at 312 (quoting *Kelly* v. *United States*, 590 U. S. 391, 398 (2020)).

The money-or-property requirement lies at the heart of this dispute. Although the lower courts once interpreted the phrase "money or property" as something of a catchall, we recently reiterated that the federal fraud statutes reach only "traditional property interests." *Ciminelli*, 598 U. S., at 316. Schemes that target the exercise of the Government's regulatory power, for example, do not count. See *Kelly*, 590 U. S., at 400; see also *Cleveland* v. *United States*, 531 U. S. 12, 23–24 (2000). Nor do schemes that seek to

─────────

[2] Although *McNally* involved the mail fraud statute, §1341, "'we have construed identical language in the wire and mail fraud statutes *in pari materia*.'" *Ciminelli* v. *United States*, 598 U. S. 306, 312, n. 2 (2023); see *Kelly* v. *United States*, 590 U. S. 391, 398 (2020).

deprive another of "intangible interests unconnected to property." *Ciminelli*, 598 U. S., at 315; see also *McNally*, 483 U. S., at 356.[3] And in all cases, because money or property must be an *object* of the defendant's fraud, the traditional property interest at issue "must play more than some bit part in a scheme." *Kelly*, 590 U. S., at 402. Obtaining the victim's money or property must have been the "aim," not an "incidental byproduct," of the defendant's fraud. *Id.*, at 402, 404.

From these rules, Alpha and Kousisis attempt to glean another: A federal fraud conviction cannot stand, they argue, unless the defendant sought to hurt the victim's bottom line. Brief for Petitioners 2; Reply Brief 8. Yet the theory under which petitioners were prosecuted—what they call the fraudulent-inducement theory—is devoid of an economic-loss requirement. As both parties describe it, the theory supports liability for federal fraud anytime a defendant "'us[es] falsehoods to induce a victim to enter into a transaction.'" Brief for Petitioners 29 (quoting Brief in Opposition 9). In these situations, the defendant need not—and given the reciprocal nature of most transactions, often will not—aim to inflict economic loss. Because Alpha and Kousisis did not aim to do so here, they contend that their convictions are invalid.

We are not convinced. The fraudulent-inducement theory is consistent with both the text of the wire fraud statute and our precedent interpreting it. We therefore reject petitioners' proposed economic-loss requirement.

---

[3]Responding to our decision in *McNally*, Congress amended the statute to include schemes that seek to "deprive another of the intangible right of honest services." §1346; see also *Cleveland*, 531 U. S., at 19–20 (describing this history). That exception is irrelevant here.

## A

### 1

Start with the statute. To be guilty of wire fraud, a defendant must (1) "devis[e]" or "inten[d] to devise" a scheme (2) to "obtai[n] money or property" (3) "by means of false or fraudulent pretenses, representations, or promises." §1343. The prototypical fraudulent-inducement scheme plainly satisfies each of these statutory elements. Under the theory, a defendant (1) "devise[s]" a "scheme" (2) to induce the victim into a contract to "obtai[n]" her "money or property" (3) "by means of false or fraudulent pretenses." No matter how long we stare at it, the broad, generic language of §1343 leaves us struggling to see any basis for excluding a fraudulent-inducement scheme.

Take the facts of this very case. By using Markias as a pass-through entity, petitioners "devised" a "scheme" to obtain contracts through feigned compliance with PennDOT's disadvantaged-business requirement. *Ibid.* Their goal? To "obtai[n] money" (tens of millions of dollars) from Penn-DOT. *Ibid.* And how? By making a number of "false or fraudulent . . . representations"—first about their plans to obtain paint supplies from Markias and later about having done exactly that. *Ibid.* Section 1343 requires nothing more.

Alpha and Kousisis's contrary view rests on the premise that a scheme cannot constitute wire fraud if, as here, the defendant provides something—be it money, property, or services—of equal value in return. But the statute says otherwise. To "obtain" something means "to gain or attain possession" of it, usually "by some planned action or method." Webster's Third International Dictionary 1559 (2002). A thing is no less "obtained" simply because something *else* is simultaneously given in return. An art collector who acquires a rare sculpture can rightfully say that she "obtained" it, notwithstanding the six-figure price tag. And because the meaning of "obtain" does not turn on the value of

the exchanged items, the art collector can still say that she "obtained" the sculpture even if it was not objectively worth the price she paid.

In short, the wire fraud statute is agnostic about economic loss. The statute does not so much as mention loss, let alone require it. Instead, a defendant violates §1343 by scheming to "obtain" the victim's "money or property," regardless of whether he seeks to leave the victim economically worse off. A conviction premised on a fraudulent inducement thus comports with §1343.

### 2

Resisting this conclusion, Alpha and Kousisis assert that economic loss is part and parcel of the common-law understanding of fraud, a term that appears in two forms in the wire fraud statute. §1343 (a "scheme or artifice to *defraud* . . . by means of false or *fraudulent* pretenses" (emphasis added)). When Congress uses a term with origins in the common law, we generally presume that the term "'brings the old soil with it.'" *Sekhar* v. *United States*, 570 U. S. 729, 733 (2013). As petitioners note, we have long interpreted the statutory term "fraud" (and its variations) this way— that is, by reference to its common-law pedigree. See *Neder* v. *United States*, 527 U. S. 1, 21–22 (1999); *Universal Health Services, Inc.* v. *United States ex rel. Escobar*, 579 U. S. 176, 187 (2016) ("[T]he term 'fraudulent' is a paradigmatic example of a statutory term that incorporates the common-law meaning of fraud").

This old-soil principle applies, however, only to the extent that a common-law term has "'accumulated [a] settled meaning.'" *Neder*, 527 U. S., at 21; *Kemp* v. *United States*, 596 U. S. 528, 539 (2022). So to show that economic loss is necessary to securing a federal fraud conviction, Alpha and Kousisis must show that such loss was "widely accepted" as a component of common-law fraud. *Morissette* v. *United States*, 342 U. S. 246, 263 (1952). They cannot.

At common law, "fraud" was a term with expansive reach. Rather than settle on a single form of liability, courts recognized at least three, and the particular elements and remedies turned on the nature of the plaintiff's alleged injury.

To appreciate how the three forms differed, it may help to consider a variation of the facts here. Imagine that PennDOT discovered petitioners' scheme soon after Alpha and Kousisis had begun work on the Girard Point and 30th Street projects. In such a circumstance, law and equity provided at least three avenues for relief: PennDOT could (1) seek to rescind the contracts; (2) refer the matter for indictment under the crime of false pretenses; or (3) bring a tort action against the fraudsters for the damages incurred.

If PennDOT had wanted to rescind the fraud-infected contracts, most courts would historically have permitted it to do so even without a showing of economic loss. To obtain a rescission, PennDOT would have needed to establish only that it had "received property of a different character or condition than [it] was promised" ("although of equal value") or, more relevant here, that the transaction had "prove[d] to be less advantageous than as represented" ("although there [was] no actual loss"). W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts §110, p. 766 (5th ed. 1984) (Prosser & Keeton). Put differently, many courts would have awarded the equitable remedy of rescission simply because Alpha and Kousisis had tricked PennDOT into a bargain materially different from the one they had promised. See *Hirschman* v. *Healy*, 162 Minn. 328, 331, 202 N. W. 734, 735 (1925) ("[I]t is to be noted that it was not indispensable to prove damages in dollars and cents to have cancellation or rescission of the contract and note for misrepresentations"); *Williams* v. *Kerr*, 152 Pa. 560, 565, 25 A. 618, 619 (1893); *Spreckels* v. *Gorrill*, 152 Cal. 383, 391, 92 P. 1011, 1015 (1907). To borrow a summary from Black (of Black's Law Dictionary fame)

many "decisions repudiate[d] altogether [a] rule requiring a showing of actual damage." 1 H. Black, Rescission of Contracts and Cancellation of Written Instruments §112, p. 314 (1916).[4]

The same no-loss-required rule applied with equal force to the crime of false pretenses. As many courts held, the crime "was complete when the property was fraudulently obtained." *West* v. *State*, 63 Neb. 257, 259, 88 N. W. 503, 504 (1901); see also *Commonwealth* v. *Coe*, 115 Mass. 481, 502–503 (1874); *People* v. *Bryant*, 119 Cal. 595, 597, 51 P. 960, 961 (1898); *Commonwealth* v. *Ferguson*, 135 Ky. 32, 34, 121 S. W. 967, 968 (1909); F. Byrne, False Pretenses and Cheats §II(7), in 12 American and English Encyclopaedia of Law 835 (D. Garland, L. McGehee, & J. Cockcroft eds., 2d ed. 1899). And because "actual loss" need not "follow[,] . . . it [was] immaterial that goods given in an exchange secured by false pretenses were equal in value to those obtained." 1 E. McClain, Criminal Law §680, p. 686 (1897). Thus, if someone purchased "a picture upon the assertion untruly made that it was from the brush of some distinguished painter," the fact that "the picture was of value" would not relieve the seller of "the criminality of the false pretense." *Bartlett* v. *State*, 28 Ohio St. 669, 672 (1876). In such a case, the plaintiff had been "actually defrauded" even though she had not "suffered actual pecuniary loss." *In re Rudebeck*, 95 Wash. 433, 440, 163 P. 930, 933 (1917).

The Maine Supreme Court's decision in *State* v. *Mills* is illustrative. 17 Me. 211 (1840). There, a horse owner represented to a potential buyer that the horse "was called the Charley," even though "he knew that it was not the horse

---

[4] To be sure, some courts saw things differently. See 1 Black, Rescission of Contracts §112, at 312–313. But because Alpha and Kousisis must show that an economic-loss requirement "was 'well-settled' before the transplantation" of the term "fraud" into §1343, any divergence among courts further confirms that the old-soil principle does not apply. *Kemp* v. *United States*, 596 U. S. 528, 539 (2022).

called by that name." *Ibid.* (syllabus). Persuaded, the
buyer exchanged his "colt and five dollars in money" for the
horse. *Ibid.* But as the buyer soon learned, the horse was
not "the Charley," though the seller claimed that it "was as
good a horse" and "of equal or greater value" than the colt
and money. *Id.*, at 212. The court, overruling the defend-
ant's objections to the guilty verdict, explained that the
facts constituted "a case literally within" the false-
pretenses statute. *Id.*, at 218 (majority opinion). Obtaining
a conviction on false pretenses required proving simply
"that one of the pretenses [*sic*] was false, and that the in-
jured party was induced thereby to part with his property."
*Id.*, at 217.

