# 24-3296(L)
# & 25-0119(Con)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

SANDRA YOUSEFZADEH, *et al.*, NEWTON'S PHARMACY, INC.,
*Plaintiffs-Appellants*,

GWEN THOMAS, RHONDA NITTO,
*Plaintiffs*,

v.

JOHNSON & JOHNSON CONSUMER INC., RB HEALTH (US) LLC, TARGET CORPORATION, BAYER HEALTHCARE, LLC, a Delaware limited liability corporation, WALMART INC., a Delaware corporation, CVS PHARMACY, INC., a Delaware corporation, WALGREEN CO., an Illinois corporation, THE PROCTER & GAMBLE COMPANY, HALEON US HOLDINGS LLC, PUBLIX SUPER MARKETS, INC., AMAZON.COM, INC., AMAZON.COM SERVICES LLC, KENVUE, INC., GLAXOSMITHKLINE LLC, RITE AID CORPORATION, ALBERTSONS COMPANIES, INC., COSTCO WHOLESALE CORP.,
*Defendants-Appellees*,

*(Caption Continued on Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF OF DEFENDANTS-APPELLEES

Jay P. Lefkowitz, P.C.
Jacob M. Rae
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

*Attorneys for Defendant Haleon US Holdings LLC*

*(Counsel Continued on Inside Cover)*

Andrew Soukup
David M. Zionts
Victoria Stilwell
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

*Attorneys for Defendant The Procter & Gamble Company*

---

Does 1-200, GlaxoSmithKline Consumer Healthcare Holdings (US) LLC, Reckitt Benckiser LLC, Merck, McNeil Consumer Healthcare, Sanofi-Aventis U.S. LLC, Church & Dwight Co. Inc., Associated Wholesale Grocers Inc, Valu Merchandisers Co., Pfizer Inc., Perrigo Company PLC, Helen of Troy Limited, Dierbergs Markets, Inc., Reckitt Benckiser Pharmaceuticals Inc., The Kroger Co., Harris Teeter, LLC, Harris Teeter Supermarkets, Inc., Dolgencorp, Inc., Family Dollar, LLC,

*Defendants.*

---

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 S. Flower Street
Los Angeles, CA 90071
(213) 680-8400

Cole Carter
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-1951

*Attorneys for Defendant Haleon US Holdings LLC*

Hannah Y. Chanoine
Bruce Crawford
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, Suite 1700
New York, NY 10019
(212) 326-2000

Amy J. Laurendeau
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
(949) 823-6900

Jason Zarrow
O'MELVENY & MYERS LLP
400 South Hope Street, 19th Floor
Los Angeles, CA 90071
(213) 430-6000

*Attorneys for Defendant Johnson & Johnson Consumer Inc.*

Jessica L. Ellsworth
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5886

James L. Bernard
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3121

Lauren S. Colton
HOGAN LOVELLS US LLP
100 International Drive, Suite 2000
Baltimore, MD 21202
(410) 659-2733

*Attorneys for Defendant RB Health (US) LLC*

Cara D. Edwards
Colleen Carey Gulliver
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th Fl.
New York, NY 10020
(212) 335-4714

Christopher G. Campbell
DLA PIPER LLP (US)
1201 West Peachtree Street, Suite 2800
Atlanta, GA 30309
(404) 736-7800

Christopher M. Young
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, CA 92121
(619) 699-4748

*Attorneys for Defendant Bayer HealthCare, LLC*

Nilda Isidro
Dale Rose Goldstein
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9200

*Attorneys for Defendants CVS Pharmacy Inc.,
Target Corporation, Walgreen Co., and
Walmart Inc.*

## DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1,

Defendant-Appellee Haleon US Holdings LLC hereby states that:

1.    Haleon US Holdings LLC is a wholly owned subsidiary of Haleon US Holdings Inc.

2.    Haleon US Holdings Inc. is a wholly owned subsidiary of Haleon UK Holdings (No.2) Limited.

3.    Haleon UK Holdings (No.2) Limited is a 75.38% majority owned subsidiary of Haleon UK Holdings Limited. The remaining 24.62% is owned by Haleon Intermediate Holdings Limited.

4.    Haleon UK Holdings Limited is a wholly owned subsidiary of Haleon Intermediate Holdings Limited.

5.    Haleon Intermediate Holdings Limited is a wholly owned subsidiary of Haleon plc.

Defendant-Appellee The Procter & Gamble Company ("P&G") hereby states that P&G is a publicly traded company.  P&G has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Defendant-Appellee RB Health (US) LLC hereby states that RB Health (US) LLC is a wholly-owned subsidiary of Mead Johnson Nutrition Company.  Mead Johnson Nutrition Company is an indirect wholly-owned subsidiary of Reckitt

i

Benckiser Group plc. No publicly held corporation holds 10% or more of Reckitt Benckiser Group plc's stock.

Defendant-Appellee CVS Pharmacy, Inc. hereby states that it is a wholly owned subsidiary of CVS Health Corporation. CVS Health Corporation is a publicly traded corporation, but no publicly traded corporation owns 10% or more of its stock. CVS Health Corporation is the only publicly traded corporation that owns a 10% or more interest in CVS Pharmacy, Inc.

Defendant-Appellee Target Corporation hereby states that it has no parent corporation. Target Corporation is a publicly traded corporation, but no publicly traded corporation owns 10% or more of its stock.

Defendant-Appellee Walgreen Co. hereby states that it is owned by Walgreens Boots Alliance, Inc. Walgreens Boots Alliance, Inc. is a publicly traded corporation, but no publicly traded corporation owns 10% or more of its stock.

Defendant-Appellee Walmart Inc. hereby states that it has no parent corporation. Walmart Inc. is a publicly traded corporation, but no publicly traded corporation owns 10% or more of its stock.

Defendant-Appellee Johnson & Johnson Consumer Inc. ("JJCI") hereby states that JJCI is a direct, wholly owned subsidiary of JNTL Holdings 2, Inc., and JNTL Holdings 2, Inc. is a direct, wholly owned subsidiary of Kenvue Inc., a publicly

traded corporation. Kenvue Inc. has no parent corporation, and no corporation owns 10 percent or more of its stock.[*]

Defendant-Appellee Bayer HealthCare LLC hereby states that Bayer HealthCare LLC, a non-governmental entity, is an indirect subsidiary of Bayer AG. Bayer AG, a publicly held German stock company, has no parent company, and no publicly held company owns 10 percent or more of its stock.

---

[*] JJCI recently underwent a statutory conversion to Kenvue Brands LLC pursuant to section 18-214 of Delaware's Limited Liability Company Act. JJCI has been conferring with opposing counsel regarding substitution and intends to move to substitute JJCI for Kenvue Brands LLC as Defendant-Appellee in this appeal. Kenvue Brands LLC will file a corporate disclosure when the forthcoming motion to substitute is filed.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................... i

TABLE OF CONTENTS ...................................................................... iv

TABLE OF AUTHORITIES ................................................................. vi

INTRODUCTION ............................................................................... 1

STATEMENT OF THE ISSUES........................................................... 3

STATEMENT OF THE CASE............................................................... 4

    A.    Congress Comprehensively Regulates Over-the-Counter Drugs. ....... 4

    B.    FDA Approves Phenylephrine as a Safe and Effective Nasal Decongestant and Promulgates Labeling Requirements..................... 7

    C.    FDA Continues to Recognize Phenylephrine as a Safe and Effective Nasal Decongestant. ........................................... 8

    D.    Plaintiffs Challenge the Labeling and Marketing of Phenylephrine as a Nasal Decongestant............................................ 11

    E.    The District Court Dismisses Plaintiffs' Claims................................ 14

SUMMARY OF ARGUMENT .............................................................. 15

STANDARD OF REVIEW ................................................................... 17

ARGUMENT .................................................................................... 18

I.    Federal Law Preempts Plaintiffs' State-Law Claims. ................................. 18

    A.    The FDCA Expressly Preempts State-Law Requirements That Are Not Identical to Applicable FDA Regulations. ........................... 19

    B.    Plaintiffs Seek to Impose State-Law Requirements That Are Not Identical to FDA Regulations..................................................... 22

    C.    Plaintiffs' Attempts to Evade Preemption Fail. ................................ 25

iv

1.    Plaintiffs Cannot Invoke the General Misbranding
Prohibition to Override FDA's Drug-Specific Regulation. ..... 25

2.    *Loper Bright* Does Not Make FDA's Drug-Specific
Regulations Irrelevant to Preemption. ..................................... 32

3.    The "Product Liability" Exception Is Inapplicable. ............... 34

4.    Plaintiffs' Purported "Non-Monograph" Claims Fail ............. 36

D.    Implied Conflict Preemption Bars Plaintiffs' State-Law Claims. ..... 40

II.    Plaintiffs' RICO Claim Fails. .......................................................... 45

A.    Plaintiffs Lack Statutory Standing. ..................................... 45

1.    RICO's Text Incorporates the Indirect-Purchaser Rule. .......... 45

2.    RICO's Proximate-Cause Requirement Does Not
Displace the Indirect-Purchaser Rule. .................................... 51

3.    *Horn*'s and *Sedima*'s Rejection of an "Antitrust Injury"
Requirement Do Not Undermine the Indirect-Purchaser
Rule. ..................................................................................... 53

B.    The FDCA Precludes Plaintiffs' RICO Claim. ................................. 55

CONCLUSION ...................................................................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*,
2022 WL 17348351 (S.D.N.Y. Nov. 14, 2022)................................................41

*Alix v. McKinsey & Co.*,
23 F.4th 196 (2d Cir. 2022) ..................................................52

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
823 F.3d 51 (2d Cir. 2016) ...........................................................58, 59

*Apple Inc. v. Pepper*,
587 U.S. 273 (2019)..........................................................46, 47, 51

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005)....................................................21, 22, 27, 33

*Biederman v. FCA LLC*,
765 F.Supp.3d 920 (N.D. Cal. 2025)..................................................49

*Biederman v. FCA US LLC*,
2025 WL 1266907 (N.D. Cal. May 1, 2025)......................................47

*Bimont v. Unilever U.S., Inc.*,
2015 WL 5256988 (S.D.N.Y. Sept. 9, 2015) ....................................29

*Booker v. E.T. Browne Drug Co., Inc.*,
2021 WL 4340489 (S.D.N.Y. Sept. 23, 2021) ..................................29

*Bowling v. Johnson & Johnson*,
65 F. Supp. 3d 371 (S.D.N.Y. 2014) ....................................................44

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008)..........................................................52

*Bruce Katz, M.D., P.C. v. Focus Forward, LLC*,
22 F.4th 368 (2d Cir. 2022) ..................................................17

*Buckman Co. v. Pls Legal Comm.*,
531 U.S. 341, 350 (2001)..........................................................56

*Buono v. Tyco Fire Prods., LP,*
    78 F.4th 490 (2d Cir. 2023) ...............................................................18

*Canale v. Colgate-Palmolive Co.,*
    258 F.Supp.3d 312 (S.D.N.Y. 2017) ..................................................29

*Carter v. Berger,*
    777 F.2d 1173 (7th Cir. 1985) ......................................................49, 54

*Carter v. Novartis Consumer Health, Inc.,*
    582 F.Supp.2d 1271 (C.D. Cal. 2008) .................................................37

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH,*
    843 F.3d 48 (2d Cir. 2016) .........................................................58, 59

*Cohen v. ConAgra Brands, Inc.,*
    16 F.4th 1283 (9th Cir. 2021) ............................................................28

*Critcher v. L'Oreal USA, Inc.,*
    959 F.3d 31 (2d Cir. 2020) ........................................................*passim*

*Diaz v. Little Remedies Co.,*
    81 A.D.3d 1419 (N.Y. App. Div. 2011) .............................................35

*Dubin v. United States,*
    599 U.S. 110 (2023)............................................................................20

*E. River S.S. Corp. v. Transamerica Delaval, Inc.,*
    476 U.S. 858 (1986)............................................................................34

*Fenner v. Gen. Motors, LLC,*
    113 F.4th 585 (6th Cir. 2024) ......................................................48, 50

*Geier v. Am. Honda Motor Co.,*
    529 U.S. 861 (2000)............................................................................40

*Gibbons v. Bristol-Myers Squibb Co.,*
    919 F.3d 699 (2d Cir. 2019) ..............................................................42

*Goldstein v. Walmart, Inc.,*
    637 F.Supp.3d 95 (S.D.N.Y. 2022) ......................................22, 31, 34

*Gomez v. St. Jude Med. Daig Div. Inc.*,
442 F.3d 919 (5th Cir. 2006) ................................................................44

*Gonzalez Rodriguez v. Walmart Inc.*,
2023 WL 2664134 (S.D.N.Y. Mar. 28, 2023)...................................39

*In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*,
702 F. Supp. 3d 692 (N.D. Ill. 2023)....................................................35

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
392 U.S. 481 .............................................................................47, 48

*Harris Cnty. v. Eli Lilly & Co.*,
2020 WL 5803483 (S.D. Tex. Sept. 29, 2020)..................................49

*Headly v. Tilghman*,
53 F.3d 472 (2d Cir. 1995) ....................................................................17

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1 (2010)........................................................................52

*Hinck v. United States*,
550 U.S. 501 (2007).....................................................................55

*Holmes v. Securities Investor Protection Corp.*,
503 U.S. 258 (1992)................................................................*passim*

*Humana, Inc. v. Biogen, Inc.*,
666 F.Supp.3d 135 (D. Mass. 2023), *aff'd*, 126 F.4th 94 (1st Cir.
2025) ...........................................................................................49

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977)................................................................*passim*

*In re Insulin Pricing Litig.*,
2019 WL 643709 (D.N.J. Feb. 15, 2019) ................................52, 54

*Jackson-Mau v. Walgreen Co.*,
115 F.4th 121 (2d Cir. 2024) ...........................................................19, 20

*Kansas v. UtiliCorp United, Inc.*,
497 U.S. 199 (1990)..........................................................47, 49, 50

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)...................................................................16, 32, 33

*Marentette v. Abbott Labs., Inc.*,
886 F.3d 112 (2d Cir. 2018) ..........................................................*passim*

*McCarthy v. Recordex Serv., Inc.*,
80 F.3d 842 (3d Cir. 1996) ...............................................................48, 51

*Medical Marijuana, Inc. v. Horn*,
145 S. Ct. 931 (2025)........................................................................53, 54

*Merck Sharp & Dohme Corp. v. Albrecht*,
587 U.S. 299 (2019)................................................................................42

*Mills v. Warner-Lambert Co.*,
581 F.Supp.2d 772 (E.D. Tex. 2008)......................................................36

*MSP Recovery Claims, Series LLC v. Lundbeck LLC*,
2024 WL 37208 (E.D. Va. Jan. 3, 2024), *aff'd*, 130 F.4th 91 (4th
Cir. 2025) ...............................................................................................49

*MSP Recovery Claims, Series LLC v. Pfizer, Inc.*,
728 F.Supp.3d 89 (D.D.C. 2024), *appeal docketed*, No. 25-7045
(D.C. Cir. Apr. 8, 2025)......................................................................49, 52

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018)................................................................................18

*Mut. Pharm. Co. v. Bartlett*,
570 U.S. 472 (2013)....................................................................36, 40, 41

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*,
710 F.3d 71 (2d Cir. 2013), *as amended* (Mar. 21, 2013)...............4, 5

*Nat'l Meat Ass'n v. Harris*,
565 U.S. 452 (2012)................................................................................21

*Norman v. Niagara Mohawk Power Corp.*,
873 F.2d 634 (2d Cir. 1989) ...................................................................55

*In re Nortel Networks Corp. Sec. Litig.*,
539 F.3d 129 (2d Cir. 2008) ............................................................34, 40

ix

*Palmer v. Trump Model Mgmt., LLC*,
175 F.Supp.3d 103 (S.D.N.Y. 2016) ................................................55

*PLIVA, Inc. v. Mensing*,
564 U.S. 604 (2011) ........................................................................41

*POM Wonderful LLC v. Coca-Cola Co.*,
573 U.S. 102 (2014) ..................................................55, 56, 57, 59

*Puerto Rico v. Franklin Cal. Tax-Free Trust*,
579 U.S. 115 (2016) ........................................................................18

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ........................................................................55

*Reid v. GMC Skin Care USA Inc.*,
2016 WL 403497 (N.D.N.Y. Jan. 15, 2016) ...................................29

*In re Revlimid & Thalomid Purchaser Antitrust Litig.*,
2024 WL 2861865 (D.N.J. June 6, 2024) .......................................54

*Riegel v. Medtronic, Inc.*,
552 U.S. 312 (2008) ..........................................................21, 27, 28