Treating *Mills* as an outlier, Alpha and Kousisis argue
that common-law courts generally refused to entertain an
action for fraud if the victim had not been injured. In one
sense, they are correct: We have said that a fraud occurs
only when the victim "has been actually misled to his in-
jury." *Smith* v. *Richards*, 13 Pet. 26, 39 (1839); see also
*Clarke* v. *White*, 12 Pet. 178, 196 (1838) ("[A] mere fraudu-
lent intent, *unaccompanied by any injurious act*, is not the
subject of judicial cognizance" (emphasis added)). But peti-
tioners beg the question by assuming that economic loss
alone could satisfy this common-law "injury" requirement.
As the cases and treatises discussed above confirm, it was
the deception-induced deprivation of property—not eco-
nomic loss—that common-law courts generally deemed in-
jurious.[5] See *Stillwell* v. *Rankin*, 55 Mont. 130, 135, 174 P.

─────────

[5] JUSTICE GORSUCH understands us to have "spurn[ed] fraud's historic
injury rule." *Post*, at 2 (opinion concurring in part and concurring in
judgment). Respectfully, he is mistaken. All agree that "at common law,
fraud required proof that the victim was injured." *Ibid.* But as the Su-
preme Court of Pennsylvania put it in *Williams* v. *Kerr*, an "injury" has
occurred when a fraudster "obtain[s] from an owner, by a false represen-
tation of a fact which he deems material, property which he would not
otherwise have parted with upon the terms which he is thus induced to
accept." 152 Pa. 560, 565, 25 A. 618, 619 (1893); see also *MacLaren* v.

186, 187 (1918) (Courts "do not concern themselves with wrongs which do not produce injury; but 'injury' and 'pecuniary loss' are not synonymous terms"). Thus, *Mills* is no outlier.

That said, a different rule applied to the tort of deceit. To have a complete cause of action, the plaintiff must have "suffered substantial damage"; in other words, economic loss. Prosser & Keeton §110, at 765; see *Butler* v. *Watkins*, 13 Wall. 456, 464 (1872); *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U. S. 336, 343–344 (2005) (The common-law deceit action required a plaintiff to show "that he suffered actual economic loss"). So, returning to the modified facts introduced above, PennDOT could not have brought a tort claim for deceit unless Alpha and Kousisis's scheme had caused it economic loss. (Maybe PennDOT had passed over a less costly bid, for example, or restarted the bidding process at significant expense.)

Regardless, cases involving deceit are largely inapposite to the question presented here. Courts required economic loss not because it was inherent to the common-law understanding of fraud, but because a tort action for deceit

_____

*Cochran*, 44 Minn. 255, 258, 46 N. W. 408, 410 (1890) ("If a party is induced to enter into a contract by fraudulent representations as to a fact which he deems material, and upon which he has a right to rely, . . . the party in the wrong should not be heard to say that no real injury can result from the fact misrepresented"); *Carlisle* v. *State*, 76 Ala. 75, 77 (1884) ("The only injury that can be inflicted, 'by any false pretense or token,' by which one person 'obtains from another any money or other personal property,' is the deception which imposes on the confidence of that other"); 1 E. McClain, Criminal Law §680, p. 686 (1897) ("It is the obtaining of the money or property that is the perpetration of the fraud"). And in no sense is our recognition of this common-law definition mere "dicta." *Post*, at 10 (opinion of GORSUCH, J.). Rather, it is essential to our holding. To reject that pecuniary loss is an element of fraud is to accept—as common-law courts long have—that a fraud is complete when the defendant has induced the deprivation of money or property under materially false pretenses.

"sound[ed] in damage" and thus was designed to compensate a plaintiff for her economic loss. *United States* v. *Dunn*, 268 U. S. 121, 131 (1925); see G. McCleary, Damage as Requisite to Rescission for Misrepresentation, 36 Mich. L. Rev. 1, 17 (1937) (describing rescission and damages as "two entirely different approaches to the problem of relief for misrepresentation"). So it is no surprise that courts required deceit victims to "prove damage to establish a right to recover." *Dunn*, 268 U. S., at 131.

To summarize, then, common-law courts did not uniformly condition an action sounding in fraud on the plaintiff's ability to prove economic loss. More specifically, if the action was one for rescission or a prosecution for false pretenses, the plaintiff's required "injury" ordinarily need not be financial. That sounds the death knell for Alpha and Kousisis's reliance on the common law. The old-soil principle does not apply in the absence of a well-settled rule. *Kemp*, 596 U. S., at 539. In *Pasquantino* v. *United States*, for example, we refused to read "the wire fraud statute to except frauds directed at evading foreign taxes" because the relevant common-law rule did not "clearly ba[r] such a prosecution." 544 U. S. 349, 359–360 (2005). So too here: The common law did not establish a generally applicable rule that all fraud plaintiffs must plead and prove economic loss, so we will not read such a requirement into the wire fraud statute.[6] See *id.*, at 364.

_____

[6] JUSTICE GORSUCH's proposed injury requirement suffers from much the same problem. He relies primarily on cases that involve other elements of common-law fraud—namely, falsity and intent to defraud. See *post*, at 4 (opinion concurring in part and concurring in judgment) (citing *State* v. *Casperson*, 71 Utah 68, 75, 262 P. 294, 296 (1927) (falsity); *State* v. *Asher*, 50 Ark. 427, 430–431, 8 S. W. 177, 178 (1888) (falsity); *Rex* v. *Williams*, 7 Car. & P. 354, 173 Eng. Rep. 158 (N. P. 1836) (Coleridge, J.) (intent to defraud); *People* v. *Baker*, 96 N. Y. 340, 347–348 (1884) (intent to defraud); *People* v. *Wakely*, 62 Mich. 297, 300–303, 28 N. W. 871, 872–873 (1886) (both)). And as for *State* v. *Palmer*, 50 Kan. 318, 32 P. 29 (1893), even the Kansas Supreme Court has said that it "did not define

3

Even Alpha and Kousisis concede that the common law did not require economic loss in every case. As they acknowledge, if a plaintiff was "delivered something different from what was promised"—even something of equivalent value—or if the bargain "involv[ed] an item with unique qualities," then "failing to deliver as promised might constitute property fraud." Reply Brief 15. When pressed at oral argument, petitioners referred to these scenarios as "the exception." Tr. of Oral Arg. 10. But a few examples reveal just how easily such an "exception" swallows the rule. If someone contracts for a painting of her grandfather and instead winds up with a portrait of Grover Cleveland, petitioners' so-called "exception" concededly applies. *Id.*, at 9–11. So too if a supplier promises "apples" but instead delivers "oranges." Reply Brief 15. But if these two examples fit the exception, why not a heap of coal worth a million dollars instead of a gold bar worth the same? Tr. of Oral Arg. 28–30. Or, more to the point, why not services performed with materials from a non-disadvantaged supplier when the government demanded a disadvantaged one? Petitioners offer no principled way to draw the line.

And there is none, because at the right level of specificity, *anything* can be described as "unique" or "different from" something else. After all, "animal," "horse," "sound horse," and "the horse called the Charley" are all accurate descriptions of the bargained-for property in *Mills.* 17 Me., at 212, 216. Only the most specific of those descriptions, "the horse

---

'injury.'" *State* v. *Schultz*, 252 Kan. 819, 848, 850 P. 2d 818, 837 (1993). JUSTICE GORSUCH also points to a series of cases from the courts of appeals. See *post*, at 5 (opinion concurring in part and concurring in judgment). But because these cases postdate the enactment of the wire fraud statute (many by several decades), any rule they articulate—even assuming it is a coherent one—cannot possibly satisfy the old-soil principle. Thus, JUSTICE GORSUCH's injury requirement rests not on "'well-settled'" soil, but on shifting sands. *Kemp*, 596 U. S., at 539.

called the Charley," distinguishes the property promised from the property received, yet the court still had no trouble labeling the case as one of "false pretense [*sic*], fraudulently made." *Id*., at 218.

Tellingly, Alpha and Kousisis identify no source of authority that supports treating uniqueness as some kind of exception to the no-loss-required rule. That is probably because the common law has long embraced a different standard—namely, materiality—as the principled basis for distinguishing everyday misstatements from actionable fraud. Whether in tort or contract law, "materiality look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Services*, 579 U. S., at 193 (internal quotation marks omitted; alteration in original). Resembling a but-for standard, materiality asks whether the misrepresentation "constitut[ed] an inducement or motive" to enter into a transaction. *Smith*, 13 Pet., at 39. Or, as we explained in *Universal Health Services*, a misrepresentation is material if a reasonable person would attach importance to it in deciding how to proceed, or if the defendant knew (or should have known) that the recipient would likely deem it important. 579 U. S., at 193 (citing Restatement (Second) of Torts §538 (1976); Restatement (Second) of Contracts §162(2) (1979)).[7]

Before us, the parties debate the details of the materiality standard for purposes of §1343. For their part, Alpha and Kousisis direct us to the common-law test just described— what they call "the traditional materiality test." Reply

_____

[7] While JUSTICE GORSUCH is right to note that assessing whether a misrepresentation is material "will not always be simple," *post*, at 9 (opinion concurring in part and concurring in judgment), he overlooks that "materiality is judged according to an objective standard," *Amgen Inc.* v. *Connecticut Retirement Plans and Trust Funds*, 568 U. S. 455, 459 (2013). That is not true of his proposed injury requirement. As "the horse called the Charley" example illustrates, whether a victim "'got *exactly* what he paid for'" will often lie in the eye of the beholder. *Post*, at 6 (opinion of GORSUCH, J.) (emphasis added).