*S. Pac. Co. v. Darnell-Taenzer Lumber Co.*,
245 U.S. 531 (1918) ........................................................................48

*Schaffner v. Monsanto Corp.*,
113 F.4th 364 (3d Cir. 2024) .....................................................28, 33

*Seale v. GSK Consumer Health, Inc.*,
2024 WL 1040854 (C.D. Cal. Feb. 27, 2024) .................................22

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985) ..................................................................53, 54

*Singo v. Ricola USA Inc.*,
2024 WL 196709 (S.D.N.Y. Jan. 18, 2024) ...............................22, 34

*Smith v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*,
660 F.Supp.3d 863 (N.D. Cal. 2023) ..............................................37

*Solak v. Target Corp.*,
2023 WL 5806326 (N.D.N.Y. Sept. 7, 2023) .....................................22

*Sperber v. Boesky*,
849 F.2d 60 (2d Cir. 1988) ............................................................48

*Stevens v. Walgreen Co.*,
623 F.Supp.3d 298 (S.D.N.Y. 2022) ...............................................39

*Thornton v. Tyson Foods, Inc.*,
28 F.4th 1016 (10th Cir. 2022) ...................................................28, 29

*Tiara Condo. Ass'n v. Marsh & McLennan Cos.*,
714 F.3d 1253 (11th Cir. 2013) .....................................................34

*United Health Care Servs., Inc. v. United Therapeutics Corp.*,
2024 WL 1256266 (D. Md. March 25, 2024) .............................49, 52

*United States v. Sullivan*,
332 U.S. 689 (1948) .........................................................................4

*Voss v. Black & Decker Mfg. Co.*
59 N.Y.2d 102 (N.Y. Ct. App. 1983) .............................................35

*Wyeth v. Levine*,
555 U.S. 555 (2009) ..................................................................19, 43

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
512 F.Supp.3d 1278 (S.D. Fla. 2021) ........................................22, 38

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
546 F.Supp.3d 1216 (S.D. Fla. 2021) .............................................49

## Constitutional Provisions

U.S. Const., art. VI, cl. 2 .................................................................18

## Statutes

5 U.S.C. §553 ...................................................................................11

7 U.S.C. §136v .................................................................................21

15 U.S.C. §15 ...................................................................................47

xi

18 U.S.C. §1964 .................................................................45, 46, 54

21 U.S.C. §321 .................................................................................7

21 U.S.C. §352 .......................................................4, 14, 25, 26

21 U.S.C. §355 ...................................................................2, 4, 6,

21 U.S.C. §355h ...................................................................*passim*

21 U.S.C. §360k ............................................................................21

21 U.S.C. §362 ...............................................................................26

21 U.S.C. §379r ...................................................................*passim*

21 U.S.C. §379s ................................................20, 33, 37

21 U.S.C. §393 .........................................................................4, 33

21 U.S.C. §678 ...............................................................................21

Coronavirus Aid, Relief, and Economic Security Act (CARES Act),
    Pub. L. No. 116-136, §3851, 134 Stat. 281, 435 (2020) .....................6

Food and Drug Administration Modernization Act, Pub. L. No. 105-
    115, §412, 111 Stat. 2296, 2376 (1997) ................................6

## Regulations and Other Administrative Materials

21 C.F.R. §10.30 .............................................................................9

21 C.F.R. §14.40 .............................................................................9

21 C.F.R. §14.100 ...........................................................................9

21 C.F.R. §330.1 ...................................................................*passim*

21 C.F.R. §330.1 (1997) ...........................................................31

21 C.F.R. §330.10 .........................................................................5

21 C.F.R. §341.1 .............................................................7, 22, 57

21 C.F.R. §341.20 ...................................................................7, 22, 57

21 C.F.R. §341.80 ...................................................................*passim*

21 C.F.R. §341.85 ...........................................................................7

41 Fed. Reg. 38,312 (Sept. 9, 1976) ..................................................7

50 Fed. Reg. 2,220 (Jan. 15, 1985) ....................................................7

50 Fed. Reg. 15,810 (April 22, 1985) ...............................................30

51 Fed. Reg. 16,258 (May 1, 1986) ...............................................8, 30

59 Fed. Reg. 43,386 (Aug. 23, 1994) .................................................7

64 Fed. Reg. 13,254 (Mar. 17, 1999)................................................31

U.S. Food & Drug Admin., Final Administrative Order OTC000026,
    Over-the-Counter Monograph M012: Cold, Cough, Allergy,
    Bronchodilator, and Antiasthmatic Drug Products for Over-the-
    Counter Human Use (effective Mar. 27, 2020) .....................9, 29

U.S. Food & Drug Admin., Proposed Admin. Order (OTC000036):
    Amending Over-the Counter Monograph M012: Cold, Cough,
    Allergy, Bronchodilator, and Antiasthmatic Drug Products for
    Over-the-Counter Human Use (Nov. 8, 2024) ..........................10

U.S. Food & Drug Admin., *FDA Clarifies Results of Recent Advisory
    Committee Meeting on Oral Phenylephrine* (Sept. 14, 2023) ...........10

U.S. Food & Drug Admin., *FDA Proposes Ending Use of Oral
    Phenylephrine as OTC Monograph Nasal Decongestant Active
    Ingredient After Extensive Review* (Nov. 7, 2024) ..................3

U.S. Food & Drug Admin., *The Current Status of Oral Phenylephrine
    as a Nasal Decongestant with Dr. Theresa Michele and Dr. Ilisa
    Bernstein* (Mar. 19, 2024)...........................................11

### Other Authorities

72A *C.J.S. Products Liability* §1 .........................................................35

Restatement (Third) of Torts: Products Liability §21, cmt. a (1998).....................34

## INTRODUCTION

Phenylephrine has long been approved as an over-the-counter nasal decongestant. Federal regulations, implementing a federal statutory scheme, designate the medicine as safe and effective and govern how it is sold, labeled, and marketed. Plaintiffs seek to override Congress's judgment through private civil litigation. This Court should reject that effort.

It is hard to imagine a clearer case of federal preemption. Congress charged the Food and Drug Administration ("FDA") with determining what a medicine's label must tell users about that medicine's efficacy. Congress further enacted a rule of "[n]ational uniformity for nonprescription drugs," preempting any state requirement "that is different from or in addition to, or that is otherwise not identical with," federal requirements. 21 U.S.C. §379r(a)(2). Yet Plaintiffs would impose state-law liability for selling FDA-approved medicines, for an FDA-approved purpose, with FDA-mandated labeling.

Both the broad express preemption provision for over-the-counter drugs, as well as bedrock principles of conflict preemption, readily dispose of Plaintiffs' state-law claims. Plaintiffs accuse Defendants of false or misleading conduct by "sell[ing] [phenylephrine] as a decongestant." Pls.' Br. 23. But FDA regulations *require* Defendants to label phenylephrine "as a 'nasal decongestant,'" and to say that it "relieves nasal congestion." 21 C.F.R. §341.80(a)-(b). Plaintiffs' fundamental

1

premise—that phenylephrine is "completely ineffective" (Pls.' Br. 8)—likewise contravenes Congress's judgment that an over-the-counter drug marketed in conformity with FDA regulations is "recognized as … effective." 21 U.S.C. §355h(a)(1). Plaintiffs' efforts to evade preemption run into a wall of precedent, including a recent decision of this Court. *See Critcher v. L'Oreal USA, Inc.*, 959 F.3d 31 (2d Cir. 2020).

Plaintiffs fare no better invoking the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") to try to subvert Congress's system of drug regulation. Indirect purchasers of a product, like Plaintiffs, cannot sue under RICO's civil-liability provision. Every circuit to resolve this question has so held, and this Court should join them. What is more, principles of preclusion—a close cousin of preemption—do not allow litigants to use a general law like RICO to collaterally attack FDA's specific efficacy determinations.

Whether through state law or RICO, this case poses a direct challenge to FDA's congressionally delegated authority to regulate drugs. Plaintiffs accuse the agency of "permit[ting] oral PE sales despite doubtful efficacy," making an "incorrect finding of Oral PE effectiveness," and even "permit[ting] false statements" on drug labels. Pls.' Br. 6, 13, 17. However, there is a proper way to ask FDA to change its mind: administrative process. FDA is engaged in such a process currently, with all the deliberations, diligence, and solicitation of public

2

comment that Congress has reserved for decisions about access to medicine. In the meantime, FDA has made clear that "companies may continue to market … drug products containing oral phenylephrine as a nasal decongestant."[1] Plaintiffs are not entitled to bypass this process and short-circuit the system of drug regulation that Congress established.

Allowing Plaintiffs' claims to proceed would unwind Congress's choice of national uniformity, replacing it with state-by-state and even jury-by-jury variation. Lest there be any doubt that Plaintiffs wish to turn back the clock on Congress's decision, they open their brief by extolling the virtues of Blackstone-era fraud claims against "purveyors of magical elixirs." Pls.' Br. 1-2. But in the modern era, Congress has given FDA—not States, not Plaintiffs, and not juries—authority to determine what medicines are effective and how they should be labeled. Because Plaintiffs' claims cannot override this congressional delegation, this Court should affirm the district court's well-reasoned dismissal.

## STATEMENT OF THE ISSUES

1. Whether the Federal Food, Drug, and Cosmetic Act preempts state-law claims asserting that oral phenylephrine cannot be labeled or marketed as a nasal

---

[1] U.S. Food & Drug Admin., *FDA Proposes Ending Use of Oral Phenylephrine as OTC Monograph Nasal Decongestant Active Ingredient After Extensive Review* (Nov. 7, 2024) ("*FDA Proposes Ending Use of Oral Phenylephrine as Nasal Decongestant*"), https://perma.cc/CS9Q-VRRW.

decongestant, when FDA regulations deem oral phenylephrine an effective nasal decongestant and require its labeling to state that it relieves nasal congestion.

2.      Whether Plaintiffs may assert claims under the Racketeer Influenced and Corrupt Organizations Act, when they did not directly purchase products from the relevant Defendants, and their claim challenges FDA's determination that oral phenylephrine is effective.

## STATEMENT OF THE CASE

### A.      Congress Comprehensively Regulates Over-the-Counter Drugs.

The Federal Food, Drug, and Cosmetic Act ("FDCA") is a comprehensive statutory scheme "designed primarily to protect consumers from dangerous products." *United States v. Sullivan*, 332 U.S. 689, 696 (1948). Under the FDCA, Congress charged FDA with ensuring that drugs are safe and effective. *See* 21 U.S.C. §393(b)(2)(B).

The FDCA provides that "a new drug may not enter interstate commerce unless FDA determines that it is generally recognized as safe and effective … for the particular use described in its product labeling." *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 75 (2d Cir. 2013), *as amended* (Mar. 21, 2013). By making this determination, FDA controls a monographed drug's ability to be sold. *See* 21 U.S.C. §355(a). If a drug's "labeling is false or misleading," it "shall be deemed to be misbranded" and may not be sold. 21 U.S.C. §352(a)(1).

FDA generally approves drugs on an individualized basis. *Nat. Res. Def. Council*, 710 F.3d at 75. However, beginning in 1972, FDA established a "'monograph' system" for regulating certain over-the-counter drugs, allowing manufacturers to bypass individualized review. *Id.* A "monograph" is a "detailed regulation … for each therapeutic class of [over-the-counter] drug products." *Id.*; *see* 21 C.F.R. §330.10.

As a regulation, a monograph is promulgated through rulemaking procedures. FDA first appoints an advisory panel of independent experts, which "review[s] the data" and reports its "conclusions and recommendations" to FDA "with respect to the safety and effectiveness of the drugs." *Id.* §330.10(a)(3). FDA then publishes a proposed monograph in the Federal Register, reviews comments and new information, publishes a tentative final monograph, and then promulgates a final monograph. *Id.* §330.10(a)(6)-(9).

A monograph "establish[es] conditions under which a category of [over-the-counter] drugs or … specific [over-the-counter] drugs are generally recognized as safe and effective and not misbranded." *Id.* §330.10(a)(9). Covered drugs must meet a set of drug-specific conditions as well as general conditions applicable to all drugs. *Id.* §330.1. If a drug meets all these conditions, it is "safe and effective and … not misbranded." *Id.* If it does not, the drug is "liable to regulatory action." *Id.*

In 2020, Congress endorsed and modernized FDA's monograph process. *See Coronavirus Aid, Relief, and Economic Security Act (CARES Act)*, Pub. L. No. 116-136, §3851, 134 Stat. 281, 435 (2020). Congress converted FDA's existing monographs to administrative orders and reaffirmed that drugs marketed in compliance with monographs are "deemed to be generally recognized as safe and effective." 21 U.S.C. §355h(a)(1)(A)(i). Like monographs, administrative orders "determin[e] whether there are conditions under which" a drug is "generally recognized as safe and effective." *Id.* §355h(b)(1)(A). Covered medicines must be marketed "in conformity with an administrative order." *Id.* §355h(b)(1)(B).

Congress has also enacted a provision to ensure "[n]ational uniformity for nonprescription drugs." Food and Drug Administration Modernization Act, Pub. L. No. 105-115, §412, 111 Stat. 2296, 2376 (1997). This express preemption provision bars any "State or political subdivision of a State" from "establish[ing] or continu[ing] in effect any requirement" relating to regulation of an over-the-counter drug "that is different from or in addition to, or that is otherwise not identical with," federal law. 21 U.S.C. §379r(a)(2). There is an exception for product liability claims. *Id.* §379r(e).

B.    **FDA Approves Phenylephrine as a Safe and Effective Nasal Decongestant and Promulgates Labeling Requirements.**

Phenylephrine hydrochloride is an active ingredient used to treat nasal congestion.[2] 21 C.F.R. §§341.1, 341.20. Almost fifty years ago, FDA's advisory panel concluded that phenylephrine "is safe and effective as an oral … nasal decongestant for [over-the-counter] use." 41 Fed. Reg. 38,312, 38,399 (Sept. 9, 1976). After extensive rulemaking proceedings and public comment, FDA issued a tentative final monograph in 1985, 50 Fed. Reg. 2,220 (Jan. 15, 1985), and a final monograph in 1994. In doing so, FDA determined phenylephrine to be safe and effective as a nasal decongestant. 59 Fed. Reg. 43,386, 43,408 (Aug. 23, 1994).

The final monograph established labeling requirements concerning the identity, indications, warnings, and directions of a drug containing phenylephrine. 21 C.F.R. §341.80(a)-(d); *see also* 21 C.F.R. §341.85 (labeling regulations for combination products).[3] Any product that "meets each of the conditions in this part and each of the general conditions established in §330.1" is "generally recognized as safe and effective and is not misbranded." *Id.* §341.1.

Among the labeling requirements for phenylephrine are the following:

---

[2] This brief uses the terms phenylephrine hydrochloride, phenylephrine, oral phenylephrine, and oral PE interchangeably.

[3] "Labeling" means "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. §321(m).

**Identity.** The medicine's labeling must "contain[] the established name of the drug, if any, and identif[y] the product as a 'nasal decongestant.'" *Id.* §341.80(a).

**Indications.** The labeling must include certain statements that describe the "indications for use that have been established" by the regulation. *Id.* §341.80(b). It must state either that the medicine is "[f]or the temporary relief of nasal congestion," or that it "[t]emporarily relieves nasal congestion." *Id.* §341.80(b)(1). The labeling "may" include other specified "statements," *e.g.*, that the medicine "[d]econgests … nasal passages." *Id.* §341.80(b)(2). Manufacturers can substitute the regulation's phrases with other "truthful and nonmisleading statements," but those alternatives must "describ[e] only the indications for use" set out in the regulation, and are "subject to" the FDCA's misbranding provisions. *Id.* §341.80(b). FDA gave manufacturers this "flexibility" because "there may be many ways of fairly and accurately stating the same information." 51 Fed. Reg. 16,258, 16,261-62 (May 1, 1986).

**Warnings and Directions.** The labeling must contain certain identified warnings, *id.* §341.80(c), (c)(1), as well as specific dosage information for adults and children of various age ranges, *id.* §341.80(d).

### C. FDA Continues to Recognize Phenylephrine as a Safe and Effective Nasal Decongestant.

FDA has continually evaluated phenylephrine's safety and efficacy, and has maintained to date its regulatory approval.

8

Citizen petitions are a part of FDA's process by which anyone can ask the agency to issue, amend, or revoke a regulation. 21 C.F.R. §10.30. In 2007, a group of pharmacists submitted a citizen petition seeking to increase the maximum dosage of phenylephrine for patients over 12 years old, and to withdraw its approval for younger patients. A-146 ¶54.[4] The Nonprescription Drugs Advisory Committee, which is independent of FDA and provides FDA with non-binding advice, *see* 21 C.F.R. §§14.40, 14.100, called for new studies to "evaluate the decongestant effect of higher doses of oral PE," but ultimately voted to confirm that phenylephrine was effective at the monograph's dosing levels. A-148 ¶60.