Brief 18–21. The Government, by contrast, proposes an
essence-of-the-bargain test, under which a misrepresenta-
tion is material only if it goes "'to the very essence'" of the
parties' "'bargain.'" *Universal Health Services*, 579 U. S.,
at 194, n. 5 (quoting *Junius Constr. Corp.* v. *Cohen*, 257
N. Y. 393, 400, 178 N. E. 672, 674 (1931)); see Brief for
United States 43–45. We need not settle the debate here,
however, because Alpha and Kousisis have not contested
that their misrepresentations were material. For now, it is
enough to reiterate "that materiality of falsehood is an
element of"—and thus a limit on—the federal fraud stat-
utes. *Neder*, 527 U. S., at 25. A conviction premised on the
fraudulent-inducement theory cannot be sustained without
it.

## B

Petitioners insist that our precedent forecloses the
fraudulent-inducement theory, but they are wrong: We
have twice *rejected* the argument that a fraud conviction
depends on economic loss. We did so first in *Carpenter* v.
*United States*, a case in which the defendants had repeat-
edly leaked the contents of a newspaper's investment col-
umn. 484 U. S. 19, 23 (1987). Although the scheme did not
cause the newspaper "monetary loss," it was sufficient, we
held, that the newspaper "ha[d] been deprived of its right
to exclusive use" of its proprietary information. *Id.*, at 26.
Then, in *Shaw* v. *United States*, we affirmed a conviction
under the bank fraud statute even though "no bank in-
volved in the scheme" had "suffered any monetary loss."
580 U. S. 63, 67 (2016). The statute, we explained, "de-
mands neither a showing of ultimate financial loss nor a
showing of intent to cause financial loss." *Ibid.*

Still, Alpha and Kousisis contend that the fraudulent-
inducement theory is at odds with other aspects of our prec-
edent. First, they argue that it permits a fraud conviction
premised on mere interference with "the State's 'sovereign

power to regulate.'" *Kelly*, 590 U. S., at 401 (quoting *Cleveland*, 531 U. S., at 23). Not so. No matter the underlying theory of fraud, §1343 requires that "money or property" have been an object of the fraudster's scheme. See 590 U. S., at 393. So if the scheme is one to alter the exercise of regulatory power—say, by tricking the Government into handing over a gaming license—the fraudulent-inducement theory has no role to play. See *Cleveland*, 531 U. S., at 23–24. But if, as here, the fraudster seeks to induce the Government into a transfer of its money or property, that loss is sufficient to sustain a fraud conviction. The loss is not, as petitioners argue, a mere "incidental byproduct" of a scheme to manipulate the exercise of regulatory power. *Kelly*, 590 U. S., at 403. If anything, the inverse is typically true: In the mine run of fraudulent-inducement schemes, undermining the Government's regulatory interests is merely "an incidental (even if foreseen) byproduct" of obtaining its money or property. See *ibid.* Here, for example, Alpha and Kousisis had money in mind. Nothing suggests that they concocted their scheme with the goal of thwarting PennDOT's disadvantaged-business initiative. Such a result was downstream of their "object" to line their pockets. *Ibid.*; see also 82 F. 4th, at 240.

The money-or-property requirement also explains why the fraudulent-inducement theory does not, as petitioners maintain, "collapse Congress's distinction" between the wire fraud statute and the statutes that prohibit conspiracies to defraud the United States, see 18 U. S. C. §371, and false or fraudulent statements in federal matters, see §1001. Brief for Petitioners 27. Because these latter statutes are not limited to schemes to "obtai[n] money or property," they extend beyond what the fraudulent-inducement theory can reach. §1343. See *United States* v. *Ressam*, 553 U. S. 272, 274 (2008) (describing a conviction under §1001 for making "false statements to a customs official" to obtain entry into the United States). Thus, fraudulent inducement

cannot convert every lie punishable under §371 and §1001
into a fraud offense subject to a possible 20-year sentence.

Nor does the theory undermine our precedent holding
that—aside from the honest-services exception—§1343
does not "protect intangible interests unconnected to tradi-
tional property rights." *Ciminelli*, 598 U. S., at 312. As al-
ready discussed, a defendant commits wire fraud only if his
scheme "aimed to deprive" the victim of a traditional prop-
erty interest. *Kelly*, 590 U. S., at 400; see also *Ciminelli*,
598 U. S., at 309. If the scheme instead targeted some kind
of intangible interest—for example, a citizen's interest in
"impartial government"—the fraudulent-inducement the-
ory is inapplicable. *McNally*, 483 U. S., at 355.

Finally, the fraudulent-inducement theory is not a "re-
packag[ing]" of the right-to-control theory. Reply Brief 11.
In *Ciminelli*, we rejected the latter theory, which maintains
that the term "'property' in §1343" includes "'the right to
control the use of one's assets.'" 598 U. S., at 311. Accord-
ing to this strained definition of "property," a defendant vi-
olates §1343 simply by "schem[ing] to deprive a victim of
potentially valuable economic information necessary to
make discretionary economic decisions." *Id.*, at 310. Such
a scheme, we held, does not implicate any "traditional prop-
erty interes[t]." *Id.*, at 316.

Unlike the right-to-control theory, fraudulent induce-
ment does not treat "mere information as the protected in-
terest." *Id.*, at 315. Rather, it protects money and property.
And nothing we said in *Ciminelli* is at odds with our holding
here. Although the Government urged us to affirm Ci-
minelli's conviction on an alternative ground—namely, the
fraudulent-inducement theory—we declined to do so be-
cause it would have required us "to assume not only the
function of a court of first view, but also of a jury." *Id.*, at
317. We did not discuss, much less reject, the fraudulent-
inducement theory. See *id.*, at 317–318 (ALITO, J., concur-

ring) (observing that the Court had not addressed "the Government's ability to retry petitioner" on this theory).

## III

Alpha and Kousisis warn of the consequences that will ensue if we endorse the fraudulent-inducement theory. "Under the theory," they say, "every intentional misrepresentation designed to induce someone to transact in property would constitute property fraud." Brief for Petitioners 40. In their view, this result threatens fair notice and, by encroaching into States' police powers, runs headlong into principles of federalism. *Id.*, at 38–39.

We are not persuaded. The "demanding" materiality requirement substantially narrows the universe of actionable misrepresentations. *Universal Health Services*, 579 U. S., at 194. And the boundaries of the fraudulent-inducement theory are not so imprecise as to risk encroachment on States' authority or to "create traps" for the "unwary." *Snyder* v. *United States*, 603 U. S. 1, 15 (2024). Rather, the theory criminalizes a particular species of fraud: intentionally lying to induce a victim into a transaction that will cost her money or property. As Judge Learned Hand put it, "[a] man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value." *United States* v. *Rowe*, 56 F. 2d 747, 749 (CA2 1932).

The "language of the wire fraud statute" is undeniably "broad." *Pasquantino*, 544 U. S., at 372. But Congress enacted the wire fraud statute, and it is up to Congress—if it so chooses—to change it.

\*     \*     \*

Fraudulent inducement "has long been considered a species of actionable fraud." *United States* v. *Feldman*, 931 F. 3d 1245, 1270 (CA11 2019) (Pryor, J., concurring). Because the Third Circuit's judgment comports with §1343,

we affirm it.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–909

_____

## STAMATIOS KOUSISIS, ET AL., PETITIONERS v. UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[May 22, 2025]

JUSTICE THOMAS, concurring.

Petitioners Stamatios Kousisis and Alpha Painting and Construction Co., Inc., ask the Court to add an economic-loss requirement to the federal wire-fraud statute, 18 U. S. C. §1343. The Court correctly rejects that request, and I join its opinion in full.

I write separately to address an issue that the Court reserves: whether petitioners' misstatements were "material," and thus actionable, under §1343. When the Government prosecutes a defendant for wire fraud under a theory of fraudulent inducement, the requirement of "materiality" provides "the principled basis for distinguishing everyday misstatements from actionable fraud." *Ante,* at 15. Because petitioners "have not contested that their misrepresentations were material," the Court has no occasion to pass on that issue today. *Ante,* at 16. But, I am skeptical that petitioners' misrepresentations were material.

## I

Petitioners entered into contracts with the Pennsylvania Department of Transportation (PennDOT) for the restoration of two Philadelphia properties, the Girard Point Bridge and the 30th Street Station. The purpose of the Girard Point Bridge contract was the "preservation of the Girard Point Bridge." App. 108. The 30th Street Station contract

had a similar goal: the "[r]ehabilitation of bridges." *Id.*, at
169. To achieve these goals, the contracts required paint-
ing, structural steel repairs, roadway reconstruction, and
other miscellaneous construction projects.

The contracts for these two jobs totaled more than a thou-
sand pages and imposed numerous regulatory, technical,
and ethical obligations. Among other things, the agree-
ments required petitioners to abide by the Workmen's Com-
pensation Act of 1915; to follow specific "Buy America Pro-
visions" that required petitioners to use steel and iron
manufactured in the United States; to generally avoid us-
ing "materials produced by convict labor"; and to "not dis-
criminate on the basis of race, color, national origin or sex."
See, *e.g.*, App. 112, 114, 117–119, 173, 175.

The contracts also required petitioners to "carry out ap-
plicable requirements of 49 C.F.R. Part 26," *id.*, at 114, 175
(emphasis deleted), which implements the Federal Govern-
ment's Disadvantaged Business Enterprise (DBE) pro-
gram. The DBE program is the Government's "most far-
reaching federal status-based contracting program." D.
Bernstein, The Modern American Law of Race, 94 S. Cal. L.
Rev. 171, 208 (2021) (Bernstein). Established in 1983, it
sets a goal that at least 10 percent of federal funds author-
ized for any highway and transit program "be expended
with small business concerns owned and controlled by so-
cially and economically disadvantaged individuals." Sur-
face Transportation Assistance Act of 1982, 96 Stat. 2100.
Under Department of Transportation (DOT) regulations, a
small business qualifies as a so-called DBE if it is "at least
51 percent owned by one or more individuals who are both
socially and economically disadvantaged," and managed
and controlled "by one or more of the socially and economi-
cally disadvantaged individuals who own it." 49 CFR §26.5
(2024).