In 2015, another petition asked FDA to remove oral phenylephrine from the cold-and-cough monograph, contending that new studies had shown that the drug is ineffective. A-159 ¶103; A-161-62 ¶111. While that petition was pending, FDA converted the cold-and-cough monograph into a final administrative order, which continued to recognize phenylephrine as an effective decongestant. *See* U.S. Food & Drug Admin., Final Administrative Order OTC000026: Over-the-Counter Monograph M012: Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use (effective Mar. 27, 2020), https://perma.cc/US8W-BZFK.

---

[4] Citations beginning "A-" refer to the Joint Appendix.

In September 2023, FDA convened another meeting of the Nonprescription Drugs Advisory Committee. A-153 ¶74. The committee—and not FDA, as Plaintiffs suggest, *see* Pls.' Br. 9-10—concluded that oral phenylephrine is ineffective as a nasal decongestant. A-153 ¶75. That did not, however, change the medicine's regulatory status. Days after the meeting, FDA clarified that while it would "consider the input of th[e] advisory committee," the agency would "make[] the final decision."[5] Neither the committee nor FDA raised concerns about phenylephrine's safety.

In November 2024, FDA proposed an administrative order that, if finalized, would amend the regulation to remove oral phenylephrine as a nasal decongestant on the basis that it is not effective. *See* U.S. Food & Drug Admin., Proposed Admin. Order (OTC000036): Amending Over-the-Counter Monograph M012: Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use (Nov. 8, 2024), https://perma.cc/QVX5-P6PY. The proposed order is subject to public comment. *Id.* at 1. "If, after considering the comments, the FDA concludes oral phenylephrine is not effective as a nasal decongestant, the FDA will issue a final order removing oral phenylephrine from the [over-the-counter] monograph, and drug products thereafter could no longer contain oral phenylephrine

---

[5] *See* U.S. Food & Drug Admin., *FDA Clarifies Results of Recent Advisory Committee Meeting on Oral Phenylephrine* (Sept. 14, 2023), https://perma.cc/L6BP-K8RN.

as a nasal decongestant." *FDA Proposes Ending Use of Oral Phenylephrine as Nasal Decongestant.* *See also* 5 U.S.C. §553 (providing for notice and comment before certain agency actions are taken).

"For now," however, FDA made clear in its proposed administrative order that "companies may continue to market [over-the-counter] monograph drug products containing oral phenylephrine as a nasal decongestant," and that "[o]nly a final order will affect what products can be marketed," at which point FDA "would provide manufacturers with appropriate time to either reformulate drugs containing oral phenylephrine or remove such drugs from the market." *FDA Proposes Ending Use of Oral Phenylephrine as Nasal Decongestant.* FDA officials have likewise confirmed that "the status of oral phenylephrine products remains the same—they are considered generally recognized as safe and effective as [over-the-counter] nasal decongestants." U.S. Food & Drug Admin., *The Current Status of Oral Phenylephrine as a Nasal Decongestant with Dr. Theresa Michele and Dr. Ilisa Bernstein* (Mar. 19, 2024), https://perma.cc/QYR4-F66N.

### D. Plaintiffs Challenge the Labeling and Marketing of Phenylephrine as a Nasal Decongestant.

The advisory committee's 2023 vote triggered a slew of class actions accusing manufacturers and sellers of oral phenylephrine products of false advertising. To date, 99 putative class actions have been filed and centralized in multidistrict litigation ("MDL") in the Eastern District of New York.

11

Plaintiffs in the MDL elected to file an Initial Streamlined Consolidated Complaint ("Complaint") containing "sufficient representative examples of the conduct and claims that they allege to be wrongful." A-132. The Complaint does not allege that any plaintiff suffered bodily harm or personal injury from taking phenylephrine. *See* A-134-256. Nor does the Complaint dispute that Defendants' medicines comply with the monograph's labeling requirements.

Instead, alleging economic injury, the Complaint brings state-law claims asserting it was deceptive for Defendants to "market and sell PE products as 'decongestants,'" A-151-52 ¶69, and that Defendants failed to "disclose to consumers that PE Products do not decongest," A-153 ¶73. The Complaint briefly takes issue with marketing statements referencing the "maximum strength" of certain products, which the Complaint alleges are false because phenylephrine is ineffective. A-151-52 ¶¶68, 70. *See generally* A-218-37.

The purpose of the Complaint was to allow Defendants to raise a threshold federal preemption defense capable of "resolv[ing] this litigation in its entirety." A-132; *accord* A-1154. Faced with a case-dispositive preemption defense, Plaintiffs added a federal RICO claim, *see* A-237-52, even though none of the underlying actions asserted such a claim. They allege that a subset of Defendants formed an unlawful enterprise with an industry trade association to defraud FDA and the public

12

about phenylephrine's effectiveness. *See* A-155-70 ¶¶85-130.[6]  The crux of the purported fraud is that the RICO Defendants "assert[ed] in the press and to regulators that PE Products are effective," *id.* ¶88, which allegedly caused FDA to "substantially delay" its review of their effectiveness, A-170 ¶129; A-240 ¶480. Plaintiffs allege economic injuries from their "purchase" of and "overpayment for oral PE Products."  A-249 ¶512.

Defendants moved to dismiss Plaintiffs' state-law claims as preempted, and the RICO claim for lack of statutory standing under the indirect-purchaser rule and preclusion by the FDCA and FDA regulations.  Dkt.213.[7]  In response, Plaintiffs admitted that Defendants' labeling was required to "include verbatim the 'exact language' in the monograph" for the "statement of identity," Dkt.225 at 4—i.e., that their products are "nasal decongestant[s]," 21 C.F.R §341.80(a).  But they contended that the regulation did not require "the *indications* section of the Defendants' PE Products" to say that the drug relieves nasal congestion.  Dkt.225 at 4.  And they argued that their claims were not preempted because "both federal and state law [require] Defendants [to] tell the truth about their drugs, including on their labels." *Id.* at 5-6.

---

[6] The RICO Defendants are named at A-155-56 ¶86.

[7] Citations beginning "Dkt." refer to district-court docket entries.

### E.    The District Court Dismisses Plaintiffs' Claims.

The district court dismissed.  *See generally* SPA-1-17.[8]  It determined that Plaintiffs' state-law claims were expressly preempted by 21 U.S.C. §379r, and therefore did not reach conflict preemption.  SPA-3.  The district court recognized that applicable FDA regulations govern what manufacturers can and must say about phenylephrine's indications.  SPA-7.  The court observed that while FDA allows "some flexibility in describing th[ose] indications," *id.*, manufacturers must describe phenylephrine as a nasal decongestant, SPA-7-9.  Plaintiffs' state-law claims would require manufacturers to do something different (although Plaintiffs "never clarif[ied]" exactly what), such as "removing the indications, or updating the indications to state that [phenylephrine] is an ineffective decongestant."  SPA-7.

The court rejected Plaintiffs' reliance on the FDCA's general misbranding provision, which prohibits labeling that is "false or misleading in any particular."  SPA-9 (quoting 21 U.S.C. §352(a)).  The court found that "unless and until the FDA amends the monograph," "nothing on the labels was false or misleading."  *Id.*  It noted that in *Critcher*, 959 F.3d 31, this Court "rejected a near-identical" attempt to use the general misbranding provision to evade a near-identical preemption provision.  SPA-10.  The district court's reasoning extended to statements describing

---

[8] Citations beginning "SPA-" refer to the Special Appendix for Plaintiffs-Appellants.

certain products as "maximum strength" or suited for "severe" symptoms, which could "only [be] false and misleading if [phenylephrine] is ineffective." SPA-9 n.2.

The district court also dismissed as preempted Plaintiffs' claims premised on an alleged failure to disclose phenylephrine's ineffectiveness in marketing materials, which would have "required defendants to update the labels of their PE products or stop selling the products altogether" to "avoid liability." SPA-13. The court also rejected Plaintiffs' argument that their express-warranty claim fell within an exception to preemption for product-liability actions, because such "claims … arise out of contract law, not product-liability law." SPA-13-14.

Finally, the district court determined that Plaintiffs, as indirect purchasers, lacked statutory standing under RICO. SPA-14. The district court recognized that under *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258 (1992), "the same standing requirements established in antitrust cases apply to RICO cases," SPA-14-15, and it noted that "[e]very circuit to have considered the issue has held" that the indirect-purchaser rule applies to RICO. SPA-15 & n.6 (internal quotation marks omitted). The district court joined that consensus. SPA-14-16. It did not reach the question of whether the FDCA precludes the RICO claim. SPA-14 n.5.

## SUMMARY OF ARGUMENT

I.A. The FDCA forbids States from imposing "any requirement" for over-the-counter drugs "that is different from or in addition to, or … otherwise not

identical with, a requirement under" the FDCA.  21 U.S.C. §379r(a)(2).  Under well-settled precedent, "requirement[s] under" the FDCA include FDA regulations.

B.  Here, the state requirements (as Plaintiffs see them) diverge from federal requirements.  Under federal law, Defendants *must* say that their products relieve nasal congestion.  21 C.F.R. §341.80(a)-(b).  Under Plaintiffs' view of state law, Defendants *may not* make such statements and must instead say the opposite.

C.  Plaintiffs cannot circumvent preemption.  They rely on the FDCA's general misbranding prohibition, but this Court rejected that argument in *Critcher*.  Extensive precedent from the Supreme Court and other circuits is in accord.  And *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024)—which concerns de novo review of agency interpretations of ambiguous statutes—does not negate the relevance of regulations to the preemption analysis.

Nor can Plaintiffs invoke the exception to preemption for product liability claims.  21 U.S.C. §379r(e).  Plaintiffs seek to recover only for economic losses, not for personal injuries, and it is well settled that product liability law excludes such claims.  Plaintiffs also cannot avoid preemption for their "failure to disclose" and "Maximum Strength" claims, which are derivative of their impermissible challenge to FDA's efficacy determination.

D.  Implied conflict preemption independently bars Plaintiffs' state-law claims.  Defendants cannot simultaneously comply with a federal requirement to sell

16

oral phenylephrine as a "nasal decongestant," and a state-law prohibition on doing so. States may not demand that Defendants "stop selling" phenylephrine to resolve that dilemma.

Plaintiffs' claims also pose an obstacle to Congress's objectives: they would upend Congress's uniform, federally-led scheme, and vitiate its instruction that FDA-approved over-the-counter drugs are recognized as effective.

II.A. Plaintiffs do not dispute that they are indirect purchasers of the RICO Defendants' products. But indirect purchasers cannot bring RICO claims, just as they cannot bring antitrust claims, and every circuit to resolve the issue has so held. Under settled principles of statutory interpretation, when Congress modeled RICO after the Clayton Act, the indirect-purchaser rule came with that statutory text.

B. Plaintiffs' RICO claim is also precluded by the FDCA. Congress and FDA have specifically regulated over-the-counter medicines and determined that phenylephrine is effective. A general law like RICO cannot be used to override this specific federal determination.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6)." *Bruce Katz, M.D., P.C. v. Focus Forward, LLC*, 22 F.4th 368, 370 (2d Cir. 2022). The Court is "free to affirm on any ground that finds support in the record." *Headly v. Tilghman*, 53 F.3d 472, 476 (2d Cir. 1995).

## ARGUMENT

### I. Federal Law Preempts Plaintiffs' State-Law Claims.

Federal law is "the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. The Supremacy Clause gives rise to several types of preemption, two of which— "express" preemption and implied "conflict" preemption—are relevant here. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018).

"Express" preemption applies when Congress has enacted a provision stating that certain state laws are preempted. Courts applying express preemption "do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016) (internal quotation marks omitted); *see also Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023) (same). By contrast, "conflict" preemption addresses "situations where compliance with both state and federal law is a physical impossibility, or … where the state law at issue stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Marentette v. Abbott Labs., Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (internal quotation marks omitted).

Plaintiffs ignore important differences between the two doctrines. They conflate express preemption with conflict preemption, *see, e.g.*, Pls.' Br. 18, 21, 29, 30, 33 (relying on *Wyeth v. Levine*, 555 U.S. 555 (2009), an implied conflict preemption case), and suggest that a presumption against preemption applies to express preemption*, see* Pls.' Br. 18.

But under either path, this case is as straightforward as they come. "[T]he basis" of Plaintiffs' claims is that Defendants violated state law by "sell[ing] oral PE as a decongestant." Pls.' Br. 23. Federal law, however, requires Defendants to sell phenylephrine as a "nasal decongestant" and to state that it "relieves nasal congestion." 21 C.F.R. §341.80(a)-(b). Plaintiffs' claims are therefore expressly preempted under 21 U.S.C. §379r(a) and pose a direct conflict between federal and state law.

### A. The FDCA Expressly Preempts State-Law Requirements That Are Not Identical to Applicable FDA Regulations.

Congress adopted "expansive" preemption language in the FDCA. *Jackson-Mau v. Walgreen Co.*, 115 F.4th 121, 127 (2d Cir. 2024). As relevant here, 21 U.S.C. §379r forbids States from imposing "any requirement" for over-the-counter drugs "that is different from or in addition to, or … otherwise not identical with, a requirement under this chapter," i.e., under the FDCA. This Court has given such preemption language broad effect, holding that it "preempts not only those state laws that are in conflict with" federal requirements, "but also *any* state law" that

19

establishes requirements "that are not *exactly the same* as those set forth in the FDCA and its regulations." *Critcher*, 959 F.3d at 35-36 (construing 21 U.S.C. §379s, the FDCA's substantially similar preemption clause for cosmetics labeling). The section's title confirms Congress's reason for such broad language: to achieve "[n]ational uniformity for nonprescription drugs." 21 U.S.C. §379r; *see Dubin v. United States*, 599 U.S. 110, 120-21 (2023) ("heading of a section" relevant to interpretation).

In deciding whether state and federal requirements are "exactly the same," this Court considers whether the plaintiffs are "using state law" to impose "requirements on top of those already mandated in the FDCA and the regulations promulgated thereunder." *Critcher*, 959 F.3d at 36. The relevance of regulations flows from the statutory text: the FDCA preempts state requirements not identical to any "requirement under [the FDCA]," 21 U.S.C. §379r(a)(2), and regulations implementing a statute are requirements under that statute, *Critcher*, 959 F.3d at 36. *See also Jackson-Mau*, 115 F.4th at 128 (citing and quoting *Critcher*, 959 F.3d at 35-36, for same point of law).

The Supreme Court likewise holds that when a court compares state and federal requirements for purposes of similarly worded preemption provisions, it must consider federal regulations. For instance, when the Court construed the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), it instructed that

20

preemption applies to state rules that "impose a labeling requirement that diverges from those set out in FIFRA *and its implementing regulations*." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 452 (2005) (emphasis added). That is because "relevant [agency] regulations … give content to" statutory standards. *Id.* at 453. Similarly, the Court applied a provision in the Federal Meat Inspection Act ("FMIA") to preempt a state law that "deal[s]" with a subject "in ways that the federal Act *and regulations* do not." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459-60 (2012) (emphasis added). And when FDA approves the design and labeling of a medical device, that "approval" itself "imposes 'requirements' under the MDA [Medical Device Amendments of 1976]" for purposes of another similar preemption provision. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 322 (2008). The preemption clauses in each of these cases share the FDCA's key language: they preempt any State "requirement" that is "in addition to" or "different" from requirements "under" the relevant federal statute. 7 U.S.C. §136v(b) (FIFRA); 21 U.S.C. §678 (FMIA); 21 U.S.C. §360k(a) (MDA).

Plaintiffs ignore this body of precedent, and instead seem to suggest that FDA's regulations are not requirements under the FDCA within the meaning of Section 379r. *See* Pls.' Br. 19 (faulting the district court for "turn[ing] to the implementing regulations of the FDA to define the boundaries of preemption"). But Congress has expressly endorsed FDA's regulatory approach to over-the-counter

21

drugs.  *See* 21 U.S.C. §355h(a)(1)(A).  The district court thus correctly followed the boundaries *Congress* set: it compared the state-law requirements asserted in the Complaint to federal requirements "under" the FDCA, including its implementing regulations.  That approach is in lockstep with Supreme Court precedent, Circuit precedent, and decisions of numerous district courts.[9]  In short, FDA regulations *do* establish "requirement[s] under [the FDCA]." 21 U.S.C. §379r(a)(2).

### B. Plaintiffs Seek to Impose State-Law Requirements That Are Not Identical to FDA Regulations.

Here, the differences between the applicable federal requirements and the putative state requirements are obvious.