DOT defines the term "socially and economically disad-

vantaged" primarily on the basis of race and sex. The program "rebuttably presume[s]" that any member of certain enumerated races "has been subjected to racial or ethnic prejudice or cultural bias within American society because of his or her identity as a member of a group," and thus qualifies as a "socially and economically disadvantaged individual." *Ibid.* Among the groups presumptively eligible for DBE benefits are "'Black Americans,'" "'Hispanic Americans,'" "'Native Americans,'" "'Asian-Pacific Americans,'" and "'Subcontinent Asian Americans.'" *Ibid.* The DBE program also provides this favorable presumption to women. *Ibid.* DBE certifiers "may not question claims of group membership as a matter of course." §26.67(a)(3). Thus, "[i]n practice, being certified as a 'minority' to get presumptive status as the owner of a disadvantaged business eligible for preferences primarily operates on the honor code, as the information is rarely verified." Bernstein 223.

While those excluded from DOT's list of presumptively disadvantaged groups may "attempt to prove" sufficient disadvantage, §26.67(d)(1), the application process is "a high hurdle," *Mid-America Milling Co., LLC* v. *United States Dept. of Transp.*, 2024 WL 4267183, *9 (ED Ky., Sept. 23, 2024). For example, "[a] White male claiming to have experienced employment discrimination" must submit a detailed "Personal Narrative" providing evidence that "his employment status and/or limited opportunities to earn income result from specific prejudicial acts directed at him personally because of an [objective distinguishing feature]." §26.67(d).

PennDOT incorporated DBE goals into both contracts at issue in this case, and, as the majority explains, petitioners misrepresented their compliance with those provisions. See *ante,* at 3. The Government prosecuted petitioners under 18 U. S. C. §1343, alleging fraudulent inducement. *Ante,* at 1. The jury convicted, and petitioner Kousisis was sentenced to nearly six years in prison.

## II

Although the Court leaves the question of materiality for another day because it was uncontested here, *ante,* at 15–16, materiality is an element that the Government must satisfy in any federal wire-fraud prosecution.  See *Neder* v. *United States*, 527 U. S. 1, 25 (1999).  The Government argues that the standard for materiality in this context is the one this Court articulated in *Universal Health Services, Inc.* v. *United States ex rel. Escobar*, 579 U. S. 176 (2016)—whether a misrepresentation went to the very "'essence of the bargain,'" Brief for United States 43 (quoting *Universal Health Services*, 579 U. S., at 194, n. 5).  I seriously doubt that the DBE provisions can meet this standard.

### A

*Universal Health Services* presented the question whether "a defendant should face False Claims Act liability only if it fails to disclose the violation of a contractual, statutory, or regulatory provision that the Government expressly designated a condition of payment."  *Id.*, at 190.  While we rejected that limitation, we stressed that "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable" under the False Claims Act (FCA).  *Id.*, at 192.

We further observed that, "[u]nder any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'"  *Id.*, at 193 (quoting 26 R. Lord, Williston on Contracts §69:12, p. 549 (4th ed. 2003) (Williston)).  In contracting specifically, "'[a] misrepresentation is material' only if it would 'likely . . . induce a reasonable person to manifest his assent,' or the defendant 'knows that for some special reason [the representation] is likely to induce the particular recipient to manifest his assent' to the transaction."  579 U. S., at 193 (quoting Restatement (Second) of Contracts

§162(2), and Comment *c*, pp. 439, 441 (1979)). Thus, we explained, for a contract term to be material, it must go to "'the very essence of the bargain.'" 579 U. S., at 194, n. 5 (quoting *Junius Constr. Co.* v. *Cohen*, 257 N. Y. 393, 400, 178 N. E. 672, 674 (1931)); see also 23 Williston §63:3, p. 483 (4th ed. 2018) (materiality "'go[es] to the root'" of the parties' agreement, and "touches the fundamental purpose of the contract").

This materiality inquiry does not rest solely on a contract's labels. Even in the face of contrary contract language, materiality "cannot be found where noncompliance is minor or insubstantial." *Universal Health Services*, 579 U. S., at 194. A party's actions may reveal that a contract term is not material even if the contract's language would suggest otherwise. For example, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in its position, that is strong evidence that the requirements are not material." *Id.*, at 195.

Applying these "familiar and rigorous" principles, *ibid.*, n. 6, we made clear that regulatory requirements in a contract are not automatically material. We thus rejected the Government's contention that, if it "contracts for health services and adds a requirement that contractors buy American-made staplers, anyone who submits a claim for those services but fails to disclose its use of foreign staplers violates the False Claims Act." *Id.*, at 195–196. That logic would have meant that, "if the Government required contractors to aver their compliance with the entire U. S. Code and Code of Federal Regulations, . . . failing to mention noncompliance with any of those requirements would always be material." *Id.*, at 196. The FCA, we explained, "does not adopt such an extraordinarily expansive view of liability." *Ibid.*[1]

_____

[1] In my view, the Court's reluctance to presume the materiality of every

The Court reserved the question whether the standard for materiality in the FCA context is identical to the standard that applies to wire-fraud prosecutions, *id.*, at 192–193, and I express no definitive view on that question here. But, the standard we articulated in *Universal Health Services* was a "familiar" one that aligned with authoritative treatises and the common law. *Id.*, at 195, n. 6. And, particularly in light of the Government's endorsement, see Brief for United States 43, it, at minimum, provides a useful baseline for evaluating the DBE provisions' materiality.

B

The contracts in this case were for bridge repairs, not minority hiring. There are several reasons to think that the DBE provisions did not go "'to the very essence of the bargain.'" *Universal Health Services*, 579 U. S., at 194, n. 5.

*First*, the DBE provisions were irrelevant to the contracts' fundamental purpose—bridge repair—which suggests that they were the sort of "minor or insubstantial" conditions that cannot count as material. *Id.*, at 194. As the Third Circuit recognized below, although petitioners

―――――――――

contract provision is particularly appropriate in the context of Government contracting. The Government often tries to use monetary incentives to advance political objectives. For example, the Government sometimes seeks to use its spending power to "create incentives for States to act in accordance with federal policies." *National Federation of Independent Business* v. *Sebelius*, 567 U. S. 519, 577 (2012) (plurality opinion). And, those policies may bear little relation to the expenditure of federal funds. See, *e.g.*, *South Dakota* v. *Dole*, 483 U. S. 203, 218 (1987) (O'Connor, J., dissenting) (arguing that "a condition that a State will raise its drinking age to 21" exceeded the Government's spending power because it could not "fairly be said to be reasonably related to the expenditure of funds for highway construction"). In Government contracting, the Government's inclusion of political or regulatory requirements unrelated to the contracts' core purpose might simply reflect the Government's attempt to achieve policy goals by leveraging its unmatched bargaining position. The DBE provisions' apparent irrelevance to bridge repair seems to fit this pattern. See *infra* this page and 7.

did not meet PennDOT's DBE conditions, they "delivered the requested work, and the quality of the workmanship and materials [was] uncontested."  82 F. 4th 230, 244 (2023).

If the DBE conditions "'went to the very essence of the [parties'] bargain,'" *Universal Health Services*, 579 U. S., at 194, n. 5, the failure to meet those conditions presumably would have had *some* impact on the final work product.  Accord, *e.g.*, *Cohen*, 257 N. Y., at 400, 178 N. E., at 674 (describing term that goes to an agreement's "essence" as one which, if not met, would "destroy the [agreement's] value"); *3511 13th St. Tenants' Assn.* v. *3511 13th St., N. W. Residences, LLC*, 922 A. 2d 439, 445 (D. C. 2007) ("'For a breach to be material, it must be so serious [as] to destroy the essential object of the agreement'").  But, the DBE conditions had no bearing on petitioners' ability to complete their projects.  See 82 F. 4th, at 244.  That disconnect tends to support the conclusion that those requirements would not meet the "demanding" materiality standard this Court has articulated.  *Universal Health Services*, 579 U. S., at 194; accord, *e.g.*, *Landmark Health Solutions, LLC* v. *Not For Profit Hospital Corp.*, 950 F. Supp. 2d 130, 137–138 (DC 2013) ("[C]ompl[iance] with the District's requirement to be registered and to obtain a license" did not go to "the essential purpose" of a contract for "providing management consulting and staffing services").

*Second*, the DBE provisions appear to have been less important than contract terms going to the quality and timeliness of bridge repair, further indicating that the latter went to the essence of the parties' bargain while the former did not.  The contracts required PennDOT to deduct payments due petitioners if the "work . . . on th[e] project[s]" was late or unsatisfactory.  App. 109, 170.  While the contracts labeled the failure to comply with the DBE provisions "a material breach" that "*may* result in termination," *id.*, at

114, 175 (emphasis added), nothing in the contracts re-
quired PennDOT to take any action, let alone to withhold
or deduct payment. Accord, Brief for United States 19
(DBE noncompliance "*could* have resulted in corrective ac-
tion" (emphasis added)).

As we explained in *Universal Health Services*, while "the
Government's decision to expressly identify a provision as
a condition of payment" is not dispositive of materiality, it
is still relevant evidence that tends to suggest that a par-
ticular term is material. 579 U. S., at 194. Tethering pay-
ment to workmanship and timeliness requirements sug-
gests that the essence of the parties' contracts was timely
and satisfactory "work . . . on th[e] project[s]"—that is,
"painting, structural steel repairs, expansion dam repairs,
latex modified concrete overlay, and other miscellaneous
construction," or, more generally, the "[r]ehabilitation of
bridges," App. 108–109, 169–170. Read "with reference to
the whole" contract, 11 Williston §32:5, p. 692 (4th ed.
2012), the comparative absence of any such express condi-
tions for DBE noncompliance counsels against reading
those provisions into the contract's "fundamental purpose,"
23 *id.*, §63:3, at 483.

*Third*, we have explained that the Government's decision
to fulfill its end of a bargain "despite actual knowledge that
certain requirements were violated" is very "strong evi-
dence that those requirements are not material," *Universal
Health Services*, 579 U. S., at 195, and similar logic might
apply where, as here, contract violations are notorious and
widespread. No one contends that the Government had "ac-
tual knowledge" of petitioners' fraud when it entered into
the contracts. *Ibid.* But, if DBE fraud is so prevalent that
the Government would have to assume a significant num-
ber of its contractors violate contract provisions requiring
DBE compliance, that fact could cast further doubt on those
provisions' materiality.