**Federal Requirements.**  FDA "g[a]ve content" to the FDCA, *Bates*, 544 U.S. at 453, by regulating "[o]ral nasal decongestants" containing "[p]henylephrine hydrochloride," 21 C.F.R. §341.20(a)(1).  The FDCA requires FDA approval to sell medicine.  *Supra* p. 4.  FDA has approved over-the-counter phenylephrine by determining it is "generally recognized as safe and effective and … not misbranded," if sold in compliance with "each of the conditions in this part" (i.e., the monograph) and certain general conditions.   21 C.F.R. §341.1(a); *see also* 21 U.S.C.

---

[9] *See, e.g.*, *Singo v. Ricola USA Inc.*, 2024 WL 196709, at *6 (S.D.N.Y. Jan. 18, 2024); *Solak v. Target Corp.*, 2023 WL 5806326, at *5 (N.D.N.Y. Sept. 7, 2023); *Goldstein v. Walmart, Inc.*, 637 F.Supp.3d 95, 110 (S.D.N.Y. 2022); *Seale v. GSK Consumer Health, Inc.*, 2024 WL 1040854, at *6 n.5 (C.D. Cal. Feb. 27, 2024); *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 512 F.Supp.3d 1278, 1296 (S.D. Fla. 2021).

§355h(a)(1)(A) (reaffirming that "[a] drug is deemed to be generally recognized as safe and effective" when it complies with the applicable final monograph). In other words, FDA has established requirements governing the sale of phenylephrine.

Those requirements cover the "[l]abeling of nasal decongestant drug products." 21 C.F.R. §341.80. They require a drug containing phenylephrine to "identif[y] the product as a 'nasal decongestant.'" *Id.* §341.80(a). The labeling must state, under the heading "Indications," that the drug is "[f]or the temporary relief of nasal congestion" or that it "[t]emporarily relieves nasal congestion," or an equivalent statement of that indication. *Id.* §341.80(b)(1); *supra* p. 8. The regulation further provides that the labeling "may contain" certain other statements (or their equivalent), such as that phenylephrine "[h]elps clear … nasal passages," provides "temporary relief of … [a] stuffy nose," and "temporarily relieves sinus congestion and pressure." *Id.* §341.80(b)(2).

**State Requirements.** Notably, Plaintiffs avoid explaining exactly what they think Defendants' labeling should have said. In the district court, Plaintiffs disclaimed that they were challenging "the *statement of identity* on Defendants' labels," Dkt.225 at 10, i.e., the statement identifying phenylephrine "as a 'nasal decongestant,'" 21 C.F.R. §341.80(a). Instead, Plaintiffs objected to "indications" stating that oral phenylephrine "[t]emporarily relieves nasal congestion," Dkt.225 at

23

10, even though the regulation *requires* that phrase or its equivalent, 21 C.F.R. §341.80(b).

On appeal, Plaintiffs are less specific but seem to go even further, proposing to ban any description of the drugs as decongestants. They say that the "basis" of "each" of their claims is that "[Defendants] sell Oral PE as a decongestant," when, in Plaintiffs' view, "Oral PE does not in fact decongest." Pls.' Br. 23. They contend that Defendants should not have "represented" phenylephrine "to be effective as a decongestant." *Id.* at 2. And they assert that Defendants should have "disclose[d]" that "Oral PE does not decongest." *Id.* at 34 (emphasis omitted).

Whatever labeling Plaintiffs have in mind, it is far from identical to what federal regulations demand. As Plaintiffs' brief in this Court never disputes, Defendants *must* label their phenylephrine drugs as "nasal decongestants," 21 C.F.R. §341.80(a), they *must* say the drugs relieve nasal congestion, *id.* §341.80(b), and they *may* use certain other identified phrases describing the drugs' decongesting properties, *id.* Nowhere do FDA's regulations authorize or require Defendants to contradict those statements by adding that the drug does *not* decongest.

To illustrate the stark difference, here is a label containing the statements that the regulations expressly require and/or allow Defendants to say:

**Drug Facts**
**Active ingredient (in each tablet)**                                  **Purpose**
Phenylephrine HCl 10mg ……………………..…………………Nasal decongestant

**Uses**
- Temporarily relieves nasal congestion
- Decongests nasal passages; shrinks swollen membranes

And here is the label Plaintiffs apparently believe is required by state law:

**Drug Facts**
**Active ingredient (in each tablet)**                                  **Purpose**
Phenylephrine HCl 10mg ……………………..…………………………...None

**Uses**
- Does not relieve nasal congestion
- Does not decongest nasal passages or shrink swollen membranes

To put it mildly, these are not "exactly the same." *Critcher*, 959 F.3d at 35 (emphasis omitted).

### C.  Plaintiffs' Attempts to Evade Preemption Fail.

Plaintiffs try various ways to escape the normal operation of the preemption provision, some of which were barely or never presented to the district court. None is persuasive.

### 1.  Plaintiffs Cannot Invoke the General Misbranding Prohibition to Override FDA's Drug-Specific Regulation.

Attempting an end-run around the FDCA's express preemption clause, Plaintiffs argue (at 16, 20-22) that they are enforcing another part of the statute: the general misbranding provision. *See* 21 U.S.C. §352. Under that provision, a "drug … shall be deemed to be misbranded" if "its labeling is false or misleading in any

25

particular." *Id.* §352(a)(1); *see also id.* §331(a) (misbranded drugs may not be sold). In Plaintiffs' view, that means if a court or jury applying state law decides that FDA-mandated and -approved statements are "false," then it is illegal under federal law to make those very statements.

This Court rejected that exact argument in *Critcher*. There, consumers alleged they could not fully access the contents of cosmetics they bought and were therefore deceived into buying more than they could use. *Critcher*, 959 F.3d at 33. But FDA had promulgated regulations requiring labels to list "the net quantity of contents" of the cosmetic, without requiring "an additional disclosure" that "the cream that is accessible is less than the net quantity." *Id.* at 35-36.

Attempting to "rescue their claims from preemption," the plaintiffs argued that their claims "would merely … enforce the general FDCA requirement[] … that labels not be 'false and misleading in any particular,'" i.e., not be misbranded. *Id.* at 37-38 (quoting 21 U.S.C. §362(a), governing "Misbranded cosmetics"). But this Court held that the "general [misbranding] requirement" could not "be read to impose the particular labeling additions" the plaintiffs sought. *Id.* at 38. That was because "[t]he regulations" already "stated, with specificity, what information is necessary to avoid misleading consumers." *Id.* To conclude otherwise, the Court observed, would "disrupt what Congress intended to be a uniform—and federally-led—regulatory scheme." *Id.*

Against this backdrop, it is perplexing that Plaintiffs try to distinguish *Critcher* as "a case that did not involve misbranding." Pls.' Br. 25. Equally odd is their suggestion that *Critcher* is inapposite because the plaintiffs there sought "to impose a new labeling requirement." *Id.* at 26. That is exactly what Plaintiffs' claims here would impose: new labeling requirements prohibiting the identification of phenylephrine "as a decongestant," *id.* at 23, and mandating a "disclos[ure]" that "Oral PE does not decongest," *id.* at 34 (emphasis omitted).

The Supreme Court has also foreclosed such gambits. In *Bates*, the Court held that "[s]tate-law requirements must … be measured against any relevant EPA regulations that give content to FIFRA's misbranding standards." 544 U.S. at 453. The Court provided an example: a state-law claim "alleging that a given pesticide's label should have stated 'DANGER' instead of the more subdued 'CAUTION' would be pre-empted because it is inconsistent with" an EPA regulation, which assigns the words "DANGER" and "CAUTION" to specific products. *Id.* It surely would not change matters for a plaintiff to allege that a "CAUTION" label would mislead consumers, and that the agency's contrary decision was "incorrect" (Pls.' Br. 13).

The Supreme Court rejected a similar argument in *Riegel*, where the plaintiffs challenged the FDA-approved labeling and design of a medical device. 552 U.S. at 321. As here, the plaintiffs insisted they merely sought "to enforce" the "[f]ederal

27

law [that] prohibits the marketing of a misbranded product." Br. for Petrs., *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008) (No. 06-179), 2007 WL 2456946, at *41-43. But the Court found that FDA's approval "imposes 'requirements'" that go beyond "general labeling duties," and that these "device-specific 'requirements'" preempt additional state requirements. *Riegel*, 552 U.S. at 321-23.

Numerous circuits have followed suit. Courts considering state-law challenges to federally approved poultry labels subject to a similar preemption clause have rejected arguments that the plaintiffs' "claims are not preempted" "because they have alleged misbranding." *Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1025 (10th Cir. 2022). Because an agency exercising delegated authority "already determined that defendants' labels are not deceptive or misleading," those products "are not misbranded." *Id.*; *accord Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1288 (9th Cir. 2021) ("Congress granted a federal agency the authority to uniformly determine the standard for poultry mislabeling," and misbranding claims cannot be used "to second-guess the agency's decisions"). And under FIFRA, the Third Circuit embraced an approach "that incorporates content-giving regulations" over "one based solely upon the broad statutory definition of misbranding," because the "broad statutory definition of misbranding is likely to be applied less uniformly in practice than a regulatory requirement to include specific contents on … labels." *Schaffner v. Monsanto Corp.*, 113 F.4th 364, 392-93 (3d Cir. 2024).

Here, as in those cases, Plaintiffs' use of the general misbranding statute to override FDA's drug-specific regulation would upend "what Congress intended to be a uniform—and federally-led—regulatory scheme." *Critcher*, 959 F.3d at 38. FDA has "already determined that defendants' labels are not deceptive or misleading," making their medicines "not misbranded." *Thornton*, 28 F.4th at 1025. Under Congress's statutory design, a plaintiff cannot claim that an FDA-mandated label is false because FDA was "incorrect" (Pls.' Br. 13). It would make especially little sense to say that a label is false and misleading as a matter of federal law because it states that a drug is effective, when Congress instructed that such a drug is "recognized as … effective." 21 U.S.C. §355h(a)(1).[10]

Plaintiffs' characterization of the FDA regulations as "decades-old" does not help them. Pls.' Br. 20. The regulation that imposes requirements on Defendants' products is currently in effect and has the force of law. *See* Final Administrative

---

[10] None of Plaintiffs' collection of district court decisions (at 20) involved federal requirements that specifically regulated the subject of the plaintiffs' state-law claims, as exist here. *See Canale v. Colgate-Palmolive Co.*, 258 F.Supp.3d 312, 318-23 (S.D.N.Y. 2017) (federal requirements did not "specifically regulate[] the subject matter of [plaintiffs'] state law claims"); *Booker v. E.T. Browne Drug Co., Inc.*, 2021 WL 4340489, at *7 (S.D.N.Y. Sept. 23, 2021) (similar); *Reid v. GMC Skin Care USA Inc.*, 2016 WL 403497, at *10 (N.D.N.Y. Jan. 15, 2016) (similar). To the extent those cases suggest that FDA only sets a floor upon which states can build, they are superseded by *Critcher*. *See* 959 F.3d at 37 (embracing broad reading of the FDCA's preemption provision by "draw[ing] on similar conclusions already reached by … courts in this Circuit," including *Bimont v. Unilever U.S., Inc.*, 2015 WL 5256988, at *4 (S.D.N.Y. Sept. 9, 2015)).

Order OTC000026; 21 U.S.C. §355h(b)(1); *supra* pp. 6, 9. And Congress has specified how those requirements may be modified, or how an over-the-counter drug may be deemed no longer effective: through action by, or at the direction of, "[t]he Secretary" of Health and Human Services. 21 U.S.C. §355h(b)(1). Claiming that the FDA-mandated label is misbranded is not a shortcut around that process.

In a similar vein, Plaintiffs are wrong to suggest that the general regulation governing over-the-counter drugs, 21 C.F.R. §330.1, required Defendants to change their labeling when it allegedly became apparent that phenylephrine was ineffective. Pls.' Br. 28-29 & n.12. Section 330.1 provides that a drug "is not misbranded" if it "contain[s] the labeling describing the 'Indications' that have been established in an applicable [over-the-counter] drug monograph *or* alternative truthful and nonmisleading statements…, subject to" the FDCA's misbranding provision. *Id.* §330.1, (c)(2) (emphasis added). Plaintiffs tout the "subject to" proviso. Pls.' Br. n.29. But that proviso applies only to the last antecedent, i.e., "alternative truthful and nonmisleading statements." Even as to such alternative statements, "the monograph language" is the "standard in determining whether [they] are accurate." 51 Fed. Reg. 16, 258, 16,259 (May 1, 1986). In other words, manufacturers may use alternative statements to describe a drug's FDA-approved indications, but that alternative language must "not be inconsistent with that [product's] indication for use." 50 Fed. Reg. 15,810, 15,813 (April 22, 1985).

30

This reading of Section 330.1 is confirmed by ordinary tools of interpretation. Plaintiffs' construction renders the regulation circular and self-defeating, effectively saying that "a drug is not misbranded unless it is misbranded." Courts have rightly rejected this. *See, e.g.*, *Goldstein*, 637 F.Supp.3d at 112 n.6 ("Plaintiff's argument would permit a state to restrict a manufacturer from using any language the state deemed to be false or misleading, … even if the language that the states would restrict was language that the FDA would require."). The regulatory history points in the same direction. An earlier version of Section 330.1 included one subsection mandating the use of "the 'Indications' that have been established in an applicable final monograph." 21 C.F.R. §330.1(c)(2)(i) (1997). A distinct subsection allowed "alternative … truthful and nonmisleading statements" of those indications, *id.* §330.1(c)(2)(ii) (1997). *Only* the latter subsection included the misbranding proviso. *Id.* When FDA merged the subsections, it did so to "shorten[] and simplify[]"—not to radically change its regulatory approach by requiring regulated parties to second-guess the specific labeling language FDA has mandated. 64 Fed. Reg. 13,254, 13,271 (Mar. 17, 1999).[11]

---

[11] Plaintiffs (at 29 n.12) observe that "[t]he specific monograph for PE drugs contains the same language" on misbranding. That just proves Defendants' point. In the nasal decongestant regulation, the misbranding proviso is only in the sentence concerning "[o]ther truthful and nonmisleading statements." 21 C.F.R. §341.80(b). The previous sentence, requiring the use of the FDA-mandated statement of indications, contains no misbranding proviso. *Id.* The structure of Section 341.80(b) (continued…)

### 2. *Loper Bright* Does Not Make FDA's Drug-Specific Regulations Irrelevant to Preemption.

Perhaps cognizant that their misbranding argument runs headlong into binding precedent, Plaintiffs suggest (at 17) that *Loper Bright* changes everything. Plaintiffs seem to admit that they forfeited this argument by not making it below, even though *Loper Bright* was handed down before Plaintiffs filed their district court brief. Pls.' Br. 18 n.5. Plaintiffs contend that *Loper Bright* "came up in passing at oral argument," *id.*, but neglect to mention that the context in which it arose was Plaintiffs arguing that the case *should not* impact deference to FDA's reading of its own regulations, *see* SA-3 17:1-19.[12] In any event, *Loper Bright* does not alter the applicability of preemption here.[13]

*Loper Bright* holds that when reviewing agency action, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 603 U.S. at 412. In finding no "delegation of *law-interpreting power*" to agencies, *id.* at 399-400, the Court in no way undermined agencies' ability to give content to federal requirements through regulation. To the

---

thus confirms Defendants' reading of Section 330.1. The two provisions can, and should, be read harmoniously.

[12] This citation refers to the Supplemental Appendix of Defendants-Appellees.

[13] Plaintiffs' effort to avoid forfeiture—arguing that the relevant lessons of *Loper Bright* are not "new law," Pls.' Br. 18—only confirms that *Loper Bright* is consistent with all the precedent just discussed.

contrary, the Supreme Court recognized that a "statute's meaning may well be that the agency is authorized to exercise a degree of discretion," including by "prescrib[ing] rules to 'fill up the details' of a statutory scheme." *Id.* at 394-95.

*Loper Bright* confirms that this Court should independently interpret Section 379r—just as this Court did in *Critcher* with respect to Section 379s. Of course, *applying* the preemption provision requires identifying the relevant "requirements under [the FDCA]." 21 U.S.C. §379r(a)(2). And that means considering "any relevant [agency] regulations that give content to" the statutory standards, *Bates*, 544 U.S. at 453, as FDA is authorized by Congress to do, *see* 21 U.S.C. §§393, 355h(a)(1). The "best reading" of the FDCA is that Congress "empower[ed] [FDA] to prescribe rules to 'fill up the details' of" over-the-counter drug regulation. *Loper Bright*, 603 U.S. at 395; *see also Schaffner*, 113 F.4th at 381 n.9 (holding, as part of express preemption analysis, that "we do not read [*Loper Bright*] to undermine [an agency's] authority to promulgate the regulations that implement [a statute]"). *Loper Bright* thus did not disturb the well-settled rule that federal regulations can have preemptive effect, including when Congress has enacted an express preemption provision focused on federal "requirements" and delegated to an agency the authority to prescribe such requirements.