Reports of fraud in the Government's small-business-

contracting programs have "emerge[d] with some regularity," making fraud in these programs "a perennial concern for Congress and commentators." Congressional Research Service, K. Manuel & E. Lunder, Federal Contracting and Subcontracting With Small Businesses: Issues in the 112th Congress 33 (2012). The DBE program is no exception: Fraudulent DBE schemes where minority and women contractors are used as "'false front[s]'" is "an area with serious enforcement and compliance problems that appears to be nationwide in scope." Oversight Hearing on the Elimination of Waste, Fraud, and Abuse in Mandatory Transportation Programs before the House Committee on Transportation and Infrastructure, 108th Cong., 1st Sess., 109 (2003) (Oversight Hearing). Legislators have long recognized that DBE fraud is a substantial problem, and that "people are just laughing about the system" and "gaming the system blatantly." *Id.*, at 38–39; see also *id.*, at 36 (DOT Inspector General testifying that DBE fraud "is a serious problem").

Looking at materiality "from the viewpoint of the [allegedly misleading statement's] maker," Restatement (Second) of Contracts §162, Comment *c*, at 441, knowledge of rampant misrepresentations in the DBE program could suggest to a reasonable contractor that, contract language notwithstanding, the Government does not actually consider DBE compliance essential to its contracts. Pervasive fraud also suggests that the Government may be continuing performance on its contracts despite knowing that its counterparties frequently violate DBE requirements, further counseling against those terms' materiality. See *Universal Health Services*, 579 U. S., at 193–194, n. 5, 195.[2]

───────────

[2] JUSTICE SOTOMAYOR observes that "[n]o cited portion of the record" shows that PennDOT paid contracts in full despite actual knowledge that the DBE terms were being violated. *Post*, at 7 (opinion concurring in judgment). I have recognized as much, see *supra*, at 8, which is why I suggest that my materiality analysis might apply in different DBE-compliance prosecutions "where materiality is contested," *infra*, at 11.

*Fourth*, if complying with the DBE provisions would violate the law, it is difficult to see how representing such compliance "would be likely to induce a reasonable person to manifest his assent." Restatement (Second) of Contracts §162, Comment *c*, at 441. Among other things, the DBE program imposes an explicitly race-based classification system, see *supra*, at 2–3, which warrants "the strictest judicial scrutiny," *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 224 (1995). Thus, for the program to survive, the Government would need to prove that it addresses "past governmental discrimination" that is "concrete and traceable to the *de jure* segregated system," and that the segregated system has "discrete and continuing discriminatory effect." *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 260 (2023) (THOMAS, J., concurring).

I am skeptical that the Government could meet this high bar. While the Government has not been put to the test in this case, it appears to have elsewhere endorsed the DBE program's race-based benefits on the ground that "minorities represent more than 20% of the population" yet "own only 9% of all construction firms and receive only about 5% of construction receipts." Oversight Hearing, at 41. But, "'[p]roving broad sociological propositions by statistics is a dubious business, and one that inevitably is in tension with the normative philosophy that underlies the Equal Protection Clause.'" *Lamprecht* v. *FCC*, 958 F. 2d 382, 398 (CADC 1992) (THOMAS, Cir. J., for the court) (quoting *Craig* v.

───────────

For similar reasons, JUSTICE SOTOMAYOR's critique of "reports from decades prior" misses the mark. *Post*, at 7. The reports and testimony I cite provide examples suggesting that, in other DBE-compliance prosecutions, defendants may be able to build records demonstrating that the Government pays contractors despite knowing that they do not comply with DBE provisions. JUSTICE SOTOMAYOR does not dispute that, if presented, such records would constitute "strong evidence that [DBE] requirements are not material." *Universal Health Services*, 579 U. S., at 195.

*Boren*, 429 U. S. 190, 204 (1976)). And, at least one court
has preliminarily enjoined the Government's use of DBE
goals because the Government could not "justify [the DBE
program's] discriminatory policies." *Mid-America Milling
Co.*, 2024 WL 4267183, *11.

It is implausible to think that a "'reasonable person'"
would "'attach importance'" to contract provisions that
mandate constitutional violations. *Universal Health Ser-
vices*, 579 U. S., at 193, n. 5. The same intuition applies to
Government actors. Cf. *Postal Service* v. *Gregory*, 534 U. S.
1, 10 (2001) ("[A] presumption of regularity attaches to the
actions of Government agencies"). Thus, if the Government
cannot demonstrate the constitutionality of the DBE pro-
gram, I doubt that a provision requiring compliance with
the program could go to the essence of the parties' bar-
gain—particularly here, given that the very same provi-
sions requiring DBE compliance simultaneously prohibit
"discriminat[ion] on the basis of race, color, national origin
or sex." App. 114, 175.[3]

At bottom, the essence-of-the-bargain standard is rigor-
ous and context specific. Although the contracts in this case
used language suggesting the DBE provisions were mate-
rial, see *ibid.*, we have made clear that the materiality in-
quiry turns on substance rather than labels, see *Universal
Health Services*, 579 U. S., at 190. That focus may doom the
Government's prosecutions in DBE cases where materiality
is contested.

————————
[3] "[A] claim of unconstitutionality" will not "excuse a voluntary, delib-
erate and calculated course of fraud and deceit," *Dennis* v. *United States*,
384 U. S. 855, 867 (1966), but the question whether that unconstitution-
ality might contribute to materiality is distinct. No one disputes that
petitioners did not "rais[e] a challenge to the DBE program's constitu-
tionality." *Post*, at 8 (opinion of SOTOMAYOR, J.). But, had petitioners
done so, they might have been able to rely on the DBE provisions' uncon-
stitutionality to support an argument that the provisions were not "ma-
terial" to their contracts.

*        *        *

In persuading the Court to reject petitioners' economic-loss arguments today, the Government has assured us that "the 'essence of the bargain' standard for materiality" will ensure that federal wire-fraud prosecutions cannot be used to target benign, everyday misstatements. Brief for United States 43. Because a demanding approach to materiality is all that prevents an "extraordinarily expansive view of liability" from rendering the federal wire-fraud statute nearly limitless in scope, *Universal Health Services*, 579 U. S., at 196, lower courts should hold the Government to its word.

1

# SUPREME COURT OF THE UNITED STATES

—————

No. 23–909

—————

## STAMATIOS KOUSISIS, ET AL., PETITIONERS *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[May 22, 2025]

JUSTICE GORSUCH, concurring in part and concurring in the judgment.

This case touches on an old question: What is the difference between a lie and a criminal fraud? Consider an easy hypothetical. In a phone interview, a couple asks a prospective babysitter if she has a criminal record. The babysitter says no, but that's not right. While she has sought to turn her life around, a burglary conviction lurks in her past, one she is too embarrassed to mention. Relying on her misrepresentation, the parents hire the babysitter. Her work proves exemplary and the couple pays her well. Later, though, the parents discover the babysitter's lie. They might be upset and refuse to hire her again. But should the babysitter face federal fraud charges? Of course not. While "intentional deceit for purposes of gain ought sometimes to be punished," if all misrepresentations amounted to criminal fraud, "thousands of buyers and sellers" would be felons. T. Macaulay, J. Macleod, G. Anderson, & F. Millet, Notes on the Indian Penal Code (1837), in 7 The Life and Works of Lord Macaulay 527–528 (1897).

How do courts police the line between mere lies and criminal frauds warranting the law's attention? One important tool is fraud's injury requirement. To prove a criminal fraud, a prosecutor must show that the victim did not receive what the defendant promised. It is a rule that shields

people like our babysitter from the prosecutor's sights. And
it is a rule that keeps judges from becoming arbiters of good
morals. A fraud conviction can mean years, even decades,
in prison. Before a prosecutor may seek, and a court may
authorize, that kind of punishment, the law demands more
than a victimless lie.

While right about much else, the Court's decision today
contains a footnote that appears to spurn fraud's historic
injury rule. Under the federal wire-fraud statute, the Court
suggests, it does not matter if the putative victim receives
all he was promised. So long as he parts with any money
or property because of the defendant's misrepresentation,
the Court seems to say, that is injury enough to sustain a
federal wire-fraud conviction. *Ante*, at 11, n. 5. It is a star-
tling suggestion, one with no mooring in the common law of
fraud or the wire-fraud statute, and one that risks turning
victimless lies like our babysitter's into federal felonies. Re-
spectfully, that cannot be the law.

## I

The question presented in this case is a narrow one. The
parties ask us to resolve whether the federal wire-fraud
statute, 18 U. S. C. §1343, requires the government to plead
and prove that the defendant caused his victim a "net pecu-
niary loss." Brief for United States (I) (reciting the question
presented); *ante*, at 1–2. Today, the Court holds that the
answer is no. Congress, the Court explains, enacted the
federal wire-fraud statute against the backdrop of the com-
mon law. *Ante*, at 8. And, at common law, fraud required
proof that the victim was injured. *Ante*, at 11.[1] But that

---

[1] Countless cases and treatises support the Court's conclusion that
each of those common-law doctrines had an injury requirement. For the
crime of false pretenses, see *State* v. *Palmer*, 50 Kan. 318, 323–324, 32
P. 29, 30 (1893); *State* v. *Matthews*, 44 Kan. 596, 602–603, 25 P. 36, 38
(1890); *United States* v. *Rush*, 196 F. 579 (ED Wash. 1912); 2 Bishop on
Criminal Law §§415–417 (J. Zane & C. Zollman eds., 9th ed. 1923); 2 H.

injury requirement never demanded proof that the victim suffered a "net pecuniary loss." So, the Court concludes, neither does the federal wire-fraud statute. On each of those points, the Court and I agree.