### 3. The "Product Liability" Exception Is Inapplicable.

Plaintiffs argue that "each" of their New York law claims survives under Section 379r(e), which is an exemption from preemption for claims "under the product liability law of any State." Pls.' Br. 23-24. In the district court, Plaintiffs argued only that their "express warranty claims are not preempted" under the exception. Dkt.225 at 13. Their much-broader argument on appeal is forfeited. *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132-33 (2d Cir. 2008).

In any event, none of Plaintiffs' state-law claims falls within the exception. Plaintiffs allege only economic losses, not personal injuries. *See* A-137 ¶15. And it is well settled that "product liability law" excludes claims for pure economic loss. *See, e.g.*, *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 868-69, 872, 876 (1986) (no products-liability claim when only injury is economic loss); *Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 714 F.3d 1253, 1259 (11th Cir. 2013) (similar); Restatement (Third) of Torts: Products Liability §21, cmt. a (1998) ("pure economic loss" more appropriately assigned to contract law and remedies). Unsurprisingly, courts routinely hold that claims for "purely economic injury," including New York warranty claims, do not fall within the product-liability exception to preemption. *See, e.g.*, *Goldstein*, 637 F.Supp.3d at 113 n.7; *Singo*, 2024 WL 196709, at *5.

34

Any other result would read the exception to swallow the rule. If Plaintiffs are right that a plaintiff claiming economic injury from purchasing a product has a "product liability" claim, then seemingly any claim concerning an over-the-counter drug could be classified a "product liability" claim—significantly defanging Congress's uniformity provision.

Plaintiffs' authorities only support Defendants' arguments. Plaintiffs highlight a treatise's definition of "products liability" as "relat[ing] to liability arising from injury or damages resulting from the use of a product." *See* Pls.' Br. 23 (quoting 72A *C.J.S. Products Liability* §1). But economic loss from purchasing an allegedly worthless drug is not injury or damage from *the use of* the product. Even the cases Plaintiffs cite (at 24) to highlight their warranty claims all involved personal injury, not solely economic loss. *See Diaz v. Little Remedies Co.*, 81 A.D.3d 1419, 1420-21 (N.Y. App. Div. 2011); *Voss v. Black & Decker Mfg. Co.* 59 N.Y.2d 102, 104-05, 110 (N.Y. Ct. App. 1983).[14]

Properly interpreted, the product-liability exception also validates the district court's distinction between efficacy and safety claims. *See* SPA-11-13. Plaintiffs (at 16) insist that this distinction lacks textual support, but it is right there in Section

---

[14] Plaintiffs' citation (at 26) to *In re Hair Relaxer Marketing Sales Practices & Products Liability Litigation*, 702 F.Supp.3d 692 (N.D. Ill. 2023), is inapposite for the same reason. In that case, the plaintiffs had alleged not only "economic loss" and "pecuniary loss," but also "personal injury, loss of companionship and society, mental anguish and/or other compensable injuries." *Id.* at 700.

379r(e): if a drug is unsafe and causes physical harm, physically injured plaintiffs can avoid preemption. Further, when new information emerges that a drug is "dangerous to health," there may be a federal duty to pull it from the market. *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 487 n.4 (2013). There is nothing similar in the statute about immediately stopping sales of a drug when its efficacy is questioned, even while FDA considers the issue and confirms that the drug remains approved. Congress's choice makes perfect sense: at least when an issue relates to efficacy rather than safety, there is no reason for private litigation to outpace FDA's regulatory process.

### 4. Plaintiffs' Purported "Non-Monograph" Claims Fail.

Plaintiffs make a last-ditch attempt to save two categories of claims: (1) challenges to Defendants' alleged "failure to disclose"; and (2) challenges to Defendants' use of the phrase "Maximum Strength" on certain products. Pls.' Br. 34. Neither survives preemption.[15]

---

[15] Plaintiffs make a passing reference to the fact that one Defendant, Haleon, markets two of its oral phenylephrine medicines under an approved New Drug Application. Pls. Br. 30; Dkt. 225 at 3 n.2. Preemption applies the same way for those drugs—the "NDA approval process establishes a federal requirement for drug labeling under Section 379r." *Mills v. Warner-Lambert Co.*, 581 F.Supp.2d 772, 786, 793 (E.D. Tex. 2008); *see also* 21 U.S.C. §379r(a)(1) (preemption applies to all drugs except those regulated as prescription drugs). Haleon's NDA-approved packaging indicates those products treat "Nasal Congestion," "Nasal Swelling," and "Sinus Pressure," A-209 ¶329, all of which are also monograph-approved indications, 21 C.F.R. §341.80(b). Because Plaintiffs' claims would require Haleon to state something (continued…)

**"Failure to Disclose."** Plaintiffs briefly contend that Defendants should have "disclose[d] the truth" that phenylephrine is ineffective in various places, which they argue does not "implicate[] the monograph." Pls.' Br. 34-35. But the regulation requires Defendants to state on their labeling that phenylephrine decongests, and it nowhere requires Defendants to find some other way to tell consumers the opposite. A state-law requirement to say that phenylephrine does not decongest is at least "in addition to" what the federal regulation requires. 21 U.S.C. §379r(a)(2). Indeed, Plaintiffs' "failure-to-disclose" theory is squarely foreclosed by *Critcher*, where the plaintiffs similarly framed their claim as a "fail[ure] to disclose." 959 F.3d at 36.

It also does not matter whether such a disclosure would take place on the labeling or off, as the applicable preemption provision is not limited to labeling requirements. *Compare* 21 U.S.C. §379s(a) (cosmetics preemption provision applying to "any requirement for labeling or packaging"), *with id.* §379r(a) (over-the-counter drug preemption provision applying to "any requirement"); *see also id.* §379r(c)(2) (defining the scope of preemption to include any "form of public communication relating to a warning of any kind for a drug"). For this reason, "[c]ourts find that §379r pre-empts even state-law advertising claims, provided the

---

different, they are preempted. *See, e.g.*, *Smith v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 660 F.Supp.3d 863, 873-74 (N.D. Cal. 2023); *Carter v. Novartis Consumer Health, Inc.*, 582 F.Supp.2d 1271, 1280, 1290 (C.D. Cal. 2008).

advertisements are based upon content approved by the FDA for a drug's labeling, in addition to claims that would require additional warnings on labeling or in an advertisement." *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 512 F.Supp.3d at 1296 (internal citation omitted).

Plaintiffs make a related mistake in pointing to materials on one Defendant's website, as evidence that all Defendants "*could have* updated their labels." Pls.' Br. 31. Whether or not Defendants "could have" made an additional disclosure is beside the point. If that disclosure is not a federal *requirement*, then state law may not force Defendants to make it, because it would impose a state-law requirement "in addition to" and "not identical with" the federal requirements. 21 U.S.C. §379r(a)(2); *supra* Section I.A.

**"Maximum Strength."** Plaintiffs also cannot sustain their challenge to labeling statements that certain products are "maximum strength" or suitable for treating "severe" symptoms. Pls.' Br. 35. This theory received scant attention in Plaintiffs' briefing below because, as presented in the Complaint, it was derivative of their ineffectiveness theory. *See, e.g.*, A-152 ¶70 ("Defendants' PE Products *also* include claims that those PE products are of 'maximum strength,' despite the products having no efficacy at all."). The district court properly rejected that theory for the same reasons it rejected Plaintiffs' other claims: "[t]hose statements are only false and misleading if PE is ineffective." SPA-9 n. 2.

Plaintiffs try to switch tacks in this Court. They do not dispute that if the falsity of "maximum strength" is the product's alleged ineffectiveness, then that claim rises and falls with their main theory. But they now argue that "maximum strength" is false for a different reason: it is a "claim of comparative strength between the manufacturers' oral nasal decongestants … and other oral nasal decongestants available in the market." Pls.' Br. 35. However, this "comparative strength" claim was not made in the Complaint, which Plaintiffs agreed would contain "sufficient representative examples of the conduct and claims that they allege to be wrongful." A-132. The closest the Complaint comes is a passing remark in a footnote that the "maximum strength" representations are "particularly absurd" because there are "other … products that unequivocally work better." A-152 n. 19. But Plaintiffs' actual claim for relief was that Defendants "falsely state that their products had properties such as 'maximum strength' that *their products did not have*." A-234 ¶448 (emphasis added). Nor would any other claim have made sense—a consumer would naturally understand "Maximum Strength" to refer to the maximum dosage permitted of a particular drug, not a comparative claim about an entirely different drug.[16]

---

[16] The lidocaine cases Plaintiffs point to are inapposite for this reason, too, as they do not address preemption and were not about whether lidocaine is the strongest topical anesthetic. *See Gonzalez Rodriguez v. Walmart Inc.*, 2023 WL 2664134, at *4 (S.D.N.Y. Mar. 28, 2023); *Stevens v. Walgreen Co.*, 623 F.Supp.3d 298, 301 (S.D.N.Y. 2022) (similar).

Accordingly, the Complaint's "maximum strength" claims amount to the same challenge to the effectiveness of phenylephrine, and the district court correctly held those claims are preempted to the same extent as Plaintiffs' other claims. Plaintiffs' attempt to advance an entirely different theory on appeal is forfeited. *See Nortel*, 539 F.3d at 132-33.

### D. Implied Conflict Preemption Bars Plaintiffs' State-Law Claims.

While this Court (like the district court) need not reach conflict preemption, it can also affirm on that alternative ground. The presence of an "express pre-emption provision" in the FDCA "does *not* bar the ordinary working of conflict pre-emption principles." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000); *see also Marentette*, 886 F.3d at 120 (same). Two forms of conflict preemption—impossibility and obstacle—separately require dismissal.

**Impossibility.** State law is preempted when it is "impossible for a private party to comply with both state and federal requirements." *Bartlett*, 570 U.S. at 480. The "basis" of Plaintiffs' case is that state law forbids Defendants to "sell Oral PE as a decongestant." Pls.' Br. 23. But under federal law, the *only* way to sell oral phenylephrine is as a "nasal decongestant" and that "relieves nasal congestion," or something equivalent. 21 C.F.R. §341.80(a)-(b). A drug that does not "conform" to these requirements is "liable to regulatory action." *Id.* §330.1.

40

Plaintiffs baldly assert (at 30) that manufacturers of drugs subject to the monograph "can bypass individualized review by the FDA entirely" and simply "revise their labeling," but they do not explain how. They cite a case in which a district court found that a *safety* warning (which is not at issue here) could be supplemented while still "meet[ing] the conditions in the … applicable regulations" because a manufacturer would not have to "replace or otherwise modify" the FDA-required warning. *In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 2022 WL 17348351, at *7, *9 (S.D.N.Y. Nov. 14, 2022). Whether *Acetaminophen* was right or wrong, Plaintiffs here plainly do demand that Defendants "replace or otherwise modify" the FDA-mandated labeling. There is simply no way to meet the purported state-law demand—do not "sell Oral PE as a decongestant," Pls.' Br. 23—while also complying with the conditions of the federal regulation—describe phenylephrine as a "nasal decongestant" and say it "relieves nasal congestion," 21 C.F.R. §341.80(a)-(b).

It is no answer for Plaintiffs to suggest that Defendants just "not sell[] the Oral PE products." Pls.' Br. 31 n.14. The Supreme Court has squarely "reject[ed] this 'stop-selling' rationale as incompatible with [its] pre-emption jurisprudence," which presumes "an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability." *Bartlett*, 570 U.S. at 488; *see also PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618-26 (2011). And while

41

Plaintiffs point to a footnote in *Bartlett* leaving open the possibility of a stop-selling theory when a drug is "dangerous to health" based on "new and scientifically significant information that was not before the FDA," 570 U.S. at 487 n.4, the issue here is efficacy, not safety, and the allegedly new information is before FDA, which has confirmed that phenylephrine remains approved.

Nor can Plaintiffs explain what "fact finding" is needed here. Pls.' Br. 29. Preemption is a legal question "for the judge," *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 315 (2019), and this Court has applied impossibility preemption at the motion-to-dismiss stage, *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 709 (2d Cir. 2019). There is no reason not to do so here.

**Obstacle.** Even when compliance with both federal and state law is technically possible, a state-law claim is preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Marentette*, 886 F.3d at 117 (quotation omitted). Courts examine "the federal statute as a whole and identify[] its purpose and intended effects." *Id.* (quotation omitted).

The FDCA's purpose and intended effect is to create a "uniform—and federally-led—regulatory scheme." *Critcher*, 959 F.3d at 38. And in the CARES Act, Congress reaffirmed that if a drug is "in conformity with the requirements for nonprescription use of a final monograph," as Defendants' products are, it is

"deemed to be generally recognized as … effective." 21 U.S.C. §355h(a)(1)(A)(i). Yet, on Plaintiffs' view, state law can be used to recognize such a drug as *ineffective*—directly obstructing Congress's judgment.

This is not a case where state law could be regarded "as a complementary form of drug regulation," with FDA standards setting "a floor upon which States could build." *Wyeth*, 555 U.S. at 577-78. Plaintiffs think FDA is flat-out "incorrect" and believe state law should overrule it. Pls.' Br. 13; *see also id.* at 17 (faulting FDA for "permit[ting] false statements"). That is exactly the use of state law the Supremacy Clause does not tolerate. If Plaintiffs were permitted to proceed, every State (not to mention multifarious juries) could take a different approach to regulating phenylephrine—undermining FDA's exercise of congressionally delegated authority and introducing confusion and inefficiencies.

This case is just like *Marentette v. Abbott Laboratories, Inc.*, where this Court applied obstacle preemption to dismiss state-law claims challenging the certification of infant formula as organic. 886 F.3d at 114. There, the relevant federal statute assigned a "certifying agent" responsibility for deciding whether a manufacturer complied with organic certification requirements. *Id.* at 115-16. According to the plaintiffs, however, the certified formula was "not actually organic." *Id.* at 118. That claim was preempted because there was no way to accept it "without contradicting the certification decision, and, through it, the certification scheme that

43

Congress enacted." *Id.* The plaintiffs' claim would "necessarily undermine[]" Congress's purpose" "because it demands adjudication of a product's organic status separate and apart from the scheme Congress laid out in the law." *Id.* That conclusion was bolstered by Congress's "enforcement scheme," which "allocates enforcement power to the federal agency and accredited agents," not "individual consumers." *Id.* at 120.

Just so here. Congress charged FDA with making decisions about the efficacy of over-the-counter drugs, and it instructed that a drug made in conformity with an FDA monograph or administrative order be recognized as effective. Plaintiffs want state law to "contradict[]" FDA's efficacy decision, "and, through it, the … scheme that Congress enacted," creating a state-law "adjudication of [an over-the-counter drug's efficacy] separate and apart from the scheme Congress laid out in the law." *Id.* at 118. And Plaintiffs would have jurors displace the authority Congress assigned to revisit these decisions: "[t]he Secretary." 21 U.S.C. §355h(b)(1)(C). To "permit a jury to second-guess" FDA approvals and determine that its decisions "were inadequate under state law would displace the FDA's exclusive role and expertise." *Gomez v. St. Jude Med. Daig Div. Inc.*, 442 F.3d 919, 930-31 (5th Cir. 2006); *see also Bowling v. Johnson & Johnson*, 65 F.Supp.3d 371, 377 (S.D.N.Y. 2014) ("[T]he whole point of section 379r is that it is not up to private litigants—or judges—to

decide what is 'false or misleading.'  It is up to the FDA.").  It is hard to imagine a more direct conflict between a state-law claim and a federal scheme.

## II.    Plaintiffs' RICO Claim Fails.

Faced with preemption of their state-law claims, Plaintiffs introduced a RICO claim at the eleventh hour.  It fails for two reasons.  First, because Plaintiffs purchased the products at issue from retailers, not the RICO Defendants, they lack statutory standing under the "indirect-purchaser rule"—a rule every circuit to resolve the issue has applied in the RICO context.  Second, under the doctrine of preclusion—a close cousin of preemption—Plaintiffs cannot use RICO's general provisions to override Congress's and FDA's specific regulation of over-the-counter medicines.