But having dispatched the question presented, the Court does not stop there. Instead, the Court proceeds to assert that the wire-fraud statute's injury requirement is satisfied whenever a defendant "obtain[s] . . . property" that a victim "would not otherwise have parted with" by means of a material misrepresentation. *Ante*, at 11, n. 5. The Court's commentary on this score might be easy to miss. It comes only in a brief footnote deep in the Court's opinion. And on first glance, the Court's remarks might seem innocuous enough. After all, one might wonder, if a fraud causes a victim to part with money or property, isn't that necessarily an injury?

I worry, though, that initial appearances may deceive and the Court's stray footnote could portend trouble. Start with this difficulty: What the Court says in its footnote does not square with its reasoning above the line. Throughout the rest of its opinion, the Court recognizes that the wire-fraud statute's references to a "scheme or artifice to *defraud*" and "false or *fraudulent* pretenses," §1343 (emphasis added), bring with them the "old soil" of common-law fraud, *ante*, at 8. As a result, the common-law doctrines governing the crime of false pretenses, the tort of deceit, and the remedy of contractual rescission all inform, to one degree or another, the meaning of the wire-fraud statute. *Ante*, at 9–13. Yet, contrary to what the Court suggests in its footnote, at

───────────

Brill, Cyclopedia of Criminal Law §1271 (1923). For the remedy of contractual rescission, see *Williams* v. *Kerr*, 152 Pa. 560, 565, 25 A. 618, 619 (1893); *Spreckels* v. *Gorrill*, 152 Cal. 383, 388, 92 P. 1011, 1015 (1907); 1 H. Black, Rescission of Contracts and Cancellation of Written Instruments §37, p. 90 (1916); 2 T. Parsons, Law of Contracts *268–*269 (4th ed. 1860). And for the tort of deceit, see *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U. S. 336, 343–344 (2005).

common law "[t]he mere obtaining of money [or property] under false pretenses [did] not alone" satisfy fraud's injury requirement. *State* v. *Palmer*, 50 Kan. 318, 324, 32 P. 29, 30 (1893); accord, *State* v. *Casperson*, 71 Utah 68, 75, 262 P. 294, 296 (1927). Instead, common-law courts usually demanded proof that a defendant deprived his victim of "what he bargained for." *State* v. *Asher*, 50 Ark. 427, 430–431, 8 S. W. 177, 178 (1888). By the time Congress enacted the wire-fraud statute in 1952, it seems that "every American jurisdiction except Texas" had adopted a similar rule. Comment, Injury as an Element of Criminal Fraud, 23 U. Chi. L. Rev. 509, 511, and n. 7 (1956) (Injury as an Element).

Nor is the difference between the Court's formulation of fraud's injury requirement and the common-law rule a negligible one. To be sure, obtaining money or property by means of a material misrepresentation will usually injure the victim. But not always. To appreciate why, some examples help. Start with some from the common law. In *Rex* v. *Williams*, 7 Car. & P. 354, 173 Eng. Rep. 158 (N. P. 1836) (Coleridge, J.), a creditor seeking to satisfy a debt ordered his servant to induce the debtor to hand over "two sacks of malt" by falsely representing that "his master had bought [them]." *Ibid.* Even though the servant "knowingly stated that which was false," and his false statement was clearly material, his actions were not criminal because he merely intended to satisfy the debt, not to "defraud" the debtor. *Id.*, at 355, 173 Eng. Rep., at 158. When facing similar facts, a New York court later remarked that "it is difficult to see" how a victim "would be injured" when he is merely "cheated" into paying what he owed. *People* v. *Thomas*, 3 Hill 169, 170 (N. Y. Sup. Ct. 1842); accord, *People* v. *Baker*, 96 N. Y. 340, 347–348 (1884); *People* v. *Wakely*, 62 Mich. 297, 300–303, 28 N. W. 871, 872–873 (1886).

Contemporary examples under the federal wire-fraud statute illustrate the point, too. Imagine a bulk-mail com-

pany promises that it will use a "high-rate" service to de-
liver its customers' products, but the company actually
makes the deliveries "to the appropriate destination in a
timely fashion" using a cheaper service. *United States* v.
*Starr*, 816 F. 2d 94, 99–100 (CA2 1987). Doubtless, the
company's misrepresentations cause its customers to part
with their money. Even so, as the Second Circuit has rec-
ognized, the company's lies do not produce an injury be-
cause no "discrepancy [exists] between benefits 'reasonably
anticipated' and actual benefits received." *Id.*, at 99; accord,
*United States* v. *Regent Office Supply Co.*, 421 F. 2d 1174,
1179–1180 (1970). Or suppose an applicant fibs on his re-
sume about satisfying a condition of employment. He lands
the job and he completes the work exactly as promised. The
employee's lie induces the company to part with money (his
wages). But, as the D. C. Circuit has held, the employee's
lies do not injure the employer, because his "untruths do
not deprive the employer of the benefit of its bargain."
*United States* v. *Guertin*, 67 F. 4th 445, 451 (2023); accord,
*United States* v. *Takhalov*, 827 F. 3d 1307, 1313–1319
(CA11 2016); *United States* v. *Shellef*, 507 F. 3d 82, 108
(CA2 2007).[2]

_____

[2] Of course, the federal wire-fraud statute prohibits a "'scheme to de-
fraud,' rather than [a] completed fraud," so a defendant need not follow
through on his plan to commit an offense. *Neder* v. *United States*, 527
U. S. 1, 25 (1999). But, as the cases above recognize, the injury element
matters all the same. Modeled as it is after a common-law attempt of-
fense, the wire-fraud statute requires proof of a "specific intent to commit
the unlawful act." *Braxton* v. *United States*, 500 U. S. 344, 351, n. (1991);
see *United States* v. *Coffman*, 94 F. 3d 330, 333 (CA7 1996) (wire fraud
"punishes . . . the attempt to defraud"). So the government must prove
that a defendant's intended scheme, if completed, would have left the
victim without the benefit of the parties' bargain, for "it is not a criminal
attempt to try to do what the criminal law does not forbid you to do." *Id.*,
at 333. The same goes for other elements of traditional fraud, like rea-
sonable reliance and causation. Though the government need not prove
*actual* reliance or causation to secure a wire-fraud conviction, *Neder*, 527
U. S., at 25, it must prove that the defendant *intended* those results, see

As all these examples highlight, the traditional benefit-of-the-bargain injury rule is not some vestigial limb. It plays an important role in separating mere lies from criminal frauds and, in that way, reducing the risk of frivolous prosecutions. Just ask yourself, if a "putative victim of wire fraud got exactly what he paid for, how exactly is he a victim at all?" *United States* v. *Porat*, 76 F. 4th 213, 227 (CA3 2023) (Krause, J., concurring). And what business is it of the government's to punish victimless lies with prison time anyway?

The Court's footnote commentary thus is no small thing. By defying the traditional common-law rule, it risks turning prosecutors and courts into morality police with a commission to prosecute and punish harmless lies. Indeed, under the Court's novel approach, it is hard to see what would save our babysitter from a federal wire-fraud conviction. Just consider: She intentionally lied. She did so using the wires. Her lie is material because it would matter to reasonable parents that someone working in their home with their children has a felony burglary conviction. The parents reasonably relied on the babysitter's insistence that her record was clean. And they parted with money because of her lie. On the Court's account, all the elements of the offense seem to be satisfied, and the babysitter's fleeting misstatement may cost her up to 20 years in prison. The only way to ensure cases like our babysitter's don't become the domain of federal prosecutors and courts is to recognize what the common law has long recognized: Lies without injury are not criminal frauds.

## II

The Court's footnote grapples with none of these difficulties. Instead, to support its suggestion that the loss of

---

ALI, Model Penal Code §5.01, Comment 2, p. 303 (1985) (attempt requires that a "defendant manifests a purpose . . . to cause the type of result that is forbidden by the criminal law").

money or property is always enough to establish an injury, the Court relies primarily on a decision from the Supreme Court of Pennsylvania. *Ante*, at 11–12, n. 5 (citing *Williams* v. *Kerr*, 152 Pa. 560, 565, 25 A. 618, 619 (1893)). But even that case does not stand for anything like the rule the Court imagines.

In truth, *Williams* had no occasion to depart from the traditional injury rule. There, the defendant induced his victims to sell half their land by misrepresenting his plans to improve the lot—plans that (if true) would have "greatly enhance[d] the value" of the victims' remaining share. *Id.*, at 564, 25 A., at 619. Because the planned improvements turned out to be a fiction, the defendant failed to deliver what the sellers bargained for. Notably, too, *Williams*'s articulation of the injury rule is consistent with the traditional test. The court did not say that obtaining money or property by means of a material misrepresentation is always enough. Instead, the court suggested, it would be an injury to obtain money or property upon "*terms*" that the victim would not otherwise "accept." *Ibid.* (emphasis added). And lying to get more favorable terms will often involve depriving a victim of "what was pretended and what he bargained for." *Casperson*, 71 Utah, at 75, 262 P., at 296.

The Court's remaining common-law authorities are no more helpful to its cause. Neither *MacLaren* v. *Cochran*, 44 Minn. 255, 258, 46 N. W. 408, 409 (1890), nor *Carlisle* v. *State*, 76 Ala. 75, 77 (1884), mentions the money-or-property injury requirement the Court adopts. Meanwhile, the Court's treatise supports a discussion of fraud's injury element by citing a case endorsing the traditional rule that those who "obtai[n] all . . . they expected to obtain" are "not cheated or defrauded." *State* v. *Matthews*, 44 Kan. 596, 606, 25 P. 36, 40 (1890) (cited in 1 E. McClain, Criminal Law

§680, p. 686 (1897)).[3]

Not only do the Court's common-law authorities fail to support its view about the nature of fraud's injury requirement. Nothing in the text of the wire-fraud statute does either. That statute prohibits using the wires to carry out "any scheme or artifice to defraud . . . for obtaining money or property." 18 U. S. C. §1343. As this Court has recognized, that language means a prosecutor must prove (1) the defendant "engage[d] in a 'scheme or artifice to defraud,'" and (2) the "'object of the fraud [was] "money or property" in the victim's hands.'" *Pasquantino* v. *United States*, 544 U. S. 349, 355 (2005) (quoting *Cleveland* v. *United States*, 531 U. S. 12, 26 (2000) (alteration omitted)). So even when a prosecutor is able to show that the defendant sought to obtain money or property, he must still make the further showing that the defendant intended a "scheme or artifice to defraud"—a phrase that everyone agrees imports the traditional elements of common-law fraud. See *ante*, at 8, 11. And, as we have seen, those elements include an injury requirement that is not satisfied when a putative victim receives the benefit of his bargain.