### A.    Plaintiffs Lack Statutory Standing.

#### 1.    RICO's Text Incorporates the Indirect-Purchaser Rule.

Congress limited standing under RICO to a "person injured in his business or property" by the violation.  18 U.S.C. §1964(c).[17]  Construing the same statutory language in the Clayton Act, the Supreme Court has long held that an "overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the

---

[17] As relevant, §1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee …."  18 U.S.C. §1964(c).

party 'injured in his business or property.'" *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977). In other words, when Congress allows suits by "*any person …* injured in his business or property," it "authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers." *Apple Inc. v. Pepper*, 587 U.S. 273, 279 (2019). Courts call this the "indirect-purchaser rule" (or sometimes the direct-purchaser rule), and it is a "bright-line": courts may not "ask whether the rationales" for the rule apply "in every individual case." *Id.* at 285.

Plaintiffs here claim to be "injured in their business and/or property" by their alleged "overpayment for oral PE Products." A-249 ¶512. But Plaintiffs do not allege that they overpaid the RICO Defendants. Nor do they dispute that they are indirect purchasers. SPA-14-15. They nevertheless contend that indirect purchasers who pay an overcharge are "injured in their business or property" for RICO purposes, even though indirect purchasers who pay an overcharge are *not* "injured in their business or property" for antitrust purposes. But RICO's text, Supreme Court precedent, and the overwhelming consensus of courts that have considered the issue leave no doubt that the rule applies with equal force to RICO.

"Congress modeled §1964(c)," RICO's civil-action provision, "on the civil-action provision of the federal antitrust laws." *Holmes*, 503 U.S. at 267. Accordingly, courts must "assume [Congress] intended [the words in RICO] to have the same meaning that courts had already given them" in the antitrust context. *Id.* at

46

268. By the time Congress enacted RICO, the Supreme Court had interpreted the relevant Clayton Act language—"any person … injured in his business or property"—to adopt the indirect-purchaser rule. *See* 15 U.S.C. §15(a). That same language should therefore carry the same meaning in RICO as it does under the Clayton Act.

The indirect-purchaser rule was "established in *Hanover Shoe* and *Illinois Brick.*" *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990). *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, was decided in 1968—two years before RICO's 1970 enactment. It held that a direct purchaser that paid an "illegally high" price is "injured in his business or property" under section 4 of the Clayton Act, whether or not the direct purchaser passed on the overcharge to others. *Id.* at 489-90. *Illinois Brick* addressed "the other side of the coin." *Apple*, 587 U.S. at 290 (Gorsuch, J., dissenting). It applied "the construction given §4 in *Hanover Shoe*," under which "others in the chain of … distribution"—i.e., indirect purchasers—are not the "party 'injured in his business or property' within the meaning of the section." *Illinois Brick*, 431 U.S. at 729. Any other reading, the Court held, would "open the door to duplicative recoveries" and bog down litigation in the "evidentiary complexities and uncertainties" of determining just how much of the initial overcharge had been passed on. *Id.* at 731-32.

47

There is no basis for a different result under the identical language in RICO's civil-action provision. *See Holmes*, 503 U.S. at 268; *Biederman v. FCA US LLC*, 2025 WL 1266907, at *2 (N.D. Cal. May 1, 2025). The indirect-purchaser rule does not "turn on the particulars of antitrust cases," as Plaintiffs suggest. Pls.' Br. 39. Rather, *Illinois Brick* and *Hanover Shoe* "followed earlier cases" outside the antitrust context. *Illinois Brick*, 431 U.S. at 751. They highlighted a 1918 case involving a rail company's overcharge for freight, which held that "the only one who can take [an illegal profit] from [a defendant] is the one that alone was in relation with him, and from whom the [defendant] took the sum." *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 534. "[T]he ultimate consumer who in turn paid an increased price" would lack standing to recover. *Id.*

In light of the statutory text and precedents interpreting it, there is a broad consensus that the indirect-purchaser rule applies to the Clayton Act and RICO alike. This Court has observed that purchasers who allegedly suffered indirect injuries "probably cannot recover under RICO, just as they cannot recover under the antitrust laws." *Sperber v. Boesky*, 849 F.2d 60, 65 (2d Cir. 1988). The three circuits to squarely resolve the issue have all concluded that the indirect-purchaser rule applies to RICO. *See Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 604 (6th Cir. 2024) ("The indirect-purchaser rule … applies to civil RICO claims with equal force."); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) ("The precepts

48

taught by *Illinois Brick* and *UtiliCorp* apply to RICO claims, thereby denying RICO standing to indirect victims."); *Carter v. Berger*, 777 F.2d 1173 (7th Cir. 1985) (The "*Illinois Brick* rule… applies to RICO."). District courts across the country are in accord. *See, e.g.*, *Biederman v. FCA LLC*, 765 F.Supp.3d 920, 931-34 (N.D. Cal. 2025); *MSP Recovery Claims, Series LLC v. Pfizer, Inc.*, 728 F.Supp.3d 89, 107 (D.D.C. 2024), *appeal docketed*, No. 25-7045 (D.C. Cir. Apr. 8, 2025); *United Health Care Servs., Inc. v. United Therapeutics Corp.*, 2024 WL 1256266, at *11 (D. Md. March 25, 2024); *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 2024 WL 37208, at *4 (E.D. Va. Jan. 3, 2024), *aff'd*, 130 F.4th 91, 105 (4th Cir. 2025); *Humana, Inc. v. Biogen, Inc.*, 666 F.Supp.3d 135, 154 (D. Mass. 2023), *aff'd*, 126 F.4th 94, 98 (1st Cir. 2025); *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 546 F.Supp.3d 1216, 1221-25 (S.D. Fla. 2021); *Harris Cnty. v. Eli Lilly & Co.*, 2020 WL 5803483, at *12 (S.D. Tex. Sept. 29, 2020).

Plaintiffs admit that the Third, Sixth, and Seventh Circuits "hold that the indirect purchaser rule applies in RICO," and there are no "Circuit conflicts." Pls.' Br. 49-50. Plaintiffs nonetheless invite this Court to create a circuit split based on policy considerations. Pls.' Br. 40-43, 50-51. For instance, Plaintiffs claim that the direct purchasers (here, retailer intermediaries) were not injured because they "were not the intended recipients of the fraudulent statements." Pls.' Br. 42. Plaintiffs

therefore express concern that the direct purchasers will not be able to "hold [the RICO Defendants] accountable." *Id.*

Those arguments not only ignore key allegations in the Complaint but also are foreclosed by Supreme Court precedent. In their Complaint, Plaintiffs allege that the RICO Defendants caused harm by overcharging for a "worthless" product. A-248-50, ¶¶509, 512, 515. That harm—by Plaintiffs' own framing—necessarily extends to direct purchasers of the allegedly "worthless" product as well. And even if the direct purchasers in this case choose not to sue when they pass "100 percent of" the overpayment "to their customers," the Supreme Court has rejected that exact concern as a reason for crafting an exception to the indirect-purchaser rule. *UtiliCorp*, 497 U.S. at 208. The Court recognized that "[t]he rationales underlying [the indirect-purchaser rule] will not apply with equal force in all cases," but held it would be "an unwarranted and counterproductive exercise to litigate a series of exceptions." *Id.* at 216-17.

For that same reason, Plaintiffs' reliance on dicta in a footnote from the Sixth Circuit fares no better. Although the Sixth Circuit questioned whether "economic realit[ies] today" justify a bright-line indirect-purchaser rule—in either the RICO or antitrust context—that court properly acknowledged that policy considerations could not affect its analysis, as it "must be faithful to the Supreme Court's admonition against finding exceptions to the indirect-purchaser rule." *Fenner*, 113

F.4th at 604 n.6. The same holds true here. Policy concerns cannot justify a departure from the indirect-purchaser rule. This Court should decline Plaintiffs' invitation to create a circuit split.

### 2. RICO's Proximate-Cause Requirement Does Not Displace the Indirect-Purchaser Rule.

Plaintiffs cannot avoid the indirect-purchaser rule by pointing to a series of decisions addressing RICO's "analytically distinct" proximate-cause requirement. *McCarthy*, 80 F.3d at 851 n.14. A flexible proximate causation standard and a bright-line indirect-purchaser rule comfortably coexist in antitrust law, and do the same in RICO.

The proximate causation requirement flows from "the statutory words 'by reason of.'" *Holmes*, 503 U.S. at 279 (O'Connor, J., concurring). It concerns whether "a particular plaintiff's injury was too remote from" the proscribed conduct. *McCarthy*, 80 F.3d at 851 n.14. That inquiry "is subtle and resists the use of hard-and-fast 'black letter' rules," *id.*, as Plaintiffs stress in their brief (at 46-49). By contrast, the indirect-purchaser rule is a "construction" of different statutory words: "injured in his business or property." *Illinois Brick*, 431 U.S. at 729. And unlike the subtleties of proximate cause, the indirect-purchaser rule is a "bright-line rule." *Apple*, 587 U.S. at 279.

Contrary to Plaintiffs' suggestion, the Supreme Court's and this Court's proximate causation cases do not implicitly reject the indirect-purchaser rule under

RICO. Nor could they—those cases involved "no purchasing relationship … between the parties." SPA-16; *see, e.g.*, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) (competing participants in auction); *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 13 (2010) (municipal government and business that failed to comply with registration requirements); *Alix v. McKinsey & Co.*, 23 F.4th 196, 204 (2d Cir. 2022) (competing bankruptcy advisers).

Many courts have thus considered and roundly rejected the same argument Plaintiffs make here. *See, e.g.*, *Pfizer*, 728 F.Supp.3d at 107 ("None of the cases that the plaintiffs cite … suggests that the Supreme Court's proximate cause analysis in RICO cases would supplant *Illinois Brick.*"); *In re Insulin Pricing Litig.*, 2019 WL 643709, at *11 (D.N.J. Feb. 15, 2019) ("*Bridge* … does not stand for the proposition that plaintiffs multiple levels down the consumer chain may possess RICO standing despite the indirect purchaser rule."). On the contrary, the proximate cause "opinions' emphasis on the textual and contextual similarities between RICO and the Clayton Act suggests the opposite"—that the indirect-purchaser rule does apply to RICO—"especially because *Illinois Brick* and other proximate cause doctrines coexist in the antitrust context." *Pfizer*, 728 F.Supp.3d at 107; *see United Healthcare*, 2024 WL 1256266, at *9 ("The Court's reasoning [in *Holmes*, *Bridge*, and *Hemi Group*] all but dictates that the [indirect-purchaser rule] applies as well.").

### 3. *Horn*'s and *Sedima*'s Rejection of an "Antitrust Injury" Requirement Do Not Undermine the Indirect-Purchaser Rule.

The Supreme Court's recent decision in *Medical Marijuana, Inc. v. Horn*, 145 S. Ct. 931 (2025), does not alter the analysis. *Horn* simply reaffirmed the Supreme Court's longstanding recognition that the concept of "antitrust injury" has no RICO analogue. But the statutory construction at issue here—that only an "overcharged direct purchaser" is "the party 'injured in his business or property,'" *Illinois Brick*, 431 U.S. at 729—has straightforward application, no matter whether the overcharge is caused by a RICO or antitrust violation.

In *Horn*, the Supreme Court held that RICO permits recovery for an injury to "business or property" that flows from "an antecedent personal injury." 145 S. Ct. at 938. To the extent antitrust plaintiffs cannot recover for such injuries, the Court clarified, it is "because of a requirement that we have expressly declined to extend to civil RICO"—namely, the requirement of "an injury of the type the antitrust laws were intended to prevent." *Id*. at 942 (internal quotation marks omitted). The Court pointed to *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985), where it had "concluded that transplanting this cause-of-action-specific interpretation of 'injured' into the RICO context would be inappropriate" and "held that a civil RICO plaintiff need not allege a 'racketeering' or 'RICO-type injury.'" *Horn*, 145 S. Ct. at 943 (describing and citing *Sedima*, 473 U.S. at 484-85) (cleaned up).

53

In treating the Clayton Act and §1964(c) as not completely "interchangeable," *Horn* simply "reiterate[d]" *Sedima*'s longstanding holding that there is no RICO analogue to "antitrust injury." *Id*. Yet *Sedima* is plainly compatible with the indirect-purchaser rule. As the Seventh Circuit explained, although "*Sedima* held that the 'antitrust injury' rule of antitrust does not apply to RICO, … this is so because 'RICO injury' would be an unintelligible requirement, not because there is no parallel between the two statutes." *Carter*, 777 F.2d at 1176. Given the breadth of the RICO statute and the number of predicate acts it covers, one cannot say what a paradigmatic "racketeering" or "RICO injury" is supposed to be. *See Sedima*, 473 U.S. at 495 (describing the concept as "amorphous"). There is no such difficulty in applying the indirect-purchaser rule. If a plaintiff is not a direct purchaser, that plaintiff is simply not "the party 'injured in his business or property'" within the meaning of the statute, *Illinois Brick*, 431 U.S. at 729, and nothing about RICO makes that analysis any less straightforward than in the antitrust context.

In short, as one court recently put it, "*Sedima* has no bearing on whether the indirect purchaser rule applies equally in the RICO context." *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, 2024 WL 2861865, at *35 (D.N.J. June 6, 2024); *see also In re Insulin*, 2019 WL 643709, at *11 n.9. The same goes for *Horn*, which simply "reiterate[d]" *Sedima*'s holding. 145 S. Ct. at 943.

## B.    The FDCA Precludes Plaintiffs' RICO Claim.

The Court can also affirm the dismissal of Plaintiffs' RICO claim on the alternative ground that it is precluded by the FDCA.  Preclusion is a close cousin of preemption: preemption looks at the relationship between a state and federal law, while preclusion considers the relationship between two federal laws.  Preemption principles are "instructive" to the preclusion analysis "insofar as they are designed to assess the interaction of laws that bear on the same subject."  *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 111-12 (2014).

"Courts in this Circuit have routinely precluded RICO claims where the alleged conduct is already covered by a more detailed federal statute."  *Palmer v. Trump Model Mgmt., LLC*, 175 F.Supp.3d 103, 109 & n.14 (S.D.N.Y. 2016) (collecting cases).  That is because "a precisely drawn, detailed statute pre-empts more general remedies."  *Hinck v. United States*, 550 U.S. 501, 506 (2007) (internal quotation marks omitted).    Where "a general permission or prohibition is contradicted by a specific prohibition or permission," the "specific provision is construed as an exception to the general one."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012); *see Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 637 (2d Cir. 1989) (rejecting "[a]rtful invocation of controversial civil RICO" where Congress created more specific, exclusive remedy).

55

Here, Plaintiffs' invocation of the general RICO statute cannot be reconciled with Congress's and FDA's more specific and detailed regulation of over-the-counter medicines. Regulations deem phenylephrine products "effective" and require them to be marketed as "nasal decongestants," 21 C.F.R. §341.80(a), and Congress decreed that products sold in accordance with these regulations are "deemed to be generally recognized as … effective," 21 U.S.C. §355h(a)(1)(A). Yet Plaintiffs' RICO claim is premised on declaring phenylephrine to be *ineffective*, and making it *unlawful* to market it as FDA directed.

The conflict Plaintiffs have created between RICO and the FDCA is especially severe because their key RICO allegation is that Defendants defrauded FDA by "misguiding the FDA's review process." A-240 ¶479. Plaintiffs are overtly pursuing the sort of "fraud-on-the-FDA" claim that "inevitably conflict[s] with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives." *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 350 (2001). Private enforcement of fraud against FDA risks "skew[ing]" the "somewhat delicate balance of statutory objectives," which the Supreme Court has rejected. *Id.* at 348.

Plaintiffs (at 53-57) rely extensively on *POM Wonderful*, but it only confirms why preclusion applies. *POM Wonderful* permitted a Lanham Act claim alleging that the name of a drink would confuse consumers, despite arguments that FDA

regulations permitted the name. 573 U.S. at 105-06. But the Supreme Court emphasized that it was "not a case where a lawsuit is undermining an agency judgment," because "FDA ha[d] not made a policy judgment that is inconsistent with POM's Lanham Act suit." *Id.* at 120. FDA had not reviewed or approved the defendant's label, nor did it *require* the defendant's label to say that its drink contained pomegranate and blueberry juice (which only accounted for 0.5% of the blend). *Id.* at 105. As the Court explained, however, if FDA *had* made a specific determination that the labeling at issue was appropriate, then the "greater specificity" of FDA's judgment "would matter," indicating that if "the Lanham Act and the FDCA cannot be implemented in full at the same time," the Lanham Act would have to yield. *Id.* at 118.