Left without common-law authority or statutory text to support its view, the Court seems to suggest that discarding the traditional injury rule at least might make for good policy. Though common-law courts have long asked whether

---

[3] Without common-law authority to support its view, the Court resorts to disparaging contrary authority on the ground that some common-law cases discuss the benefit-of-the-bargain rule as a product of fraud's intent or falsity elements, not its injury element. See *ante*, at 13, n. 6. But what does that prove? Only that common-law courts relied on various elements to enforce the benefit-of-the-bargain rule—not that courts rejected the requirement. It is unsurprising, too, that some courts considered injury in connection with the defendant's "intent to defraud." *Ibid.* After all, fraud can be prosecuted as an inchoate offense. So the government may secure a conviction by showing that a defendant intended all the elements of the completed crime, including injury and its benefit-of-the-bargain rule. *Supra*, at 5, n. 2; Injury as an Element 511, and n. 7.

the defendant "'delivered something different from what was promised,'" the argument appears to go, that test may be just too hard for today's judges. *Ante*, at 14. Instead, we are told, fraud's "materiality" element supplies a more "principled" and equally satisfactory way to distinguish mere lies from criminal fraud. *Ante*, at 15.

But that is no answer at all. A judicial preference for "principled" rules cannot displace what is and has long been the law. When we look to the old soil of the common law for guidance, we have no license to plow over what we find there. Nor is the Court correct that fraud's materiality element can shoulder all the work traditionally performed by its injury requirement. As this Court describes it, fraud's materiality element usually asks "if a reasonable person would attach importance to [the defendant's lie] in deciding how to proceed." *Ibid.* (citing *Universal Health Services, Inc.* v. *United States ex rel. Escobar*, 579 U. S. 176, 193 (2016)). And, as the examples above illustrate, our fallen world is filled with lies, even material ones, that do not warrant the attention of criminal authorities: creditors who lie to recover their debts from evasive debtors, employees who fib about their credentials to get jobs, and even babysitters who misrepresent their pasts. In all of those cases, a reasonable person would attach significance to the defendant's lie in deciding whether and how to proceed. In all of those cases, too, the lie is intentional, induces reasonable reliance, and causes someone to part with their money or property. Without the traditional injury requirement, every one of those cases gets swept into the prosecutor's dragnet.

Even taken on its own terms, the Court's argument is misguided. The common-law materiality element is no more "principled" than the traditional injury rule. *Ante*, at 15. Yes, the traditional injury rule may require courts to assess whether the defendant delivered what he promised, and answering that question will not always be simple. See

*ibid.* But the same holds true when it comes to the materiality element, where courts must decide whether a defendant misrepresented a "minor" (immaterial) term or an "essen[tial]" (material) one. *Universal Health Services, Inc.*, 579 U. S., at 193–194, and n. 5.

Take a prominent example in the Court's opinion. Suppose a defendant promises to deliver a "'horse called the Charley.'" *Ante*, at 15 (quoting *State* v. *Mills*, 17 Me. 211, 212 (1840)). That representation would be material if the parties' dealings reveal that a reasonable person in the buyer's shoes would care about the specific identity of the horse. But if those dealings indicate that, in the circumstances of a particular industry or transaction, a buyer would have been interested only in a horse of a particular kind and quality, the representation would not be material. When it comes to fraud's materiality element, no less than when it comes to fraud's injury element, details can matter, sometimes difficult lines must be drawn, and in drawing them courts may have to attend carefully to the circumstances surrounding the parties' dealing.[4]

If there is any good news when it comes to the Court's footnote, it may be this: That digression is dicta addressing

———————

[4] Nor, contrary to the Court's suggestion, is materiality a better option because it offers an "objective" standard. *Ante*, at 15, n. 7. The traditional test for injury, too, is an objective inquiry, asking whether "there exists a 'discrepancy between benefits *reasonably* anticipated'" based on all the parties dealings and the "actual benefits which the defendant delivered, or intended to deliver." *United States* v. *Starr*, 816 F. 2d 94, 98 (CA2 1987) (quoting *United States* v. *Regent Office Supply Co.*, 421 F. 2d 1174, 1182 (CA2 1970); emphasis added). Interestingly, the Court's proposal to cast aside fraud's traditional injury rule and to rely instead on fraud's materiality requirement is just the opposite of a proposal offered by the drafters of the Model Penal Code. They suggested abandoning the common-law materiality requirement altogether, even as they hewed to the traditional injury rule that it is not a criminal fraud to give a defendant "exactly what he bargained for." ALI, Model Penal Code §223.3, Comment †, pp. 180–181, 194 (1980). The Court's footnote does not pause to address why it would have us do exactly the reverse.

a question well "beyond the case." *Cohens* v. *Virginia*, 6
Wheat. 264, 399–400 (1821). Exactly nothing before us to-
day turns on whether wire fraud's injury requirement de-
mands proof that the victim did not receive the benefit of
his bargain or, instead, proof only that he parted with
money or property. Nor is adopting one rule over another a
necessary step toward the Court's holding that "pecuniary
loss" is not an "element of fraud." *Ante*, at 12, n. 5.

Just ask yourself: If the Court deleted its footnote, or re-
versed its position and endorsed the traditional injury rule,
would its conclusion on economic loss be any different? Of
course not. Under either view, Mr. Kousisis loses. He
loses because his lies induced the Pennsylvania Department of
Transportation to part with money when it paid him for the
building projects in question. And he loses because the de-
partment did not receive what it bargained for in return:
projects completed using "'socially and economically disad-
vantaged'" firms. *Ante*, at 2; see also *ante*, at 4. Because
Mr. Kousisis committed wire fraud under both the tradi-
tional injury rule and the Court's novel one, the Court's
"throwaway footnot[e]" makes no difference. *Royal Canin
U. S. A., Inc.* v. *Wullschleger*, 604 U. S. 22, 42–43 (2025).

Try as it might, the Court cannot "transmute dictum into
a decision by waving a wand and uttering the word 'hold.'"
*United States* v. *Rubin*, 609 F. 2d 51, 69, n. 2 (CA2 1979)
(Friendly, J., concurring). And nothing in today's decision
can bind this Court in a future case where the difference
between the two rules actually matters. See *Seminole Tribe
of Fla.* v. *Florida*, 517 U. S. 44, 66 (1996); *Loper Bright En-
terprises* v. *Raimondo*, 603 U. S. 369, 426 (2024) (GORSUCH,
J., concurring).

*

Over centuries of experience, common-law courts devel-
oped a variety of tools to sort venial lies from criminal
frauds. In a brief and unfortunate diversion in an otherwise

sound opinion, the Court casts doubt on whether one of those tools still applies under the federal wire-fraud statute. In the process, the Court needlessly risks turning the federal wire-fraud statute into a weapon for punishing victimless crimes. I can only trust that future courts will recognize that aside for what it is—unsound dicta.

# SUPREME COURT OF THE UNITED STATES

————

No. 23–909

————

## STAMATIOS KOUSISIS, ET AL., PETITIONERS *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[May 22, 2025]

JUSTICE SOTOMAYOR, concurring in the judgment.

The Court today rightly rejects petitioners' request to graft an economic-loss requirement onto the federal wire fraud statute. When a defendant tricks a victim out of their money by promising one thing and delivering something materially different, it is no defense to say that the delivered items are of equal economic value. Statutory text, precedent, and history mandate that conclusion, as the majority explains. See *ante,* at 7–16. Common sense, unsurprisingly, points in the same direction. A Yankees fan deceived into buying Mets tickets is no less defrauded simply because the Mets tickets happen to be worth the same amount as the promised Yankees ones. That straightforward conclusion is all that is necessary to resolve this case, and I would go no further. To the extent the majority appears to speak more broadly, I part ways from its approach.

## I

As the majority explains, this case turns on the wire fraud statute's property requirement, which limits the statute's reach to schemes "to defraud, or for obtaining money or property." 18 U. S. C. §1343. Although that phrase uses "disjunctive language," the Court has construed it as a "unitary whole." *Kelly* v. *United States*, 590 U. S. 391, 398

(2020) (citing §1343). That is because the "'common under-
standing' of the words 'to defraud' when the statute was en-
acted referred 'to wronging one in his property rights.'" *Ci-
minelli* v. *United States*, 598 U. S. 306, 312 (2023) (quoting
*Cleveland* v. *United States*, 531 U. S. 12, 19 (2000)). Accord-
ingly, even before Congress amended the statute to add the
phrase "or for obtaining money or property," the statute
criminalized "only schemes to deprive people of traditional
property interests." *Ciminelli*, 598 U. S., at 309; see also
*Cleveland*, 531 U. S., at 18–19 (recounting §1343's amend-
ment history).

Here, petitioners convinced the Pennsylvania Depart-
ment of Transportation (PennDOT) to hand over tens of
millions of dollars by lying about the nature of what they
were selling. Petitioners promised to provide PennDOT
with repair services that complied with the U. S. Depart-
ment of Transportation's Disadvantaged Business Enter-
prise (DBE) program. See 49 CFR §26.21 (2024). They rep-
resented to PennDOT that a qualified disadvantaged
business would provide painting services for the restoration
projects, as required by PennDOT's federal grant, and they
expressly memorialized that requirement as a "'material'"
term in their contracts. *Ante*, at 3 (majority opinion; quot-
ing App. 114, 175). Yet petitioners planned all along to
have nonqualified companies do the work, while the quali-
fied disadvantaged business that they promised to work
with served as a mere pass-through. *Ante,* at 3–4 (majority
opinion). To put it simply, petitioners devised a scheme to
trick PennDOT out of its money by promising one thing and
delivering something materially different.