This case presents exactly the type of claim where the regulation's "greater specificity" "matter[s]." *Id.* at 118. FDA *has* "made a policy judgment" inconsistent with Plaintiffs' RICO claims, *id.* at 120: it determined that phenylephrine is an effective decongestant and must be labeled as such. 21 C.F.R. §§341.1, 341.20, 341.80. And Congress has confirmed that monograph-approved drugs like phenylephrine are effective. 21 U.S.C. §355h(a)(1). Because FDA's regulation makes it illegal to sell phenylephrine *without* saying it relieves congestion, 21 C.F.R. §341.80(b), it "cannot be implemented in full at the same time" as Plaintiffs' RICO claim. *POM Wonderful*, 573 U.S. at 118.

This Court has already determined, in a case Plaintiffs ignore entirely, that federal claims challenging "representations commensurate with information in an FDA label" are barred. In *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63-64 (2d Cir. 2016), the plaintiff alleged that statements made by sales representatives and in promotional materials about a drug's efficacy were misleading. *Id.* at 58. That claim failed because there was no showing that the comments were "*inconsistent* with the FDA label," and "representations that are wholly *consistent* with an FDA label" are not actionable. *Id.* at 64-65. As this Court explained, such a "rule reflects proper deference to the expertise of the FDA as the regulatory agency responsible for issuing the label by respecting the exhaustive process preceding the issuance of a label." *Id.* at 64 (internal quotation marks omitted). In this case, that rule requires respecting FDA's judgment that phenylephrine is an effective nasal decongestant, and rejecting a RICO claim alleging the exact opposite.

Plaintiffs not only ignore *Apotex*, but also this Court's discussion of *Apotex* in *Church & Dwight Company v. SPD Swiss Precision Diagnostics, GmbH*, 843 F.3d 48 (2d Cir. 2016). Plaintiffs are simply wrong to suggest (at 55) that *Church & Dwight* categorically rejected the possibility that FDA drug regulations could preclude inconsistent federal claims under other statutes. Critically, the claims in that case did "not relate to the truth or falsity of an FDA-approved factual assertion

58

about the effects of a medical product, but rather to the question of whether the phrasing of advertising messages might be misunderstood by consumers." 843 F.3d at 73 n.13. This Court made clear that *Apotex* had correctly "defer[red] to [FDA's] determination of truthfulness," where "the agency [was] responsible for approving the truthfulness of the content of the label, had expertise in the matter and had devoted exhaustive process to the inquiry." *Id.*

Plaintiffs here do not allege that Defendants' labels were confusing in a way that could have been clarified without running afoul of FDA regulations. Plaintiffs allege that Defendants should not have used the labels *mandated by FDA*. Under *POM Wonderful*, *Apotex*, and *Church & Dwight*, that claim is precluded. Plaintiffs cannot set federal law at war with itself by using the general RICO statute to challenge a highly specific policy judgment by the agency empowered to make it.

## CONCLUSION

This Court should affirm the district court's judgment.

Dated:     May 30, 2025                    Respectfully submitted,


*/s/ Jay P. Lefkowitz*
Jay P. Lefkowitz, P.C.
Jacob M. Rae
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
lefkowitz@kirkland.com
jacob.rae@kirkland.com

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 S. Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

Cole Carter
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-1951
cole.carter@kirkland.com

*Attorneys for Defendant Haleon US*
*Holdings LLC*

*/s/ Hannah Y. Chanoine*
Hannah Y. Chanoine
Bruce Crawford
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Telephone: (212) 326-2000
hchanoine@omm.com
bcrawford@omm.com

*/s/ David M. Zionts*
Andrew Soukup
David M. Zionts
Victoria Stilwell
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
asoukup@cov.com
dzionts@cov.com
vstilwell@cov.com

*Attorneys for Defendant The Procter &*
*Gamble Company*

*/s/ Jessica L. Ellsworth*
Jessica L. Ellsworth
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5886
jessica.ellsworth@hoganlovells.com

James L. Bernard
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3121
james.bernard@hoganlovells.com

Lauren S. Colton
HOGAN LOVELLS US LLP
100 International Drive, Suite 2000
Baltimore, MD 21202
Telephone: (410) 659-2733
lauren.colton@hoganlovells.com

Amy J. Laurendeau
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
alaurendeau@omm.com

Jason Zarrow
O'MELVENY & MYERS LLP
400 South Hope Street, 19th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
jzarrow@omm.com

*Attorneys for Defendant Johnson & Johnson Consumer Inc.*

*/s/ Cara D. Edwards*
Cara D. Edwards
Colleen Carey Gulliver
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
Telephone: (212) 335-4714
cara.edwards@us.dlapiper.com
colleen.gulliver@us.dlapiper.com

Christopher G. Campbell
DLA PIPER LLP (US)
1201 West Peachtree Street, Suite 2800
Atlanta, GA 30309
Telephone: (404) 736-7800
christopher.campbell@us.dlapiper.com

Christopher M. Young
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100

*Attorneys for Defendant RB Health (US) LLC*

*/s/ Nilda Isidro*
Nilda Isidro
Dale Rose Goldstein
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
nilda.Isidro@gtlaw.com
goldsteinD@gtlaw.com

*Attorneys for Defendants CVS Pharmacy Inc., Target Corporation, Walgreen Co., and Walmart Inc.*

San Diego, CA 92121
Telephone: (619) 699-4748
christopher.young@us.dlapiper.com

*Attorneys for Defendant Bayer
HealthCare, LLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned hereby certifies that this document complies with the word limit of Local Rule 32.1(a)(4)(A) because it contains 13,354 words, exclusive of the parts of the document exempted by Federal Rule of Appellate Procedure Rule 32(f). The undersigned further certifies that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2408 in Times New Roman size 14 font.

Dated: May 30, 2025

*/s/ David M. Zionts*
David M. Zionts

*Attorney for Defendant-Appellee*
*The Procter & Gamble Company*

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(d)(1)(B), I hereby certify that on May 30, 2025, I caused true and correct copies of the foregoing Brief of Defendants-Appellees to be served on counsel of record via filing on the Court's ACMS system.

Dated: May 30, 2025

*/s/ David M. Zionts*
David M. Zionts

*Attorney for Defendant-Appellee*
*The Procter & Gamble Company*

**ADDENDUM**

# TABLE OF CONTENTS

**Page**

## Statutes

15 U.S.C. §15(a) ......................................................................... 1a

18 U.S.C. §1964(c) ...................................................................... 1a

21 U.S.C. §352(a) ........................................................................ 1a

21 U.S.C. §355h(a), (b) ................................................................ 2a

21 U.S.C. §379r .......................................................................... 5a

## Regulations

21 C.F.R. §330.1 ......................................................................... 7a

21 C.F.R. §341.1 ......................................................................... 8a

21 C.F.R. §341.80 ....................................................................... 8a

Excerpts from U.S. Food & Drug Admin, Final Administrative Order OTC000026: Over-the-Counter Monograph M012: Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use (effective Mar. 27, 2020)

Summary and Background .............................................. 12a

§M012.1 ..................................................................... 14a

§M012.80 ................................................................... 15a

**15 U.S.C. §15(a)**

**§ 15. Suits by persons injured**

**(a) Amount of recovery; prejudgment interest**

Except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. …

\* \* \*

**18 U.S.C. §1964(c)**

**§ 1964. Civil remedies**

\* \* \*

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

\* \* \*

**21 U.S.C. §352(a)**

**§ 352. Misbranded drugs and devices**

A drug or device shall be deemed to be misbranded—

**(a) False or misleading label**

(1) If its labeling is false or misleading in any particular. Health care economic information provided to a payor, formulary committee, or other similar entity with knowledge and expertise in the area of health care economic analysis, carrying out its responsibilities for the selection of drugs or devices for coverage or reimbursement, shall not be considered to be false or misleading under this paragraph if the health care economic information relates to an indication approved under section 355, 360(k), 360c(f)(2), or 360e of this title or section 262 of Title 42 for such drug or device, is based on competent and reliable scientific evidence, and includes, where applicable, a conspicuous and prominent statement describing any material differences between the health care economic information and the labeling approved for the drug or device under section 355, 360(k), 360c(f)(2), or 360e of this title or section 262 of Title 42. The requirements set forth in section 355, 360(k), 360c(f)(2), or 360e of this title or section 262 of Title 42 shall not apply to health care economic information provided to such a payor, committee, or entity in accordance with this paragraph. Information that is relevant to the substantiation of the health care economic information presented pursuant to this paragraph shall be made available to the Secretary upon request.

\* \* \*

## 21 U.S.C. §355h(a), (b)

### § 355h. Regulation of certain nonprescription drugs that are marketed without an approved drug application

#### (a) Nonprescription drugs marketed without an approved application

Nonprescription drugs marketed without an approved drug application under section 355 of this title, as of March 27, 2020, shall be treated in accordance with this subsection.

#### (1) Drugs subject to a final monograph; category I drugs subject to a tentative final monograph

A drug is deemed to be generally recognized as safe and effective under section 321(p)(1) of this title, not a new drug under section 321(p) of this title, and not subject to section 353(b)(1) of this title, if—

**(A)** the drug is—

**(i)** in conformity with the requirements for nonprescription use of a final monograph issued under part 330 of title 21, Code of Federal Regulations (except as provided in paragraph (2)), the general requirements for nonprescription drugs, and conditions or requirements under subsections (b), (c), and (k); and

**(ii)** except as permitted by an order issued under subsection (b) or, in the case of a minor change in the drug, in conformity with an order issued under subsection (c), in a dosage form that, immediately prior to March 27, 2020, has been used to a material extent and for a material time under section 321(p)(2) of this title; or

**(B)** the drug is—

**(i)** classified in category I for safety and effectiveness under a tentative final monograph that is the most recently applicable proposal or determination issued under part 330 of title 21, Code of Federal Regulations;

**(ii)** in conformity with the proposed requirements for nonprescription use of such tentative final monograph, any applicable subsequent determination by the Secretary, the general requirements for nonprescription drugs, and conditions or requirements under subsections (b), (c), and (k); and

**(iii)** except as permitted by an order issued under subsection (b) or, in the case of a minor change in the drug, in conformity with an order issued under subsection (c), in a dosage form that, immediately prior to March 27, 2020, has been used to a material extent and for a material time under section 321(p)(2) of this title.

\* \* \*

**(b) Administrative orders**

**(1) In general**

**(A) Determination**

The Secretary may, on the initiative of the Secretary or at the request of one or more requestors, issue an administrative order determining whether there are conditions under which a specific drug, a class of drugs, or a combination of drugs, is determined to be—

    **(i)** not subject to section 353(b)(1) of this title; and

    **(ii)** generally recognized as safe and effective under section 321(p)(1) of this title.

**(B) Effect**

A drug or combination of drugs shall be deemed to not require approval under section 355 of this title if such drug or combination of drugs—

    **(i)** is determined by the Secretary to meet the conditions specified in clauses (i) and (ii) of subparagraph (A);

    **(ii)** is marketed in conformity with an administrative order under this subsection;

    **(iii)** meets the general requirements for nonprescription drugs; and

    **(iv)** meets the requirements under subsections (c) and (k).

**(C) Standard**

The Secretary shall find that a drug is not generally recognized as safe and effective under section 321(p)(1) of this title if—

    **(i)** the evidence shows that the drug is not generally recognized as safe and effective under section 321(p)(1) of this title; or

    **(ii)** the evidence is inadequate to show that the drug is generally recognized as safe and effective under section 321(p)(1) of this title.

\* \* \*

**21 U.S.C. §379r**

**§ 379r. National uniformity for nonprescription drugs**

**(a) In general**

Except as provided in subsection (b), (c)(1), (d), (e), or (f), no State or political subdivision of a State may establish or continue in effect any requirement—

(1) that relates to the regulation of a drug that is not subject to the requirements of section 353(b)(1) or 353(f)(1)(A) of this title; and

(2) that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter, the Poison Prevention Packaging Act of 1970 (15 U.S.C. 1471 et seq.), or the Fair Packaging and Labeling Act (15 U.S.C. 1451 et seq.).

**(b) Exemption**

**(1) In general**

Upon application of a State or political subdivision thereof, the Secretary may by regulation, after notice and opportunity for written and oral presentation of views, exempt from subsection (a), under such conditions as may be prescribed in such regulation, a State or political subdivision requirement that—

(A) protects an important public interest that would otherwise be unprotected, including the health and safety of children;

(B) would not cause any drug to be in violation of any applicable requirement or prohibition under Federal law; and

(C) would not unduly burden interstate commerce.

**(2) Timely action**

The Secretary shall make a decision on the exemption of a State or political subdivision requirement under paragraph (1) not later than 120 days after receiving the application of the State or political subdivision under paragraph (1).

**(c) Scope**

**(1) In general**

This section shall not apply to—

(A) any State or political subdivision requirement that relates to the practice of pharmacy; or

(B) any State or political subdivision requirement that a drug be dispensed only upon the prescription of a practitioner licensed by law to administer such drug.

**(2) Safety or effectiveness**

For purposes of subsection (a), a requirement that relates to the regulation of a drug shall be deemed to include any requirement relating to public information or any other form of public communication relating to a warning of any kind for a drug.

**(d) Exceptions**

**(1) In general**

In the case of a drug described in subsection (a)(1) that is not the subject of an application approved under section 355 of this title or section 357 of this title (as in effect on the day before November 21, 1997) or a final order under section 355h of this title by the Secretary establishing conditions under which the drug is generally recognized as safe and effective, subsection (a) shall apply only with respect to a requirement of a State or political subdivision of a State that relates to the same subject as, but is different from or in addition to, or that is otherwise not identical with—

**(A)** a regulation or order in effect with respect to the drug pursuant to a statute described in subsection (a)(2); or

**(B)** any other requirement in effect with respect to the drug pursuant to an amendment to such a statute made on or after November 21, 1997.

**(2) State initiatives**

This section shall not apply to a State requirement adopted by a State public initiative or referendum enacted prior to September 1, 1997.

**(e) No effect on product liability law**

Nothing in this section shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State.

**(f) State enforcement authority**

Nothing in this section shall prevent a State or political subdivision thereof from enforcing, under any relevant civil or other enforcement authority, a requirement that is identical to a requirement of this chapter.

## 21 C.F.R. §330.1

### § 330.1 General conditions for general recognition as safe, effective and not misbranded.

An over-the-counter (OTC) drug listed in this subchapter is generally recognized as safe and effective and is not misbranded if it meets each of the conditions contained in this part and each of the conditions contained in any applicable monograph. Any product which fails to conform to each of the conditions contained in this part and in an applicable monograph is liable to regulatory action.

* * *

(c)(1) The product is labeled in compliance with chapter V of the Federal Food, Drug, and Cosmetic Act (the act) and subchapter C et seq. of this chapter, including the format and content requirements in § 201.66 of this chapter. An OTC drug product that is not in compliance with chapter V and subchapter C, including § 201.66 of this chapter, is subject to regulatory action. For purposes of § 201.61(b) of this chapter, the statement of identity of the product shall be the term or phrase used in the applicable OTC drug monograph established in this part.

(2) The "Uses" section of the label and labeling of the product shall contain the labeling describing the "Indications" that have been established in an applicable OTC drug monograph or alternative truthful and nonmisleading statements describing only those indications for use that have been established in an applicable

monograph, subject to the provisions of section 502 of the act relating to misbranding and the prohibition in section 301(d) of the act against the introduction or delivery for introduction into interstate commerce of unapproved new drugs in violation of section 505(a) of the act. Any other labeling under this subchapter and subchapter C et seq. of this chapter shall be stated in the exact language where exact language has been established and identified by quotation marks in an applicable OTC drug monograph or by regulation (e.g., § 201.63 of this chapter), except as provided in paragraphs (i) and (j) of this section.

(d) The advertising for the product prescribes, recommends, or suggests its use only under the conditions stated in the labeling.

* * *

## 21 C.F.R. §341.1

### § 341.1 Scope.

(a) An over-the-counter cold, cough, allergy, bronchodilator, or antiasthmatic drug product in a form suitable for oral, inhalant, or topical administration is generally recognized as safe and effective and is not misbranded if it meets each of the conditions in this part and each of the general conditions established in § 330.1.

(b) References in this part to regulatory sections of the Code of Federal Regulations are to chapter I of title 21 unless otherwise noted.

## 21 C.F.R. §341.80

### § 341.80 Labeling of nasal decongestant drug products.

(a) *Statement of identity*. The labeling of the product contains the established name of the drug, if any, and identifies the product as a "nasal decongestant."

(b) *Indications*. The labeling of the product states, under the heading "Indications," the phrase listed in paragraph (b)(1) of this section, as appropriate, and may contain any additional phrases listed in paragraph (b)(2) of this section. Other truthful and nonmisleading statements, describing only the indications for use that have been established and listed in paragraphs (b)(1) and (b)(2) of this section, may also be used, as provided in § 330.1(c)(2) of this chapter, subject to the provisions of section 502 of the Federal Food, Drug, and Cosmetic Act (the act) relating to misbranding

and the prohibition in section 301(d) of the act against the introduction or delivery for introduction into interstate commerce of unapproved new drugs in violation of section 505(a) of the act.