Against that backdrop, petitioners' only viable theory as
to why PennDOT suffered no property loss hinges on their
economic-loss theory. No property harm occurs for pur-
poses of §1343, they argue, if the victim suffers no net pe-
cuniary loss. See Reply Brief 2, 8. According to petitioners,

that makes all the difference here because the repair ser-
vices petitioners provided to PennDOT were of equal mon-
etary value. *Id.,* at 8.

Rejecting petitioners' economic-loss theory therefore re-
solves this case, and I see no reason to go further. The
Court, after all, granted certiorari to address circuit divi-
sion on petitioners' proposed economic-loss requirement,
see *ante,* at 4–5 (majority opinion), and that is the question
presented by the facts of this case.

The Court therefore has no reason to opine on a class of
fraudulent-inducement cases distinct from this one: those
in which a defendant provides exactly the goods or services
that they promised to deliver, but lies in other ways to in-
duce the transaction. Cf. *ante,* at 2, 11 (GORSUCH, J., con-
curring in part and concurring in judgment). A wide array
of everyday transactional conduct might fall into that cate-
gory. Consider, for instance, a babysitter who lands a job
by fibbing about how she will use the money (for college sav-
ings, rather than a spring break trip), but otherwise fully
and satisfactorily takes care of the child; a used car sales-
man who closes a deal by falsely claiming another buyer is
coming to look at the car later that day, while truthfully
disclosing all the pertinent details about the car; or a pro-
spective housing developer who beats out competing bid-
ders by lying about wanting to raise a family in the home,
but pays the full amount of his bid. On the Government's
view, each of those cases may well give rise to federal fraud
liability, punishable by up to 20 years in prison, so long as
the jury deems the lie "material." See Tr. of Oral Arg. 64–
66; Brief for United States 44; 18 U. S. C. §1343.

Future cases presenting such fact patterns will require
the Court to confront the outer limits of the federal fraud
statute's reach and to decide what satisfies its materiality
element. Resolving this case, however, requires no such un-
dertaking. To the extent the majority discusses the viabil-
ity of the Government's fraudulent-inducement theory

more broadly, see, *e.g., ante,* at 6–8, 11–12, n. 5, I do not
endorse its approach. That discussion is not essential to the
Court's resolution of the dispute before us, and I see no rea-
son to proceed more broadly than necessary.

## II

This case presents only a narrow question in part because
petitioners have not contested the materiality of their mis-
representations. See *ante,* at 16 (majority opinion). That
concession makes good sense. There can be no real debate
that petitioners' misstatements were material. Contra,
*ante,* at 4–11 (THOMAS, J., concurring).

## A

Recall that the parties presented two competing articula-
tions of the materiality standard for the federal wire fraud
statute. See *ante,* at 16 (majority opinion). Petitioners di-
rect the Court to the "traditional" common-law test for ma-
teriality, Reply Brief 18, under which a representation is
material if "'a reasonable man would attach importance to
its existence or nonexistence in determining his choice of
action in the transaction in question,'" or "'the maker of the
representation knows or has reason to know that its recipi-
ent regards or is likely to regard the matter as important in
determining his choice of action,'" *Neder* v. *United States*,
527 U. S. 1, 22, n. 5 (1999) (quoting Restatement (Second)
of Torts §538 (1977)). Petitioners assert that, under their
formulation, representations need "'*not* go to [the] essence'"
of the transaction to qualify as material. Reply Brief 18
(quoting Restatement (Second) of Torts §551(2)(e), Com-
ment *j*). Counterintuitively, it is the Government that pro-
poses a more demanding standard. It asserts that misstate-
ments are material only if they go to the very "'essence of
the bargain'" at issue. Brief for United States 44. That
standard stems from *Universal Health Services, Inc.* v.
*United States ex rel. Escobar*, 579 U. S. 176 (2016), which

discussed materiality under the False Claims Act. See *id.*, at 193, n. 5.

The Court need not resolve this dispute to know that petitioners correctly conceded materiality: Even under the more demanding "essence of the bargain" test, petitioners' misstatements qualify. Starting with the contract itself, PennDOT expressly made compliance with federal DBE regulations a "material" term. See App. 114, 175. That was no boilerplate designation. Out of the 17 warranties set forth in the signed documents, only the DBE requirement expressly provided that "[f]ailure by the Contractor to carry out these requirements is a material breach of this contract, which may result in the termination of this contract." *Ibid.* PennDOT, moreover, dedicated an entire phase of the contract bidding process to confirming that its prospective contractor had identified a qualified DBE partner who would provide painting services. See 3 App. in No. 19–3679 etc. (CA3), pp. 763–765; 82 F. 4th 230, 234 (CA3 2023). Petitioners also had to submit documentation throughout the projects' duration to demonstrate continued compliance with the DBE requirement. See *id.,* at 234.

What is more, PennDOT could not have proceeded with the projects as funded if it had not mandated contractor compliance with the DBE requirement. Federal grants accounted for a significant portion of PennDOT's funding for each project, and those grants were conditioned on DBE compliance. The contracts' DBE requirement thus went directly to the viability of the projects themselves, and by extension, to the "'very essence of the bargain.'" *Universal Health Services*, 579 U. S., at 193–194, n. 5 (quoting *Junius Constr. Corp.* v. *Cohen*, 257 N. Y. 393, 400, 178 N. E. 672, 674 (1931)); cf. 579 U. S., at 194 (recognizing materiality where "'[t]he government's money would never have been placed in the joint fund for payment to respondents had its agents known the bids were collusive'" (quoting *United States ex rel. Marcus* v. *Hess*, 317 U. S. 537, 543 (1943)).

If that were not already enough, PennDOT risked legal sanction if it failed to administer the DBE program in good faith. See 49 CFR §§26.101, 26.107; 2 App. in No. 19–3679 etc., at 305 ("If [a grant recipient] fail[s] to comply with any requirement mentioned in this rule," including the DBE requirement, "they could be subject to formal enforcement action or program sanctions such as suspension or termination of federal funds or refusal to approve projects, grants, or contracts until those deficiencies are remedied"); *id.*, at 290 ("[I]f you fail to operate your program in good faith, . . . [y]ou will be subject to possible withholding of funds, revoking of funds, or other sanctions available by the Department"). It is implausible that compliance with the DBE requirement was immaterial to PennDOT when knowledge of petitioners' scheme to flout those requirements would have exposed PennDOT to risk of serious legal consequences. See *Universal Health Services*, 579 U. S., at 194 ("[A]n undisclosed fact [is] material" where "'[n]o one can say with reason that the plaintiff would have signed this contract if informed of the likelihood' of the undisclosed fact" (quoting *Junius Constr. Corp.*, 257 N. Y., at 400, 178 N. E., at 674)).

In short, DBE compliance was no "minor or insubstantial" provision tucked away in a laundry list of other requirements for payment. *Universal Health Services*, 579 U. S., at 194. It played a critical role in PennDOT's ability to achieve the essential goal of the contracts: completing the restoration projects. It featured prominently in the contracts and in the bidding process itself. And petitioners were well aware of its importance to PennDOT. After all, they orchestrated an entire scheme to hide their noncompliance. The materiality of petitioners' misstatements is thus hard to dispute, even under the Government's more demanding standard.

### B

It is no answer to suggest that DBE fraud is "rampant."

*Ante,* at 9 (THOMAS, J., concurring). "Lots of people do it" has never been, nor should be, a defense to criminal liability without more. No cited portion of the record, moreover, supports the view that PennDOT "regularly pa[id contracts] in full despite actual knowledge that [the relevant] requirements were violated," *Universal Health Services*, 579 U. S., at 195, or that PennDOT "assume[d] a significant number of its contractors violate contract provisions requiring DBE compliance," *ante,* at 8 (THOMAS, J., concurring). If that were true, petitioners would have had no reason to develop an elaborate scheme to conceal their noncompliance in the first place.

Generic reports from decades prior of "'serious enforcement and compliance problems'" with a federal program do not negate the materiality of explicit contractual terms requiring compliance either. *Ante,* at 9 (THOMAS, J., concurring) (quoting Oversight Hearing on the Elimination of Waste, Fraud, and Abuse in Mandatory Transportation Programs before the House Committee on Transportation and Infrastructure, 108th Cong., 1st Sess., 109 (2003)).[1] We have never suggested, let alone held, that such reports give defendants a get-out-of-jail-free card. With good reason: That view relies on the premise that, whenever fraud is prevalent, no reasonable contractor can expect compliance, even where the contract expressly deems compliance material. To accept that premise is to turn contract law upside

_____

[1] JUSTICE THOMAS appears to agree. See *ante,* at 9–10, n. 2. Although his concurring opinion sets forth "reasons to think that the DBE provisions did not go 'to the very essence of the bargain'" to explain his "skeptic[ism] that petitioners' misrepresentations were material," *ante,* at 1, 6, JUSTICE THOMAS later acknowledges that his discussion of these reports is intended only to suggest his "materiality analysis might apply in different DBE-compliance prosecutions where 'materiality is contested'" and a different record is developed, *ante,* at 9–10, n. 2. I do not share his view of the proper materiality analysis, but at least all agree such reports are irrelevant in this case.

down.  Parties explicitly designate contractual terms as material in order to ensure compliance, particularly where the other party might not otherwise comply.

Petitioners would have had similar trouble contesting materiality on the ground that, at some point in the future, the DBE statutory scheme might be deemed unconstitutional.  Indeed, petitioners at no pertinent time raised a challenge to the DBE program's constitutionality, and the DBE statutory scheme remains good law (as it was at the time of petitioners' conviction).[2]  It should go without saying that the law should not provide a shield from criminal liability based upon personal and unspoken predictions of a law's constitutionality.

\*      \*      \*

At bottom, this case presents a classic scheme to defraud:  Petitioners tricked PennDOT into paying for one thing, and then delivered something materially different.  The Court today rightly holds that a defendant in that position may not escape federal fraud liability by asserting the victim nevertheless suffered no net economic loss.  On that basis, I agree with the majority's bottom-line decision to affirm the Third Circuit's judgment.

---

[2] See *ante*, at 11, n. 3 (THOMAS, J., concurring) (indicating agreement that, as a result, petitioners could not have raised a materiality argument on this ground).