(1) (Select one of the following: "For the temporary relief of nasal congestion" or "Temporarily relieves nasal congestion") (which may be followed by any of the following in paragraphs (b)(1) (i), (ii), and (iii) of this section):

(i) "due to" (select one of the following: "the common cold" or "a cold").

(ii) "due to" (select one of the following: "hay fever," "hay fever (allergic rhinitis)," "hay fever or other upper respiratory allergies," or "hay fever or other upper respiratory allergies (allergic rhinitis)").

(2) In addition to the information identified in paragraph (b)(1) of this section, the labeling of the product may contain any (one or more) of the following statements:

(i) (Select one of the following: "For the temporary relief of" or "Temporarily relieves") (select one of the following: "stuffy nose," "stopped up nose," "nasal stuffiness," or "clogged up nose.")

(ii) (Select one of the following: "Reduces swelling of," "Decongests," or "Helps clear") "nasal passages; shrinks swollen membranes."

(iii) "Temporarily restores freer breathing through the nose."

(iv) "Helps decongest sinus openings and passages; temporarily relieves sinus congestion and pressure."

(v) "Promotes nasal and/or sinus drainage; temporarily relieves sinus congestion and pressure."

(c) *Warnings*. The labeling of the product contains the following warnings under the heading "Warnings":

(1) *Oral nasal decongestants—*

9a

(i) *For products containing phenylephrine hydrochloride, pseudoephedrine hydrochloride, pseudoephedrine sulfate, or phenylephrine bitartrate identified in § 341.20 (a)(1) through (a)(4) when labeled for adults.*

(A) "Do not exceed recommended dosage. [first sentence in boldface type] If nervousness, dizziness, or sleeplessness occur, discontinue use and consult a doctor."

(B) "If symptoms do not improve within 7 days or are accompanied by fever, consult a doctor."

(C) "Do not take this product if you have heart disease, high blood pressure, thyroid disease, diabetes, or difficulty in urination due to enlargement of the prostate gland unless directed by a doctor."

(D) *Drug interaction precaution.* "Do not use if you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric, or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product."

(ii) *For products containing phenylephrine hydrochloride, pseudoephedrine hydrochloride, pseudoephedrine sulfate, or phenylephrine bitartrate identified in § 341.20 (a)(1) through (a)(4) when labeled for children under 12 years of age.*

(A) "Do not exceed recommended dosage. [first sentence in boldface type] If nervousness, dizziness, or sleeplessness occur, discontinue use and consult a doctor."

(B) "If symptoms do not improve within 7 days or are accompanied by fever, consult a doctor."

(C) "Do not give this product to a child who has heart disease, high blood pressure, thyroid disease, or diabetes unless directed by a doctor."

(D) *Drug interaction precaution.* "Do not use in a child who is taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric, or emotional conditions, or Parkinson's disease), or

for 2 weeks after stopping the MAOI drug. If you do not know if your child's prescription drug contains an MAOI, ask a doctor or pharmacist before giving this product."

(iii) *For oral nasal decongestant products labeled for both adults and children under 12 years of age.* The labeling of the product contains the warnings identified in paragraph (c)(1)(i) of this section.

\* \* \*

(d) *Directions.* The labeling of the product contains the following information under the heading "Directions":

(1) *Oral nasal decongestants—*

(i) *For products containing phenylephrine hydrochloride identified in § 341.20(a)(1).* Adults and children 12 years of age and over: 10 milligrams every 4 hours not to exceed 60 milligrams in 24 hours. Children 6 to under 12 years of age: 5 milligrams every 4 hours not to exceed 30 milligrams in 24 hours. Children 2 to under 6 years of age: 2.5 milligrams every 4 hours not to exceed 15 milligrams in 24 hours. Children under 2 years of age: consult a doctor.

(ii) *For products containing pseudoephedrine hydrochloride or pseudoephedrine sulfate identified in § 341.20 (a)(2) and (a)(3).* Adults and children 12 years of age and over: 60 milligrams every 4 to 6 hours not to exceed 240 milligrams in 24 hours. Children 6 to under 12 years of age: 30 milligrams every 4 to 6 hours not to exceed 120 milligrams in 24 hours. Children 2 to under 6 years of age: 15 milligrams every 4 to 6 hours not to exceed 60 milligrams in 24 hours. Children under 2 years of age: consult a doctor.

(iii) *For products containing phenylephrine bitartrate identified in § 341.20(a)(4).* Include information on the number of dosage units and the quantity of water the dosage units are to be dissolved in prior to administration as shown in the following table:

| Age[1] | Dose[1] |
| --- | --- |
| Adults and children 12 years of age and over | 15.6 milligrams every 4 hours not to exceed 62.4 milligrams in 24 hours |

11a

| Children 6 to under 12 years of age | 7.8 milligrams every 4 hours not to exceed 31.2 milligrams in 24 hours |
|---|---|
| Children under 6 years of age | Ask a doctor |

[1] Headings are not required to appear in the product's labeling

\* \* \*

**Excerpts from U.S. Food & Drug Admin., Final Administrative Order OTC000026: Over-the-Counter Monograph M012: Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use (effective Mar. 27, 2020)**

**U.S. Food and Drug Administration**

**Final Administrative Order (OTC000026)**

**Over-the-Counter Monograph M012:**
**Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use**
**(Posted October 14, 2022)**

## I.   Summary

Over-the-Counter Monograph M012: Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use, as set forth in this document, is a final administrative order (final order) deemed by section 505G(b)(8) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) (21 U.S.C. 355h(b)(8)), and effective upon enactment of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Public Law 116-136, on March 27, 2020.

## II.   Background

The CARES Act added section 505G of the FD&C Act, which revised the framework for the regulation of over-the-counter (OTC) monograph drug products. Among other things, section 505G of the FD&C Act provides as a baseline status that, as of the date of enactment of the CARES Act, drugs that satisfy certain requirements described in section 505G(a)(1) or (2) are deemed to be generally recognized as safe and effective under section 201(p)(1) of the FD&C Act (21 U.S.C. 321(p)(1)), not a new drug under section 201(p), and not subject to section 503(b)(1)

12a

of the FD&C Act (21 U.S.C. 353(b)(1)). To obtain this status, among other things, a drug either must be one that is in conformity with the requirements for nonprescription use of a final monograph issued under part 330 (21 CFR part 330) (except as provided in section 505G(a)(2)),[1] as well as other requirements,[2] or must be one that is (i) classified in category I for safety and effectiveness under a tentative final monograph that is the most recently applicable proposal or determination issued under part 330, and (ii) in conformity with the proposed requirements for nonprescription use of such tentative final monograph and any applicable subsequent determination by the Secretary, as well as other requirements.[3] Other applicable requirements in section 505G(a)(1) of the FD&C Act include conditions or requirements under section 505G(b) of the FD&C Act.

Complementary to the requirements for conformity to tentative final or final monographs described in section 505G(a)(1) and (2) of the FD&C Act, Congress provided that, under section 505G(b)(8) of the FD&C Act, a final monograph or tentative final monograph that establishes conditions of use for a drug described in section 505G(a)(1) or (2) and that represents the most recently promulgated version of the conditions of use, including as modified, in whole or in part, by any proposed or final rule, is deemed to be a final order. The final order may be amended, revoked, or otherwise modified in accordance with the procedures under section 505G of the FD&C Act. Under section 505G(b)(8)(C) of the FD&C Act, the deemed establishment of a final order is construed to include technical amendments necessary to ensure that the order is appropriately harmonized, in terms of terminology or cross-references, with the applicable provisions of the FD&C Act (and regulations) and any other final orders issued under section 505G of the FD&C Act. Congress also provided under section 505G(k)(2)(B) of the FD&C Act that regulations in effect on the day before enactment of the CARES Act, establishing requirements for specific nonprescription drugs marketed pursuant to section 505G, shall be deemed to be final orders under section 505G(b), as they apply to drugs subject to section 505G(a)(1)-(4) or otherwise subject to an order under section 505G.

---

[1] Section 505G(a)(2) of the FD&C Act is inapplicable here. It establishes the applicable requirements in terms of conformity with a final monograph, for purposes of section 505G(a)(1)(A)(i) of the FD&C Act, for sunscreen drugs subject to section 505G of the FD&C Act.

[2] Section 505G(a)(1)(A) of the FD&C Act.

[3] Section 505G(a)(1)(B) of the FD&C Act.

In the Federal Register of October 2, 1986 (51 FR 35339), FDA issued a final OTC monograph under the procedure in part 330, establishing conditions under which OTC cold, cough, allergy, bronchodilator, and antiasthmatic drug products are generally recognized as safe and effective (GRASE). This final OTC monograph was codified in 21 CFR part 341 and subsequently amended by final rules issued on March 9, 1987 (52 FR 7126), March 13, 1987 (52 FR 7830), August 12, 1987 (52 FR 30055, 30057), September 22, 1987 (52 FR 35610), September 15, 1988 (53 FR 35810), February 28, 1989 (54 FR 8509), July 6, 1990 (55 FR 27808), October 3, 1990 (55 FR 40382), June 30, 1992 (57 FR 29177), December 9, 1992 (57 FR 58374, 58376), October 20, 1993 (58 FR 54236, 54242), January 28, 1994 (59 FR 4218), June 3, 1994 (59 FR 29174), July 15, 1994 (59 FR 36051), August 23, 1994 (59 FR 43409), April 9, 1996 (61 FR 15703), May 20, 1996 (61 FR 25146), March 4, 1997 (62 FR 9684), July 30, 1998 (63 FR 40650), September 15, 1998 (53 FR 35809), March 17, 1999 (64 FR 13295), January 3, 2000 (65 FR 8), August 1, 2000 (65 FR 46867), February 1, 2002 (67 FR 4907), December 6, 2002 (67 FR 72559), December 23, 2002 (67 FR 78168), April 14, 2003 (68 FR 17881), March 24, 2004 (69 FR 13717), October 11, 2005 (70 FR 58977), August 1, 2006 (71 FR 43362), and July 26, 2011 (76 FR 44487).

In addition, FDA finalized a regulation exempting certain OTC drug products containing codeine as an active ingredient from prescription requirements in the Federal Register of February 1, 2002 (67 FR 4907), codified in 21 CFR 290.2. Accordingly, this final order for OTC cold, cough, allergy, bronchodilator, and antiasthmatic drug products incorporates the requirements of the final monograph for OTC cold, cough, allergy, bronchodilator, and antiasthmatic drug products issued under part 330, as codified in part 341 as of March 27, 2020, with technical amendments including consolidating a professional use provision into its own part. For drug products marketed under this final order, it also incorporates the exemption from prescription requirements for certain codeine-containing nonprescription drug products codified in 21 CFR 290.2.

* * *

## §M012.1 Scope

An over-the-counter (OTC) cold, cough, allergy, bronchodilator, or antiasthmatic drug product in a form suitable for oral, inhalant, or topical administration is generally recognized as safe and effective and is not misbranded if it meets each of the conditions in this OTC monograph and each of the general conditions established in 21 CFR 330.1.

[51 FR 35339, Oct. 2, 1986]

* * *

### §M012.80 Labeling of nasal decongestant drug products

(a) Statement of identity. The labeling of the product contains the established name of the drug, if any, and identifies the product as a "nasal decongestant."

(b) Indications. The labeling of the product states, under the heading "Uses," the phrase listed in § M012.80(b)(1), as appropriate, and may contain any additional phrases listed in § M012.80(b)(2). Other truthful and nonmisleading statements, describing only the indications for use that have been established and listed in §§ M012.80(b)(1) and (b)(2), may also be used, as provided in 21 CFR 330.1(c)(2), subject to the provisions of section 502 of the FD&C Act relating to misbranding and the prohibition in section 301(d) of the FD&C Act against the introduction or delivery for introduction into interstate commerce of unapproved new drugs in violation of section 505(a) of the FD&C Act.

(1) (Select one of the following: "For the temporary relief of nasal congestion" or "Temporarily relieves nasal congestion") (which may be followed by any of the following in §§ M012.80(b)(1) (i) and (ii)):

(i) "due to" (select one of the following: "the common cold" or "a cold").

(ii) "due to" (select one of the following: "hay fever," "hay fever (allergic rhinitis)," "hay fever or other upper respiratory allergies," or "hay fever or other upper respiratory allergies (allergic rhinitis)").

(2) In addition to the information identified in § M012.80(b)(1), the labeling of the product may contain any (one or more) of the following statements:

(i) (Select one of the following: "For the temporary relief of" or "Temporarily relieves") (select one of the following: "stuffy nose," "stopped up nose," "nasal stuffiness," or "clogged up nose.")

(ii) (Select one of the following: "Reduces swelling of," "Decongests," or "Helps clear") "nasal passages; shrinks swollen membranes."

(iii) "Temporarily restores freer breathing through the nose."

(iv) "Helps decongest sinus openings and passages; temporarily relieves sinus congestion and pressure."

(v) "Promotes nasal and/or sinus drainage; temporarily relieves sinus congestion and pressure."

(c) Warnings. The labeling of the product contains the following warnings under the heading "Warnings":

(1) Oral nasal decongestants

(i) For products containing phenylephrine hydrochloride, pseudoephedrine hydrochloride, pseudoephedrine sulfate, or phenylephrine bitartrate identified in §§ M012.20 (a)(1) through (a)(4) when labeled for adults.

(A) "Do not exceed recommended dosage. [first sentence in boldface type] If nervousness, dizziness, or sleeplessness occur, discontinue use and consult a doctor."

(B) "If symptoms do not improve within 7 days or are accompanied by fever, consult a doctor."

(C) "Do not take this product if you have heart disease, high blood pressure, thyroid disease, diabetes, or difficulty in urination due to enlargement of the prostate gland unless directed by a doctor."

(D) Drug interaction precaution. "Do not use if you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric, or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product."

(ii) For products containing phenylephrine hydrochloride,

16a

pseudoephedrine hydrochloride, pseudoephedrine sulfate, or phenylephrine bitartrate identified in §§ M012.20 (a)(1) through (a)(4) when labeled for children under 12 years of age.

(A) "Do not exceed recommended dosage. [first sentence in boldface type] If nervousness, dizziness, or sleeplessness occur, discontinue use and consult a doctor."

(B) "If symptoms do not improve within 7 days or are accompanied by fever, consult a doctor."

(C) "Do not give this product to a child who has heart disease, high blood pressure, thyroid disease, or diabetes unless directed by a doctor."

(D) Drug interaction precaution. "Do not use in a child who is taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric, or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your child's prescription drug contains an MAOI, ask a doctor or pharmacist before giving this product."

(iii) For oral nasal decongestant products labeled for both adults and children under 12 years of age. The labeling of the product contains the warnings identified in § M012.80(c)(1)(i).

\* \* \*

(d) Directions. The labeling of the product contains the following information under the heading "Directions":

(1) Oral nasal decongestants
(i) For products containing phenylephrine hydrochloride identified in § M012.20(a)(1). Adults and children 12 years of age and over: 10 milligrams every 4 hours not to exceed 60 milligrams in 24 hours. Children 6 to under 12 years of age: 5 milligrams every 4 hours not to exceed 30 milligrams in 24 hours. Children 2 to under 6 years of age: 2.5 milligrams every 4 hours not to exceed 15 milligrams in 24 hours. Children under 2 years of age: consult a doctor.

17a

(ii) For products containing pseudoephedrine hydrochloride or pseudoephedrine sulfate identified in §§ M012.20(a)(2) and (a)(3). Adults and children 12 years of age and over: 60 milligrams every 4 to 6 hours not to exceed 240 milligrams in 24 hours. Children 6 to under 12 years of age: 30 milligrams every 4 to 6 hours not to exceed 120 milligrams in 24 hours. Children 2 to under 6 years of age: 15 milligrams every 4 to 6 hours not to exceed 60 milligrams in 24 hours. Children under 2 years of age: consult a doctor.

(iii) For products containing phenylephrine bitartrate identified in § M012.20(a)(4). Include information on the number of dosage units and the quantity of water the dosage units are to be dissolved in prior to administration as shown in the following table:

| Age[1] | Dose[1] |
|---|---|
| Adults and children 12 years of age and over | 15.6 milligrams every 4 hours not to exceed 62.4 milligrams in 24 hours |
| Children 6 to under 12 years of age | 7.8 milligrams every 4 hours not to exceed 31.2 milligrams in 24 hours |
| Children under 6 years of age | Ask a doctor |

[1] Headings are not required to appear in the product's labeling

* * *