# 24-3296(L)

## 25-119(CON)

IN THE

# United States Court of Appeals for the Second Circuit

SANDRA YOUSEFZADEH, *et al.*, NEWTON'S PHARMACY, INC.,

*Plaintiffs-Appellants,*

GWEN THOMAS, RHONDA NITTO,

*Plaintiffs,*

V.

JOHNSON & JOHNSON CONSUMER, INC., RB HEALTH (US) LLC, TARGET CORPORATION, BAYER HEALTHCARE, LLC, a Delaware limited liability corporation, WALMART INC., a Delaware corporation, CVS PHARMACY, INC., a Delaware corporation, WALGREEN CO., an Illinois corporation, THE PROCTOR & GAMBLE COMPANY, HALEON US HOLDINGS LLC, PUBLIX SUPER MARKETS, INC., AMAZON.COM, INC., AMAZON.COM SERVICES LLC, KENVUE, INC., GLAXOSMITHKLINE LLC, RITE AID CORPORATION, ALBERTSONS COMPANIES, INC., COSTCO WHOLESALE CORP.,

*Defendants-Appellees,*

*(Caption Continued on Inside Cover)*

Appeal from the United States District Court
for the Eastern District of New York

## SUPPLEMENTAL APPENDIX

Andrew Soukup
David M. Zionts
Victoria Stilwell
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000

*Attorneys for Defendant-Appellee*
*The Procter & Gamble Company*

Jessica L. Ellsworth
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5886
jessica.ellsworth@hoganlovells.com

*Attorneys for Defendant-Appellee*
*RB Health (US) LLC*

*Additional Counsel Listed on Inside Cover*

Does 1-200, GlaxoSmithKline Consumer Healthcare Holdings (US) LLC, Reckitt Benckiser LLC, Merck, McNeil Consumer Healthcare, Sanofi-Aventis U.S. LLC, Church & Dwight Co. Inc., Associated Wholesale Grocers Inc., Valu Merchandisers Co., Pfizer Inc., Perrigo Company PLC, Helen of Troy Limited, Dierbergs Markets, Inc., Reckitt Benckiser Pharmaceuticals Inc., The Kroger Co., Harris Teeter, LLC, Harris Teeter Supermarkets, Inc., Dolgencorp, Inc., Family Dollar, LLC,

*Defendants.*

———————————————

Hannah Y. Chanoine
Bruce Crawford
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
(212) 326-2000

Amy J. Laurendeau
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
(949) 823-6900

Jason Zarrow
O'MELVENY & MYERS LLP
400 South Hope Street, 19th Floor
Los Angeles, CA 90071
(213) 430-6000

*Attorneys for Defendant-Appellee*
*Johnson & Johnson Consumer Inc.*

James L. Bernard
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3121

Lauren S. Colton
HOGAN LOVELLS US LLP
100 International Drive, Suite 200
Baltimore, MD 21202
(410) 659-2733

*Attorneys for Defendant-Appellee*
*RB Health (US) LLC*

Jay P. Lefkowitz, P.C.
Jacob M. Rae
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Robyn E. Bladow
KIRKLAND & ELLIS LLP
555 S. Flower Street
Los Angeles, CA 90071
(213) 680-8400

Cole Carter
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-1951

*Attorneys for Defendant-Appellee*
*Haleon US Holdings LLC*

# TABLE OF CONTENTS[1]

Page

Newton's Pharmacy, Inc.'s Class Action Complaint, No. 1:23-cv-
09307-BMC (E.D.N.Y.) (Sept. 28, 2023) (ECF No. 1) ...................... NPSA-1

[Proposed] Case Management Order No. 1 (Dec. 21, 2023)
(ECF No. 5) ........................................................................ NPSA-26

Consensus Plaintiffs' Motion for an Order Appointing Plaintiffs'
Proposed Leadership Structure and Appointing Interim Class
Counsel (Feb. 9, 2024) (ECF No. 115) ............................................ NPSA-31

Consensus Plaintiffs' Memorandum in Support of Motion for an
Order Appointing Plaintiffs' Proposed Leadership Structure
and Appointing Interim Class Counsel (Feb. 9, 2024)
(ECF No. 115-1) .............................................................. NPSA-34

[Amended Proposed] Order Appointing Plaintiffs' Leadership
Structure and Appointing Rule 23(g) Interim Class Counsel
(Feb. 14, 2014) (ECF No. 135-2) ...................................... NPSA-60

Application of Beasley Allen Law Firm for Appointment to
Executive Committee Leadership Position (Feb. 16, 2024)
(ECF No. 143) ................................................................. NPSA-69

Response to Consensus Plaintiffs' Amended Motion for an Order
Appointing Plaintiffs' Proposed Leadership Structure and
Appointing Interim Class Counsel (Feb. 28, 2024)
(ECF No. 158) ................................................................. NPSA-74

Letter re: [Proposed] Order Governing Plaintiffs' Initial Streamlined
Consolidated Complaint and Defendants' Motion to Dismiss
in Response (Apr. 16, 2024) (ECF No. 196).................................... NPSA-82

---

[1] Unless otherwise indicated, all ECF references are to the district court MDL
docket, No. 1:23-md-03089-BMC (E.D.N.Y.).

Page

Letter re: [Proposed] Amended Order Governing Initial Streamlined Consolidated Class Action Complaint and Defendants' Motion to Dismiss in Response (May 16, 2024) (ECF No. 203) ................................................................... NPSA-92

Letter re: Joint Discovery Status Report (May 23, 2024) (ECF No. 209) ...................................................................................... NPSA-103

Defendants' Motion to Dismiss (June 3, 2024) (ECF No. 212) ................ NPSA-114

Defendants' Memorandum of Law in Support of Motion to Dismiss (June 3, 2024) (ECF No. 213) ........................................................ NPSA-118

MDL Status Conference Transcript (June 11, 2024) .................................. NPSA-153

MDL Status Conference Transcript (Aug. 20, 2024) (ECF No. 258) ....... NPSA-167

MDL Status Conference Transcript (Sept. 23, 2024) ............................... NPSA-179

Letter re: [Proposed] Order Entering Judgment (Nov. 6, 2024) (ECF No. 250) ............................................................................ NPSA-239

Plaintiff Newton's Pharmacy, Inc.'s Motion for Partial Relief from Judgment and for Remand (Nov. 15, 2024) (ECF No. 253) ........... NPSA-253

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

| | |
|---|---|
| NEWTON'S PHARMACY, INC., individually and on behalf of those similarly situated,<br><br>                   Plaintiffs,<br><br>      v.<br><br>PROCTER & GAMBLE COMPANY; KENVUE, INC.; MCNEIL CONSUMER HEALTHCARE; RECKITT & BENCKISER LLC; and GLAXOSMITHKLINE, LLC,<br><br>                Defendants. | Case No. _____<br><br>**JURY TRIAL DEMAND** |

## CLASS ACTION COMPLAINT

Plaintiff Newton's Pharmacy Inc., ("Plaintiff"), brings this action individually and on behalf of all others similarly situated, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation of counsel, allege as follows:

## INTRODUCTION

1. This case arises from the Plaintiff's and putative class members' purchase of ineffective over-the-counter ("OTC") medications drugs that were manufactured, promoted, marketed, distributed and sold as providing nasal decongestant effects when the active ingredient in those medications, phenylephrine ("PE") has failed to demonstrate any pharmacological benefit to treat that symptom beyond what would be offered by a placebo when administered orally. On September 11, 2023, the Nonprescription Drug Advisory

1

Committee ("NDAC") to the Food and Drug Administration issued a report concluding that oral OTC medications using PE as the active ingredient to treat nasal congestion had no effect beyond placebo in treating that condition. At the time the NDAC issued this report the Plaintiff and thousands of other similarly situated retail pharmacies across the country had hundreds of these OTC medications stocked on its shelves that immediately lost value. The FDA is now considering whether to pull these products from the market and retail pharmacies are now stuck having to decide whether to pull these products from its shelves, cancel wholesaling contracts, or impose disclaimers that the manufacturers of these products have failed to include on their own products.

2.      The case involves some of the most well-known consumer facing brands in the OTC medication market including Advil, Tylenol, Dayquil, Nyquil, TheraFlu, Sudafed and many others. Throughout this Complaint the Defendants' OTC products containing orally administered PE as the active ingredient to provide nasal decongestant relief shall be referred to as the "**Ineffective Decongestant Products**."

3.      Plaintiff seeks damages and equitable relief, individually and on behalf of other class members, for Defendants' improper marketing sales tactics that have resulted in retail pharmacy loss of sales and other pecuniary harm as a result of Defendant's unfair and deceptive practices.

## PARTIES

### A. Plaintiff

4.      Plaintiff Newton Pharmacy Inc., is an Arkansas corporation with its principal place of business in Russellville, Arkansas. Plaintiff is a licensed retail pharmacy and has been in the business of providing both prescription and OTC medications along with other personal

and household goods to members of the general public for over fifty years. As part of its routine business, Plaintiff stocked on its shelves the Ineffective Decongestant Products made by the Defendants. Plaintiff purchases these products through wholesalers with the intent to resell them to customers within the store. Plaintiff paid money for Defendants' Ineffective Decongestant Products and as a result of the Defendant's false representations that these products provided nasal decongestant relief, and now Plaintiff has a large inventory of product whose resale value has been impaired. Plaintiff has also had to devote time and resources to establishing an appropriate cold and flu therapy inventory now that customers are beginning to understand that traditional brands using oral PE they relied upon to provide nasal decongestant relief do not actually treat such a symptom.

**B. Defendants**

5.     Defendant The Procter & Gamble Company ("P&G") is an Ohio corporation with its principal place of business and headquarters located at One Procter & Gamble Plaza in Cincinnati, Ohio.  At all times material to this case, P&G has been engaged in the manufacturing, sale, and distribution of OTC medications containing PE that have been falsely marketed as providing nasal decongestant relief when in fact PE provides no such relief. GSK markets, promotes, and distributes Ineffective Decongestive Products containing PE through the Vicks, Dayquil, Nyquil, and FluTherapy brands.

6.     Defendant Kenvue Inc. ("Kenvue") is an American consumer health company and formerly the consumer division of Johnson & Johnson ("J&J"). Kenvue is headquartered in New Jersey. At all relevant times Kenvue and its predecessor J&J has been engaged in the manufacturing, sale, and distribution of OTC medications containing PE that have been falsely marketed as providing nasal decongestant relief when in fact PE provides no such relief.

Kenvue and previously J&J markets, promotes, and distributes Ineffective Decongestive Products containing PE through the Sudafed PE and Benadryl brands.

7.     Defendant McNeil Consumer Healthcare ("McNeil") is a wholly owned subsidiary of Kenvue with headquarters in Pennsylvania. At all times material to this case, McNeil has been engaged in the manufacturing, sale, and distribution of OTC medications containing PE that have been falsely marketed as providing nasal decongestant relief when in fact PE provides no such relief. McNeil markets, promotes, and distributes Ineffective Decongestive Products containing PE through the Tylenol Cold + Flu brand.

8.     Defendants Reckitt & Benckiser LLC ("Reckitt") is a Delaware limited liability corporation with its headquarters and principal place of business located in Parsippany, New Jersey. At all times material to this case, Reckitt has been engaged in the manufacturing, sale, and distribution of OTC medications containing PE that have been falsely marketed as providing nasal decongestant relief when in fact PE provides no such relief. Reckitt markets, promotes, and distributes Ineffective Decongestive Products containing PE through the Mucinex brand.

9.     Defendant GlaxoSmithKline LLC ("GSK") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. At all times material to this case, GSK has been engaged in the manufacturing, sale, and distribution of OTC medications containing PE that have been falsely marketed as providing nasal decongestant relief when in fact PE provides no such relief. GSK markets, promotes, and distributes Ineffective Decongestive Products containing PE through the Theraflu, Advil, and Robitussin brands.

10.     Collectively the P&G, Kenvue, Reckitt, and GSK shall be collectively referred

to throughout the complaint when appropriate as "Defendants."

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed class is a citizen of a state different from that of each Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed class consists of more than 100 class members, and (d) none of the exceptions under the subsection apply to this action.

12.     This Court has personal jurisdiction over Defendants because each Defendant has sufficient minimum contacts in this state, and because each Defendant has otherwise intentionally availed itself of the markets within this state through their business activities, such that the exercise of jurisdiction by this Court is proper and necessary.

13.     Venue is proper in this District because the claims alleged in this action accrued in this District and each Defendant regularly transacts its affairs in this District.

14.     Each Defendant is subject to the personal jurisdiction of this Court because the Defendants conduct business within this state, maintain and carry out continuous and systematic contacts within this state and this judicial District, regularly transacts business within this state and this judicial District, and regularly avails themselves of the benefits of their presence in this state and this judicial District.

## FACTUAL ALLEGATIONS

### A.  The Big Business Of Nasal Decongestants

15.     The market for drugs purported to relieve congestion is over $2 billion per year and includes at least 250 products.

16.     One of the two leading ingredients, only phenylephrine ("PE") is sold over the

counter ("OTC"). The other leading ingredient, pseudoephedrine, is effective but is usually sold behind the counter from locked containers, and consumers are limited in the number they can buy. As a result, PE drugs are more popular and account for approximately 80% of the $2 billion annual market.

17.     These medicines are most often used to treat the common cold. According to the American Lung Association, approximately 200 different viruses can cause cold like symptoms which often leads to runny nose, congestion, sneezing.

18.     In the United States, colds account for more visits to the doctor than any other single condition. Adults get an average of two to four colds per year, mostly between September and May. In the United States it is estimated that people in the United States suffer 1 billion colds annually.

19.     There are no antiviral medications available for treating the common cold and instead the vast majority of patients rely on products to provide symptom relief. OTC medications are a common form patients seek to receive symptom relief for the common cold.

20.     This stunning demand has caused companies to leverage the OTC space in order to provide ostensible symptom relief for the millions of Americans suffering this common ailment.

21.     When OTC medications containing pseudoephedrine began receiving adding regulatory scrutiny (due to their propensity to make it into the illegal drug market), companies began marketing efforts to drive consumers to products containing PE.

22.     PE and pseudoephedrine have different mechanism of action. PE is a specific alpha-1 adrenergic receptor agonist that works by temporarily constricting blood vessels. By

6

contrast, pseudoephedrine is a relatively less selective agonist that acts on both alpha and beta-adrenergic receptors and is therefore more lipophilic than PE and is more accessible to the central nervous system because it crosses the blood-brain barrier. As a result, pseudophedrine when taken orally does not metabolize at the same rate as PE making it more bioavailable when administered orally when compared to PE. Defendants are well aware of the mechanisms of action between pseudophedrine and PE and the different metabolic rates for each ingredient.

**B. Defendants Marketed OTC Medications Containing PE As A Decongestant**

23.     P&G market the following OTC medications as a decongestant: Vicks Nyquil Severe Cold and Flu, Vicks NyQuil Sinex, Vicks Dayquil Severe Cold and Flu, Vicks Sinex Severe, Vicks Flu Therapy Night Severe Cold and Flu. On its website, P&G makes the following representations regarding PE:

**Vicks Products for Nasal Congestion Relief**

Nasal congestion, also known as stuffy nose, is when the lining of the nasal cavity becomes inflamed and swollen, which can cause mucus to build up. Nasal congestion is typically caused by one of two things—a viral infection (like a cold or flu) or allergies (often triggered by dust, pet dander, and more). Learn more about nasal congestion.

To relieve your nasal congestion symptoms, look for an OTC medicine with a decongestant like Phenylephrine or Oxymetazoline. Decongestants constrict enlarged blood vessels to shrink the swollen nasal tissues causing your stuffy nose. The ingredients label on the back of Vicks products will give the name of the active ingredient, and identify what type of active ingredient it is, to help clear up any confusion on the shelf.

24.     P&G's product package all indicate that PE provides decongestant relief. As just one example, here is the product packaging for Dayquil Severe Fold and Flu:

7

**NPSA-7**



25.    Kenvue, formerly J&J, and McNeil through their consumer brands market the following OTC medications as decongestants: Sudafed PE, Benadryl Allergy Plus Congestion, and Tylenol Cold + Flu. On its website for Sudafed OE, J&J makes the following representations:



26.    GSK market the following OTC medications as decongestants: Advil Sinus Congestion and Pain and Robitussin. On its website GSK makes the following representations:

8



**Advil Sinus Congestion & Pain**     See Drug Facts

Advil Sinus Congestion & Pain combines the speed and
strength of Advil and a proven nasal decongestant for fast,
effective relief of sinus pressure and congestion associated
with colds. Though mucus can contribute to the stuffed up
feeling, nasal congestion is the swelling of the tissues in the
nose and sinuses caused by inflammation. Advil Sinus
Congestion & Pain re-opens your airways by constricting the
blood vessels in your nose and sinuses.

Advil Sinus Congestion & Pain also treats the pain
associated with colds. The philosophy behind Advil Sinus
Congestion & Pain is that cold-sufferers who treat only nasal
congestion or the pain associated with it really only address
half the problem. Both pain and congestion are major
symptoms of colds so it just makes sense to treat them both
with just one tablet. Get fast, powerful relief with Advil Sinus
Congestion & Pain.

27.     PE is listed as the active ingredient providing the "decongestant" effect marketed
in all of these products.

28.     Each Defendant makes similar claims that PE works as the active nasal
decongestant ingredients in these numerous consumer facing brands. Each Defendant promises,
and expects consumers to rely upon these promises, that these products contain active ingredients
that will aid to relieve the symptoms of nasal congestion.

29.     Defendants know that consumers rely upon decongestant relief when searching for
an OTC medication to provide symptom relief for the common cold and other ailments and
illnesses causing nasal congestion and directly market their products as providing this relief. In
fact, in many of the product packaging for cold and flu OTC medications "nasal congestion" is
often the first symptom listed that these OTC medications treat. Defendants do this because they
know when suffering from cold and flu and other similar ailments nasal congestion is one of the
key symptoms consumers of these OTC medications seek to relieve.

30.     Defendants marketing and promotional efforts created an expectation in
consumer's minds that PE was an effective decongestant and it created demand for these types of
products. As a result, Plaintiff and other similarly situated retail pharmacies took steps to ensure

**NPSA-9**

that they could meet this consumer demand by purchasing these products and devoting shelf space to these products. As demand was constant retail pharmacies needed to ensure an adequate supply of these medications for fear of losing customers to other competitors if these products were not in stock on an as needed basis.

31.     All Defendants either in websites, advertisements, product packaging or other messages communicated to the public that all Ineffective Decongestant Products would help alleviate nasal congestion. For all Ineffective Decongestant Products these statements were false or misleading and caused customers of Plaintiff and the putative classes to believe that these products would be effective in providing relief from nasal congestion. Customer relied upon these representations and would not have purchased the Ineffective Decongestant Products had they been aware that PE simply was not effective as a nasal decongestant. Retail pharmacies would not have stocked these products, would not have entered into wholesaling contracts to secure a supply of these products, and would not have devoted shelf space to these products had they known of this fact.

### C. PE Is Simply Not A Decongestant When Administered Orally

32.     Unfortunately for consumers (but known to Defendants), phenylephrine does not work when taken orally to relieve congestion. This is because once metabolized by the stomach the bioavailable amount of PE available is around 1%, an insufficient amount to actually result in a pharmacological effect.

33.     The NDAC conducted a meta-review of the original data used by the FDA to approve PE as a nasal decongestant and the data from studies conducted after the initial FDA review. The conclusion of the NDAC could not be more clear: PE when used orally does not work

as a decongestant. Specifically, the NDAC found:

> As a result of our evaluation, we believe that the new efficacy data far outweigh the data provided to the Agency as part of the original Panel review. These results suggest that: 1) oral PE at monographed dosages is not effective as a decongestant (i.e., in the face of the new data, the original data are likely not sufficient to support a GRASE determination), 2) oral doses up to 40 mg would also not be effective, 3) finding an effective oral dose that is also safe is not feasible (meaning that doses higher than 40 mg would need to be explored but would also not be safe to study due to effects on blood pressure), and 4) an appropriate dosing interval for oral PE has not been established (meaning that, based on the PK data, an every-4-hour dosing interval is likely too long). Therefore, in addition to lack of efficacy, there may be no path to evaluating higher doses of oral PE as a nasal decongestant.

34.    The NDAC reached this conclusion through an exhaustive review of the available studies including studies from 2015-2017 showing that PE when taken orally at the dosages available in OTC medications resulted in no greater effect on decongestants than a placebo. The NDAC Briefing Document published on September 11, 2023 on the oral efficacy of PE as a decongestant is attached as **Exhibit A**.

35.    The FDA is now considering banning PE from oral medication, which would result in pulling hundreds of products containing PE from shelves. Since the FDA panel's conclusion came out, prices for oral medication containing PE have plummeted and consumers are looking elsewhere for the decongestant relief Defendants promised PE would deliver.

### D.  Defendants Knew PE Is Not Effective As A Decongestant.

36.    Defendants are large corporations with dedicated units devoted to reviewing and commenting on studies that affect their products.

37.    As a result, Defendants knew of the studies cited by the NDAC and specifically were aware of the studies from 2015-present that demonstrate PE is not an effective decongestant.

38.    Nevertheless, Defendants continued to promote to the public that OTC

medications containing PE and that would be administered orally were effective as a "decongestant."

**E. Retail Pharmacies Have Been Injured By Defendants' Misrepresentations About the Effectiveness of the Ineffective Decongestant Products**

39.      The FDA originally designated PE as safe and effective for use as a decongestant in 1976 and it became a common ingredient in multidrug cold medications like DayQuil and Sudafed PE over the course of the past 50 years. When originally greenlighted relied upon a review of 14 studies (12 unpublished and two published) from pharmaceutical companies.

40.      Retail pharmacies like Plaintiff are pharmacies where drugs are compounded, dispensed, stored or sold and where prescriptions are filled or dispensed to the general public. Foot traffic is an important part of retail pharmacy business and the common cold and flu are one of the common drivers of foot traffic within retail pharmacies as customers come into obtain both prescription and OTC medications to relieve cold and flu symptoms.

41.      Retail pharmacy is a highly competitive space in the provision of healthcare in this country and the industry has seen a dramatic amount of consolidation. Additionally, According to a report by the Assistant Secretary for Planning and Evaluation (ASPE), there has been a change in the location where Americans receive their drugs. Between 2016 and 2021, there has been a 95% increase in the number of Americans receiving their drugs from home health care. Additionally, there has been a 45% increase in drugs received from clinics and a 35% increase from mail-order pharmacies over the same period. On the other hand, there has been a decline in drugs received from long-term facilities (17%), federal facilities (9%), and independent pharmacies (5%). The shift towards home health care, clinics, and mail-order pharmacies can be attributed to the increasing consumer preference for over-the-counter (OTC) drugs and the

growing demand for home delivery of medications, which is expected to contribute to the growth of the U.S. pharmacy market in the coming years but is expected to add to the decline in market share for independent retail pharmacies like Plaintiff.

42.      To meet these market conditions, pharmacies in the U.S. offer a variety of patient-care services and implement strategies to increase medication sales. Pharmacies offer their customers a wide range of services. For example, 84% of pharmacies provide flu immunizations, 80% provide non-flu immunizations, 53% offer blood pressure monitoring, and 30% offer diabetes education.

43.      Ensuring adequate supply of routine OTC medications commonly used by members of the general public is a key part of the retail pharmacy business because it helps drive foot traffic and ensure customers come into stores. These market pressures require pharmacies like Plaintiff to carry a variety of OTC medication and as a result Plaintiff purchased through wholesalers the Ineffective Decongestant Products and provided a large amount of shelf space for the sale of these products because customers often look for these types of well marketed and promoted OTC medications to treat symptoms associated with the common cold and flu.

44.      When the NDAC announced the results of its review and its conclusion that PE when administered orally was simply not an effective nasal decongestant, contrary to what Defendants have been telling Plaintiff, retail pharmacies, and consumers for years, the value and desirability of the Ineffective Decongestant Products plummeted.  As a result, Plaintiff and other retail pharmacies now have a surplus of product whose value has been impaired, may eventually be removed from the market altogether, and face the prospect of taking either a partial or total loss on their purchases.

NPSA-13

45.    Worse because the FDA has not yet pulled these products from the market and because not every consumer is aware of the recent disclosures, retail pharmacies are having to devote significant resources to educating customers about these developments. This process is hindered because even today on their websites, advertisements, and product labels, the Defendants continue to misrepresent the Ineffective Decongestant Products as being effective in treating nasal congestion.

46.    Retail pharmacies like Plaintiff have purchased virtually all available OTC medications marketed, distributed and sold by the Defendants containing PE as the active ingredient purportedly to treat nasal decongestant. Retail pharmacies are therefore caught in a difficult situation as to removing these products from product shelves altogether and risk losing foot traffic as customers go to other sources or continue to purchase these products and educate customers about the ineffectiveness of these products to treat the conditions Defendants claim they treat.

## CLASS ALLEGATIONS

47.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated. Plaintiffs seek to represent the following Classes:

> All retail pharmacies that purchased oral nasal decongestant containing phenylephrine manufactured by Defendants (the "Nationwide Class").

> All retail pharmacies who purchased an oral nasal decongestant containing phenylephrine manufactured by Defendants in the State of Arkansas (the "Arkansas Class").

48.    Excluded from the Classes are any retail pharmacies that manufacturer or promote

14

their own version of OTC medications containing PE as the active ingredient to treat nasal decongestants and Defendants, and any of the Defendants' members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case. Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation. This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

49.    Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

50.    **Numerosity**: Rule 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Plaintiffs are informed and believe that there are hundreds of thousands of members of the Classes based on the size of the market for decongestant products and Defendants' share of that market, but the precise number of Class members is unknown to Plaintiffs.

51.    **Commonality and Predominance**: Rule 23(a)(2) and (b)(3): This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation: a. When Defendants knew that phenylephrine was ineffective as a decongestant; b. Whether Defendants sold Ineffective Decongestant Products as effective; c. What measures Defendants took to conceal the true nature of their Ineffective Decongestant Products; d. Defendants' duty to disclose the true nature of their Ineffective Decongestant Products; e. Whether Plaintiffs and the other Class members overpaid for

Defendants' Ineffective Decongestant Products; and f. Whether Plaintiffs and the other Class members are entitled to equitable and injunctive relief.

52.     **Typicality**: Rule 23(a)(3): Plaintiffs' claims are typical of the other Class Members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above. Plaintiffs suffered damages as a direct proximate result of the same wrongful practices in which Defendants engaged.

53.     **Adequacy**: Rule 23(a)(4): Plaintiffs are adequate Class Representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the Class's interests.

54.     **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in managing this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the members of the Classes to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, such litigation creates a potential for inconsistent or contradictory judgments. It increases the delay and expense to all parties and the court system. By contrast, a class action is suited and intended to manage such difficulties and provide the benefits of uniform and common adjudication, economy of scale, and comprehensive supervision.

55.     **Declaratory Relief**: Federal Rule of Civil Procedure 23(b)(2): Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making declaratory relief appropriate, with respect to each Class as a whole.

## CLAIMS

### COUNT I
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (All Defendants)

56.     Plaintiffs repeat and reallege the foregoing as if fully set forth herein.

57.     Plaintiffs bring this claim on behalf of the Nationwide Classes or, in the alternative, the State Classes (the "Class," for purposes of this Count).

58.     Defendants were at all times a "merchant" within the meaning of Article 2 of the U.C.C., as codified under applicable law.

59.     The Ineffective Decongestant Products are and were "goods" within the meaning of Article 2 of the U.C.C., as codified under applicable law

60.     Defendants were obligated to provide Plaintiffs and the other Class members Ineffective Decongestant Products that were of merchantable quality, were reasonably fit for the purpose for which they were sold, and conformed to the standards of the trade.

61.     Defendants impliedly warranted that those drugs were of merchantable quality and fit for that purpose.

62.     Defendants breached their implied warranties, because their Ineffective Decongestant Products were not of merchantable quality or fit for their ordinary purpose.

63.     Defendants' breaches of implied warranties were a direct and proximate cause of Plaintiffs' and the other Class members' damages.

## COUNT II
## FRAUD BY OMISSION OR CONCEALMENT
### (All Defendants)

64.    Plaintiffs repeat and reallege the forgoing as if fully set forth herein.

65.    Plaintiffs bring this claim on behalf of the Nationwide Classes or, in the alternative, the State Classes (the "Class," for purposes of this Count).

66.    Defendants intentionally and knowingly falsely concealed, suppressed and/or omitted material facts including as to the standard, quality or grade of the PE Drugs. Due to their fraudulent conduct, Plaintiffs and the other Class members have suffered actual damages.

67.    Defendants knew that phenylephrine is ineffective at safe dosages when consumed orally.

68.    Defendants were obligated to inform Plaintiff and the other members of the Class of the effectiveness of phenylephrine due to their exclusive and superior knowledge of the Decongestant Products.

69.    Plaintiffs and other Class members also expressly reposed a trust and confidence in Defendants because the nature of their dealings as a healthcare entity and with Plaintiffs and other members of the Class as their consumers.

70.    Plaintiffs and the other Class members would not have purchased the Decongestant Products but for Defendants' omissions and concealment of material facts regarding the nature and quality of the Decongestant Products and existence of the Decongestant Products, or would have paid less for the Decongestant Products.

71.    Defendants knew their concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts.

72.    Defendants acted with malice, oppression, and fraud.

73.     Plaintiffs and the other Class members reasonably relied on Defendants' knowing, affirmative, and active false concealment and omissions. As a direct and proximate result of Defendants' omissions and active concealment of material facts regarding the Decongestant Products, Plaintiffs and the other Class members have suffered actual damages in an amount to be determined at trial.

## COUNT III
## FALSE ADVERTISING UNDER THE LANHAM ACT
## 15 U.S.C. § 1125(A)
## (All Defendants)

74.     Plaintiffs repeat and reallege the foregoing as if fully set forth herein.

75.     Plaintiffs bring this claim on behalf of the nationwide Class or, in the alternative, the State Classes (the "Class," for purposes of this Count).

76.     Defendants made and make false and misleading statements regarding the descriptions of fact and/or representations of fact in commerce regarding the nature, characteristics, qualities, and/or origin of the Ineffective Decongestant Products. Such false and misleading statements include claiming that PE in oral OTC medications acts as a "decongestant" and/or that the Ineffective Decongestant Products were effective in treating the symptoms of nasal congestion.

77.     These representations constitute false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

78.     These misrepresentations are made in interstate commerce and in connection with the Defendants' goods, which are sold, marketed, and distributed in interstate commerce. Defendants make these misrepresentations in advertising, product packaging, websites throughout the United States.

79.     These misrepresentations are false or misleading, confusing and deceptive.

80.    These misrepresentations deceived or had the tendency to deceive Plaintiff, the Class, and their customers. Among other things these misrepresentations cause confusion within the general public and Plaintiff and the Class' customers by duping them into believing that the Ineffective Decongestant Products are effective in treating nasal congestion. Customers came to believe these products were effective and required and expected retail pharmacies like Plaintiff and the Class to carry these products. Had Plaintiff and the Class not carried these products customers would have looked elsewhere for these products because of Defendants misrepresentations caused customers to believe the Ineffective Decongestant Products could treat nasal congestion.

81.    Defendants have acted in bad faith and have willfully and deliberately committed the foregoing acts with knowledge that the information is intended to deceive or confuse customers.

82.    Retail pharmacies like Plaintiff and the Class have been injured and are likely to be injured as a result of Defendants' false and misleading claims. These injuries include paying more for the Ineffective Decongestant Products than they otherwise would have, devoting shelf space to these products that could have been devoted to other products that actually worked, incurring the initial costs to stock the product and then costs associated with both removing the product from the shelves and re-stocking with different effective products, having inventory at the time of the NDAC report that could not be sold or had to be sold at a loss, devoting resources to educate customers on Defendants' misleading misrepresentations, and losing customer trust and loyalty because Plaintiff and the Class stocked and sold OTC medications that could not and did not deliver the relief to customers that Defendants promised.

83.    Retail Pharmacies like Plaintiff and the Class are within the zone of interest to be

protected by the Lanham Act as pharmacists and staff of these retail establishments are often called to answer questions and concerns patients have when seeking to alleviate common symptoms associated with the common cold and flu and other ailments like nasal congestion. Retail pharmacies like Plaintiff and the Class are expected to carry these OTC medications and customers have come to trust retail pharmacies to carry and provide these types of medications when patients and customers need them.

84.     Accordingly, Plaintiff and the Class have suffered and will likely suffer injury to their commercial interest in their business reputation as well as injury to their commercial interests in sales and future sales as a result of Defendants' misrepresentations. These misrepresentations have a chilling effect on the ability to credibly engage in the pharmacy business and discourage customers from seeking purchases of other goods and services that in fact would provide the nasal congestion relief that Defendants promised the Ineffective Decongestant Products offered.

85.     Plaintiffs and the Class are entitled to recover their actual damages and costs of this action in an amount to be proven at trial and such damage should be trebled as allowed by 15 U.S.C. § 1117(A).

86.     Plaintiff and the Class are further entitled to recover the Defendants profits, the amount of which is currently unknown, and which amount should be trebled as allowed under 15 U.S.C. § 1117(a). This is an exceptional case pursuant to 15 U.S.C. § 1117(a), and Plaintiffs and the Class are therefore entitled to recover their reasonable attorneys' fees.

<div align="center">

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**
**(All Defendants)**

</div>

87.     Plaintiffs repeat and reallege the foregoing as if fully set forth herein.

88.     Plaintiffs bring this claim on behalf of the nationwide Class or, in the alternative,

the State Classes (the "Class," for purposes of this Count).

89.     Defendants had a duty to provide truthful and accurate information regarding the Ineffective Decongestant Products. Defendants had a duty to make themselves aware of the medical literature regarding PE and to track over time the medical literature regarding the efficacy of PE to treat nasal congestion when administered orally.

90.     Defendants breached these duties in the following ways:

 a. Misrepresenting that PE when administered orally is effective in treating nasal congestion;

 b. Misrepresenting that PE when administered orally provided "decongestant" effects;

 c. Misrepresenting that the Ineffective Decongestant Products was an effective treatment to alleviate nasal congestion.

 d. Failing to timely learn or review the available medical literature to determine that PE when administered orally was ineffective to treat nasal congestion.

 e. Failing to timely alert the FDA that the Ineffective Decongestant Products were ineffective to treat the condition of nasal congestion.

91.     Additionally, Defendants made and make false and misleading statements regarding the descriptions of fact and/or representations of fact in commerce regarding the nature, characteristics, qualities, and/or origin of the Ineffective Decongestant Products. Such false and misleading statements include claiming that PE in oral OTC medications acts as a "decongestant" and/or that the Ineffective Decongestant Products were effective in treating the symptoms of nasal congestion.

92.     These breaches and misrepresentations caused Plaintiff and the class harm. As a result of the breaches of duties described herein Plaintiff and the Class have product that they

**NPSA-22**

cannot sell or must sell at significant discounts, must devote resources to educated customers as to the truth of PE's effectiveness to treat nasal congestion when administered orally, and loss of customer goodwill and loyalty for selling products that were ineffective to treat the conditions Defendants promised they would treat.

93.    Plaintiffs and the Class are entitled to recover their actual damages and costs of this action in an amount to be proven at trial.

<div align="center">

**COUNT V**
**UNJUST ENRICHMENT**
**(All Defendants)**

</div>

94.    Plaintiffs repeat and reallege the foregoing as if fully set forth herein.

95.    Plaintiffs bring this claim on behalf of the nationwide Class or, in the alternative, the State Classes (the "Class," for purposes of this Count).

96.    It would be inequitable for Defendants to insulate themselves from liability on this unjust enrichment claim by asserting that retail sales by their retailers cuts off any relationship between the Plaintiffs and the Classes and Defendants because Plaintiffs and the other Class members cannot seek a remedy directly from Defendants' retailers based on Defendants' sale of the Decongestant Products.

97.    Plaintiffs and all other Class members conferred a benefit on Defendants by purchasing Decongestant Products.

98.    Defendants have been unjustly enriched in retaining the revenues derived from Class members' purchases of Decongestant Products, which retention under these circumstances is unjust and inequitable because Defendants misrepresented that Decongestant Products were effective for providing congestion relief when in fact they were not, which caused injuries to Plaintiffs and all Class members because they paid a price premium due to Defendants' deception.

<div align="center">

23

**NPSA-23**

</div>

Because Defendants' retention of the non-gratuitous benefit conferred on it by Plaintiffs and all Class members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the Class members for their unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgement in their favor and against Defendant, as follows:

A. Certification of the proposed Class with Plaintiffs as class representatives;

B. Appointment of Plaintiffs' counsel as Class Counsel;

C. Injunctive relief, including, but not limited to requiring Defendants to make full disclosure of their knowledge of the efficacy of their Ineffective Decongestant Products;

D. Disgorgement of their profits from the sales of their Ineffective Decongestant Products;

E. Damages, including punitive damages, treble damages costs, and disgorgement in an amount to be determined at trial;

F. An order requiring Defendants to pay both pre- and post-judgment interest on all amounts awarded;

G. An award of costs and attorneys' fees; and

H. Such other further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of those similarly situated, demands a trial by jury on all issues so triable.

NPSA-24

Dated: September 27, 2023

Respectfully submitted,

By: */s/ Alyson S. Beridon*
Alyson S. Beridon, Trial Attorney (#87496)
**Herzfeld, Suetholz, Gastel, Leniski**
**& Wall, PLLC**
600 Vine St., Suite 2720
Cincinnati, OH 45202
Ph: (513) 381-2224
Fax: (615) 994-8625
alyson@hsglawgroup.com

Benjamin A. Gastel* (TN BPR #28699)
Joey Leniski* (TN BPR #22891)
**Herzfeld, Suetholz, Gastel, Leniski**
**& Wall, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Ph: (615) 800-6225
Fax: (615) 994-8625
ben@hsglawgroup.com
joey@hsglawgroup.com

James A. Streett* (ABA #2007092)
**Streett Law Firm, P.A.**
107 West Main
Russellville, AR 72801
Ph: 479-968-2030
Fax: 479-968-6253
james@streettlaw.com

*Application for admission *pro hac vice* forthcoming

**NPSA-25**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                                    :

IN RE: ORAL PHENYLEPHRINE MARKETING     :
AND SALES PRACTICES LITIGATION         :
_____   :    23-md-3089-BMC
                                                                    :

THIS DOCUMENT APPLIES TO:                :    **[PROPOSED] CASE**
                                                           :    **MANAGEMENT ORDER**
ALL CASES                                :    **NO. 1**
                                                                    :
------------------------------------------------------------- X

**COGAN**, District Judge.

In order to set out preliminary rules for the process of this case, it is **ORDERED**:

## I.    **APPLICABILITY**

This order shall govern the practice and procedure in the cases that have been or will be transferred to this Court as part of this MDL.  Any additional cases assigned to the undersigned judge following entry of this Order which the Court deems to be related to these cases shall be subject to this Order.

## II.    **ADMINISTRATION**

All member cases will be administratively closed.  This means that all member cases are closed <u>only</u> for Court statistical purposes, which will not affect nor terminate the members' association with the MDL.  Hyperlinks to all open cases will remain on the docket.

## III.    **ELECTRONIC CASE FILING**

All counsel shall familiarize themselves with this District's local rules and the Court's Individual Practice Rules, which may be obtained on the Court's website at

https://www.nyed.uscourts.gov/content/judge-brian-m-cogan.

The parties are advised that all cases will be associated. Each document shall indicate if it relates to "All Cases" (as above) or only specific cases. Future filings that are applicable in all related cases may be electronically "spread" to all related cases, thus avoiding the need for separate filings. If the filing pertains to a specific case or cases, that entry should only be filed in that particular case or those particular cases. If assistance is needed in a filing in this manner, please contact the Clerk's Office at (718) 613-2332.

Additionally, all documents filed on ECF must be appropriately labeled so that the docket remains intelligible, e.g., "Letter regarding parties' discovery disputes." Letters or filings that request relief from the Court should be designated as an ECF event "Motion."

## IV.    **APPLICATIONS TO THE COURT**

Individual Practice Rule III.A.1 for discovery motions shall be generally applicable to all communications or applications requiring a response from the Court, except substantive motions, which require a pre-motion conference letter (Practice Rule III.A.2). Counsel should meet and confer with the goal of agreeing on a request before filing a letter with the Court. Counsel shall file a **single** letter, jointly composed, setting out each party's position. Separate and successive letters will be disregarded.

Attorneys admitted and in good standing of the bar of any state or of any United States District Court may be admitted to practice *pro hac vice* in this litigation upon the filing of a motion pursuant to Local Rule 1.3(c), and upon (1) filing a certificate of the court for each of the states in which the applicant is a member of the bar, which has been issued within (30) days of filing and states that the applicant is a member in good standing of the bar of that state; and (2) filing a Notice of Appearance in this litigation that recites that the attorney is in good standing in his or her home jurisdiction (which shall be named) and has no disciplinary matters

pending.  The motion for *pro hac vice* admission must be filed in the lead case (23-md-3089) **and only** in the member case with which the party is associated.

## V.    INITIAL STATUS CONFERENCE

The Court will hold an **Initial Status Conference by video on one of these dates (to be determined by the Court upon filing): [DATE 1], [DATE 2], OR [DATE 3]**].  Parties at the conference should be prepared to present their positions on the following issues:

- Consolidation of all cases (and whether certain subsets of cases should be coordinated in any way)

- Appointment of Lead Class Counsel and Liaison Counsel

- An initial discovery schedule

- A class certification schedule

- Entry of orders directing preservation of evidence and a protocol for discovery of ESI

Any party may submit proposed agenda items for the initial status conference no later than three days before the conference.  Any such list may not exceed two pages, without attachments, and must consist of bullet-point items, without argument or legal analysis, reasoning, or justification.

At least one attorney for each defendant should attend the initial status conference.  To minimize unnecessary expense, the Court does not require attorneys for each plaintiff to attend.  Plaintiffs with similar interests should attempt to agree, to the extent practicable, on an attorney who will act on their joint behalf at the hearing.

## VI.    ORGANIZATION OF COUNSEL

Prior to the initial status conference, counsel on each side shall confer and attempt to seek consensus on whether lead counsel and liaison counsel should be appointed and, if so, the

selection of candidates for these positions.  Plaintiffs' counsel and defense counsel shall attempt to reach and file a stipulation as to the organization of their respective counsel.  If the parties are unable to do so, any party may file a motion for the appointment of lead counsel and/or liaison counsel, including proposed orders, no later than _____.

**VII.    PRESERVATION OF EVIDENCE**

Pending entry of an order regarding preservation of evidence, all parties shall take reasonable steps to preserve all documents, data, ESI, and tangible things containing information potentially relevant to this litigation.  All counsel shall make reasonable efforts to identify and notify parties and nonparties (including employees of corporate or institutional parties) of this directive.

**VIII.    EXTENSION AND STAY**

Any defendant that has not yet answered or otherwise pleaded is granted an extension of time for answering or otherwise pleading until a date to be set by the Court.  Pending the initial status conference and until further order of the Court, all outstanding discovery is stayed, and no further discovery may be initiated.  All pending motions that predate transfer or reassignment of any action are hereby terminated.

**IX.    ORDERS ENTERED BY TRANSFEROR COURTS**

All orders entered by transferor courts imposing deadlines for pleadings or discovery are vacated.

**SO ORDERED.**

_____
U.S.D.J.

Dated:
Brooklyn, New York

**NPSA-30**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: ORAL PHENYLEPHRINE MARKETING AND SALES PRACTICES LITIGATION | MDL No. 1:23-md-3089-BMC<br><br>**This Document Relates to<br>ALL CASES** |

**CONSENSUS PLAINTIFFS' MOTION FOR AN ORDER APPOINTING PLAINTIFFS'
PROPOSED LEADERSHIP STRUCTURE AND APPOINTING INTERIM CLASS
COUNSEL**

Consensus Plaintiffs, on behalf of all Plaintiffs' counsel, respectfully submit this Motion

for an Order Appointing Plaintiffs' Proposed Leadership Structure and Appointing Interim Class

Counsel. For the reasons set forth in the accompanying memorandum of law, Consensus Plaintiffs

respectfully request that the Court grant their motion, appoint their proposed leadership structure,

and grant such other and further relief as the Court deems just, proper and appropriate under the

circumstances.

Dated:  February 9, 2024

Respectfully submitted,

/s/ Michael A. London
Michael A. London
**DOUGLAS & LONDON P.C.**
59 Maiden Lane – 6th Floor
New York, New York 10038
Tel: 212-566-7500
mlondon@douglasandlondon.com

Bryan F. Aylstock
**AYLSTOCK WITKIN KREIS
OVERHOLTZ PLLC**
17 East Main Street, Suite 200
Pensacola, Florida 32502
Tel: 850-202-1010

baylstock@awkolaw.com

Kiley L. Grombacher
**BRADLEY GROMBACHER LLP**
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Tel: 866-881-0403
kgrombacher@bradleygrombacher.com

James E. Cecchi
**CARELLA BYRNE CECCHI BRODY &
AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: 973-994-1700
jcecchi@carellabyrne.com

Adam J. Levitt
**DiCELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: 312-214-7900
alevitt@dicellolevitt.com

Elizabeth A. Fegan
**FEGAN SCOTT LLC**
150 South Wacker Drive, 24th Floor
Chicago, Illinois 60606
Tel: 630-273-2625
beth@feganscott.com

Jonathan D. Selbin
**LIEFF CABRASER HEIMANN &
BERNSTEIN LLP**
250 Hudson Street, 8th Floor
New York, New York 10013
Tel: 212-355-9500
jselbin@lchb.com

Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road
Ridgefield Park, New Jersey 07660
Tel: 888-546-8799
cseeger@seegerweiss.com

2

**NPSA-32**

Jason P. Sultzer
**THE SULTZER LAW GROUP P.C.**
85 Civic Center Plaza Ste. 200
Poughkeepsie, New York 12601
Tel: 845-244-5595
sultzerj@thesultzerlawgroup.com

Lindsey N. Scarcello
**WAGSTAFF & CARTMELL**
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Tel: 816-701-1102
lscarcello@wcllp.com

***Plaintiffs' Proposed Executive Committee and
Proposed Interim Class Counsel***

**NPSA-33**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: ORAL PHENYLEPHRINE MARKETING AND SALES PRACTICES LITIGATION | MDL No. 1:23-md-3089-BMC<br><br>**This Document Relates to ALL CASES** |

**CONSENSUS PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR AN ORDER APPOINTING PLAINTIFFS' PROPOSED LEADERSHIP STRUCTURE AND <u>APPOINTING INTERIM CLASS COUNSEL</u>**

# I.    **INTRODUCTION**

On December 6, 2023, the Judicial Panel on Multidistrict Litigation ("JPML") created this industry-wide Multidistrict Litigation ("MDL"), transferring all actions containing allegations that Defendants' oral phenylephrine products are ineffective as nasal decongestants to this Honorable Court for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1402.[1] In so doing, the Panel tasked your Honor with "steer[ing] this litigation on a prudent and expeditious course."[2]

Following this MDL's creation, Your Honor instructed the parties to, among other things, respectively confer on the organization of counsel.[3] Specifically, in its December 21, 2023 Order, [ECF 5], the Court stated that:

> [p]rior to the initial status conference, counsel on each side shall confer and attempt to seek consensus on whether lead counsel and liaison counsel should be appointed and, if so, the Plaintiffs' counsel and defense counsel shall attempt to reach and file a stipulation as to the organization of their ***respective*** counsel. If the parties are unable to do so, any party may file a motion for the appointment of lead counsel and/or liaison counsel, including proposed orders, no later than _____.

*Id*. at 5 (emphasis added).

In compliance with the Court's directive, approximately 58 Plaintiffs' firms (representing approximately 82% of the 90 related cases before this Court[4] (following the JPML transfer Order and the subsequent conditional transfer orders being issued) ("the Consensus Plaintiffs")

---

[1] ECF No 1.
[2] *Id*.
[3] ECF No. 5.
[4] Both of those numbers continue to increase.

conferred[5] and reached agreement on the proposed two-tiered leadership structure set forth in Exhibit A. The list of 58 firms supporting this structure is attached as Exhibit B.[6]

The Consensus Plaintiffs' proposed two-tiered leadership structure—the result of extensive discussion and cooperation among counsel as part of a private-ordering effort—contemplates the appointment of a ten-member Plaintiffs' Executive Committee ("PEC"), to be chaired by New York attorney Michael A. London of Douglas and London, P.C., and a Plaintiffs' Steering Committee ("PSC"). The PEC—the proposed members of which are also seeking appointment as Interim Class Counsel pursuant to Fed. R. Civ. P. 23(g)—would be tasked with, among other things, undertaking the cohesive efforts necessary to efficiently prosecute this case and instructing

---

[5] Of note, several plaintiffs' lawyers—all of whom support the leadership structure proposed here—commenced informal efforts to work cooperatively before the creation of this MDL on issues germane to all of the cases and have been working as a cohesive and productive team from that time through the present day.

[6] In further compliance with the Court's directive, Plaintiffs' counsel—consistent with the Court's statement that "the Plaintiffs' counsel and defense counsel shall attempt to reach and file a stipulation as to the organization of their *respective* counsel," *id.*—reached out to Defendants' counsel, who, rather than limit their comments to their own side's leadership organization, requested that Plaintiffs include the following language in this Memorandum: "Defendants take no position on plaintiffs' proposed leadership structure, although they reserve their rights, including the right to challenge the efficiency of the proposed structure." Defendants also requested that Plaintiffs include language to the effect that Defendants "oppose the interim class counsel at this stage as premature, and defendants propose to discuss whether the appointment of interim class counsel is appropriate or necessary at the initial status conference."

Given the Court's directive regarding "organization of their *respective* counsel" it was understood that neither side comment on, or otherwise interfere with, the other side's proposed leadership structure (moreover, to actually enable Defendants to interfere with Plaintiffs' private ordering process and their proposed leadership structure would epitomize Judge Posner's admonition in *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 895 (7th Cir. 1981), about how a defendant, trying to interpose itself into plaintiff-side issues, "is a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house."). Notwithstanding that fact, and in an effort to present to the Court a clear record of the meet and confer that occurred on this issue, Plaintiffs have elected to include Defendants' requested language here—if only to advise the Court that even if the Court's Order permitted Defendants to weigh in on these inherently plaintiff-specific issues, Plaintiffs do not believe that Defendants' contentions are well taken.

and advising the PSC and other Plaintiffs' attorneys doing common benefit work at the PEC's direction and under its supervision.[7]

The Consensus Plaintiffs submit that presently appointing their comprehensive and near-unanimous[8] supported proposed leadership structure, in the form attached as Exhibit A, will allow them to efficiently and effectively prosecute this class action litigation on behalf of all Plaintiffs and absent Class members, speaking in one voice on behalf of all of them, consistent with Rule 23(g)'s dictates. A detailed explanation of the proposed leadership structure is set forth below.

As set forth in the Declarations from the attorneys applying for leadership roles attached as Exhibits C through X[9] hereto, the proposed leadership team members have demonstrated the willingness and the ability to commit to time-consuming litigation and settlement processes; have demonstrated the ability to work cooperatively and efficiently with others; have substantial professional experience in leading this type of litigation; and have access to sufficient resources to advance the litigation in a timely and efficient manner.[10]

---

[7] *See* Proposed Order Appointing Plaintiffs' Leadership Structure and Appointing Rule 23(G) Interim Class Counsel, pp. 5-7, attached as Ex. A for a complete list of PEC duties and responsibilities. ("Ex. A")

[8] While certain plaintiff law firms who initially filed a lawsuit have not affirmatively agreed to the leadership structure, we are not aware of any lawyer or law firm who opposes the Consensus Plaintiffs' proposed leadership structure.

[9] Declaration of Michael A. London, attached as Ex. C; Declaration of Bryan A. Aylstock, attached as Ex. D; Declaration of James E. Cecchi, attached as Ex. E; Declaration of Kiley L. Grombacher, attached as Ex. F; Declaration of Adam J. Levitt, attached as Ex. G; Declaration of Elizabeth A. Fegan, attached as Ex. H; Declaration of Jonathan D. Selbin, attached as Ex. I; Declaration of Christopher A. Seeger, attached as Ex. J; Declaration of Jason P. Sultzer, attached as Ex. K; Declaration of Lindsey N. Scarcello, attached as Ex. L; Declaration of Sarah N. Wescot, attached as Ex. M; Declaration of Michael A. Sacchet, attached as Ex. N; Declaration of Shireen M. Clarkson, attached as Ex. O; Declaration of Alexander E. Barnett, attached as Ex. P; Declaration of Kelsey L. Stokes, attached as Ex. Q; Declaration of Darren E. Kaplan, attached as Ex. R; Declaration of Jordan E. Jacobson, attached as Ex. S; Declaration of Laura S. Dunning, attached as Ex. T; Declaration of Fred S. Longer, attached as Ex. U; Declaration of Marlene J. Goldenberg, attached as Ex. V; Declaration of Stuart A. Davidson, attached as Ex. W; and Declaration of Melanie H. Muhlstock, attached as Ex. X.

[10] Additionally, brief summaries of each of the proposed PEC members are set forth below.

Accordingly, the Consensus Plaintiffs respectfully move this Court for approval of their proposed leadership slate and appointment of members of the proposed PEC as Rule 23(g) Interim Class Counsel.[11]

## II.    LEGAL STANDARD

Courts have traditionally appointed individual counsel organized in a plaintiffs' leadership structure to coordinate the prosecution of a complex litigation.[12] According to the MANUAL FOR COMPLEX LITIGATION (4th ed. 2005) ("MANUAL"), the function of the plaintiffs' leadership structure is to "promote efficiency," "avoid unruly proceedings" and "clarify responsibility for protecting the interests of the class during precertification proceedings."[13] Moreover, courts have historically given deference to the individuals and organization structure of counsel selected by mutual cooperation.[14] This approach is known as private-ordering:

> There are several methods for selecting among competing applicants. By far the most common is the so-called 'private ordering' approach: The lawyers agree who should be lead class counsel and the court approves the selection after a review to ensure that the counsel selected is adequate to represent the class interests. Counsel may agree to designate a particular lead class counsel in exchange for commitments to share the legal work and fees.[15]

---

[11] *See* Ex. A.

[12] *In re Facebook, Inc.*, 288 F.R.D. 26, 43-44 (S.D.N.Y. 2012); *In re Bank of Am. Corp. Secs., Derivative and ERISA Litig.*, 258 F.R.D. 260, 272 (S.D.N.Y. 2009)).

[13] *In re Parking Heaters Memorandum Antitrust Litig.*, 310 F.R.D. 54, 56 (E.D.N.Y. 2015) (quoting MANUAL § 21.11.

[14] *Doe v. GoodRx Holdings, Inc.*, No. 23-cv-00501 2023 U.S. Dist. LEXIS 117086, at *8 (N.D. Cal. Jul. 7, 2023) (appointing class counsel where all other Plaintiffs' counsel's firms supported the appointment); *In re Vanguard Chester Funds Litig.*, 625 F. Supp. 3d 362, 370 (E.D. Pa 2022) (concluding court will respect the private ordering of Plaintiffs in selecting lead counsel); *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, MDL No. 1674 2011 U.S. Dist. LEXIS 107366, at *22 (W.D. Pa. Sep. 20, 2011) (observing that private ordering has long been the preferred approach and concluding the Court has no reason to deviate from that approach when selecting interim lead counsel); *See also* Bolch Judicial Institute, Duke Law School, *Guidelines and Best Practices for Large And Mass Tort MDLs* (Second ed. 2018) p. 13 at ¶ 1.

[15] MANUAL § 21.272.

NPSA-38

Judges presiding over complex cases agree that selecting the right individual counsel for leadership is of paramount importance to the overall success of the litigation.[16] Section 10.22 of the MANUAL explains when a court should appoint lead counsel:

> Complex litigation often involves numerous parties with common or similar interests but separate counsel. Traditional procedures in which all papers and documents are served on all attorneys, and each attorney files motions, presents arguments, and examines witnesses, may waste time and money, confuse and misdirect the litigation, and burden the court unnecessarily. Instituting special procedures for coordination of counsel early in the litigation will help to avoid these problems.

When selecting counsel to serve in leadership roles, the Manual recommends that Courts ensure that counsel are "qualified and responsible and that they will fairly and adequately represent all of the parties on their side."[17] Finally, courts should consider the attorneys' resources, commitment, and "ability to command respect of their colleagues and work cooperatively with opposing counsel and the Court."[18]

In addition, because this is a class action, the Court, in conjunction with its leadership analysis, must also consider the elements of Federal Rule of Civil Procedure 23(g).[19] That Rule provides, in pertinent part, that "[t]he court may designate interim counsel to act on behalf of the putative class before determining whether to certify the action as a class action." Fed. R. Civ. Pro. 23(g)(3).

It is "generally accepted that the considerations set out in [Rule 23(g)(1)(A)], which governs appointment of class counsel once a class is certified, apply equally to the designation of

---

[16] MANUAL § 10.224 ("Few decisions by the Court in Complex litigation are as difficult and sensitive as the appointment of designated Counsel")

[17] MANUAL § 10.220.

[18] MANUAL § 10.224.

[19] *In re Fairlife Milk Prods. Mktg. & Sales Practices Litig.*, No. 19-cv-3924, 2020 U.S. Dist. LEXIS 10291, at *5 (N.D. ILL. Jan. 22, 2020) (noting that an MDL court must look to Fed. R. Civ. Pro. 23(g)(3) factors in appointing leadership positions where Plaintiffs expect to seek class certification).

interim class counsel before certification." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 240 F.R.D. 56, 56 (E.D.N.Y. 2006)); *In re Mun. Derivatives Antitrust Litig.*, 252 F.R.D. 184, 186 (S.D.N.Y. 2008) ("When appointing interim class counsel, courts generally look to the same factors used in determining the adequacy of class counsel under Rule 23(g)(1)(A)"). These factors are:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).

Pursuant to Rule 23(g)(1)(B), courts may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). The most important factor is "achieving efficiency and economy without jeopardizing fairness to the parties." Manual § 10.221. As discussed above, and more fully below, the attorneys comprising Consensus Plaintiffs' proposed leadership team—and the size and structure of the team as a whole—meet this standard in this litigation.

### III.    ARGUMENT

**A.    The Consensus Plaintiffs' Proposal Best Serves the Needs of Plaintiffs, the Other Members of the Proposed Class, and The Management of the MDL as a Whole**

The Consensus Plaintiffs' proposal recognizes the significant size, scope, and needs of this case, and leverages a team of experienced attorneys of diverse backgrounds who are fully capable of prosecuting the case efficiently and effectively through all aspects of pre-trial, discovery, trial, appeal, and resolution. The case is neither simple nor small. It is an industry-wide MDL regarding oral phenylephrine sold in hundreds of products by more than two dozen defendants to millions of consumers across all fifty states. Oral phenylephrine exploded in use after the nasal decongestant

6

pseudoephedrine was moved "behind the counter" in 2006. According to recent reporting, in 2022 alone, more than $1.8 billion in oral-phenylephrine-containing products were sold in the United States in hundreds of different products (in approximately 242 million bottles or packages).[20]

In recognition of the size and complexity of this matter, the Consensus Plaintiffs' counsel have, since September 2023, been actively working together and with other plaintiffs' law firms to investigate and develop legal and factual theories and strategies. They formed multiple working groups that have held weekly calls and Zoom meetings, as well as several in-person meetings. They expended hundreds of hours investigating the matter, drafted multiple substantive legal and factual memoranda, constructed databases supporting factual claims, conferred with experts, and otherwise developed the legal and factual theories underpinning the prosecution of the case. This pre-appointment work supports the Consensus Plaintiffs' appointment. *See, e.g.*, *In re Mun. Derivatives Antitrust Litig.*, 252 F.R.D. 184, 186 (S.D.N.Y. 2008) (explaining that leadership applicant firms' "significant investigations into the potential claims" weighed in favor of its appointment in leadership).

1.   **The Consensus Plaintiffs' Counsel Have Substantial Experience and Wide-Ranging Knowledge of the Relevant Law**

The proposed ten-member PEC is comprised of some of the most accomplished MDL and class action trial lawyers in the plaintiffs' bar. They have led teams that recovered tens of billions of dollars for plaintiffs, led dozens of MDL, and count among their team members individuals who have been characterized by courts as part of a "class action dream team."[21] The proposed chair of the PEC, Michael London, co-led *In re: Bayer Corp Combination Aspirin Products Marketing and*

---

[20] Megan Cerullo, *Ineffective* ingredient *could make Dayquil, Sudafed and others disappear from store shelves*, CBS News (Sept. 12, 2023), *available at* https://www.cbsnews.com/news/phenylephrine-fda-ruling-nasal-decongestants/.

[21] *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*, No. 15-MD-2672 (N.D. Cal.).

NPSA-41

*Sales Practices Litigation*, MDL 2023, a case involving a number of issues similar to this one. Together, the proposed leadership team understands how to manage large, complex multi-district litigations, and manage them well.

Indeed, this experience is reflected in the proposed structure itself. Recognizing the substantial discovery burdens that will inevitably fall on Plaintiffs in a case characterized by dozens of defendants and hundreds of products, the Consensus Plaintiffs have proposed a large slate with diverse geographic reach.[22] The PEC will direct the efforts of the PSC, which will assist the PEC in undertaking all tasks necessary for the successful litigation of this matter. This approach—as more fully framed in the proposed Order—will serve as a powerful check in: (1) ensuring that only necessary work is being conducted efficiently and effectively by Plaintiffs' counsel; and (2) protecting against unnecessary work that only leads to an increase in costs and fees. Further, foregoing the traditional lead or co-lead counsel structure seen in other MDLs in favor of the PEC and PSC structure proposed here has greatly assisted with achieving the consensus of Plaintiffs' counsel, and reflects both the cooperative effort of counsel and their willingness to set aside ego in service to consensus.

### 2.  **Counsel Will Expend Significant Resources on This Matter**

As detailed in their declarations attached as Exhibits C through L, each proposed member of the PEC has committed to expending significant resources—in terms of both time and treasure—to prosecute this matter and have a documented history of a willingness and ability to do so however long it takes. Indeed, as detailed above, they have already begun to do so here. In addition, attached hereto are declarations of each proposed member of the PSC.

---

[22] The proposed leadership committee includes attorneys from New York, New Jersey, Illinois, Missouri, Florida, California, Minnesota, Pennsylvania, and Washington.

3.    **The Consensus Plaintiffs Comprise a Slate Diverse in Geography, Experience, and Perspective**

This is a nationwide case, with Plaintiffs from all walks of life. The Consensus Plaintiffs are comprised of law firms and lawyers located across the United States. Attorneys on the proposed leadership committees hail from New York, New Jersey, Illinois, Missouri, Florida, California, Minnesota, Pennsylvania, Texas, and Washington with class action experience ranging from ten to thirty years. Women hold over 45% of the proposed leadership positions.

In short, Consensus Plaintiffs' proposed structure is an effective and efficient structure that will best serve Plaintiffs and the other members of the proposed Class. The structure can tackle the complexities inherent in an industry-wide MDL given the multiple defendants and products at issue, address any nuances in the MDL as they arise, and ensure that firms with particular skills will be relied upon, as the PEC deems necessary.

B.    **The Proposed PEC Members**

The proposed PEC slate will be chaired by Michael A. London of New York-based Douglas & London P.C. As PEC Chair, Mr. London will coordinate, schedule, and monitor the activities of the leadership team, as well as perform other necessary administrative or logistical tasks. He will also be responsible for traditional liaison counsel duties in lieu of the appointment of a formal liaison counsel. Significantly, however, serving as Chair does not give Mr. London greater authority over any other PEC member. As stated above, the proposed leadership structure contemplates a majority rules approach. The other nine proposed PEC members (listed alphabetically by firm name) are:

Bryan F. Aylstock
Aylstock Witkin Kreis Overholtz PLLC
17 East Main Street, Suite 200
Pensacola, Florida 32502
Tel: 850-202-1010
baylstock@awkolaw.com

Elizabeth A. Fegan
Fegan Scott LLC
150 South Wacker Drive, 24th Floor
Chicago, Illinois 60606
Tel: 630-273-2625
beth@feganscott.com

9

**NPSA-43**

Kiley L. Grombacher
Bradley Grombacher LLP
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Tel: 866-881-0403
kgrombacher@bradleygrombacher.com

Jonathan D. Selbin
Lieff Cabraser Heimann & Bernstein LLP
250 Hudson Street, 8th Floor
New York, New York 10013
Tel: 212-355-9500
jselbin@lchb.com

James E. Cecchi
Carella Byrne Cecchi Brody & Agnello, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: 973-994-1700
jcecchi@carellabyrne.com

Christopher A. Seeger
Seeger Weiss LLP
55 Challenger Road
Ridgefield Park, New Jersey 07660
Tel: 888-546-8799
cseeger@seegerweiss.com

Adam J. Levitt
DiCello Levitt LLP
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: 312-214-7900
alevitt@dicellolevitt.com

Jason P. Sultzer
The Sultzer Law Group P.C.
85 Civic Center Plaza Ste. 200
Poughkeepsie, New York 12601
Tel: 845-244-5595
sultzerj@thesultzerlawgroup.com

Lindsey N. Scarcello
Wagstaff & Cartmell, LLP
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Tel: 816-701-1102
lscarcello@wcllp.com

1.  **Michael A. London of Douglas & London Should Be Appointed as PEC Chair**

Michael A. London should be appointed as PEC Chair, due to his extensive leadership experience in managing pharmaceutical class actions and mass torts,[23] his firm's abundant resources, and the universal support for the appointment that he enjoys from the Consensus Plaintiffs' firms involved in this case. Importantly, Douglas and London is based locally in New

---

[23] *See* Declaration of Michael A. London, attached as Ex. C at pp. 2-3 (listing the eleven (11) complex litigations in which Mr. London has been appointed Co-Lead Counsel or Chair of Plaintiffs' Executive Committees)

**NPSA-44**

York City, less than fifteen minutes from the Eastern District of New York courthouse,[24] and has a proven record of successfully managing cases here in the United States District Court for the Eastern District of New York in addition to MDLs nationwide.

Perhaps the most relevant experience is Mr. London's success at managing a similar pharmaceutical consumer class action: *In re: Bayer Corp Combination Aspirin Products Marketing and Sales Practices Litigation*, MDL 2023, in which this Court appointed him Co-Lead Counsel and Liaison Counsel—roles that he performed through the successful resolution of that MDL. *See* Case Management Order No. 1, 09-md-2023 [Dkt. No. 17]. Heading up that litigation, along with his co-lead counsel, Mr. London oversaw the work of the Plaintiffs' Executive Committee and Plaintiffs' Steering Committee, which included the filing of a consolidated class action complaint, successful Rule 12(b)(6) motion practice, extensive defendant and third-party fact discovery, extensive expert discovery, *Daubert* motion practice and class certification motion practice, all of which ultimately resulted in a successful resolution. Indeed, the work performed by Mr. London played an integral part in bringing about the $15 million settlement for class members. In addition, the Consensus Plaintiffs have suggested this role and support it.

### 2. Bryan F. Aylstock of Aylstock Witkin Kreis Overholtz PLLC Should Be Appointed as a PEC Member

Bryan Aylstock, co-founder of the nationally recognized law firm of Aylstock, Witkin, Kreis and Overholtz, PLLC, should be appointed as a member of the PEC. Mr. Aylstock has served with distinction as lead or co-lead counsel in multiple high-profile MDLs, bringing all of them to

---

[24] *See Guidelines and Best Practices for Large and Mass-Tort MDLs*, Bolch Judicial Institute, Duke Law School, p. 32, https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1004&context=bolch ("Liaison counsel often has offices in the same location as the court, though that is not necessarily a requirement. Appointing as liaison counsel an attorney who has practiced before the transferee judge can be helpful, since the attorney will already be familiar with the local rules, the judge's practices and preferences, and other court-specific procedures.)

a successful conclusion. Mr. Aylstock graduated number one in his law school section from the University of Florida College of Law and served as a senior editor of the Florida Law Review. Following law school, Mr. Aylstock clerked for the Honorable Roger Vinson, Chief Judge for the United States District Court for the Northern District of Florida. He has specialized in multi-district and class action litigation for more than 25 years and has developed substantial experience in handling complex class litigation consolidated within the multi-district mechanism. He has also authored numerous publications on various issues related to his practice. Most recently, Mr. Aylstock served as the court-appointed Lead Counsel in the 3M Combat Arms Product Liability Litigation, MDL 2885, the largest MDL in United States history. In that capacity, he was recognized for receiving one of the Top 50 verdicts in the United States in 2021 and 2022. The Honorable M. Casey Rodgers even bestowed upon him the Court's "MDL MVP" award for his litigation efforts and bringing that massive litigation to a successful resolution. Prior to that, Mr. Aylstock served as Coordinating Co-Lead Counsel helping to oversee and eventually bringing to resolution the five separate transvaginal mesh MDLs (MDLs 2187, 2325, 2326, 2327 & 2387), that were all consolidated in the Southern District of West Virginia. Taken together, those MDLs represented approximately one-third of the civil docket of the federal court system at the time. Mr. Aylstock was also appointed as Co-Lead Counsel in the *In re Avandia Marketing, Sales and Products Liability Litigation*, MDL 1871, and as court-appointed Liaison Counsel in *In re Abilify Products Liability Litigation*, MDL 2734. He was also appointed Co-Lead Class Counsel in the recently settled class action case of *In re Johnson & Johnson Sunscreen Marketing, Sales Practices, and Products Liability Litigation*, MDL 3015, and serves as class counsel the *In re Proctor & Gamble Aerosol Products Marketing and Sales Practices Litigation* pending in the S.D. of Ohio.

**NPSA-46**

Mr. Aylstock is regularly invited to speak at attorney and bench/bar conferences on issues and law school classrooms related to the handling of mass tort and class action litigation. He is widely respected by attorneys in the plaintiffs' bar and defense bar alike. He is licensed to practice in Alabama, Mississippi and Florida and before numerous federal courts, including the United States Supreme Court.

### 3.  Kiley L. Grombacher of Bradley Grombacher LLP Should Be Appointed as a Member of the Plaintiffs' Executive Committee

Kiley Grombacher should be appointed as a member of the PEC. Courts have appointed Ms. Grombacher as class counsel in more than a hundred class actions and as co-lead counsel in complex consumer class action MDLs. Additionally, Ms. Grombacher has successfully briefed and/or argued cases before appellate courts regarding issues germane to consumer class actions. Her writings on legal topics pertaining to class and representative actions have appeared in professional publications and she has been called upon to speak at conferences and seminars for professional organizations. Ms. Grombacher has also been honored as a Super Lawyer in the area of class actions by Los Angeles Magazine since 2018 and was recently honored as one of the Top 100 Women in Law and the Top 100 Plaintiff's Lawyers for the current year by the Daily Journal.

Ms. Grombacher and her firm. Bradley/Grombacher ("BG") have been actively involved in this litigation and have devoted significant resources to this action. BG has participated in phone conferences and in-person meetings with other plaintiffs' counsel from around the country to discuss legal strategy and coordinate efforts. Additionally, BG has filed a brief with the JPML in support of consolidation and has devoted a significant amount of time working with plaintiffs' ad-hoc committees on issues that will inevitably arise during this litigation.

13

**NPSA-47**

### 4.    James E. Cecchi of Carella Byrne Cecchi Brody & Agnello, P.C Should Be Appointed as a Member of the Plaintiffs' Executive Committee

James E. Cecchi, a former federal prosecutor, should be appointed as a member of the PEC. Mr. Cecchi has held leadership positions in many of the nation's most complex and important consumer class actions affecting consumer rights in the last fifteen years and, under his leadership, the firm has returned billions of dollars to consumers. Besides securing substantial compensation for class members, Mr. Cecchi's efforts prosecuting class action cases in New Jersey and nationwide have won him the respect and esteem of fellow class action litigators across the country. As head of his firm's class action litigation practice, Mr. Cecchi has been selected to serve as lead, co-lead, liaison, and PEC member in many multidistrict litigations—cases that have resulted in significant settlements.[25] Mr. Cecchi's extensive experience encompasses prosecuting numerous pharmaceutical-related class actions in which he was either co-lead counsel or a member of the PEC, including *In re National Prescription Opiate Litig.*, *In re Vytorin/Zetia Marketing, Sales Practices and Prods. Liab. Litig.* ($41.5M), *In re Insulin Pricing Litig.* ($13.5M), and *In re Valeant Pharms. Int'l, Inc. Sec. Litigation*) ($23M).[26] These appointments reflect the confidence that other federal courts have expressed regarding his skills and professionalism in handling large and important multi-district litigation. The history of working successfully together—and the independent experiences Carella Byrne brings to the team—certainly would enhance the strength of the leadership slate proposed to the Court.

---

[25] *See* Declaration of James E. Cecchi, attached as Ex. E at ¶ 4.
[26] *Id.*

14

**NPSA-48**

### 5.    Adam J. Levitt of DiCello Levitt LLP Should Be Appointed as a PEC Member

Co-founder of DiCello Levitt LLP—named 2023 Plaintiffs' Law Firm of the Year by the *National Law Journal*—Adam Levitt has the credentials and the experience necessary to be appointed to the proposed PEC. His ability to build and lead winning teams and his innovative approaches to litigation strategy and willingness to lead difficult cases through trial and beyond has led to his appointment as lead or co-lead counsel in close to 25 multidistrict litigations. It has also resulted in his retention by institutional investors and multinational corporations, and his retention—through competitive bidding processes—by numerous State Attorneys General in a wide variety of matters, including by the States of Illinois and Michigan in the PFAS water contamination cases, the largest environmental litigations of our lifetime.[27] Moreover, as a court-appointed member of a leadership group characterized as a "class action dream team" in the historic litigation arising from Volkswagen's emissions scandal, Mr. Levitt helped secure a $16 billion settlement that benefitted car buyers across the United States.[28] He has also served as co-lead counsel in three of the largest biotechnology class actions in history, and, in doing so, created a game-changing economic model to measure crop contamination damages that set the modern industry standard.[29]

Mr. Levitt's work on behalf of plaintiffs has been recognized locally and nationally in ranking directories, including Chambers USA, where he has received a Band 1 ranking for Mainly

---

[27] *Nessel v. 3M Co., et al.*, MDL No. 2873 (D.S.C.); *Nessel v. EI DuPont de Nemours and Co.*, *et al.*, MDL No. 2873 (D.S.C.); *Nessel v. Chemguard, et al.*, MDL No. 2873 (D.S.C.); *Nessel v. Asahi Kasei Plastics N. Am. Inc.*, Case No. 20-30909-NZ (Livingston Cir. Ct.); *People ex rel. Raoul v. 3M Co.*, Case No. 22-cv-4075 (C.D. Ill.).

[28] *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*, No. 15-MD-2672 (N.D. Cal.).

[29] *In re Genetically Modified Rice Litig.*, MDL No. 1811 (E.D. Mo.); *In re Imprelis Herbicide Mktg., Sales Pracs., & Prods. Liab. Litig.*, MDL No. 2284 (E.D. Pa.); *In re StarLink Corn Prods. Liab. Litig.*, MDL No. 1403 (N.D. Ill.).

Plaintiffs Litigation in Illinois. Chambers USA has also ranked him in Illinois for General Commercial Litigation and nationwide for Product Liability Litigation, where editors described him as the "go-to plaintiffs' attorney in the class action space." Benchmark Litigation has also repeatedly recognized him as a National Litigation Star: Securities and Litigation Star in Illinois, and Lawdragon has named him one of the 500 Leading Plaintiff Financial Lawyers and one of the 500 Leading Plaintiff Consumer Lawyers in the United States. As further confirmation of his standing in the national class action bar, Mr. Levitt writes a monthly column on class action litigation ("Arguing Class Actions") in the National Law Journal. He is also an elected member of the American Law Institute and the Economic Club of Chicago.

### 6. Elizabeth A. Fegan of Fegan Scott LLC Should Be Appointed as a PEC Member

Elizabeth Fegan is the Managing Member and founder of Fegan Scott LLC ("Fegan Scott").[30] Ms. Fegan has nearly 30 years of experience representing plaintiffs in complex and class action litigation and has successfully prosecuted similar cases, including before this Court as Co-Lead Counsel with Michael London in *In re Bayer Corp. Combination Aspirin Prod. Marketing and Sales Practices Litig.*, MDL No. 2023 (E.D.N.Y.).[31] Since founding Fegan Scott in 2019, Ms. Fegan has already achieved significant recoveries as Lead Class Counsel on behalf of consumers in several MDLs, including with Mr. London in *In re Aqueous Film-Forming Foams Products Liab. Litig.*, MDL No. 2873 (D.S.C.) (two pending class settlements valued at more than $13.5 billion), *In re Kia Hyundai Vehicle Theft Marketing, Sales Practices, and Products Liab. Litig.*, MDL No. 3052 (C.D. Cal.) (preliminarily approved $200 million class settlement), and *In re Tiktok, Inc., Consumer Privacy Litig.*, MDL No. 2948 (N.D. Ill.) (final $92 million class

---

[30] Declaration of Elizabeth A. Fegan, attached as Ex. H, at ¶ 1.
[31] *Id.* at ¶¶ 1, 8.

settlement).[32] Ms. Fegan's and her firm's achievements resulted in the firm being named Law Firm of the Year in the consumer protection category at The National Law Journal's 2023 Elite Trial Lawyers Awards.[33]

Ms. Fegan's experience, tenacity, and ability to work cooperatively with attorneys on both sides of the v. have been recognized throughout the bar and the judiciary. Indeed, the Hon. John Z. Lee sua sponte appointed Ms. Fegan as Co-Lead Counsel in *In re Tiktok* based on her role in *In re NCAA Student-Athlete Concussion Injury Litig.*, No. 1:13-cv-9116 (N.D. Ill.) ($75 million medical monitoring settlement).[34] When appointing Ms. Fegan, Judge Lee remarked that "Ms. Fegan demonstrated to me during her work in the NCAA Student-Athlete Concussion MDL that she is very astute, hard-working and, perhaps most important of all in this circumstance, fair and level-headed." *Id.* In her frequent appointments as class counsel and on leadership teams, Ms. Fegan has worked with most of the plaintiffs' counsel in this litigation, including Michael London in the Combination Aspirin MDL.[35] Throughout her career, Ms. Fegan has also been a vocal advocate for female attorneys and diversity as a whole amongst leadership in MDLs.[36]

### 7.    Jonathan D. Selbin of Lieff Cabraser Heimann & Bernstein LLP Should Be Appointed as a PEC Member

Jonathan Selbin is a senior partner in the New York City office of Lieff, Cabraser, Heimann & Bernstein, LLP ("LCHB"), with almost 30 years of experience. He is widely-recognized as a leading consumer class action lawyer.[37] Courts have appointed him lead counsel in many MDL and other large complex consumer class actions, including Judge Seybert in this District, and he

---

[32] *Id.* at ¶¶ 2-7.
[33] *Id.* at ¶ 2.
[34] *Id.* at ¶ 11.
[35] *Id.* at ¶ 8.
[36] *Id.* at ¶ 15.
[37] Declaration of Jonathan D. Selbin, attached as Ex. I, at ¶¶1, 3-5.

17

**NPSA-51**

has briefed, argued, and obtained multiple important consumer class action appellate decisions.[38] Cases in which Mr. Selbin played a leading role have resulted in over $3.5 billion in cash paid out to class members, plus other relief such as extended and enhanced warranties.[39]

LCHB is counsel of record in the first-filed case in this District, and was first to indicate interest in seeking JPML transfer here.[40] LCHB is one of the premier plaintiffs' class and complex action firms in the country. LCHB attorneys have been appointed to lead some of the largest MDLs in history, as well as many cases within this District including before Your Honor.[41] It has obtained many tens of billions of dollars in cash in settlements and judgments, including 27 cases in which more than $1 billion was paid to class members and claimants.[42] As one court concluded in appointing LCHB to a co-lead position just weeks ago, LCHB "is a large, diversified, multi-office plaintiffs' firm that has secured significant results in a range of cases."[43] The court determined that LCHB, together with its co-counsel, can "harness the benefits of diversity" to "find solutions faster" and "generate better performance overall."[44] In this case, LCHB lawyers have been active since last Fall in cooperation with other counsel, with a particular focus on analyzing and proposing legal strategy.[45]

8. **Christopher A. Seeger of Seeger Weiss LLP Should Be Appointed as a PEC Member**

Christopher A. Seeger is a founding partner of Seeger Weiss LLP ("Seeger Weiss") a trial firm of approximately 40 lawyers with offices in New York, New Jersey, Pennsylvania, and

---

[38] *Id.* at ¶¶10-11.
[39] *Id.* at ¶3.
[40] *Id.* at ¶¶13-14.
[41] *Id.* at ¶¶5-9.
[42] *Id.* at ¶6.
[43] *Id*. at ¶7.
[44] *Id*. at ¶7.
[45] *Id.* at ¶15.

NPSA-52

Massachusetts, and is widely recognized as one of the nation's leading lawyers representing plaintiffs in complex litigation.[46] For most of his 33-year career, Mr. Seeger has represented the interests and defended the rights of individuals in products liability and consumer protection actions in multi-district litigation and class actions across a versatile range of litigation, including drug injury, product liability, property damage, third-party payer litigation, antitrust, and securities fraud.[47]

Selected by his peers or appointed by courts, Mr. Seeger has held and continues to hold leadership positions in many of the most noteworthy multi-district litigation of the past decade, including: redressing the Opioid epidemic where he directly oversaw the resolution of billions of dollars of claims against key defendants; obtaining life-changing benefits for former NFL players and their families related to potential neurological harm caused by head-hits; compensating thousands of veterans injured by 3M's defective earplugs; and bringing Volkswagen to justice in the "Clean Diesel" litigation.[48] With these leadership appointments, Mr. Seeger established himself as capable of leading elite teams pursuing claims against some of the largest corporations, including, with the Opioids litigation, litigation against an entire industry. Mr. Seeger has brought the same level of commitment and success when working to hold manufacturers and retailers of over-the-counter medications, prescription pharmaceuticals, and medical devices accountable for years of deception as he has to these watershed cases.[49] *Id.*

---

[46] *See* Declaration of Christopher A. Seeger, attached as Ex. J, at ¶ 1.
[47] *Id.* at ¶ 2.
[48] *Id.* ¶¶ 1, 2.
[49] *Id.*

19

**NPSA-53**

### 9.     Lindsey N. Scarcello of Wagstaff & Cartmell Should Be Appointed as a PEC Member

Lindsey N. Scarcello is a partner at Wagstaff & Cartmell, LLP ("W&C"), a Kansas City-based law firm with a nationwide complex litigation practice.[50] Ms. Scarcello has more than 10 years' experience litigating claims on behalf of individuals injured by corporate and professional misconduct.[51] Since joining W&C over five years ago, Ms. Scarcello has been heavily involved in several consolidated actions, including *In Re: Acetaminophen – ASD–ADHD Products Liability Litigation*, MDL 3043, where she was appointed to the PSC, and *In Re: 3M Combat Arms Earplug Products Liability Litigation*, MDL 2885, where she worked closely with plaintiffs' general liability experts and was a member of the trial team in three bellwether cases.[52]

Over the last several months, W&C has worked closely with other members of the proposed leadership slate to coordinate efforts and strategy.[53] W&C filed the first class actions against the defendants in the Western District of Missouri and the District of Kansas and filed a brief before the JPML in support of consolidation.[54] With more than 35 attorneys – the vast majority of whom specialize in complex litigation – and a substantial history of litigating against manufacturers of prescription and over-the-counter medical devices and drugs, W&C has the resources and experience to effectively prosecute this action.[55]

---

[50] Declaration of Lindsey N. Scarcello, attached as Ex. L, at ¶ 1.
[51] *Id*. at ¶ 3.
[52] *Id*. at ¶¶ 4, 6.
[53] *Id*. at ¶ 10.
[54] *Id*. at ¶ 10.
[55] *Id*. at ¶ 5, 8.

### 10. **Jason P. Sultzer of the Sultzer Law Group Should be Appointed as a PEC Member**

Jason Sultzer is the founding partner of The Sultzer Law Group, P.C. Over the past decade, Mr. Sultzer has developed The Sultzer Law Group P.C. into one of the preeminent plaintiff's class-action and complex commercial law firms in the nation with particular expertise in consumer class-actions. Mr. Sultzer has litigated and resolved dozens of consumer class actions nationwide and recovered over $1 billion dollars in class relief. The firm is particularly proud of the record it has developed within the Second Circuit and in the Eastern District of New York. Mr. Sultzer and his firm have gained a reputation for handling matters in an efficient and cost-effective manner, as this Court recently recognized in the *Bangoura* benzene contamination class action case. *See Bangoura v. Beiersdorf, Inc.*, Docket No. 22:cv-00291-BMC (E.D.N.Y.) (Your Honor observed during the final approval hearing "that the fact that I'm looking at 2022 index number on this case is, in itself, a testament to the efficiency of plaintiffs' counsel's efforts.").

Mr. Sultzer has earned selection as a Senior Fellow of the Litigation Counsel of America (LCA), recognizing the country's top trial attorneys, and is a member of their Trial Law and Diversity Institute. He has also been recognized as a Super Lawyer for the last ten years and was selected for Lawdragon's list of 500 Leading Plaintiff Financial Lawyers for 2019, 2020, 2021 and 2023.

### C. **The Proposed PSC Members and Assistance from Other Plaintiffs' Counsel**

As set forth above, the Consensus Plaintiff's proposed leadership plan contemplates drawing upon the expertise of the members of the Plaintiff Steering Committee to support the PEC and to provide assistance to the PEC in completing tasks necessary to prosecute this complex case. As mentioned above, in addition to the PSC appointments, the Consensus Plaintiffs anticipate the need to enlist other plaintiffs' counsel's assistance, under the PEC and PSC oversight, and have

been organizing and working with the many lawyers and law firms who have filed cases and who have agreed to work on these committees.

If the present proposal meets with the Court's approval, the PEC intends to litigate this case in an efficient and inclusive manner by dividing responsibilities according to each lawyer's skill set and interests. In particular, the PEC plans to form various subcommittees relevant to the needs of the litigation, including topics of experts, law and briefing and specific defendant discovery teams. This model has—in the PEC's experience—worked well in past, similar MDLs, including a prior MDL *In Re Bayer Corp. Combination Aspirin Products Marketing and Sales Practices Litigation* before Your Honor.

Like the PEC, the PSC members are highly accomplished top tier lawyers. The proposed PSC members are:

### PLAINTIFFS' STEERING COMMITTEE ("PSC") MEMBERS

Sarah N. Wescot
Burson & Fisher, P.A.
701 Brickell, Suite 1420
Miami, Florida 33131
Tel: 305-330-5512
swescot@bursor.com

Michael A. Sacchet
Ciresi Conlin LLP
225 South 6th Street, #4600
Minneapolis, MN 55402
Tel: 612-361-8200
MAS@CiresiConlin.com

Shireen M. Clarkson
Clarkson Law Firm P.C.
590 Madison Avenue, 21st Floor
New York, New York 10022
Tel: 213-788-4050
sclarkson@clarksonlawfirm.com

Jordan Jacobson
Kessler, Topaz, Meltzer & Check, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel: 484-270-1488
jjacobson@ktmc.com

Laura S. Dunning
Levin Papantonio Rafferty Proctor
Buchanan O'Brien Barr Mougey, P.A.
316 South Baylen Street
Pensacola, Florida 32502
Tel: 850-435-7000
ldunning@levinlaw.com

Frederick S. Longer
Levin Sedran & Berman LLP
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Tel: 215-592-1500
flonger@lfsblaw.com

Alexander E. Barnett
Cotchett, Pitre & McCarthy, LLP
40 Worth Street, Suite 602
New York, New York 10013
Tel: 212-201-6820
abarnett@cpmlegal.com

Kelsey L. Stokes
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd.
Suite 6000
Houston, Texas 77056
Tel: 713-621-7944
kstokes@fleming-law.com

Darren Kaplan
Kaplan Gore LLP
1359 Broadway
New York, New York 10018
Tel:404-537-3300
dkaplan@kaplangore.com

Marlene Goldenberg
Nigh, Goldenberg, Raso, & Vaughn PLLC
14 Ridge Square NW Third Floor
Washington D.C. 20016
Tel: (202) 792-7927
mgoldenberg@nighgoldenberg.com

Melanie Muhlstock
Parker Waichman LLP
6 Harbor Park Drive
Port Washington, New York 11050
Tel: 516-466-6500
mmuhlstock@yourlawyer.com

Stuart Davidson
Robins Geller Rudman & Dowd LLP
225 Mizner Boulevard, Suite 720
Boca Raton, Florida 33432
Tel: 561-750-3000
SDavidson@rgrdlaw.com

## IV.    <u>CONCLUSON</u>

As demonstrated by their actions in this litigation to date, as well as prior litigations in which they have been involved, the Consensus Plaintiffs work cooperatively with others and build consensus among all Plaintiffs' counsel. The attorneys comprising the proposed leadership slate satisfy the Court's requirements, the teachings of the MANUAL FOR COMPLEX LITIGATION, and the requirements of Rule 23(g), and possess the experience necessary to prosecute this class action MDL litigation in a fair, efficient, and successful manner. Accordingly, the Consensus Plaintiffs respectfully request that the Court grant their motion, appoint their proposed leadership structure, and appoint members of the proposed PEC as Rule 23(g) Interim Class Counsel, and grant such other and further relief as the Court deems just and proper under the circumstances

Dated:  February 9, 2024
        New York, New York

Respectfully submitted,

/s/ Michael A. London
Michael A. London (ML-7510)
**DOUGLAS & LONDON P.C.**
59 Maiden Lane – 6th Floor
New York, New York 10038
Tel: 212-566-7500
mlondon@douglasandlondon.com

Bryan F. Aylstock
**AYLSTOCK WITKIN KREIS
OVERHOLTZ PLLC**
17 East Main Street, Suite 200
Pensacola, Florida 32502
Tel: 850-202-1010
baylstock@awkolaw.com

Kiley L. Grombacher
**BRADLEY GROMBACHER LLP**
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Tel: 866-881-0403
kgrombacher@bradleygrombacher.com

James E. Cecchi
**CARELLA BYRNE CECCHI BRODY &
AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: 973-994-1700
jcecchi@carellabyrne.com

Adam J. Levitt
**DiCELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: 312-214-7900
alevitt@dicellolevitt.com

Elizabeth A. Fegan
**FEGAN SCOTT LLC**
150 South Wacker Drive, 24th Floor
Chicago, Illinois 60606
Tel: 630-273-2625

beth@feganscott.com

Jonathan D. Selbin
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN LLP**
250 Hudson Street, 8th Floor
New York, New York 10013
Tel: 212-355-9500
jselbin@lchb.com

Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road
Ridgefield Park, New Jersey 07660
Tel: 888-546-8799
cseeger@seegerweiss.com

Jason P. Sultzer
**THE SULTZER LAW GROUP P.C.**
85 Civic Center Plaza Ste. 200
Poughkeepsie, New York 12601
Tel: 845-244-5595
sultzerj@thesultzerlawgroup.com

Lindsey N. Scarcello
**WAGSTAFF & CARTMELL**
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Tel: 816-701-1102
lscarcello@wcllp.com

***Plaintiffs' Proposed Executive Committee and***
***Interim Class Counsel***

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Oral Phenylephrine Marketing and Sales Practices Litigation | **Case No. 1:23-md-3089**<br>**MDL No. 3089**<br><br>**[AMENDED PROPOSED] ORDER APPOINTING PLAINTIFFS' LEADERSHIP STRUCTURE AND APPOINTING RULE 23(g) INTERIM CLASS COUNSEL** |

On December 6, 2023, the Judicial Panel on Multidistrict Litigation (JPML) transferred to this Court for coordinated pretrial proceedings certain actions relating to marketing and sales practices for Oral Phenylephrine.  Those proceedings are now styled as "In re: Oral Phenylephrine Marketing and Sales Practices Litigation."

 On December 21, 2023, the Court directed the parties to complete a proposed Case Management Order.  *See* Dkt. No. 5.  On February 14, 2024, the Consensus Plaintiffs[1] filed an Amended Motion for an Order Appointing Plaintiffs' Proposed Leadership Structure seeking the appointment of case leadership structure, pursuant to the Manual for Complex Litigation (4th ed. 2005) (the "Manual"), and the appointment of the Plaintiffs' Executive Committee ("PEC") as Interim Class Counsel, pursuant to Rule 23(g)(3) of the Federal Rules of Civil Procedure.

In multidistrict litigation such as this, to coordinate the prosecution of complex litigation, the Court is empowered to appoint counsel to lead the case.  According to the Manual, the function of the plaintiffs' leadership structure is to "promote efficiency," "avoid unruly proceedings," and

---

[1] At the time the motion was filed, there were approximately 70 Plaintiffs' firms involved in this MDL, representing plaintiffs in the related cases before this Court.  They reached near unanimous agreement on the Proposed Leadership Structure and are referred to herein as the "Consensus Plaintiffs."

"clarify responsibility for protecting the interests of the class during precertification proceedings." *See In re Parking Heaters Memorandum Antitrust Litig.*, 310 F.R.D. 54, 56 (E.D.N.Y. 2015) (quoting Manual § 21.11).

Additionally, Federal Rule of Civil Procedure 23(g)(3) provides for the appointment of Interim Class Counsel, "to act on behalf of the putative class before determining whether to certify the action as a class action." Fed. R. Civ. P. 23(g)(3). In designating Interim Class Counsel, the Court must consider: (i) the work counsel has undertaken in investigating potential claims; (ii) counsel's experience in handling class actions and other complex litigation; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A).

Having reviewed and considered the motion, brief, and supporting declarations from counsel,

IT IS HEREBY ORDERED THAT:

**A.** **Appointment of Plaintiffs' Leadership Structure**

Plaintiffs' proposed two-tier leadership structure meets all requirements for appointment, and is approved. Counsel have demonstrated they are qualified and responsible and will fairly and adequately represent Plaintiffs and the other Class members. *See* Manual § 10.220. Counsel have further demonstrated that they have the resources, commitment, and ability to command respect of their colleagues and work cooperatively with all plaintiffs' counsel, opposing counsel, and the Court. *See* Manual § 10.224.

Further, counsel have demonstrated that they have: (1) a willingness and ability to commit to a time-consuming litigation and settlement process; (2) the ability to work cooperatively with

others; (3) professional experience in this type of litigation; and (4) access to sufficient resources to advance the litigation in a timely manner.

The Court hereby appoints the following attorneys to serve as "Plaintiffs' Executive Committee" ("PEC")[2]:

Bryan F. Aylstock
Aylstock Witkin Kreis Overholtz PLLC
17 East Main Street, Suite 200
Pensacola, Florida 32502
Tel: 850-202-1010
baylstock@awkolaw.com

Kiley L. Grombacher
Bradley/Grombacher LLP
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Tel: 866-881-0403
kgrombacher@bradleygrombacher.com

James E. Cecchi
Carella Byrne Cecchi Brody & Agnello, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: 973-994-1700
jcecchi@carellabyrne.com

Adam J. Levitt
DiCello Levitt LLP
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: 312-214-7900
alevitt@dicellolevitt.com

Michael A. London (Chairperson)
Douglas & London, P.C.
59 Maiden Lane, 6th Floor
New York, New York 10038
Tel: 212-566-7500
mlondon@douglasandllondon.com

Elizabeth A. Fegan
Fegan Scott LLC
150 South Wacker Drive, 24th Floor
Chicago, Illinois 60606
Tel: 630-273-2625
beth@feganscott.com

Jonathan D. Selbin
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street, 8th Floor
New York, New York 10013
Tel: 212-355-9500
jselbin@lchb.com

Christopher A. Seeger
Seeger Weiss LLP
55 Challenger Road
Ridgefield Park, New Jersey 07660
Tel: 888-546-8799
cseeger@seegerweiss.com

Jason P. Sultzer
The Sultzer Law Group P.C.
85 Civic Center Plaza Ste. 200
Poughkeepsie, New York 12601
Tel: 845-244-5595
sultzerj@thesultzerlawgroup.com

Lindsey N. Scarcello
Wagstaff & Cartmell, LLP
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Tel: 816-701-1102
lscarcello@wcllp.com

---

[2] The PEC members are listed alphabetically, by firm name.

NPSA-62

The Court further appoints PEC member, Michael A. London, of Douglas & London, P.C., to serve as the Chair of the PEC.  His duties and responsibilities are identified below and shall also include traditional liaison counsel duties in lieu of the appointment of a formal liaison counsel.

The Court further appoints a Plaintiffs' Steering Committee ("PSC"), consisting of the following attorneys:[3]

Sarah N. Wescot
Bursor & Fisher, P.A.
701 Brickell, Suite 1420
Miami, Florida 33131
Tel: 305-330-5512
swescot@bursor.com

Michael A. Sacchet
Ciresi Conlin LLP
225 South 6th Street, #4600
Minneapolis, Minnesota 55402
Tel: 612-361-8200
MAS@CiresiConlin.com

Shireen M. Clarkson
Clarkson Law Firm P.C.
590 Madison Avenue, 21st Floor
New York, New York 10022
Tel: 213-788-4050
sclarkson@clarksonlawfirm.com

Alexander E. Barnett
Cotchett, Pitre & McCarthy, LLP
40 Worth Street, Suite 602
New York, New York 10013
Tel: 212-201-6820
abarnett@cpmlegal.com

Darren T. Kaplan
Kaplan Gore LLP
1359 Broadway
New York, New York 10018
Tel:404-537-3300
dkaplan@kaplangore.com

Cari C. Laufenberg
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: (206) 623-1900
claufenberg@kellerrohrback.com

Jordan E. Jacobson
Kessler, Topaz, Meltzer & Check, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel: 484-270-1488
jjacobson@ktmc.com

Kelsey L. Stokes
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Boulevard, Ste. 6000
Houston, Texas 77056
Tel: 561-750-3000
kstokes@fleming-law.com

Laura S. Dunning
Levin Papantonio Rafferty Proctor
Buchanan O'Brien Barr Mougey, P.A.
316 South Baylen Street
Pensacola, Florida 32502
Tel: 850-435-7000
ldunning@levinlaw.com

---

[3] The PSC members are listed alphabetically, by firm name.

**NPSA-63**

Frederick S. Longer
Levin Sedran & Berman LLP
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Tel: 215-592-1500
flonger@lfsblaw.com

Melanie H. Muhlstock
Parker Waichman LLP
6 Harbor Park Drive
Port Washington, New York 11050
Tel: 516-466-6500
mmuhlstock@yourlawyer.com

Marlene J. Goldenberg
Nigh, Goldenberg, Raso & Vaughn PLLC
14 Ridge Square NW, Third Floor
Washington D.C. 20016
Tel: (202) 792-7927
mgoldenberg@nighgoldenberg.com

Stuart A. Davidson
Robbins Geller Rudman & Dowd LLP
225 Mizner Boulevard, Suite 720
Boca Raton, Florida 33432
Tel: 561-750-3000
Sdavidson@rgrdlaw.com

**B.**     **Executive Committee Duties and Responsibilities**

Plaintiffs' Executive Committee shall assume responsibility for the following duties:

1.     Directing, coordinating, and supervising prosecution of Plaintiffs' and the other Class members' claims, including the drafting and filing of any amended/consolidated class action complaint, the briefing of any motion to dismiss by any Defendant(s), as well as any class certification motion, and any matters pertaining thereto;

2.     Determining (in consultation with the PSC) and presenting to the Court and Defendants Plaintiffs' position in the litigation on all matters, substantive and procedural, arising from these proceedings;

3.     Organizing, initiating, and conducting discovery, including, without limitation:

       a.    coordinating discovery with Defendants' counsel;

       b.    preparing and finalizing written interrogatories, requests for production of documents, and requests for admission;

       c.    directing and coordinating the examination of witnesses in depositions; and

       d.    retaining, coordinating the selection of, and preparing experts.

**NPSA-64**

4.      Communicating with the Court;

5.      Communicating with Defendants' counsel;

6.      Entering into stipulations with Defendants' counsel, as necessary;

7.      Conducting any trial(s) and appeals in this litigation;

8.      Informing other Plaintiffs' counsel of the progress of the litigation and seeking consultation where necessary concerning decisions of consequence to their clients;

9.      Monitoring the activities of co-counsel to ensure that schedules are met and unnecessary expenditures of time and funds are avoided;

10.     Evaluating all work assigned to other Plaintiffs' counsel in this litigation and allocating and distributing any fees awarded in this litigation to all such counsel in amounts that reflect their relative contributions to the litigation, as solely determined by Plaintiffs' Executive Committee, or to agree and move for the appointment of a Special Master to aid counsel and the Court in allocating and determining any fees and reimbursement of costs;

11.     Negotiating settlement with Defendants' counsel, absent a subsequent Court Order; or decision by the Executive Committee appointing a negotiating committee; and

12.     Performing such other duties as are necessary in connection with the prosecution of this litigation or as may be further directed by the Court.

Any discussions of a settlement of this litigation shall be conducted by Plaintiffs' Executive Committee and any other counsel that Plaintiffs' Executive Committee may designate.  No motion shall be initiated or filed on behalf of any plaintiff in this action except through Plaintiffs' Executive Committee or by leave of the Court.

**NPSA-65**

The Plaintiffs' Executive Committee Chair must promptly serve a copy of this Order and all future orders on counsel for Plaintiffs in each related action not yet consolidated in this proceeding to the extent that Plaintiffs' Executive Committee is aware of any such action(s).

## C.    Plaintiffs' Executive Committee Chair's Duties and Responsibilities

Plaintiffs' Executive Committee Chair shall assume responsibility to coordinate, schedule, and monitor the activities of the leadership team, as well as to perform other necessary administrative or logistical tasks.  He will also be responsible for traditional liaison counsel duties in lieu of the appointment of a formal liaison counsel.

Plaintiffs' Executive Committee Chair shall also assume the following duties: (a) serve as the recipient for all Court Orders; (b) coordinate services and filings; (c) maintain and distribute to co-counsel and to Defendants' Counsel a current service list; (d) make himself (or his designees(s)) available for any telephone conferences convened by the Court and communicate the substance of any such conference to all other Plaintiffs' counsel; (e) receive and distribute pleadings, Orders, and motions; (f) maintain and make available to all Plaintiffs' counsel of record at reasonable hours a complete file of all documents served by or upon each party (except as such documents as may be available at a document depository); and (g) carry out such other duties as the Court may order.

## D.    Designations, Funding, and Future Changes in Leadership Structure

All appointments to the PEC and PSC are for a period of one year.  Each appointee must apply for continued service thereafter, unless otherwise ordered by the Court.

These designations are of a personal nature and the Court looks to these counsel to undertake personal responsibility to perform the designated functions.  Accordingly, the above appointees cannot be substituted by other attorneys, including members of the appointees' law

**NPSA-66**

firms, to perform their functions, such as attending committee meetings and making court appearances, except with prior approval by the PEC and/or the Court, as appropriate.  Should any appointee become unable to do so, the Court reserves the discretion to replace counsel on their own request, at the request of the PEC, or on the Court's own motion.

This Court is mindful that counsel within the PEC and PSC will be advancing funding for the litigation and that each of the PEC and PSC members have warranted their ability and willingness to advance such funds as determined necessary by the PEC.  The failure of any PEC or PSC member to meet their funding obligations in this litigation, as determined necessary by the PEC, may constitute good cause for their removal from the PEC or PSC.

**E.    General Responsibilities of Plaintiffs' Counsel**

Counsel are expected to familiarize themselves with the Manual, so that they may suggest procedures that will facilitate the "just, speedy, and inexpensive determination" of this Litigation. *See* Fed. R. Civ. P. 1.  These procedures include, but are not limited to, structure and timing of discovery plans, amendments of pleadings, pretrial consideration of substantive issues, communications, and the like.  Counsel are also required to review and familiarize themselves with the Local Rules for the Eastern District of New York.

All attorneys carrying out such common benefit work who may look to any common fund or agreement for reimbursement or compensation shall maintain and timely submit time and expense records in accordance with guidelines to be set by the Court in a subsequent Case Management Order.  Notwithstanding all such reimbursement and compensation shall be subject to the Court's final approval.

Under no circumstances are the PEC or any member of the PSC responsible for the filings, discovery, or any other issue or matter related to an individual plaintiff's case or claim.  More

specifically, neither the PEC nor the PSC, nor any individual attorney on the PEC or the PSC, is in any way responsible for the attorney-client relationship and duties and responsibilities that each individual attorney or law firm owe their own client(s) with respect to this litigation.

It shall be the responsibility of all parties and their counsel to stay apprised of the litigation and to review and abide by all orders entered by the Court.

## F. **Appointment of Rule 23(g)(3) Interim Class Counsel.**

Plaintiffs' Executive Committee also satisfies the Rule 23(g)(3) requirements for appointment as Interim Class Counsel. The Court finds, based on the applicants' motion and supporting declarations, that the members of the PEC have demonstrated that they investigated potential claims; have robust experience in handling class actions and other complex litigation; have sufficient knowledge of applicable consumer protection law; and have ample resources to commit to representing the class. *See* Fed. R. Civ. P. 23(g). The leadership applications demonstrate to me that these firms have been working cooperatively together to investigate factual and legal claims, and have the requisite experience and resources to litigate the case to trial, if necessary.

SO ORDERED.

Dated: _____
      Brooklyn, New York

_____
Hon. Brian M. Cogan, U.S.D.J.

9

**NPSA-68**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

<table>
<tr>
<td>

IN RE: ORAL PHENYLEPHRINE MARKETING AND SALES PRACTICES LITIGATION

THIS DOCUMENT RELATES TO ALL CASES

</td>
<td>

Case No.: 1:23-md-3089-BMC

**APPLICATION OF BEASLEY ALLEN LAW FIRM FOR APPOINTMENT TO EXECUTIVE COMMITTEE LEADERSHIP POSITION**

</td>
</tr>
</table>

This Court directed counsel for each side to confer and attempt to reach a consensus regarding a leadership structure for this case. The undersigned filed a Complaint in the Northern District of Florida that was transferred to this Court[1] after the Consensus Plaintiffs filed their Motion for an Order Appointing Plaintiffs' Proposed Leadership Structure and Appointing Interim Class Counsel.[2] Consequently, counsel was unable to participate in the conferral process. Rebecca D. Gilliland of Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. (hereinafter "Beasley Allen") respectfully requests appointment to the Plaintiffs' Executive Committee ("PEC") and as Interim Class Counsel, or, alternatively, appointment to the Plaintiff's Steering Committee ("PSC").

**I.      The Addition of Ms. Gilliland to Leadership Will Benefit Plaintiffs and the Class**

Ms. Gilliland is an experienced complex litigation attorney with over a decade of experience in all phases of class and MDL cases. On top of this, Ms. Gilliland is a female southerner and a United States Marine Corps veteran, both of which provide new and additional points of view and diversity to the Consensus Plaintiffs' proposal.

*a. Beasley Allen Attorneys' Experience in Class Actions, Complex Litigation, and the Types of Claims Asserted Here*

Beasley Allen has a record of accomplished leadership in class action and MDL cases throughout this country, and specifically in consumer protection MDL/class action litigation. Rebecca D. Gilliland is a Principal at Beasley Allen and a seasoned litigator with experience

---

[1] ECF No. 128.

[2] ECF No. 115.

directly suited to the claims at issue in this MDL.  Ms. Gilliland has worked for several years on the *In re: Blue Cross Blue Shield Antitrust Litigation* where she was one of the attorneys taking multiple depositions of the Blue Cross Blue Shield Association, Blue Cross Blue Shield of Alabama, and several of the 30(b)(6) depositions of various other Blue entities.  In addition to her deposition duties, Ms.  Gilliland also was heavily involved in briefing complex matters and managing a team of document reviewers throughout the process.

Ms.  Gilliland was also trial counsel in the firm's recent class action trial in the Northern District of California, successfully handling many of the pretrial matters and examining defense witnesses at trial. That case, *Siqueiros, et al., v. General Motors LLC*, resulted in a full verdict in favor of the Classes in all three certified states. Not only was Ms.  Gilliland trial counsel, she also handled extensive briefing and arguing of motions, including a hard-fought denial of the defendant's Rule 50(b) motion, confirming the jury's award. In addition to class action trial work, Ms.  Gilliland has previously worked on multiple litigations on behalf of various states' attorneys general, with a focus on consumer protection claims, including representing multiple states in the *Average Wholesale Pricing Litigation*, and on other multi-district litigations, including *In re: Prempro Products Liability Litigation*.

Ms.  Gilliland, a veteran of the United States Marine Corps, also sought and obtained an L.L.M., with honors, in insurance law from the University of Connecticut School of Law.  She has lectured on Whistleblower litigation for CLE Alabama, multiple insurance concepts for NALA, the Paralegal Association, and was a featured panelist for the San Francisco Trial Lawyers' recent CLE: *Don't Be Terrorized by Terabytes: Tips and Tricks for Handling Data and Documents from Class and Mass Action Practitioners*. Ms.  Gilliland was also recognized by the National Trial Lawyers Top 40 under 40 in 2018 and is the current secretary and CLE co-chair of the Escambia Santa Rosa Bar Association.

Based on the personal experience and qualifications of Ms.  Gilliland, as well as that of the Beasley Allen Law Firm and the Firm's commitment to financial and staffing obligations (*see* Exhibit A –Personal Resumé of Rebecca D. Gilliland; and Exhibit B – Beasley Allen Firm

Resumé, attached hereto) Beasley Allen is supremely qualified for appointment as a member of the PEC and Interim Class Counsel, or, alternatively, the PSC, in this MDL.

**b. *Beasley Allen's Knowledge of the Applicable Law***

As evidenced by Beasley Allen's experience, noted above, the Firm has extensive knowledge of the law applicable to the claims asserted in this MDL. Ms. Gilliland's credentials evidence a history of representing plaintiffs in complex litigation, particularly class litigation and litigation involving consumer and pharmaceutical claims, giving her first-hand knowledge of the legal issues that will apply to the claims asserted here.

**c. *The Resources that Beasley Allen Will Commit to Representing the Class***

Beasley Allen employs 101 attorneys and 257 support staff, and has offices in Montgomery, AL; Atlanta, GA; Mobile, AL; and Dallas, TX. As noted in the Firm Resumé, numerous Beasley Allen attorneys have been recognized or profiled in national publications for the work they have done in class action litigation. Beasley Allen will be able to dedicate the resources, personnel, and time necessary to pursue these claims on behalf of the putative Class, as it has done in the past.

Beasley Allen has ample financial resources and staffing to fund and manage large class action litigations. We do not have to use litigation financing for our cases, and will not do so in this litigation, which also demonstrates our total commitment to this important case. We have committed substantial resources in many high profile and complex class actions such as the VW "Clean Diesel" MDL, Chrysler-Fiat "EcoDiesel" MDL, Toyota SUA MDL, Takata Airbag MDL, the BCBS Antitrust MDL, the GM 5300 Litigation, and many others with no issue as to sufficiency or timeliness. In light of the fact that Beasley Allen handles these major class action matters on a contingency fee basis, it is apparent that our firm is committed to zealously representing the rights of putative Class Members and pursuing a favorable result for their claims. Beasley Allen proudly accepts the financial responsibility to make this case successful on behalf of putative Class Members.

### d.  Ability to Work Collaboratively with Co-Counsel, Opposing Counsel and Non-Party Counsel

The volume of class action and MDL appointments in Beasley Allen's Firm Resumé demonstrates cooperative working relationships with numerous plaintiffs' firms, including many of the Consensus Plaintiffs' firms, as well as defense firms.  A firm that does not collaboratively work with other firms does not receive the number of repeat appointments that Beasley Allen has been awarded.  Our attorneys are committed to working collaboratively with other firms, with utmost skill and professionalism.

To prosecute their claims against the Defendants in this MDL, Plaintiffs and the putative Class need a team of experienced attorneys working collaboratively on their behalf.  The Beasley Allen attorneys stand ready to work as part of the team of Interim Lead Co-Counsel in such a position.

### II.  Conclusion

For the reasons stated above, Plaintiffs Haley Hadden and Bonnie Van Noy, and their lead counsel at Beasley Allen request significant and defined leadership roles in this litigation that will steward this MDL through class certification and beyond.  The value that Beasley Allen adds to the case and the dedication of both Class Representatives will benefit all putative Class Members. For this reason, Beasley Allen respectfully requests that this Court 1) appoint Rebecca D. Gilliland as a member of the Plaintiffs' Executive Committee and Interim Class Counsel; or 2) appoint Rebecca D. Gilliland to the Plaintiffs' Steering Committee.

DATED:          February 16, 2024                   Respectfully submitted,


                                                    /s/ Demet Basar
                                                    W.  Daniel  "Dee"  Miles,  III,  pro  hac
                                                    forthcoming
                                                    Alison D. Hawthorne, pro hac forthcoming
                                                    Demet Basar
                                                    BEASLEY, ALLEN, CROW, METHVIN,
                                                    PORTIS & MILES, P.C.

NPSA-72

272 Commerce Street
Montgomery, Alabama 36104
(334) 269-2343
Dee.miles@beasleyallen.com
Alison.hawthorne@beasleyallen.com
Demet.basar@Beasleyallen.com

Rebecca D. Gilliland *pro hac filed*
Jessica M. Haynes, *pro hac forthcoming*
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
301 St. Louis St.
Mobile, Alabama 36602
(251) 308-1515
Rebecca.gilliland@beasleyallen.com
Jessi.haynes@beasleyallen.com

***Counsel for Plaintiffs and the Class and
Subclass***

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: ORAL PHENYLEPHRINE MARKETING AND SALES PRACTICES LITIGATION | MDL No. 1:23-md-03089-BMC |
| | **RESPONSE TO CONSENSUS PLAITIFFS' AMENDED MOTION FOR AN ORDER APPOINTING PLAINTIFFS' PROPOSED LEADERSHIP STRUCTURE AND APPOINTING INTERIM CLASS COUNSEL** |
| THIS DOCUMENT APPLIES TO: ALL CASES | |

## I.    INTRODUCTION

Plaintiffs Claudette Sanes, Daniel Flick, Janis Zimmerman, Thomas Lewis, Dena Fichot, John Jeffrey Ward, Ruta Taito, Karen Schwartz, Michael Lee, Toni Heuchan, Jonathan Brandman, Michelle Garza, Cece Davenport, Randall Sygal, Regina Brookshier, Erzen Krica, Allison Sammarco, and Hollie Verdi (collectively, "LC Plaintiffs") hereby submit this response to the Consensus Plaintiffs' Amended Motion for an Order Appointing Plaintiffs' Proposed Leadership Structure and Appointing Interim Class Counsel (ECF No. 135, the "Leadership Motion"). The LC Plaintiffs present this response in compliance with Local Civil Rule 6.1(b) and in response to inaccurate statements made in the transmittal letter providing the Proposed CMO to this Court. (ECF No. 149.)

The Leadership Motion is premature and fails to comply with the Local Rules and this Court's Individual Practices. It was also filed without any effort to meet and confer with all counsel as mandated in the Court's Proposed CMO. (*See* ECF No. 5.) The "Consensus" Plaintiffs knew at the time of filing their initial motion, which excluded Lynch Carpenter from both tiers of proposed leadership, that the LC Plaintiffs did not support the proposed structure and intended to file their own leadership application. They nonetheless indicated to the Court, and to other Plaintiffs' counsel, that they were "not aware of any lawyer or law firm who opposes the Consensus

Plaintiffs' proposed leadership structure." (ECF No. 115-1-1 at 3 n.8.) This inaccurate statement was repeated in the amended Leadership Motion.

The "Consensus" Plaintiffs' proposed leadership structure, albeit over-sized, is comprised of many highly competent law firms and lawyers. The LC Plaintiffs simply want an opportunity to meaningfully meet and confer and, if the parties are unable to stipulate to an agreed upon leadership structure, to present an application for leadership for the Court's consideration. As a result, the LC Plaintiffs respectfully ask this Court to deny the Leadership Motion without prejudice to refile after meeting and conferring, within the timeline ordered by the Court.

## II.    PROCEDURAL BACKGROUND

### A.    The LC Plaintiffs' Lawsuits

The LC Plaintiffs have been involved in this multi-district litigation since its inception. On 29 September 2023, LC Plaintiffs Thomas Lewis and Dena Fichot filed a class action complaint against Johnson and Johnson, Johnson and Johnson Consumer Inc., Kenvue Inc., and McNeil Consumer Healthcare Inc.[1] in the District of New Jersey (Case No. 3:23-cv-20816-GC-RLS). That same day, LC Plaintiffs John Jeffrey Ward, Karen Schwartz, and Ruta Taito also filed a class action complaint Johnson and Johnson, Johnson and Johnson Consumer Inc., Kenvue Inc., and McNeil Consumer Healthcare Inc.[2] in the District of New Jersey (Case No. 3:23-cv-20818-MAS-RLS).

On 11 October 2023, LC Plaintiffs Randall Sygal, Regina Brookshier, Erzen Krica, Allison Sammarco, and Hollie Verdi filed a class action suit against Reckitt Benckiser LLC, later corrected to RB Health (US) LLC, in the District of New Jersey (Case No. 2:23-cv-21090-BRM-JRA). On

---

[1] Defendants were later corrected to name solely Johnson and Johnson Consumer Inc.

[2] *Id.*

12 October 2023, LC Plaintiffs Michael Lee, Toni Heuchan, Jonathan Brandman, Michelle Garza, and CeCe Davenport filed a class action lawsuit against The Procter & Gamble Company and Helen of Troy Limited in the District of New Jersey (Case No. 2:23-cv-21126-SRC-ESK). Finally, on 13 October 2023, LC Plaintiffs Claudette Sanes, Daniel Flick and Janis Zimmerman filed a class action lawsuit against Bayer HealthCare LLC in the District of New Jersey (Case No. 2:23-cv-21163-CCC-MAH).

In their filings with the Judicial Panel on Multi-District Litigation ("JPML"), the LC Plaintiffs argued for transfer to this Court and were one of only a handful of Plaintiff firms to do so. (French Decl. ¶ 2.)  On 30 November 2023, Scott Braden appeared on behalf of the LC Plaintiffs at the JPML hearing. (*Id.*) After the hearing, Braden informed certain "Consensus" Plaintiffs' counsel that Lynch Carpenter was available to work collaboratively and conference at any time. (*Id.*) The LC Plaintiffs did not hear from the "Consensus" Plaintiffs again until 8 February 2024. (*Id.*)

### B.    The Court's Initial Order

On 21 December 2023, the Court issued the Proposed CMO and directed the parties to meet and confer and "jointly file only one proposed CMO that is agreed upon by all parties." (ECF No. 5.) The Proposed CMO provided the parties with a specific process to resolve issues pertaining to the organization of counsel. (*Id*. at § IV.) It stated that, before the initial status conference, "counsel on each side shall confer and attempt to seek consensus on whether lead counsel and liaison counsel should be appointed." (*Id.*) "Plaintiffs' counsel and defense counsel shall attempt to reach and file a stipulation as to the organization of their respective counsel." (*Id.*) If the parties are unable to do so, only then may "any party file a motion for the appointment of lead and/or liaison counsel." (*Id.*) The deadline was blank because the Court had not yet entered a Proposed CMO. (*Id.*)

**C.    The "Consensus" Plaintiffs Failed to Meet and Confer on the Leadership Motion**

The LC Plaintiffs were neither involved nor otherwise included in any discussions with other Plaintiffs' counsel regarding a plaintiffs' leadership structure. On 8 February 2024, James Cecchi of Carella Byrne Cecchi Brody & Agnello, P.C., one of the attorneys who filed the Leadership Motion and a proposed member of the "Plaintiffs' Executive Committee" (ECF No. 135-2 at 3), reached out to Gary Lynch. (French Decl. ¶ 3.) Cecchi informed Lynch that certain counsel had formed a leadership slate of 20 firms, that it did not include Lynch Carpenter, and that counsel intended to file a "consensus" motion immediately. (*Id.*) During that conversation, Lynch made clear that the LC Plaintiffs did not support the proposed leadership structure and intended to file a separate application for leadership at the appropriate time. (*Id.*) The next day, on 9 February 2024, the "Consensus" Plaintiffs filed their initial motion for leadership. (ECF No. 115, the "First Motion.") The "Consensus" Plaintiffs stated that they were "not aware of any lawyer or law firm who opposes the Consensus Plaintiffs' proposed leadership structure." (ECF No. 115-1-1 at 3 n.8.) In the First Motion, the LC Plaintiffs' counsel (under the wrong name) were inaccurately included in the "the list of 58 firms supporting this structure." (ECF No. 115-2.)

On 14 February 2024, the "Consensus" Plaintiffs filed their amended Leadership Motion. (ECF No. 135.) Lynch Carpenter, again erroneously identified as Carlson Lynch, was again inaccurately included among the purported supporters. (ECF No. 135-3.) The "Consensus" Plaintiffs also repeated the inaccurate statement that they were unaware of any opposition to the proposed leadership structure. (ECF No. 135-1 at 4 n.8.)

**D.    The "Consensus" Plaintiffs Failed to Meet and Confer on the Proposed CMO**

On 22 February 2024, the LC Plaintiffs, through counsel, made the first attempt to meet and confer with all Plaintiffs' counsel regarding the Proposed CMO. (French Decl. ¶ 4.) None of

the "Consensus" Plaintiffs had attempted to do so, before or after filing the Leadership Motion. (*Id.*) In response to the LC Plaintiffs' reaching out to all Plaintiffs' counsel to begin discussions regarding the Proposed CMO, the "Consensus" Plaintiffs suddenly indicated they intended to submit a Proposed CMO to the Court "shortly." (*Id.*) The LC Plaintiffs requested that the Proposed CMO be shared with all Plaintiffs' counsel for review before submission to the Court. (*Id.*) The LC Plaintiffs also informed all Plaintiffs' counsel of their position that the Leadership Motion was premature under the Proposed (and not entered) CMO. (*Id.*) The LC Plaintiffs requested that counsel withdraw the pending motion without prejudice so that all Plaintiffs' counsel could meet and confer and follow the timeline to be set when the Court entered the CMO. (*Id.*)

On 23 February 2024, at 12:07 p.m. EST, the "Consensus" Plaintiffs circulated a Proposed CMO that they "intend[ed] to submit to the Court." (French Decl. ¶ 5.) The "Consensus" Plaintiffs further represented that the defense had already signed off and approved the Proposed CMO (that had not yet been circulated to all Plaintiffs' counsel). (*Id.*) They asked for any edits or comments to be submitted "by 5:30pm Eastern time today." (*Id.*) Contrary to the representations in the transmittal letter (ECF No. 149), the "Consensus" Plaintiffs neither requested nor provided counsel with a "final three-day comment period." (French Decl. ¶ 5.) Nonetheless, at approximately 6:08 pm EDT on 23 February 2024, the LC Plaintiffs proposed one small edit: to change the deadline to file leadership motions to 19 March 2024. (*Id.*) This deadline is two weeks from the first proposed Initial Case Management Conference and would provide the Court with sufficient time to review the stipulation and/or competing motions while providing counsel with an opportunity to comply with the CMO and attempt to reach a stipulation. (*Id.*) The "Consensus" Plaintiffs did not respond. (*Id.*) Instead, on 27 February 2024, the "Consensus" Plaintiffs filed the Proposed CMO. (ECF No. 149.)

III.    **ARGUMENT**

A.    **The Leadership Motion Fails to Comply with the Local Rules and This Court's Individual Practices**

Absent a court order, both the Local rules and the Court's Individual Practices require the parties to engage in an informal dispute resolution process before filing any discovery or non-dispositive pretrial dispute motions. Local Rule 37.3(a) requires the parties to "attempt to meet and confer in good faith in person or by telephone in an effort to resolve the dispute." If the "attorneys for the affected parties cannot agree on a resolution," "they shall notify the Court by letter not exceeding three pages in length outlining the nature of the dispute. Local Civil Rule 37.3(c). "Except for the letters and attachments authorized herein . . . papers shall not be submitted with respect to a dispute governed by this rule *unless the Court has so directed*." *Id.* (added emphasis). Similarly, this Court's Individual Practices require that, "[f]or all other motions except for (1) provisional remedies, reconsideration, and post-judgment relief, or (2) motions in habeas corpus, social security, and bankruptcy appeals, a pre-motion conference is required before a party may file any motion." Individual Prac. of Judge Brian M. Cogan at § III.A.2. The parties are then directed to submit detailed letters and responses "unless the Court directs otherwise." *Id.* The "Consensus" Plaintiffs failed to follow any of these instructions.

B.    **The Leadership Motion Is Premature and Fails to Comply with the Proposed CMO**

On 9 February 2024, the "Consensus" Plaintiffs filed their First Motion for leadership—nearly three weeks before the deadline for the Parties to submit a *Proposed* CMO (suggesting a deadline for leadership applications) and before any such order was entered. The First Motion does not comply with either Local Rule 37.3(a) or Section III.A.2 of the Court's Individual Practices. In the First Motion, "Consensus" Plaintiffs admit that they did not meet and confer with all Plaintiffs' counsel before filing. (ECF No. 115-1 at 2-3.) Although the First Motion refers to conferences with

**NPSA-79**

certain firms, none of the supporting declarations contain the required "factual information . . . necessary for the decision of the motion." *See* Local Rule 7.1(a)(3). And, as established above, the "Consensus" Plaintiffs inaccurately represented that Lynch Carpenter supported their proposed structure and that they were unaware of any opposition. (ECF No. 115-1-1 at 3 n.8, ECF No. 115-2; French Decl. ¶ 3.) On 14 February 2024, without leave of Court, the "Consensus" Plaintiffs filed an amended motion. (ECF No. 135.) The Leadership Motion contained the same incorrect statements about the LC Plaintiff's position with respect to leadership.

### C. The Court Should Deny the Leadership Motion Without Prejudice so the Parties Can Meet and Confer

To date, Plaintiffs' counsel have yet to meaningfully meet and as ordered by the Court. It appears that the "Consensus" Plaintiffs have also failed to meaningfully meet and confer with defendants. (*See* ECF No. 151.) After undersigned counsel sent the first emails to all Plaintiffs' counsel, numerous other Plaintiffs' attorneys contacted the LC Plaintiffs and indicated they also would like to seek a leadership appointment. (French Decl. ¶ 6.) Since the time of those initial contacts from other Plaintiffs' counsel, the "Consensus" Plaintiffs represent that they have added three additional "supporters." (ECF No. 149.) The LC Plaintiffs have not entered into any agreements or understandings with other Plaintiffs' counsel regarding the division of work or fees in this litigation. (French Decl. ¶ 6.)

Lynch Carpenter has handled numerous false advertising cases like this one. (French Decl. ¶ 7.) The firm has experience leading large MDL actions like this one. (*Id.* at ¶ 8.) Lynch Carpenter has a strong history of working collaboratively and successfully with other Plaintiffs' counsel in large, consolidated actions like this one. The LC Plaintiffs remain optimistic that counsel can work together to efficiently prosecute and defend this action. They want nothing more than a fair opportunity to apply for a leadership appointment at the appropriate time and after meaningful

efforts to reach agreement among all Plaintiffs' counsel regarding an appropriately sized leadership structure. Denying the "Consensus" Plaintiffs' motion will allow counsel the opportunity to meet and confer and potentially reach such an agreement, thereby obviating the need for any competing motions. There is no prejudice if the Court were to deny the Leadership Motion as premature, and doing so would secure the just, speedy, and inexpensive determination of this action.

## IV.    CONCLUSION

For these reasons, the LC Plaintiffs respectfully request that the Court deny the Leadership Motion without prejudice to refile after an opportunity to meaningfully meet and confer, as contemplated by the Proposed CMO, the Local Rules, and this Court's Individual Practices.

Dated: 28 February 2024                         **LYNCH CARPENTER, LLP**

By:    */s/ Scott G. Braden*
                                                Jennifer M. French (*pro hac vice pending*)
                                                jennf@lcllp.com
                                                Scott G. Braden (*admitted pro hac vice*)
                                                scott@lcllp.com
                                                1234 Camino del Mar
                                                Del Mar, California 92014
                                                Telephone:    (619) 762-1900
                                                Facsimile:    (858) 313-1850

                                                *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on 28 February 2024, I electronically filed the above-referenced document with the Clerk of the Court using CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service.

Dated: 28 February 2024                         **LYNCH CARPENTER, LLP**

By:    */s/ Scott G. Braden*
                                                Scott G. Braden

**NPSA-81**



**DOUGLAS & LONDON**

59 Maiden Lane, 6th Floor
New York, NY 10038

Phone: (212) 566-7500
Fax: (212) 566-7501
www.DouglasAndLondon.com

Gary J. Douglas ᴾ
Michael A. London *
Stephanie O'Connor *
Randolph D. Janis
Virginia E. Anello ^

Rebecca G. Newman *
Robin J. Bond *
Alicia Ellsayed
Lara J. Say *ⁿ
Tate J. Kunkle ᵗ
Anne Accettella
Sara Castronuova *
Joseph Grenner ᶠ

\* Also admitted in NJ
ᴾ Also admitted in PA
^ Also admitted in LA & MA
ⁿ Also admitted in NC
ᵗ Also admitted in CT
ᶠ Only admitted in LA

*The attorney in charge of New Jersey
practice is Michael A. London*

April 16, 2024

**VIA ECF**
Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

Re:    **In re: Oral Phenylephrine Marketing and Sales Practices Litigation
1:23-md-03089-BMC**

Dear Judge Cogan:

The Plaintiffs' Executive Committee in the above litigation, with the consent of all Defendants, write to advise the Court that the parties have met-and-conferred and reached agreement, subject to the approval of the Court, on a proposed order governing Plaintiffs' forthcoming Initial Streamlined Consolidated Complaint and the motion to dismiss arguments that Defendants will raise in response to that Initial Streamlined Consolidated Complaint.  The parties respectfully request that the Court enter the proposed order attached as Exhibit 1, which reflects the parties' agreement.

Dated: April 16, 2024                    Respectfully Submitted:

                                                        */s/ Michael A. London*
                                                        Michael A. London (ML-7510)
                                                        **DOUGLAS & LONDON P.C.**
                                                        59 Maiden Lane – 6th Floor
                                                        New York, New York 10038
                                                        Tel: 212-566-7500
                                                        mlondon@douglasandlondon.com
                                                        *Chairperson of the Plaintiffs' Executive Committee*

1

Bryan F. Aylstock
**AYLSTOCK WITKIN KREIS
OVERHOLTZ PLLC**
17 East Main Street, Suite 200
Pensacola, Florida 32502
Tel: 850-202-1010
baylstock@awkolaw.com

Kiley L. Grombacher
**BRADLEY/GROMBACHER LLP**
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Tel: 866-881-0403
kgrombacher@bradleygrombacher.com

James E. Cecchi
**CARELLA BYRNE CECCHI BRODY &
AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: 973-994-1700
jcecchi@carellabyrne.com

Adam J. Levitt
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: 312-214-7900
alevitt@dicellolevitt.com

Elizabeth A. Fegan
**FEGAN SCOTT LLC**
150 South Wacker Drive, 24th Floor
Chicago, Illinois 60606
Tel: 630-273-2625
beth@feganscott.com

Jonathan D. Selbin
**LIEFF CABRASER HEIMANN &
BERNSTEIN LLP**
250 Hudson Street, 8th Floor
New York, New York 10013
Tel: 212-355-9500
jselbin@lchb.com

2

Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road
Ridgefield Park, New Jersey 07660
Tel: 888-546-8799
cseeger@seegerweiss.com

Jason P. Sultzer
**THE SULTZER LAW GROUP P.C.**
85 Civic Center Plaza Ste. 200
Poughkeepsie, New York 12601
Tel: 845-244-5595
sultzerj@thesultzerlawgroup.com

Lindsey N. Scarcello
**WAGSTAFF & CARTMELL**
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Tel: 816-701-1102
lscarcello@wcllp.com

*Plaintiffs' Executive Committee
and Interim Class Counsel*


*/s/ Andrew Soukup*
Andrew Soukup (*pro hac vice*)
Laura Flahive Wu
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-5066
asoukup@cov.com
lflahivewu@cov.com

Cortlin H. Lannin (*pro hac vice*)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-7078
clannin@cov.com

*Attorneys for Defendant The Procter & Gamble
Company*

**NPSA-84**

*/s/ Jay P. Lefkowitz*
Jay P. Lefkowitz. P.C.
Jacob M. Rae
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
lefkowitz@kirkland.com
jacob.rae@kirkland.com

Robyn E. Bladow (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
555 S. Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

*Attorneys for Defendant Haleon US Holdings LLC*


*/s/ Hannah Y. Chanoine*
Hannah Y. Chanoine
**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
hchanoine@omm.com

Amy J. Laurendeau (*pro hac vice*)
Emilie W. Hamilton
**O'MELVENY & MYERS LLP**
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
alaurendeau@omm.com
ehamilton@omm.com

*Attorneys for Defendant Johnson &
Johnson Consumer Inc.*

**NPSA-85**

/s/ Robert W. Sparkes, III
Robert W. Sparkes, III (*pro hac vice*)
Jennifer Janiera Nagle (*pro hac vice*)
**K&L GATES LLP**
1 Congress Street, Suite 2900
Boston, MA 02114
Telephone: (617) 261-3100
robert.sparkes@klgates.com
jennifer.nagle@klgates.com

Ruby A. Nagamine (*pro hac vice*)
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Telephone: (206) 623-7580
ruby.nagamine@klgates.com

*Attorneys for Defendants Amazon.com, Inc. and Amazon.com Services LLC*

/s/ E. Paige Sensenbrenner
E. Paige Sensenbrenner (*pro hac vice*)
Diana Cole Suprenant (*pro hac vice*)
**ADAMS AND REESE, LLP**
701 Poydras Street, Suite 4500
New Orleans, LA 70139
Telephone: (504) 581-3234
paige.sensenbrenner@arlaw.com
diana.suprenant@arlaw.com

*Attorneys for Defendants Associated Wholesale Grocers, Inc. and Valu Merchandisers Co.*

/s/ Michael Klebanov
Michael Klebanov (*pro hac vice*)
**HUSCH BLACKWELL LLP**
1801 Pennsylvania Avenue, NW, Suite 1000
Washington, DC 20006
Telephone: (202) 378-2363
michael.klebanov@huschblackwell.com

Tanner Cook (*pro hac vice*)
**HUSCH BLACKWELL LLP**
8001 Forsyth Boulevard, Suite 1500
St. Louis, MO 63105
Telephone: (314) 480-1500
Tanner.cook@huschblackwell.com

*Attorneys for Defendant Dierbergs Markets, Inc.*

5

**NPSA-86**

*/s/ Michael F. Healy*
Michael F. Healy (*pro hac vice*)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 544-1900
mfhealy@shb.com

Daniel B. Rogers (*pro hac vice*)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Boulevard Suite 3200
Miami, FL 33131
Telephone: (305) 358-5171
drogers@shb.com

*Attorneys for Defendant Publix Super Markets, Inc.*

*/s/ James L. Bernard*
James L. Bernard
**HOGAN LOVELLS US LLP**
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3121
James.bernard@hoganlovells.com

Lauren S. Colton (*pro hac vice*)
**HOGAN LOVELLS US LLP**
100 International Drive, Suite 2000
Baltimore, MD 21202
Telephone: (410) 659-2733
Lauren.colton@hoganlovells.com

*Attorneys for Defendant RB Health (US) LLC*

*/s/ Cara D. Edwards*
Cara D. Edwards
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
Telephone: (212) 335-4714
cara.edwards@us.dlapiper.com

Christopher G. Campbell
**DLA PIPER LLP (US)**
1201 West Peachtree Street, Suite 2800
Atlanta, GA 30309
Telephone: (404) 736-7800
christopher.campbell@us.dlapiper.com

**NPSA-87**

Christopher Young (*pro hac vice*)
**DLA PIPER LLP (US)**
4365 Executive Drive, Suite 1100
San Diego, CA 92121
Telephone: (619) 699-4748
christopher.young@us.dlapiper.com

*Attorneys for Defendant Bayer HealthCare, LLC*

/s/ Richard Fama
Richard Fama
**COZEN O'CONNOR**
3 WTC, 175 Greenwich Street, 55th Floor
New York, NY 10007
Telephone: (212) 509-9400
rfama@cozen.com

Karl Riley (*pro hac vice*)
**COZEN O'CONNOR**
Southeast Financial Center, Suite 3000
200 South Biscayne Blvd.
Miami, FL 33130
Telephone: (305) 704-5940
koriley@cozen.com

*Attorneys for The Kroger Co., Harris Teeter, LLC,*
*and Harris Teeter Supermarkets, Inc.*

/s/ Mark J. Lesko
Mark J. Lesko
**GREENBERG TRAURIG, LLP**
900 Stewart Avenue, 5th Floor
Garden City, NY 11530
Telephone: (631) 994-2408
Mark.Lesko@gtlaw.com

Nilda Isidro
Dale Rose Goldstein
**GREENBERG TRAURIG, LLP**
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Nilda.Isidro@gtlaw.com
GoldsteinD@gtlaw.com

*Attorneys for Defendants Albertsons Companies, Inc.,*
*Costco Wholesale Corporation, CVS Pharmacy Inc.,*
*Rite Aid Corporation, Target Corporation, Walgreen*
*Co., Walmart Inc., and Wal-Mart Stores East, LP*

7

**NPSA-88**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Oral Phenylephrine Marketing and Sales Practices Litigation | Case No. 1:23-md-03089-BMC |
| This document relates to: | Hon. Brian M. Cogan |
| All actions. | |

## [PROPOSED] ORDER GOVERNING PLAINTIFFS' INITIAL STREAMLINED CONSOLIDATED COMPLAINT AND DEFENDANTS' MOTION TO DISMISS IN RESPONSE

1.      By May 3, 2024, Interim Class Counsel will file an Initial Streamlined Consolidated Complaint under New York law alleging representative examples of the conduct and claims they allege to be at issue in this Multidistrict Litigation relating, among other things, to the marketing and labeling of oral phenylephrine products.

2.      By June 3, 2024, all named and served Defendants will file a single joint motion to dismiss raising arguments solely on preemption and/or primary jurisdiction.  Plaintiffs' response will be due July 15, 2024, and Defendants' reply will be due August 5, 2024.  For purposes of this motion only, the parties are excused from complying with the Court's requirement to request a pre-motion conference.

3.      Regardless of when Plaintiffs file their Full Master Consolidated Complaint, Defendants shall not be obligated to answer or otherwise respond to the Full Master Consolidated Complaint until 45 days after the Court rules on Defendants' motion to dismiss the Initial Streamlined Consolidated Complaint.  For the avoidance of doubt, Defendants shall not be obligated to raise any arguments for dismissal of either the Initial Streamlined Complaint or a Full Master Consolidated Complaint with respect to any issues other than preemption and/or primary

1

jurisdiction until their deadline to answer or otherwise respond to the Full Master Consolidated Complaint, a deadline that shall be set by the Court.

4.    The Parties agree that to the extent the Court grants or denies Defendants' motion to dismiss based on preemption and/or primary jurisdiction, the order will apply to all cases in this Multidistrict Litigation or otherwise subject to transfer into this Multidistrict Litigation.

**Parties' Reservation of Rights**

5.    **Plaintiffs.**   In filing the Initial Streamlined Complaint, Plaintiffs will not be prejudiced by failure to (1) allege every single instance of the conduct they allege to be wrongful relating to the marketing and labeling of oral phenylephrine cold medicines, (2) identify all products at issue, (3) file on behalf of every named plaintiff in this litigation, or (4) refer to the laws of any state other than New York.  Plaintiffs hereby commit to filing sufficient representative examples of the conduct and claims that they allege to be wrongful that a motion to dismiss based on preemption and/or primary jurisdiction will, if such arguments prevail, resolve this litigation in its entirety, regardless of additional specific examples of wrongful conduct, additional products named, additional Plaintiff-related allegations, or additional state-law claims that are pled or could be pled in a future Full Master Consolidated Complaint.

6.    **Defendants.**   In moving to dismiss the Initial Streamlined Complaint based only on preemption and/or primary jurisdiction, Defendants will not be prejudiced by failure to raise additional arguments for dismissal under Federal Rule of Procedure 12 unrelated to preemption and/or primary jurisdiction if, in the event the Court denies the motion to dismiss based on preemption and/or primary jurisdiction, a subsequent Full Master Consolidated Complaint is filed. Plaintiffs agree that, in the event the Court denies the motion to dismiss based on preemption and/or primary jurisdiction, Defendants shall be permitted to move to dismiss any subsequent Full

2

Master Consolidated Complaint based on any ground under Federal Rule of Civil Procedure 12(b) other than those issues that shall have already been briefed and addressed by the Court in ruling on the motion to dismiss the Initial Streamlined Complaint.  Nothing about this stipulation, or the filing of any motion to dismiss the Initial Streamlined Complaint, waives any Defendants' personal jurisdiction defense.

**SO ORDERED.**

Dated: _____          _____
                                        THE HONORABLE BRIAN M. COGAN
                                        UNITED STATES DISTRICT JUDGE

**NPSA-91**

# COVINGTON

BEIJING   BOSTON   BRUSSELS   DUBAI   FRANKFURT
JOHANNESBURG   LONDON   LOS ANGELES   NEW YORK
PALO ALTO   SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

**Andrew Soukup**

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 5066
asoukup@cov.com

**Via ECF**                                                                 May 16, 2024

Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

       **Re:  In re: Oral Phenylephrine Marketing and Sales Practices**
          **Litigation, 1:23-md-03089-BMC**

Dear Judge Cogan:

      Defendants in the above-captioned litigation, with the consent of the Plaintiffs' Executive Committee, write to advise the Court that the parties have met-and-conferred and reached agreement, subject to the approval of the Court, on a modification of the Court's order (ECF No. 197) governing Plaintiffs' Initial Streamlined Consolidated Complaint and the motion to dismiss arguments that Defendants will raise in response to that Initial Streamlined Consolidated Complaint.  The parties respectfully request that the Court enter the proposed order attached as Exhibit A, which reflects the parties' agreed-upon modifications to the Court's order.

Dated:  May 16, 2024                          Respectfully submitted,

                               */s/ Andrew Soukup*
                               Andrew Soukup (*pro hac vice*)
                               Laura Flahive Wu
                               **COVINGTON & BURLING LLP**
                               One CityCenter
                               850 Tenth Street, NW
                               Washington, DC 20001-4956
                               Telephone: (202) 662-5066
                               asoukup@cov.com
                               lflahivewu@cov.com

                               Cortlin H. Lannin (*pro hac vice*)
                               **COVINGTON & BURLING LLP**
                               Salesforce Tower
                               415 Mission Street, Suite 5400
                               San Francisco, CA 94105
                               Telephone: (415) 591-7078
                               clannin@cov.com
                               *Attorneys for Defendant The Procter & Gamble*
                               *Company*

**COVINGTON** M. Cogan
May 16, 2024
Page 2

/s/ Jay P. Lekfowitz
Jay P. Lefkowitz. P.C.
Jacob M. Rae
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
lefkowitz@kirkland.com
jacob.rae@kirkland.com

Robyn E. Bladow (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
555 S. Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

*Attorneys for Defendant Haleon US Holdings LLC*

/s/ Hannah Y. Chanoine
Hannah Y. Chanoine
**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
hchanoine@omm.com

Amy J. Laurendeau (*pro hac vice*)
Emilie W. Hamilton
**O'MELVENY & MYERS LLP**
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
alaurendeau@omm.com
ehamilton@omm.com

*Attorneys for Defendant Johnson &
Johnson Consumer Inc.*

/s/ Robert W. Sparkes, III
Robert W. Sparkes, III (*pro hac vice*)
Jennifer Janiera Nagle (*pro hac vice*)
**K&L GATES LLP**
1 Congress Street, Suite 2900

Boston, MA 02114
Telephone: (617) 261-3100
robert.sparkes@klgates.com
jennifer.nagle@klgates.com

Ruby A. Nagamine (*pro hac vice*)
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Telephone: (206) 623-7580
ruby.nagamine@klgates.com

*Attorneys for Defendants Amazon.com, Inc. and
Amazon.com Services LLC*


/s/ E. Paige Sensenbrenner
E. Paige Sensenbrenner (*pro hac vice*)
Diana Cole Suprenant (*pro hac vice*)
**ADAMS AND REESE, LLP**
701 Poydras Street, Suite 4500
New Orleans, LA 70139
Telephone: (504) 581-3234
paige.sensenbrenner@arlaw.com
diana.suprenant@arlaw.com

*Attorneys for Defendants Associated Wholesale
Grocers, Inc. and Valu Merchandisers Co.*


/s/ Michael Klebanov
Michael Klebanov (*pro hac vice*)
**HUSCH BLACKWELL LLP**
1801 Pennsylvania Avenue, NW, Suite 1000
Washington, DC 20006
Telephone: (202) 378-2363
michael.klebanov@huschblackwell.com

Tanner Cook (*pro hac vice*)
**HUSCH BLACKWELL LLP**
8001 Forsyth Boulevard, Suite 1500
St. Louis, MO 63105
Telephone: (314) 480-1500
Tanner.cook@huschblackwell.com

*Attorneys for Defendant Dierbergs Markets, Inc.*

Honorable Brian M. Cogan
May 16, 2024
Page 4

/s/ Michael F. Healy
Michael F. Healy (*pro hac vice*)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 544-1900
mfhealy@shb.com

Daniel B. Rogers (*pro hac vice*)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Boulevard Suite 3200
Miami, FL 33131
Telephone: (305) 358-5171
drogers@shb.com

*Attorneys for Defendant Publix Super Markets, Inc.*

/s/ James L. Bernard
James L. Bernard
**HOGAN LOVELLS US LLP**
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3121
James.bernard@hoganlovells.com

Lauren S. Colton (*pro hac vice*)
**HOGAN LOVELLS US LLP**
100 International Drive, Suite 2000
Baltimore, MD 21202
Telephone: (410) 659-2733
Lauren.colton@hoganlovells.com

*Attorneys for Defendant RB Health (US) LLC*

/s/ Cara D. Edwards
Cara D. Edwards
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
Telephone: (212) 335-4714
cara.edwards@us.dlapiper.com

Christopher G. Campbell
**DLA PIPER LLP (US)**
1201 West Peachtree Street, Suite 2800

Atlanta, GA 30309
Telephone: (404) 736-7800
christopher.campbell@us.dlapiper.com

Christopher Young (*pro hac vice*)
**DLA PIPER LLP (US)**
4365 Executive Drive, Suite 1100
San Diego, CA 92121
Telephone: (619) 699-4748
christopher.young@us.dlapiper.com

*Attorneys for Defendant Bayer HealthCare, LLC*

/s/ Mark J. Lesko
Mark J. Lesko
**GREENBERG TRAURIG, LLP**
900 Stewart Avenue, 5th Floor
Garden City, NY 11530
Telephone: (631) 994-2408
Mark.Lesko@gtlaw.com

Nilda Isidro
Dale Rose Goldstein
**GREENBERG TRAURIG, LLP**
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Nilda.Isidro@gtlaw.com
GoldsteinD@gtlaw.com

*Attorneys for Defendants Albertsons Companies,
Inc., Costco Wholesale Corporation, CVS
Pharmacy Inc., Rite Aid Corporation, Target
Corporation, Walgreen Co., Walmart Inc., and
Wal-Mart Stores East, LP*

/s/ Richard Fama
Richard Fama
**COZEN O'CONNOR**
3 WTC, 175 Greenwich Street, 55th Floor
New York, NY 10007
Telephone: (212) 509-9400
rfama@cozen.com

Karl Riley (*pro hac vice*)

**COZEN O'CONNOR**
Southeast Financial Center, Suite 3000
200 South Biscayne Blvd.
Miami, FL 33130
Telephone: (305) 704-5940
koriley@cozen.com

*Attorneys for The Kroger Co., Harris Teeter,
LLC, and Harris Teeter Supermarkets, Inc.*

*/s/ Michael A. London*
Michael A. London (ML-7510)
**DOUGLAS & LONDON P.C.**
59 Maiden Lane – 6th Floor
New York, New York 10038
Tel: 212-566-7500
mlondon@douglasandlondon.com
*Chairperson of the Plaintiffs' Executive Committee*

Bryan F. Aylstock
**AYLSTOCK WITKIN KREIS
OVERHOLTZ PLLC**
17 East Main Street, Suite 200
Pensacola, Florida 32502
Tel: 850-202-1010
baylstock@awkolaw.com

Kiley L. Grombacher
**BRADLEY/GROMBACHER LLP**
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Tel: 866-881-0403
kgrombacher@bradleygrombacher.com

James E. Cecchi
**CARELLA BYRNE CECCHI BRODY &
AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: 973-994-1700
jcecchi@carellabyrne.com

Adam J. Levitt
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: 312-214-7900

**COVINGTON** M. Cogan
May 16, 2024
Page 7

alevitt@dicellolevitt.com

Elizabeth A. Fegan
**FEGAN SCOTT LLC**
150 South Wacker Drive, 24th Floor
Chicago, Illinois 60606
Tel: 630-273-2625
beth@feganscott.com

Jonathan D. Selbin
**LIEFF CABRASER HEIMANN &
BERNSTEIN LLP**
250 Hudson Street, 8th Floor
New York, New York 10013
Tel: 212-355-9500
jselbin@lchb.com

Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road
Ridgefield Park, New Jersey 07660
Tel: 888-546-8799
cseeger@seegerweiss.com

Jason P. Sultzer
**THE SULTZER LAW GROUP P.C.**
85 Civic Center Plaza Ste. 200
Poughkeepsie, New York 12601
Tel: 845-244-5595
sultzerj@thesultzerlawgroup.com

Lindsey N. Scarcello
**WAGSTAFF & CARTMELL**
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Tel: 816-701-1102
lscarcello@wcllp.com

*Plaintiffs' Executive Committee
and Interim Class Counsel*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Oral Phenylephrine Marketing and Sales Practices Litigation | Case No. 1:23-md-03089-BMC |
| This document relates to: | Hon. Brian M. Cogan |
| All actions. | |

### [PROPOSED] AMENDED ORDER GOVERNING INITIAL STREAMLINED CONSOLIDATED CLASS ACTION COMPLAINT AND DEFENDANTS' MOTION TO DISMISS IN RESPONSE

1.      Pursuant to the parties' previously-filed [Proposed] Order Governing Plaintiffs' Initial Streamlined Consolidated Complaint and Defendants' Motion to Dismiss in Response (ECF No. 196-1) and the Court's related Order of April 17, 2024 (ECF No. 197), the parties and the Court agreed Plaintiffs would "file an Initial Streamlined Consolidated Complaint under New York law alleging representative examples of the conduct and claims they allege to be at issue in this multidistrict litigation relating, among other things, to the marketing and labeling of oral phenylephrine products."

2.      The parties and the Court also agreed that, by June 3, 2024, all named and served Defendants will "file a single joint motion to dismiss raising arguments solely on preemption and/or primary jurisdiction."

3.      On May 3, 2024, Interim Class Counsel filed the Intitial [sic] Streamlined Consolidated Class Action Complaint (the "Initial Streamlined Complaint") (ECF No. 200), alleging representative examples of the conduct and claims they allege to be at issue in this multidistrict litigation relating, among other things, to the marketing and labeling of oral phenylephrine products.  Plaintiffs included, for the first time in any complaint filed in this multidistrict litigation, a federal RICO claim against the "RICO Defendants" (ECF No. 200 at Count 7).  This claim is governed by federal law, not New York

1

law.

4.      In light of Plaintiffs' inclusion of the new federal RICO claim, the parties now agree that, in addition to defenses of preemption and/or primary jurisdiction outlined in the parties' prior stipulation (ECF No. 196) and the Court's corresponding Order (ECF No. 197), Defendants are also permitted to raise in their forthcoming Motion to Dismiss certain arguments responsive to the RICO claim (hereinafter "initial RICO arguments").

5.      Plaintiffs' response will be due July 15, 2024, and Defendants' reply will be due August 5, 2024.  For purposes of this motion only, the parties are excused from complying with the Court's requirement to request a pre-motion conference.

6.      Regardless of when Plaintiffs file their Full Master Consolidated Complaint, Defendants shall not be obligated to answer or otherwise respond to the Full Master Consolidated Complaint until 45 days after the Court rules on Defendants' motion to dismiss the Initial Streamlined Complaint.  For the avoidance of doubt, Defendants shall not be obligated to raise any arguments for dismissal of either the Initial Streamlined Complaint or a Full Master Consolidated Complaint with respect to any issues other than preemption and/or primary jurisdiction and/or initial RICO arguments until their deadline to answer or otherwise respond to the Full Master Consolidated Complaint, a deadline that shall be set by the Court.

7.      The Parties agree that to the extent the Court grants or denies Defendants' motion to dismiss based on preemption and/or primary jurisdiction and/or any initial RICO argument(s) raised, the order will apply to all cases in this multidistrict litigation or otherwise subject to transfer into this multidistrict litigation.

**Parties' Reservation of Rights**

**8.      Plaintiffs.**  In filing the Initial Streamlined Complaint, Plaintiffs will not be prejudiced

by failure to (1) allege every single instance of the conduct they allege to be wrongful relating to the marketing and labeling of oral phenylephrine cold medicines, (2) identify all products at issue, (3) file on behalf of every named plaintiff in this litigation, or (4) refer to the laws of any state other than New York. Plaintiffs hereby represent that they have filed sufficient representative examples of the conduct and claims that they allege to be wrongful that a motion to dismiss based on preemption and/or primary jurisdiction and/or initial RICO arguments will, if such arguments prevail, resolve this litigation in its entirety, regardless of additional specific examples of wrongful conduct, additional products named, additional Plaintiff-related allegations, or additional state-law claims that are pled or could be pled in a future Full Master Consolidated Complaint.

9. **Defendants.** In moving to dismiss the Initial Streamlined Complaint based only on preemption and/or primary jurisdiction and/or initial RICO arguments, Defendants will not be prejudiced by failure to raise additional arguments for dismissal under Federal Rule of Procedure 12 unrelated to preemption and/or primary jurisdiction and/or the initial RICO arguments if, in the event the Court denies the motion to dismiss based on preemption and/or primary jurisdiction and/or initial RICO arguments, a subsequent Full Master Consolidated Complaint is filed. Plaintiffs agree that, in the event the Court denies the motion to dismiss based on preemption and/or primary jurisdiction and/or initial RICO arguments, Defendants shall be permitted to move to dismiss any cause of action set forth in the subsequent Full Master Consolidated Complaint based on any defense under Federal Rule of Civil Procedure 12(b) that has not already been briefed and addressed by the Court in ruling on the motion to dismiss the Initial Streamlined Complaint. Nothing about this stipulation, or the filing of any motion to dismiss the Initial Streamlined Complaint, waives any Defendants' personal jurisdiction defense.

**NPSA-101**

**SO ORDERED.**


Dated: _____          _____
                                       THE HONORABLE BRIAN M. COGAN
                                       UNITED STATES DISTRICT JUDGE

4

**NPSA-102**



59 Maiden Lane, 6th Floor
New York, NY 10038

Phone: (212) 566-7500
Fax: (212) 566-7501
www.DouglasAndLondon.com

Gary J. Douglas ᴾ
Michael A. London *
Stephanie O'Connor *
Randolph D. Janis
Virginia E. Anello ^

Rebecca G. Newman *
Robin J. Bond *
Alicia Ellsayed
Lara J. Say *ⁿ
Tate J. Kunkle ᵗ
Anne Accettella
Sara Castronuova *

*  Also admitted in NJ
ᴾ  Also admitted in PA
^  Also admitted in LA & MA
ⁿ  Also admitted in NC
ᵗ  Also admitted in CT

*The attorney in charge of New Jersey
practice is Michael A. London*

May 23, 2024

<u>**VIA ECF**</u>
Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

    **Re:**    <u>**In re: Oral Phenylephrine Marketing and Sales Practices Litigation**</u>
          **1:23-md-03089-BMC**

Dear Judge Cogan:

    The parties respectfully submit this joint discovery status report pursuant to the Court's Order dated May 16, 2024.  The parties have competing positions on the current status of discovery and how it should proceed in the future.  The parties' positions are as follows:

**A.**    <u>**Plaintiffs' Position**</u>

    <u>**Rule 26(a)(1) Disclosures.**</u>  On May 17, 2024, the Parties timely exchanged their Initial Disclosures. Plaintiffs believe that many of the Initial Disclosures received are deficient and will engage in a meet and confer with each Defendant on their respective responses.

    <u>**Initial Discovery Orders.**</u>  At the April 2, 2024, Case Management Conference ("CMC"), the Court generously gave the parties 60 days to negotiate confidentiality and ESI orders.  *See* April 2, 2024 Tr, at pp. 13-14.  On April 3, 2024, Plaintiffs provided Defendants with their proposed ESI protocol. On April 22, 2024, Plaintiffs provided Defendants with their proposed Protective Order and Privilege Log Order. These proposed orders contained provisions relating to preservation of relevant information, the protection of confidential information, privilege logs and claw-backs. On May 9, 2024, over thirty days following the submission of Plaintiffs' proposal,

1

**NPSA-103**

Defendants responded to Plaintiffs' proposed ESI protocol with an entirely different ESI protocol, indicating they thought it impractical to redline Plaintiffs' proposal, due to the competing interests of the various Defendants. On May 14, 2024, the parties met and conferred on Defendants' proposed ESI Protocol. On this call, Defendants advised that they would respond to the Plaintiffs' proposed Protective Order and Privilege Order the following week (i.e. the week of May 20, 2024) and that they believed the Protective Order and Privilege Order should be two separate documents. Plaintiffs thereafter provided a markup and comments to Defendant's ESI protocol on May 20, 2024. Yesterday, May 22, 2024, thirty days following the submission of Plaintiffs' proposal, Defendants provided Plaintiffs with their revisions to the Protective Order only and advised that they would be sending a separate Privilege Log Order "shortly". Defendants also offered dates to meet and confer on the ESI Order. Plaintiffs accepted the first date and time slot offered and intend to also meet and confer on the Protective Order.

Plaintiffs respectfully request that, consistent with the deadlines set by the Court at the April 2, 2024 CMC, the parties be directed to submit proposed Orders concerning ESI, Confidential Information, Privileged Information, and Document Preservation to the Court by June 3, 2024. To the extent the parties are unable to agree on certain terms of the proposed Orders, Plaintiffs respectfully request that the parties be permitted to submit competing provisions, explaining their respective positions, by June 3, 2024.

**Rule 26(f) Conferences and Additional Discovery.** On April 26, 2024, Plaintiffs requested that Defendants provide available dates for Rule 26(f) conferences. On May 1, 2024, Defendants responded that they believed Rule 26(f) conferences were premature and that there was a discovery stay in place per Case Management Order No. 1 ("CMO 1"). Further communications resulted in no changes to the parties' respective positions.

Plaintiffs respectfully submit that discovery efforts should not be delayed. However, and unfortunately, Defendants are taking the position that all discovery, except for Rule 26(a)(1) disclosures and protective and ESI order negotiations, should be stayed pending a decision on their motion to dismiss – a position that goes against the general well-accepted rule of law that a motion to dismiss, even if it dispositive, does not in and of itself justify a stay of discovery. *See Hachette Distribution, Inc. v. Hudson Cnty. News Co.,* 136 F.R.D. 356 (E.D.N.Y. 1991). Further, Defendants' claim that the scope of discovery here is dependent upon a Master Complaint that has not yet been filed, but that argument is misguided, at best. As Your Honor previously noted at the April 2, 2024 CMC in response to a similar scope argument:

> Everybody knows what this case is about. Really. There will be lots of legal issues and nuances and all that in terms of the facts and what happened and who knew what when. You know where to look for those documents. To the extent they help your case, you can start identifying. Let's start in 45 days. *See* Tr. at p. 17.

Plaintiffs understood from the discussions at the last CMC that the beginning stages of discovery were commencing, and any discovery stay imposed by CMO 1 had been lifted. To this end, Plaintiffs respectfully submit that CMO 1 should not be used, nor was it intended to be used, to prevent discovery from advancing, especially Rule 26(f) conferences, or to delay exchanges of information that will help the parties in their negotiation and advancing discovery in this MDL. Plaintiffs fail to see how commencement of Rule 26(f) conferences, which will assist with moving forward with initial discovery, are burdensome to Defendants. Indeed, they are standard fare in

2

any MDL.

To the extent the stay imposed by CMO 1 is still in place, Plaintiffs maintain that such a stay is not warranted here, especially where Plaintiffs are confident that their claims will survive because defendants have not, and will not, make a strong showing that their claims are unmeritorious. *See Robbins v. Candy Digit. Inc.,* 2024 U.S. Dist. LEXIS 88694 (S.D.N.Y. May 15, 2024) (denying motion to stay because, even though the defendants had made strong arguments in support of dismissal, the plaintiff had made equally strong arguments against dismissal). Proceeding with preliminary discovery is the most efficient way to avoid unnecessary delays.

Accordingly, Plaintiffs respectfully request that the Court lift any discovery stay that may be in place and direct each defendant to engage in and complete Rule 26(f) conferences on or before June 17, 2024. Further, Plaintiffs request that they be permitted to serve initial Requests for Interrogatories and Requests for Production of Documents on all Defendants named in the NY Bellwether Complaint by June 21, 2024, and that the parties be required to confer on a joint discovery plan by June 7, 2024.[1]

## B.   **Defendants' Statement**

At the April 2 case management conference, Plaintiffs proposed that they would file a bellwether complaint in lieu of a master consolidated complaint, the purpose of which they said was "to get this preemption motion teed up early." Tr. 10:23-24. The parties and this Court then agreed that Defendants may file a motion to dismiss raising threshold legal defenses that "will, if such arguments prevail, resolve this litigation in its entirety." ECF No. 204 at 3. Despite the parties' agreement and this Court's order that the Initial Streamlined Complaint would only raise claims "under New York law" (ECF No. 197 ¶ 1), Plaintiffs added a federal RICO claim (not previously included in any of the 98 MDL complaints). Defendants have not asked for more time or more pages for their motion to dismiss, which they believe will "resolve this litigation in its entirety," including the new RICO claim. They will file it on June 3, and—because Plaintiffs wanted six weeks to file an opposition—it will be fully briefed by August 5.

Meanwhile, this Court has explicitly stayed discovery in this litigation, with two limited exceptions, and Defendants have complied with this Court's orders. *See* CMO 1 ECF No. 162 § VIII, ECF No. 205 § VIII ("until further order of the Court, all outstanding discovery is stayed, and no further discovery may be initiated"). *First*, CMO 1 contemplates that the parties will negotiate protective orders and ESI protocols, *see id.* § V, and those efforts are well underway. As Defendants previewed at the initial case management conference, *see* Tr. 14:5-17, these efforts are time intensive given the number of defendants in this litigation--each of whom has unique e-discovery systems, practices, and requirements--and given the fact that defendants are competitors with each other. Plaintiffs' initial draft orders did not account for these complexities. Defendants remain committed to working with Plaintiffs to submit any agreed-upon orders or competing drafts to the Court, and they have set follow up calls to narrow any areas of disagreement. Defendants anticipate there will be numerous areas of disagreement if the parties are forced to file proposed orders by June 3, but they believe if given until June 28, any areas of disagreement can be

---

[1] In the event the Court is inclined to stay discovery because Plaintiffs have asserted a RICO claim, Plaintiffs respectfully request that such a stay be limited only to discovery that pertains to Plaintiffs' RICO claims.

**NPSA-105**

eliminated or at least narrowed. *Second*, this Court also directed the parties to exchange initial disclosures, which they did for all defendants who are properly named in and served with the Initial Streamlined Complaint on May 17.

The Court's general stay of discovery remains in place, and there are at least three reasons the Court should maintain this status quo until after it rules on Defendants' motion to dismiss.

*First*, the purpose of the streamlined complaint was to focus the parties' and this Court's efforts on case-dispositive defenses that, if granted, would end the litigation before the parties and the Court are burdened with unnecessary discovery. Defendants' motion will show that Plaintiffs' claims are preempted, and courts commonly stay discovery when presented with this threshold defense. *See, e.g., Cohen v. Saraya USA, Inc.*, 2024 WL 198405 (E.D.N.Y. Jan. 18, 2024) (staying discovery pending resolution of preemption defense to labeling claims). Plaintiffs attempted to plead around this problem by adding a new RICO claim against some defendants. But Plaintiffs lack standing to bring that claim because they did not directly purchase the medicine at issue from the RICO defendants, and that claim is also precluded by the FDCA. This Court previously stayed discovery in similar circumstances. *See Lawson v. Rubin*, 2018 WL 4211446, at *1-2 (E.D.N.Y. Mar. 7, 2018) (Cogan, J.) (staying discovery where defendants raised "credible arguments that plaintiffs cannot demonstrate RICO standing").

*Second*, consistent with focusing the initial phases of this case on threshold legal defenses, the streamlined complaint did not include any non-New York plaintiffs, and it did not name all defendants in this MDL as defendants. Plaintiffs further have stated that litigation (including discovery) is stayed as to all defendants (and all plaintiffs) not named in the streamlined complaint. It makes no sense to arbitrarily commence discovery involving some parties but not others based solely on Plaintiffs' whim as to what parties were or were not named in the streamlined complaint.

*Third*, having filed the streamlined complaint to facilitate threshold resolution of certain case-dispositive arguments, Plaintiffs have not yet undertaken the burden of preparing a master complaint, which will frame the scope of discovery here. The parties should not be forced to bear discovery-related burdens when Plaintiffs have not prepared a master complaint.[2]

This Court should therefore (1) direct the parties to submit by June 28 agreed-upon protective and ESI orders, or if the parties cannot reach agreement, competing drafts, (2) set the next status conference on a date after this Court anticipates ruling on Defendants' forthcoming motion to dismiss, and (3) if this Court denies Defendants' motion to dismiss, direct the parties to submit 14 days in advance of that status conference a proposed schedule to govern the filing of a master consolidated complaint, any additional motions to dismiss any Defendant may make, discovery, and class certification. To the extent this Court is inclined to enter any additional orders at this time, Defendants would welcome the opportunity to discuss these issues with the Court at a hearing.

---

[2] The Court's comments above quoted by Plaintiffs came only in the context of discussing the burdens associated with preparing initial disclosures, and since the Court made those comments, Plaintiffs added new RICO claims to this case.

Dated: May 23, 2024

Respectfully Submitted:

*/s/ Michael A. London*
Michael A. London (ML-7510)
DOUGLAS & LONDON P.C.
59 Maiden Lane – 6th Floor
New York, New York 10038
Tel: 212-566-7500
mlondon@douglasandlondon.com
*Chairperson of the Plaintiffs' Executive Committee*

*/s/ Bryan F. Aylstock*
AYLSTOCK WITKIN KREIS
OVERHOLTZ PLLC
17 East Main Street, Suite 200
Pensacola, Florida 32502
Tel: 850-202-1010
baylstock@awkolaw.com

*/s/ Kiley L. Grombacher*
BRADLEY/GROMBACHER LLP
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Tel: 866-881-0403
kgrombacher@bradleygrombacher.com

*/s/ James E. Cecchi*
CARELLA BYRNE CECCHI BRODY &
AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: 973-994-1700
jcecchi@carellabyrne.com

*/s/ Adam J. Levitt*
DICELLO LEVITT LLP
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: 312-214-7900
alevitt@dicellolevitt.com

*/s/ Elizabeth A. Fegan*
FEGAN SCOTT LLC
150 South Wacker Drive, 24th Floor
Chicago, Illinois 60606
Tel: 630-273-2625
beth@feganscott.com

**NPSA-107**

*/s/ Jonathan D. Selbin*
LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
250 Hudson Street, 8th Floor
New York, New York 10013
Tel: 212-355-9500
jselbin@lchb.com

*/s/ Christopher A. Seeger*
SEEGER WEISS LLP
55 Challenger Road
Ridgefield Park, New Jersey 07660
Tel: 888-546-8799
cseeger@seegerweiss.com

*/s/ Jason P. Sultzer*
THE SULTZER LAW GROUP P.C.
85 Civic Center Plaza Ste. 200
Poughkeepsie, New York 12601
Tel: 845-244-5595
sultzerj@thesultzerlawgroup.com

*/s/ Lindsey N. Scarcello*
WAGSTAFF & CARTMELL
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Tel: 816-701-1100
lscarcello@wcllp.com

*Plaintiffs' Executive Committee
and Interim Class Counsel*

*/s/ Andrew Soukup*
Andrew Soukup (*pro hac vice*)
Laura Flahive Wu
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-5066
asoukup@cov.com
lflahivewu@cov.com

**NPSA-108**

Cortlin H. Lannin (*pro hac vice*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-7078
clannin@cov.com

*Attorneys for Defendant The Procter & Gamble Company*


/s/ Jay P. Lekfowitz
Jay P. Lefkowitz. P.C.
Jacob M. Rae
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
lefkowitz@kirkland.com
jacob.rae@kirkland.com

Robyn E. Bladow (*pro hac vice*)
KIRKLAND & ELLIS LLP
555 S. Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

*Attorneys for Defendant Haleon US Holdings LLC*


/s/ Hannah Y. Chanoine
Hannah Y. Chanoine
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
hchanoine@omm.com

NPSA-109

Amy J. Laurendeau (*pro hac vice*)
Emilie W. Hamilton
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
alaurendeau@omm.com
ehamilton@omm.com

*Attorneys for Defendant Johnson &
Johnson Consumer Inc.*


*/s/ Robert W. Sparkes, III*
Robert W. Sparkes, III (*pro hac vice*)
Jennifer Janiera Nagle (*pro hac vice*)
K&L GATES LLP
1 Congress Street, Suite 2900
Boston, MA 02114
Telephone: (617) 261-3100
robert.sparkes@klgates.com
jennifer.nagle@klgates.com

Ruby A. Nagamine (*pro hac vice*)
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Telephone: (206) 623-7580
ruby.nagamine@klgates.com

*Attorneys for Defendants Amazon.com, Inc.
and Amazon.com Services LLC*


*/s/ E. Paige Sensenbrenner*
E. Paige Sensenbrenner (*pro hac vice*)
Diana Cole Suprenant (*pro hac vice*)
ADAMS AND REESE, LLP
701 Poydras Street, Suite 4500
New Orleans, LA 70139
Telephone: (504) 581-3234
paige.sensenbrenner@arlaw.com
diana.suprenant@arlaw.com

*Attorneys for Defendants Associated
Wholesale Grocers, Inc. and Valu
Merchandisers Co.*

**NPSA-110**

*/s/ Michael Klebanov*
Michael Klebanov (*pro hac vice*)
HUSCH BLACKWELL LLP
1801 Pennsylvania Avenue, NW, Suite 1000
Washington, DC 20006
Telephone: (202) 378-2363
michael.klebanov@huschblackwell.com

Tanner Cook (*pro hac vice*)
HUSCH BLACKWELL LLP
8001 Forsyth Boulevard, Suite 1500
St. Louis, MO 63105
Telephone: (314) 480-1500
Tanner.cook@huschblackwell.com

*Attorneys for Defendant Dierbergs Markets, Inc.*


*/s/ Michael F. Healy*
Michael F. Healy (*pro hac vice*)
SHOOK, HARDY & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 544-1900
mfhealy@shb.com

Daniel B. Rogers (*pro hac vice*)
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Boulevard Suite 3200
Miami, FL 33131
Telephone: (305) 358-5171
drogers@shb.com

*Attorneys for Defendant Publix Super Markets, Inc.*


*/s/ James L. Bernard*
James L. Bernard
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3121
James.bernard@hoganlovells.com

9

Lauren S. Colton (*pro hac vice*)
HOGAN LOVELLS US LLP
100 International Drive, Suite 2000
Baltimore, MD 21202
Telephone: (410) 659-2733
Lauren.colton@hoganlovells.com

*Attorneys for Defendant RB Health (US) LLC*


/s/ Cara D. Edwards
Cara D. Edwards
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
Telephone: (212) 335-4714
cara.edwards@us.dlapiper.com

Christopher G. Campbell
DLA PIPER LLP (US)
1201 West Peachtree Street, Suite 2800
Atlanta, GA 30309
Telephone: (404) 736-7800
christopher.campbell@us.dlapiper.com

Christopher Young (*pro hac vice*)
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, CA 92121
Telephone: (619) 699-4748
christopher.young@us.dlapiper.com

*Attorneys for Defendant Bayer HealthCare, LLC*


/s/ Mark J. Lesko
Mark J. Lesko
GREENBERG TRAURIG, LLP
900 Stewart Avenue, 5th Floor
Garden City, NY 11530
Telephone: (631) 994-2408
Mark.Lesko@gtlaw.com

**NPSA-112**

Nilda Isidro
Dale Rose Goldstein
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Nilda.Isidro@gtlaw.com
GoldsteinD@gtlaw.com

*Attorneys for Defendants Albertsons
Companies, Inc., Costco Wholesale
Corporation, CVS Pharmacy Inc., Rite Aid
Corporation, Target Corporation, Walgreen
Co., Walmart Inc., and Wal-Mart Stores
East, LP*


*/s/ Richard Fama*
Richard Fama
COZEN O'CONNOR
3 WTC, 175 Greenwich Street, 55th Floor
New York, NY 10007
Telephone: (212) 509-9400
rfama@cozen.com

Karl Riley (*pro hac vice*)
COZEN O'CONNOR
Southeast Financial Center, Suite 3000
200 South Biscayne Blvd.
Miami, FL 33130
Telephone: (305) 704-5940
koriley@cozen.com

*Attorneys for The Kroger Co., Harris
Teeter, LLC, and Harris Teeter
Supermarkets, Inc.*

**NPSA-113**

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: Oral Phenylephrine Marketing and Sales Practices Litigation<br><br>This document relates to:<br><br>All actions. | Case No. 1:23-md-03089-BMC<br><br>**NOTICE OF MOTION**<br><br>**ORAL ARGUMENT REQUESTED** |

PLEASE TAKE NOTICE that the undersigned Defendants by their respective counsel, upon the accompanying Memorandum of Law dated June 3, 2024, and all prior pleadings and proceedings herein, will move this Court, before the Honorable Brian M. Cogan, at the United States Courthouse, 225 Cadman Plaza East, Brooklyn, New York 11201, as soon as counsel may be heard, for an order pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure granting Defendants' Motion to Dismiss Plaintiffs' Initial Streamlined Consolidated New York Bellwether Class Action Complaint.

The Initial Streamlined Complaint named some, but not all, of the Defendants in this MDL as Defendants. However, undersigned Defendants are authorized to report on behalf of all Defendants that all Defendants who are not named in the Initial Streamlined Complaint are entitled to dismissal from all actions in the MDL for the same reasons as the named Defendants because the Court's decision on this motion "will apply to all cases in this multidistrict litigation or otherwise subject to transfer into this multidistrict litigation." ECF No. 204 at 2. Further, Defendants do not waive the right to raise any additional arguments for dismissal under Rule 12 of the Federal Rules of Civil Procedure unrelated to preemption and initial RICO arguments. *See id.* at 3.

1

**NPSA-114**

June 3, 2024

Respectfully Submitted,

*/s/ Andrew Soukup*
Andrew Soukup (*pro hac vice*)
Laura Flahive Wu
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
asoukup@cov.com
lflahivewu@cov.com

Cortlin H. Lannin (*pro hac vice*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-6000
clannin@cov.com

*Attorneys for Defendant The Procter & Gamble Company*

*/s/ Jay P. Lefkowitz*
Jay P. Lefkowitz. P.C.
Jacob M. Rae
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
lefkowitz@kirkland.com
jacob.rae@kirkland.com

Robyn E. Bladow (*pro hac vice*)
KIRKLAND & ELLIS LLP
555 S. Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

*Attorneys for Defendant Haleon US Holdings LLC*

**NPSA-115**

/s/ Hannah Y. Chanoine
Hannah Y. Chanoine
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
hchanoine@omm.com

Amy J. Laurendeau (*pro hac vice*)
Emilie W. Hamilton
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
alaurendeau@omm.com
ehamilton@omm.com

*Attorneys for Defendant Johnson &
Johnson Consumer Inc.*

/s/ James L. Bernard
James L. Bernard
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3121
James.bernard@hoganlovells.com

Lauren S. Colton (*pro hac vice*)
HOGAN LOVELLS US LLP
100 International Drive, Suite 2000
Baltimore, MD 21202
Telephone: (410) 659-2733
Lauren.colton@hoganlovells.com

*Attorneys for Defendant RB Health (US)
LLC*

/s/ Cara D. Edwards
Cara D. Edwards
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
Telephone: (212) 335-4714
cara.edwards@us.dlapiper.com

**NPSA-116**

Christopher G. Campbell
DLA PIPER LLP (US)
1201 West Peachtree Street, Suite 2800
Atlanta, GA 30309
Telephone: (404) 736-7800
christopher.campbell@us.dlapiper.com

Christopher Young (*pro hac vice*)
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, CA 92121
Telephone: (619) 699-4748
christopher.young@us.dlapiper.com

*Attorneys for Defendant Bayer HealthCare,*
*LLC*

*/s/ Mark J. Lesko*
Mark J. Lesko
GREENBERG TRAURIG, LLP
900 Stewart Avenue, 5th Floor
Garden City, NY 11530
Telephone: (631) 994-2408
Mark.Lesko@gtlaw.com

Nilda Isidro
Dale Rose Goldstein
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Nilda.Isidro@gtlaw.com
GoldsteinD@gtlaw.com

Sara K. Thompson (*pro hac vice*)
GREENBERG TRAURIG, LLP
3333 Piedmont Rd NE
Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2392
Sara.Thompson@gtlaw.com

*Attorneys for Defendants CVS Pharmacy*
*Inc., Target Corporation, Walgreen Co., and*
*Walmart Inc.*

4

**NPSA-117**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Oral Phenylephrine Marketing and Sales Practices Litigation<br><br>This document relates to:<br><br>All actions. | Case No. 1:23-md-03089-BMC |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS THE INITIAL STREAMLINED CONSOLIDATED NEW YORK
<u>BELLWETHER CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    A.    The Extensive Federal Regulatory Scheme for Over-The-Counter Drugs. ............ 2

    B.    After a Years-Long Monograph Process, the FDA Authorizes Phenylephrine as a Safe and Effective Nasal Decongestant. ................................. 4

    C.    The FDA Continues to Recognize Phenylephrine as Safe and Effective. ............. 6

    D.    Plaintiffs' Lawsuits. ............................................................................................... 7

ARGUMENT ...................................................................................................................... 9

I.    Federal Law Preempts Plaintiffs' State-Law Claims. .......................................... 9

    A.    Plaintiffs' State-Law Claims Are Expressly Preempted. ..................................... 10

        1.    The FDCA preempts state-law claims that seek to impose requirements "different from or in addition to, or that [are] otherwise not identical with" federal law. ................................................. 10

        2.    Section 379r bars Plaintiffs' claims because they are inconsistent with the monograph. ..................................................................... 13

    B.    Plaintiffs' State-Law Claims Conflict with Federal Law and Are Preempted. .......................................................................................................... 17

        1.    Defendants cannot comply with federal law and Plaintiffs' purported state-law obligations. ................................................................... 17

        2.    Plaintiffs' state-law claims impose obstacles to Congress's purposes. ................................................................................................... 19

II.    The RICO Claim Fails for at Least Two Independent Reasons ........................... 21

    A.    Plaintiffs Lack Statutory Standing to Assert the RICO Claim. ........................... 21

    B.    The RICO Claim Is Precluded by the FDCA ..................................................... 23

CONCLUSION .................................................................................................................. 25

NPSA-119

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
   823 F.3d 51 (2d Cir. 2016)...........................................................................24, 25

*Apple Inc. v. Pepper*,
   587 U.S. 273 (2019).............................................................................................22

*Arizona v. United States*,
   567 U.S. 387 (2012).......................................................................................17, 19

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015).............................................................................................18

*Bates v. Dow Agrosciences LLC*,
   544 U.S. 431 (2005).............................................................................................20

*Bimont v. Unilever U.S., Inc.*,
   2015 WL 5256988 (S.D.N.Y. Sept. 9, 2015).......................................................12

*Bischoff v. Albertsons Cos., Inc.*,
   2023 WL 4187494 (S.D.N.Y. June 26, 2023) ......................................................13

*Bowling v. Johnson & Johnson*,
   65 F. Supp. 3d 371 (S.D.N.Y. 2014)..............................................................11, 17

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001).............................................................................................25

*Carter v. Berger*,
   777 F.2d 1173 (7th Cir. 1985) .............................................................................22

*Carter v. Novartis Consumer Health, Inc.*,
   582 F. Supp. 2d 1271 (C.D. Cal. 2008) ....................................................10, 15, 21

*Colella v. Atkins Nutritionals, Inc.*,
   348 F. Supp. 3d 120 (E.D.N.Y. 2018) .................................................................16

*Critcher v. L'Oreal USA, Inc.*,
   959 F.3d 31 (2d Cir. 2020).......................................................10, 11, 12, 13, 14, 16

*Frei v. Taro Pharms. U.S.A., Inc*,
   443 F. Supp. 3d 456 (S.D.N.Y. 2020)..................................................................19

iii

**NPSA-120**

*Geier v. Am. Honda Motor Co., Inc.*,
  529 U.S. 861 (2000)........................................................................................17

*Goldstein v. Walmart, Inc.*,
  637 F. Supp. 3d 95 (S.D.N.Y. 2022).................................................10, 11, 16, 20

*Gomez v. St. Jude Med. Daig Div. Inc.*,
  442 F.3d 919 (5th Cir. 2006) ........................................................................21

*Gutterman v. Herzog*,
  2020 WL 6728787 (E.D.N.Y. Nov. 16, 2020)..............................................21

*Holmes v. Sec. Inv. Prot. Corp.*,
  503 U.S. 258 (1992)........................................................................................22

*Humana, Inc. v. Biogen, Inc.*,
  666 F. Supp. 3d 135 (D. Mass. 2023) ...........................................................22

*IBP, Inc. v. Alvarez*,
  546 U.S. 21 (2005)..........................................................................................11

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977)........................................................................................22

*In re Insulin Pricing Litig.*,
  2019 WL 643709 (D.N.J. Feb. 15, 2019) ....................................................23

*Jarman v. United Indus. Corp.*,
  98 F. Supp. 2d 757 (S.D. Miss. 2000)..........................................................25

*Jovel v. i-Health, Inc.*,
  2013 WL 5437065 (E.D.N.Y. Sept. 27, 2013) ..............................................11

*Lester v. CVS Pharmacy, Inc.*,
  2024 WL 1312935 (S.D.N.Y. Mar. 27, 2024) ...............................................14

*Marentette v. Abbott Labs., Inc.*,
  886 F.3d 112 (2d Cir. 2018)........................................................................9, 17

*McCarthy v. Recordex Serv., Inc.*,
  80 F.3d 842 (3d Cir. 1996)...........................................................................22

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996)........................................................................................17

*Mills v. Warner-Lambert Co.*,
  581 F. Supp. 2d 772 (E.D. Tex. 2008) ..........................................................15

iv

**NPSA-121**

*Murphy v. Nat. Collegiate Athletic Ass'n,*
   584 U.S. 453 (2018)....................................................................................................9

*Mutual Pharm. Co., Inc. v. Bartlett,*
   570 U.S. 472 (2013)...................................................................................17, 18, 19

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.,*
   710 F.3d 71 (2d Cir. 2013)...........................................................................................3

*Norman v. Niagara Mohawk Power Corp.,*
   873 F.2d 634 (2d Cir. 1989)......................................................................................23

*O'Connor v. Henkel Corp.,*
   2015 WL 5922183 (E.D.N.Y. Sept. 22, 2015) ........................................................11

*Palmer v. Trump Model Mgmt., LLC,*
   175 F. Supp. 3d 103 (S.D.N.Y. 2016)......................................................................23

*Patora v. Vi-Jon, LLC,*
   2023 WL 5610300 (S.D.N.Y. Aug. 30, 2023) .........................................................13

*PLIVA, Inc. v. Mensing,*
   564 U.S. 604 (2011).......................................................................................9, 18, 19

*POM Wonderful v. Coca-Cola Co.,*
   573 U.S. 102 (2014)...................................................................................23, 24, 25

*Poretsky v. Hirise Eng'g, P.C.,*
   2016 WL 5678880 (E.D.N.Y. Sept. 30, 2016) ........................................................24

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
   579 U.S. 115 (2016)....................................................................................................9

*S & R Dev. Ests., LLC v. Town of Greenburgh, New York,*
   336 F. Supp. 3d 300 (S.D.N.Y. 2018)........................................................................9

*Sapienza v. Albertson's Companies, Inc.,*
   2022 WL 17404919 (D. Mass. Dec. 2, 2022) ....................................................12, 13

*Se. Laborers Health & Welfare Fund v. Bayer Corp.,*
   444 F. App'x 401 (11th Cir. 2011) ...........................................................................25

*Seale v. GSK Consumer Health, Inc.,*
   2024 WL 1040854 (C.D. Cal. Feb. 27, 2024)................................................12, 15, 16

*Shepard v. Applebees's Int'l, Inc.,*
   2010 WL 1418588 (D. Kan. Apr. 7, 2010) ..............................................................24

**NPSA-122**

*Singo v. Ricola USA, Inc.*,
   2024 WL 196709 (S.D.N.Y. Jan. 18, 2024) ...................................................13, 21

*Solak v. Target Corp.*,
   2023 WL 5806326 (N.D.N.Y. Sept. 7, 2023) .................................................13, 15

*Sperber v. Boesky*,
   849 F.2d 60 (2d Cir. 1988).........................................................................................22

*Town of Islip v. Datre*,
   245 F. Supp. 3d 397 (E.D.N.Y. 2017) .......................................................................21

*Trisvan v. Heyman*,
   305 F. Supp. 3d 381 (E.D.N.Y. 2018) .......................................................................19

*Trollinger v. Tyson Foods, Inc.*,
   370 F.3d 602 (6th Cir. 2004) .....................................................................................22

*Utts v. Bristol-Myers Squibb Co.*,
   226 F. Supp. 3d 166 (S.D.N.Y. 2016).......................................................................19

*Warren Gen. Hosp. v. Amgen Inc.*,
   643 F.3d 77 (3d Cir. 2011).........................................................................................23

*Wegoland Ltd. v. NYNEX Corp.*,
   27 F.3d 17 (2d Cir. 1994)...........................................................................................25

*Wyeth v. Levine*,
   555 U.S. 555 (2009)....................................................................................................18

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
   512 F. Supp. 3d 1278 (S.D. Fla. 2021) ......................................................................12

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
   546 F. Supp. 3d 1216 (S.D. Fla. 2021) ...........................................................21, 22, 23

*Zogenix, Inc. v. Patrick*,
   2014 WL 1454696 (D. Mass. Apr. 15, 2014) ...........................................................20

**Statutes**

21 U.S.C. § 331...................................................................................................................3

21 U.S.C. § 333(a) ............................................................................................................18

21 U.S.C. § 352(a)(1).....................................................................................................1, 16

21 U.S.C. § 355h.........................................................................................................3, 7, 20

21 U.S.C. § 379r ..........................................................................................1, 4, 10, 12

The Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136,
    134 Stat. 281 (2020)..........................................................................................3

The Food and Drug Administration Modernization Act, Pub. L. No. 105-115,
    111 Stat. 2296 (1997).........................................................................................4

**Regulations**

21 C.F.R. § 201.66(c).......................................................................................18

21 C.F.R. § 330.1 ...................................................................................3, 16, 18

21 C.F.R. § 330.10(a).....................................................................................3, 4

21 C.F.R. § 341.80...............................................................1, 5, 8, 14, 17, 18

21 C.F.R. § 341.85..............................................................................................5

**Other Legislative Materials**

S. Rep. 105-43, 1997 WL 394244 (1997)................................................12, 20

**Other Administrative Materials**

Establishment of a Monograph for OTC Cold, Cough, Allergy, Bronchodilator
    and Antiasthmatic Products, 41 Fed. Reg. 38,312 (Sept. 9, 1976) ...............4, 5

Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for
    Over-the-Counter Human Use; Tentative Final Monograph for Over-the-
    Counter Nasal Decongestant Drug Products, 50 Fed. Reg. 2,220
    (Jan. 15, 1985)....................................................................................................5

Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for
    Over-the-Counter Human Use; Final Monograph for OTC Nasal Decongestant
    Drug Products, 59 Fed. Reg. 43,386 (Aug. 23, 1994) ......................................5, 18

U.S. Food & Drug Admin., *FDA clarifies results of recent advisory committee meeting
    on oral phenylephrine* (Sept. 14, 2023), *available at*: http://tinyurl.com/2tbhkvyf .............6, 7

U.S. Food & Drug Admin., *NDAC Briefing Document: Oral Phenylephrine in the
    CCBA Monograph*, *available at*: https://tinyurl.com/2dk7248p.................................6

U.S. Food & Drug Admin., *Nonprescription Drugs Advisory Committee* (Feb. 16,
    2023), *available at*: https://tinyurl.com/2s439zwk .......................................6

U.S. Food & Drug Admin., *The Current Status of Oral Phenylephrine as a Nasal
    Decongestant* (March 19, 2024), *available at*: https://tinyurl.com/2jwfsh8m.........................7

**NPSA-124**

## INTRODUCTION

These cases seek to override decades-old federal regulations approving phenylephrine—an over-the-counter medicine used to treat nasal congestion—as safe and effective and regulating how this medicine is sold, labeled, and marketed.  The FDA has for decades authorized the sale of phenylephrine and required Defendants to sell phenylephrine with statements that Plaintiffs now claim are false.  Plaintiffs do not allege that phenylephrine is dangerous, has hurt consumers, or presents any safety risk.  Instead, Plaintiffs accuse Defendants of engaging in false or misleading conduct by selling phenylephrine and marketing that medicine as a treatment for nasal congestion, as the FDA has authorized them to do.

Congress, however, has delegated to the FDA the authority to regulate the national drug marketplace.  The FDA determined phenylephrine effectively treats nasal congestion following a years-long process involving an expert advisory panel that included physicians and pharmacologists and multiple rounds of notice-and-comment rulemaking.  When it did so, the FDA required manufacturers and retailers selling medicine containing phenylephrine to "identif[y] the product as a 'nasal decongestant'" and state on the medicine's packaging that it, for example, "[t]emporarily relieves nasal congestion."  21 C.F.R. § 341.80(a), (b)(1).  Companies violate federal law if they do not comply with these requirements.  *See* 21 U.S.C. § 352(a)(1).

This Court should therefore dismiss all of Plaintiffs' state-law claims because federal law preempts Plaintiffs' attempt to use state law to attack efficacy claims that the FDA has required to be included on the products at issue.  To ensure national uniformity in over-the-counter drug labeling, Congress enacted an express preemption provision that bars plaintiffs from using state law to impose any requirement "that is different from or in addition to, or that is otherwise not identical with" federal law.  21 U.S.C. § 379r(a)(2).  That is exactly what Plaintiffs are seeking to

1

do here: use state law to hold Defendants liable for selling FDA-approved medicine, for an FDA-approved purpose, with FDA-regulated labeling.  Section 379r prohibits such a result.  Plaintiffs' claims also are barred by conflict preemption principles: federal law requires Defendants to state on their medicines' packaging that phenylephrine is a nasal decongestant, yet Plaintiffs claim state law prohibits Defendants from doing so.

Plaintiffs appear to acknowledge their claims are preempted.  Trying to avoid preemption, the Initial Streamlined Complaint accuses some Defendants of violating RICO, even though none of the 99 complaints consolidated into this MDL includes a RICO claim.  This last-ditch gambit does not keep Plaintiffs' claims alive for at least two reasons.  *First*, none of the RICO Defendants sells their products directly to consumers, and so Plaintiffs lack statutory standing to sue them under RICO.  *Second*, even if Plaintiffs were direct purchasers (they are not), their RICO claim is precluded by the Federal Food, Drug, and Cosmetic Act ("FDCA"), because Plaintiffs cannot use RICO to collaterally attack the FDA's determination that Defendants may lawfully market products that contain phenylephrine with the statements Plaintiffs claim are fraudulent here.

Allowing Plaintiffs' claims to proceed would have serious and substantial ramifications.  It would clear the way for the judgment of lay juries to override the FDA's expert determinations about when medicine is safe and effective.  It would also throw the door open for each of the 50 states to adopt 50 different approaches about when medicine is safe and effective and what information must be shared with consumers.  In short, the uniform federal regulatory regime governing over-the-counter drugs created by Congress would be thrown into disarray.  This Court should bring this litigation to an end.

## BACKGROUND

### A.    The Extensive Federal Regulatory Scheme for Over-The-Counter Drugs.

For decades, Congress has delegated regulatory authority for over-the-counter drugs to the

2

FDA, which devotes significant resources and brings substantial subject-matter expertise to regulating the market. Under the FDCA, "a new drug may not enter interstate commerce unless FDA determines that it is generally recognized as safe and effective . . . for the particular use described in its product labeling." *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 75 (2d Cir. 2013).

Beginning in 1972, the FDA "established FDA's 'monograph' system for regulating over-the-counter drugs."[1] *Id.* A monograph is a "detailed regulation . . . for each therapeutic class of OTC drug products." *Id.* The final monograph specifies the conditions under which a medicine may be sold, including setting acceptable doses, formulations, and labeling for covered medications. *See* 21 C.F.R. § 330.10(a)(9); *Nat. Res. Def. Council*, 710 F.3d at 75.

Congress granted the FDA nearly exclusive authority to enforce the FDCA's provisions and its implementing regulations. *See* 21 U.S.C. §§ 331-337a. An over-the-counter drug is "generally recognized as safe and effective and is not misbranded" if it complies with the "applicable monograph" and certain other federal regulations. 21 C.F.R. § 330.1. The converse is also true: a drug that fails to comply with the monograph is "liable to regulatory action" and violates federal law. *Id.* Congress further confirmed its approval of the FDA's historical use of the monograph process when it passed the CARES Act in 2020, at which point Congress "deemed to be generally recognized as safe and effective" drug products marketed in compliance with the final monograph. 21 U.S.C. § 355h(a)(1)(A)(i).

---

[1] The CARES Act overhauled the way the FDA administers the OTC monograph process by converting existing monograph regulations to administrative orders and replacing notice-and-comment rulemaking with an administrative order process. *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 3851, 134 Stat. 281, 435 (2020). The previous process is summarized in this motion because the FDA published the final monograph for nasal decongestant products in 1994. *See infra* at 5.

NPSA-127

Congress intended the FDA's judgment in matters relating to over-the-counter drugs to reign supreme.  In 1997, Congress responded to the lack of uniformity resulting from 50 different state standards for over-the-counter drug labels by enacting the Food and Drug Administration Modernization Act, which contained an express preemption provision.  *See* Pub. L. No. 105-115, § 412, 111 Stat. 2296, 2376 (1997).  That provision declares that "no State or political subdivision of a State may establish or continue in effect any requirement" that relates to an over-the-counter drug that is "different from or in addition to, or that is otherwise not identical with" federal law. 21 U.S.C. § 379r(a)(2).

**B.    After a Years-Long Monograph Process, the FDA Authorizes Phenylephrine as a Safe and Effective Nasal Decongestant.**

The FDA's monograph process is rigorous.  A monograph is developed only after the FDA has appointed an advisory panel of independent experts, which "review[s] the data" and reports its "conclusions and recommendations" to the FDA "with respect to the safety and effectiveness of the drugs."  21 C.F.R. § 330.10(a)(3).

The FDA began the monograph process for over-the-counter cold and cough medications in the 1970s.  *See* 41 Fed. Reg. 38,312 (Sept. 9, 1976).  The agency appointed an advisory panel of experts to evaluate the safety and efficacy of active ingredients used in cold and cough medications, including phenylephrine.  *Id.*  The panel, which included physicians and pharmacologists, thoroughly reviewed literature and data concerning the safety and efficacy of various ingredients.  *Id.* at 38,319-418.  The panel held more than 20 multi-day working meetings and considered presentations from more than 40 witnesses.  *Id.* at 38,314.

After this rigorous review, the panel "conclude[d] that phenylephrine hydrochloride is safe and effective as an oral and as a topical nasal decongestant for OTC use."  *Id.* at 38,399.  In support, it cited "[c]linical studies [that] have documented the effectiveness of phenylephrine as an oral

4

**NPSA-128**

nasal decongestant." *Id.* The FDA published the panel's findings in a notice of proposed rulemaking and solicited public comment. *See generally id.* at 38,312.

In 1985, the FDA published the tentative final monograph for OTC nasal decongestants. 50 Fed. Reg. 2,220 (Jan. 15, 1985). One public comment had "questioned the studies used by the Panel to substantiate the effectiveness of phenylephrine hydrochloride as an oral nasal decongestant" and "recommended that phenylephrine hydrochloride not be used as an oral nasal decongestant." *Id.* at 2,226. But the FDA did "not accept[]" the comment, finding instead "there is sufficient basis to determine [that] phenylephrine hydrochloride is generally recognized as effective for OTC use as an oral nasal decongestant." *Id.*

In 1994, the FDA published the final monograph for nasal decongestants, which continued to recognize phenylephrine as generally safe and effective. 59 Fed. Reg. 43,386, 43,408 (Aug. 23, 1994). The final monograph promulgated specific dosage, warning, and labeling regulations for medicine containing phenylephrine. *See id.* at 43,409-12 (codified at 21 C.F.R. § 341.80); *see also* 21 C.F.R. § 341.85 (labeling regulations for combination products, including those containing phenylephrine). Among other things, the label of a medicine with phenylephrine *must* (i) contain "the established name of the drug, if any"; (ii) "identif[y] the product as a 'nasal decongestant'"; and (iii) state, "For the temporary relief of nasal congestion" or "Temporarily relieves nasal congestion." 21 C.F.R. § 341.80(b)(1). The label "may" contain additional statements about the drug's efficacy, such as "For the temporary relief of [a] stuffy nose," "Decongests nasal passages," and "Temporarily restores freer breathing through the nose." *Id.* § 341.80(b)(2). These requirements apply both to medicine that contains only phenylephrine as well as combination cough-and-cold medicine that includes phenylephrine as one of several ingredients. *See* 21 C.F.R. § 341.85 (labeling regulations for combinations of active ingredients).

C.      **The FDA Continues to Recognize Phenylephrine as Safe and Effective.**

In 2007, a group of pharmacists submitted a citizen petition to the FDA regarding phenylephrine.  *See* U.S. Food & Drug Admin., *NDAC Briefing Document: Oral Phenylephrine in the CCBA Monograph*, at 23, *available at*: https://tinyurl.com/2dk7248p.  That petition sought to increase the maximum dosage for patients over 12 years old and withdraw approval for patients younger than 12.  *Id.*  The FDA held an advisory committee meeting on the petition in late 2007, after which 11 of the 12 committee members voted to confirm that phenylephrine was effective at the monograph's dosing levels.  *Id.* at 23-30.  No changes were made to the final monograph.

In 2015, two of the petitioners from the unsuccessful 2007 citizen petition submitted another petition.  *Id.* at 8 & n.4.  This petition requested that the FDA reclassify oral phenylephrine as not generally recognized as safe and effective and remove it from the monograph.  *Id.* at 8.  In September 2023, the FDA's Non-prescription Drugs Advisory Committee—which is independent of the FDA and provides non-binding advice to the agency[2]—met to discuss the effectiveness of oral phenylephrine.  The advisory committee voted that oral phenylephrine is ineffective as a decongestant, but it did not raise any concerns about the medicine's safety.  *See generally id.*

Two days after the meeting, the FDA issued a press release to "clarif[y] results of [the] recent advisory committee meeting on oral phenylephrine."  U.S. Food & Drug Admin., *FDA clarifies results of recent advisory committee meeting on oral phenylephrine* (Sept. 14, 2023), *available at*: http://tinyurl.com/2tbhkvyf.  The FDA confirmed that "[a]dvisory committees provide independent advice and recommendations to FDA, but the agency makes the final

---

[2] *See* U.S. Food & Drug Admin., *Nonprescription Drugs Advisory Committee* (Feb. 16, 2023), *available at*: https://tinyurl.com/2s439zwk.

decision.  FDA will consider the input of this advisory committee, and the evidence, before taking any action on the status of oral phenylephrine."  *Id.*

No changes have been made or proposed to the final monograph for nasal decongestants. As an FDA official recently reaffirmed, to date "the status of oral phenylephrine products remains the same – they are considered generally recognized as safe and effective as OTC nasal decongestants."  U.S. Food & Drug Admin., *The Current Status of Oral Phenylephrine as a Nasal Decongestant*, at 07:22 (March 19, 2024), *available at*: https://tinyurl.com/2jwfsh8m [hereinafter *Current Status of Phenylephrine*].  To make any changes, the FDA must follow an administrative order process.  *See* 21 U.S.C. § 355h(b)(2)(B)(ii).  "Only after FDA issues a final order" removing phenylephrine from the monograph "would manufacturers be required to reformulate or remove OTC monograph products containing oral phenylephrine."  *Current Status of Phenylephrine*, at 09:16.

### D.    Plaintiffs' Lawsuits.

Even though the FDA has recognized phenylephrine as a safe and effective treatment for nasal congestion for more than 50 years and has repeatedly and recently reaffirmed that conclusion, the advisory committee's vote triggered a slew of false advertising lawsuits against companies that manufacture and sell oral phenylephrine.  To date, 99 putative class actions have been filed and centralized in this MDL.  Plaintiffs have now filed an Initial Streamlined Complaint (ECF No. 200) that they acknowledge contains "sufficient representative examples of the conduct and claims that they allege to be wrongful."  ECF No. 204 at 3.

The Complaint does not claim that any Plaintiff in these cases suffered bodily harm or personal injury.  And no Plaintiff disputes that the medicines comply with the monograph.

Instead, the Complaint seeks to proceed on deception-based theories under state law, *see* Compl. ¶¶ 383-462, even though the monograph mandates or authorizes virtually all of the

7

**NPSA-131**

statements that Plaintiffs challenge as false or misleading. The gravamen of the Complaint is that it is deceptive for Defendants to "continue[] to market and sell PE Products as 'decongestants,'" *id.* ¶ 69, even though federal law *requires* PE products to be marketed as "nasal decongestant[s]," 21 C.F.R. § 341.80(a). The Complaint further alleges that Defendants failed to "disclose to consumers that PE Products do not decongest," Compl. ¶ 73, even though federal law contains no such requirement and in fact requires companies to state the opposite—for example, that phenylephrine provides "temporary relief of nasal congestion," *see* 21 C.F.R. § 341.80(b)(1). The Complaint also briefly takes issue with some marketing statements referencing the "maximum strength" of certain products, which the Complaint alleges is false because phenylephrine is ineffective. *E.g.*, Compl. ¶ 68.

The purpose of the Initial Streamlined Complaint was to allow Defendants to raise a threshold federal preemption defense that "will, if such arguments prevail, resolve this litigation in its entirety." ECF No. 197 at 2; *accord* ECF No. 204 at 3. Perhaps recognizing that their claims face fatal preemption defenses, Plaintiffs added a federal RICO claim to that Complaint, *see* Compl. ¶¶ 463-521, even though none of the underlying complaints in the MDL asserted such a claim. The RICO claim rests on the premise that some (but not all) Defendants formed a RICO enterprise with an industry trade association to allegedly defraud the FDA and the public about the effectiveness of phenylephrine. *See id.* ¶¶ 85-130. The crux of the purported fraud is that Defendants "assert in the press and to regulators that PE Products are effective," *id.* ¶ 88, even though an FDA official confirmed as recently as *March 2024* that PE products are "generally recognized as safe and effective as OTC nasal decongestants" and may be lawfully sold, *Current Status of Phenylephrine*, at 07:22.

## ARGUMENT

**I.    Federal Law Preempts Plaintiffs' State-Law Claims.**

The Supremacy Clause "establishes that federal law 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of Any State to the Contrary notwithstanding.'" *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (quoting U.S. Const., Art. VI, cl. 2).  Where "state and federal law directly conflict, state law must give way" as preempted.  *Id.* (cleaned up). "A defense of preemption is properly considered on a motion to dismiss."  *S & R Dev. Ests., LLC v. Town of Greenburgh, New York,* 336 F. Supp. 3d 300, 308 (S.D.N.Y. 2018).

The Supreme Court has identified several different types of preemption, two of which— "express" and "conflict" preemption—are relevant here.  *Murphy v. Nat. Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018).  "Express" preemption focuses on statutory provisions enacted by Congress stating that certain state laws are preempted, and courts applying this type of preemption "do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."  *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (cleaned up).  "Conflict" preemption addresses "situations where compliance with both state and federal law is a physical impossibility, or . . . where the state law at issue stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Marentette v. Abbott Labs., Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (Cogan, J., sitting by designation) (cleaned up).  Both forms of preemption "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted."  *Murphy*, 584 U.S. at 477.

All of Plaintiffs' state-law claims are preempted under both of these preemption principles. For nearly 30 years, the FDA's final monograph has recognized phenylephrine as an effective oral

NPSA-133

treatment for nasal congestion and required that any medicine containing phenylephrine be labeled as a "nasal decongestant." This Court should therefore dismiss Plaintiffs' state-law claims, which attempt to use state law to override federal law expressly permitting Defendants to sell phenylephrine and regulating how the challenged products may be marketed.

### A.    Plaintiffs' State-Law Claims Are Expressly Preempted.

#### 1.    The FDCA preempts state-law claims that seek to impose requirements "different from or in addition to, or that [are] otherwise not identical with" federal law.

The FDCA contains an express preemption provision declaring that "no State or political subdivision of a State may establish or continue in effect any requirement" that relates to an over-the-counter drug "that is different from or in addition to, or that is otherwise not identical with" federal law. 21 U.S.C. § 379r(a). As its title indicates, this preemption provision was intended to create "National Uniformity for Nonprescription Drugs." *Id*. State-imposed requirements that are subject to express preemption under Section 379r include attempts to challenge the labeling and marketing of over-the-counter drugs under consumer protection statutes and through other common-law claims like those asserted in the Complaint. *See Goldstein v. Walmart, Inc.*, 637 F. Supp. 3d 95, 113 & n.7 (S.D.N.Y. 2022) (dismissing GBL and warranty claims); *see also Carter v. Novartis Consumer Health, Inc.*, 582 F. Supp. 2d 1271, 1283 (C.D. Cal. 2008) ("The touchstone of preemption under § 379r is the *effect* that a finding of liability on a particular claim would have on the Defendants, and not the particular common law or state law theory upon which that claim was brought.").

The Second Circuit has given this preemption language broad effect. In *Critcher v. L'Oreal USA, Inc.*, the Second Circuit considered whether the FDCA expressly preempted state-law claims that cosmetic labels deceptively misrepresented the amount of cream that consumers could extract from the products' containers. 959 F.3d 31, 33 (2d Cir. 2020). The Court explained

that Section 379s(a), a provision for cosmetics worded identically to Section 379r, "preempts not only those state laws that are in conflict with it (*i.e.*, any law that is 'different from' the FDCA), but also *any* state law that provides for labeling requirements that are not *exactly the same* as those set forth in the FDCA and its regulations." *Critcher*, 959 F.3d at 35-36.  Those plaintiffs' state-law claims did not survive preemption because such claims would "impose labeling requirements on top of those already mandated in the FDCA and the regulations promulgated thereunder," which "is exactly what the FDCA does not permit." *Id.* at 36.

While the Second Circuit has not yet had the opportunity to apply *Critcher* to the FDCA's identically worded preemption provision for over-the-counter drugs, Section 379r has a similarly broad preemptive effect because "the normal rule of statutory interpretation [is] that identical words used in different parts of the same statute are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005).  Courts have thus correctly recognized that under Section 379r, "preemption is certainly appropriate when a state law prohibits labeling that is permitted under federal law.  But it is *also* appropriate when a state law prohibits labeling that is *not prohibited* under federal law." *Bowling v. Johnson & Johnson*, 65 F. Supp. 3d 371, 375 (S.D.N.Y. 2014).  "The standard, in other words, is not whether a state law actively undermines federal law.  It is whether state law diverges from federal law *at all*." *Id.*; *see also Goldstein*, 637 F. Supp. 3d at 110 (plaintiffs' claims preempted when FDA had promulgated a "monograph [that] deals squarely with the issue"); *O'Connor v. Henkel Corp.*, 2015 WL 5922183, at *5 (E.D.N.Y. Sept. 22, 2015) ("[P]laintiffs can escape the preemptive force of the FDCA only if their claims seek to impose requirements that (1) are identical to those imposed by the FDCA, or (2) are outside the scope of the relevant federal requirements.").[3]  Courts elsewhere have likewise confirmed that

---

[3] Prior to *Critcher*, some decisions suggested that the FDCA only sets a "floor upon which states can build additional protections." *Jovel v. i-Health, Inc.*, 2013 WL 5437065, at *6 (E.D.N.Y. Sept.

11

Section 379r broadly preempts "state-law advertising claims, provided the advertisements are based upon content approved by the FDA for a drug's labeling." *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 512 F. Supp. 3d 1278, 1296 (S.D. Fla. 2021); *see also Seale v. GSK Consumer Health, Inc.*, 2024 WL 1040854, at *6 n.5 (C.D. Cal. Feb. 27, 2024) ("[W]here Plaintiff's claims seek to alter or control Defendant's labeling of . . . products in ways not identical to the [monograph], the preemption provision in 21 U.S.C. § 379r(a) applies.").

Congress's decision to exempt certain state laws from Section 379r's requirements underscores the otherwise broad reach of this provision. *See* 21 U.S.C. § 379r(b)(1)(A) (permitting states to apply to the FDA for exemptions from preemption where a state law "protects an important public interest that would otherwise be unprotected"); *id.* § 379r(e) (exempting product liability actions). The availability of these exemptions underscores that Congress was aware that Section 379r generally would have broad preemptive effect and knew how to carve out exemptions when it wanted them.

The legislative history provides "[f]urther support for" a broad reading of Section 379r. *Sapienza v. Albertson's Companies, Inc.*, 2022 WL 17404919, at *3 (D. Mass. Dec. 2, 2022). The Senate Report accompanying the preemption provision observed that "[n]onprescription drugs are subject to careful and comprehensive regulation by the FDA," "[t]he conditions under which nonprescription drugs are considered safe and effective, for use by the lay consumer, are specified by FDA in nonprescription drug monographs," and "[t]he FDA authority in this area extends from manufacture through retail sale of these products." S. Rep. 105-43, 1997 WL 394244, at *64

---

27, 2013). This approach "cannot be right" in the wake of *Critcher*, which rejected such a narrow view of FDCA preemption. *Bimont v. Unilever U.S., Inc.*, 2015 WL 5256988, at *4 (S.D.N.Y. Sept. 9, 2015); *see also Critcher*, 959 F.3d at 37 (embracing broad reading of the FDCA by "draw[ing] on similar conclusions already reached by [] courts in this Circuit," including *Bimont*).

(1997). Congress therefore enacted Section 379r to create "one consistent national regulatory system." *Id.* at *65. Congress's intent was to ensure that "[n]o State or local government is permitted to impose different or additional requirements that relate to the subject matter covered by the three Federal laws as they apply to nonprescription drugs," including "requirements imposed on product manufacture or composition, labeling, advertising, or any other form of public notification or communication." *Id.* at *64.

### 2. Section 379r bars Plaintiffs' claims because they are inconsistent with the monograph.

Through the monograph process, the FDA has "promulgated rules regulating what must be included on labels" for over-the-counter medications "to avoid misleading consumers." *Critcher*, 959 F.3d at 38. "[T]he technical nature of such requirements—combined with Congress's broad, categorical statement of preemption in the FDCA," confirm that Plaintiffs' claims are preempted. *Id.*; *see also Solak v. Target Corp.*, 2023 WL 5806326, at *5 (N.D.N.Y. Sept. 7, 2023) ("monograph conditions are 'requirements' that have preemptive effect"). Thus, courts routinely dismiss claims as preempted under Section 379r when they challenge the substance of FDA-approved monograph representations. *See, e.g.*, *Singo v. Ricola USA, Inc.*, 2024 WL 196709, at *6 (S.D.N.Y. Jan. 18, 2024) (preempting claims seeking to impose state-law requirement different from monograph); *Bischoff v. Albertsons Cos., Inc.*, 2023 WL 4187494, at *6 (S.D.N.Y. June 26, 2023) (same); *Patora v. Vi-Jon, LLC*, 2023 WL 5610300, at *5 (S.D.N.Y. Aug. 30, 2023) (same).

The same result is compelled here. The FDA has declared phenylephrine an effective treatment for nasal congestion when taken orally at dosages prescribed by the monograph. *See supra* at 4-5. The Complaint nevertheless seeks to hold Defendants liable for representing that the products are "effective decongestants," *e.g.*, Compl. ¶ 2, even though the FDA *requires* products with phenylephrine to be marketed as "nasal decongestant[s]" and to state that they are indicated

13

"[f]or the temporary relief of nasal congestion" or "[t]emporarily relieves nasal congestion," 21 C.F.R. § 341.80(a), (b)(1). The Complaint also challenges other statements Defendants have made relating to phenylephrine's efficacy. *See, e.g.*, Compl. ¶ 68 (challenging statement that medicine "relieves 'sinus pressure' and 'sinus congestion'"), ¶ 73 (alleging Defendants "continued to make false representations to consumers that phenylephrine could be used to relieve nasal and sinus congestion"), ¶ 83 (challenging statement that medicine provides "effective . . . symptom relief"). But the FDA does not prohibit Defendants from making these statements, and it specifically authorizes Defendants to state, for example, "for the temporary relief of [a] stuffy nose," "[d]econgests nasal passages," "[t]emporarily restores freer breathing through the nose," and "temporarily relieves sinus congestion and pressure." *Id.* § 341.80(b)(2). The Complaint further seeks to force Defendants to "disclos[e] . . . that their PE Products do not decongest," Compl. ¶ 2, even though the monograph requires Defendants to state the opposite, *see* 21 C.F.R. § 341.80(a).

In short, all of Plaintiffs' claims are preempted because they seek to force Defendants either to delete FDA-authorized or FDA-required statements or to add language flatly inconsistent with the monograph. Such claims plainly seek to impose state-law requirements "different from or in addition to, or that [are] otherwise not identical with" federal law, and they suffer from the same defects that led other courts to dismiss other similar lawsuits on preemption grounds. For example, in *Lester v. CVS Pharmacy, Inc.*, 2024 WL 1312935 (S.D.N.Y. Mar. 27, 2024), the court held that Section 379r preempted claims seeking "to challenge the FDA's findings on the medical effectiveness of hydrogen peroxide," because "[l]itigating the scientific properties of hydrogen peroxide in an area where the FDA has already considered the evidence and authorized language is exactly the type of claim that is preempted by the FDCA." *Id.* at *5-6 (citing *Critcher*, 959 F.3d at 38). Similarly, in *Carter*, an FDA advisory panel concluded that cold and cough products were

14

unsafe and ineffective for children under six and recommended that the FDA prohibit their sale to

that group.  582 F. Supp. 2d at 1284.  As here, the panel's conclusion triggered litigation, but the

case was dismissed as preempted because, also as here, it was "based entirely upon FDA-approved

labeling and advertising," which "explain[ed] the conditions under which the FDA has determined

that OTC cough and cold medicine will be safe and effective."  *Id.*  Any effort to impose liability

on defendants "for complying with FDA regulations . . . constitute[s] perhaps the clearest example

of state law requirements that differ from federal requirements."  *Id.* at 1285.

Other courts have reached similar results when confronted with similar claims based on

challenges to the FDA's efficacy determinations.  *See  Solak*, 2023 WL 5806326, at *5 (dismissing

claims challenging hydrogen peroxide's efficacy in treating wounds because the FDA "ha[d]

approved" hydrogen peroxide through a monograph "and has the authority to regulate the package

labelling and marketing"); *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 784-85, 789 (E.D.

Tex. 2008) (rejecting challenge to the effectiveness of lice medication that the FDA had approved

in a monograph, when plaintiffs' claims were "based solely on the ideas that Defendants' drugs

are *not* effective for the treatment of lice, and that Defendants are liable for representing that they

*are* effective").  There is no reason to reach a different result here.

It is irrelevant whether the FDA specifically considered the exact language a manufacturer

or retailer might use to market phenylephrine as a nasal decongestant.  Claims seeking to dictate

labeling language different from the FDA-approved monograph are preempted when the FDA

addressed the general subject matter of a lawsuit, even though the agency did not expressly approve

of the exact representation.  *See, e.g.*, *Seale*, 2024 WL 1040854, at *6 (Section 379r preempted

claims challenging labeling of cough medication because "[t]he FDA's monograph for cough and

cold medications . . . already regulates the labeling of antitussive drug products . . . [and] does not

15

**NPSA-139**

impose any requirement or prohibition like those that Plaintiff seeks"); *Colella v. Atkins Nutritionals, Inc.*, 348 F. Supp. 3d 120, 137 (E.D.N.Y. 2018) (claims preempted because "while the FDA may not have considered the exact language addressed . . . it had clearly addressed the substance of the claims at issue") (cleaned up); *Goldstein*, 637 F. Supp. 3d at 111-12 (similar).

Nor does it make any difference that Plaintiffs accuse Defendants of violating the general FDCA prohibition codified at 21 U.S.C. § 352(a)(1) of selling "misbranded" drugs with "labeling [that] is false or misleading." *See* Compl. ¶¶ 364-66. The FDA has declared that a decongestant, including phenylephrine, "is generally recognized as safe and effective and is not misbranded if it meets . . . each of the conditions contained in any applicable monograph." 21 C.F.R. § 330.1; *see also id.* § 341.1 (medicine that complies with monograph, as all Defendants' medicine does, "is generally recognized as safe and effective and is not misbranded"). Plaintiffs do not—and cannot—allege that phenylephrine fails to comply with the applicable monograph.

The Second Circuit in *Critcher* likewise refused to allow plaintiffs to rely on the "general requirement" that labeling not be false or misleading as a vehicle to "impose the particular labeling additions" plaintiffs sought. 959 F.3d at 38. Because the FDA had promulgated regulations providing "what information is necessary to avoid misleading consumers," plaintiffs could not impose *other* labeling requirements that have not been imposed by Congress or the FDA." *Id.*; *see also Seale*, 2024 WL 1040854, at *7 (rejecting argument because "if Plaintiff were permitted to proceed on the theory that her claims are parallel to § 352(a)(1), any finding of liability in her favor would conflict with preexisting regulations deeming Defendant's Antitussive drugs 'not misbranded'"); *Goldstein*, 637 F. Supp. 3d at 112 n.6 (finding same argument "not persuasive" because "taken to its extreme but logical limit, Plaintiff's argument would permit a state to restrict a manufacturer from using any language the state deemed to be false or misleading"). "With

16

NPSA-140

respect to the labeling of OTC drugs, the whole point of section 379r is that it is not up to private litigants—or judges—to decide what is 'false or misleading.' It is up to the FDA." *Bowling*, 65 F. Supp. 3d at 377.

**B.      Plaintiffs' State-Law Claims Conflict with Federal Law and Are Preempted.**

Plaintiffs' claims should also be dismissed under conflict preemption principles.  The presence of an "express pre-emption provision" in Section 379r "does not bar the ordinary working of conflict pre-emption principles." *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 869 (2000); *see also Marentette*, 886 F.3d at 120 ("The express preemption provision does not weaken our conclusion that there is an implicit conflict . . . .").

State laws (including the common law) can conflict with federal law in at least one of two ways.  *Marentette*, 886 F.3d at 117.  *First*, state laws are preempted "where it is impossible for a private party to comply with both state and federal requirements."  *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 480 (2013) (cleaned up).  *Second*, state laws are preempted where the challenged law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Arizona v. United States*, 567 U.S. 387, 399 (2012) (cleaned up). Under both types of conflict preemption, congressional purpose and intent "is the ultimate touchstone."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  Both versions of conflict preemption apply here.

**1.      Defendants cannot comply with federal law and Plaintiffs' purported state-law obligations.**

It is impossible for Defendants to comply with their federal-law obligations in selling FDA-approved medicine containing phenylephrine and with the obligations Plaintiffs seek to impose through state law.  The FDA, through the monograph process, comprehensively regulates the labeling and sale of covered drugs, including phenylephrine.  *See* 21 C.F.R. § 341.80; *see also id.*

§ 201.66(c), (d) (general requirements for the format and content of all over-the-counter drug labeling).  The monograph also requires the medicine to state the "purpose" (including the "pharmacological category") and the "use" (including the "indication") of the drug—which in this case is treating nasal congestion.  21 C.F.R. § 201.66(c)(3)-(4); *see also id.* § 341.80(b)(1).

Plaintiffs, by contrast, seek to use state law to prohibit Defendants from marketing medicine containing phenylephrine as a treatment for nasal congestion.  But if Defendants sold phenylephrine products *without* identifying them as treating nasal congestion, then Defendants would violate federal law.  Selling products "not in conformance with the monograph" means the products are "misbranded" and subject to enforcement action.  59 Fed. Reg. 43,386, 43,408 (Aug. 23, 1994); *see also* 21 C.F.R. § 330.1 (over-the-counter drug that "fails to conform to each of the conditions . . . in an applicable monograph is liable to regulatory action").  Doing so also subjects companies to civil and criminal penalties, including the possibility of fines, imprisonment, or both. *See* 21 U.S.C. § 333(a).

Because Defendants cannot do what Plaintiffs demand without violating federal law, Plaintiffs' claims conflict with federal law and are preempted.[4]  *See, e.g., Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) ("[A] court may not hold a civil defendant liable under state law for conduct federal law requires."); *Bartlett*, 570 U.S. at 486 (plaintiffs' claims preempted where "federal law forbids an action that state law requires"); *Frei v. Taro Pharms. U.S.A., Inc*,

---

[4] The Supreme Court's decision in *Wyeth v. Levine*, 555 U.S. 555 (2009), is not otherwise.  There, the Supreme Court rejected an impossibility preemption argument because the defendant—via a "changes being effected" regulation that applies to prescription drugs but not over-the-counter drugs—could have "unilaterally" added the warning label that was purportedly required by state law without violating any of its federal obligations.  *See* 555 U.S. at 571-73.  Unlike the defendant in *Wyeth*, Defendants cannot "independently" alter disclosures required by the monograph without violating federal law.  *Mensing*, 564 U.S. at 618, 620 (distinguishing *Wyeth* on this basis).  *Wyeth* also noted that there is no express preemption provision governing prescription drugs, which is not the case here.  *See Wyeth*, 555 U.S. at 574 ("If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision . . . .").

18

NPSA-142

443 F. Supp. 3d 456, 465-67 (S.D.N.Y. 2020) (claims preempted where defendants could not comply with purported state law obligations "without violating federal law").

It is no answer to say that Defendants can voluntarily stop selling phenylephrine altogether. The Supreme Court has repeatedly rejected "stop-selling" arguments as "incompatible" with the Supreme Court's preemption jurisprudence, which presumes "that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability." *Bartlett*, 570 U.S. at 488 (preempting state-law design defect claims); *see also Mensing*, 564 U.S. at 618-26 (state-law disclosure claims preempted where it "was not lawful under federal law for the Manufacturers to do what state law required of them").  Following *Bartlett*, New York federal courts have consistently rejected "stop-selling" arguments.  *See, e.g.*, *Trisvan v. Heyman*, 305 F. Supp. 3d 381, 405 (E.D.N.Y. 2018) (rejecting argument that defendant could avoid impossibility with "outright ban" of sales of the product); *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 186 (S.D.N.Y. 2016) (dismissing on conflict preemption grounds claims challenging prescription medication).  This Court should as well.

### 2. Plaintiffs' state-law claims impose obstacles to Congress's purposes.

Plaintiffs' state-law claims also conflict with federal law because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Arizona*, 567 U.S. at 406 (state law preempted under obstacle preemption), which sought to establish a uniform federal regulatory regime for over-the-counter medication.

*First*, permitting private plaintiffs to use state law to challenge the FDA's efficacy determinations would "disrupt what Congress intended to be a uniform—and federally-led—regulatory scheme." *Crichter*, 959 F.3d at 38.  Congress demonstrated it approved of the FDA's efficacy determinations made during the monograph process when it enacted the CARES Act in 2020, which reaffirmed that "[a] drug is deemed to be generally recognized as safe *and effective*"

19

**NPSA-143**

if it complies with the applicable final monograph, as Defendants' phenylephrine-containing products do.  21 U.S.C. § 355h(a)(1)(A)(i) (emphasis added).  If Plaintiffs' claims are permitted to proceed, nothing would stop the 50 states from taking 50 different approaches to whether phenylephrine (or other ingredients in over-the-counter drugs) is effective and at what dosage levels, even though an expert federal agency, exercising congressionally-delegated authority, has answered that question in the monograph.  Not only would a state-by-state approach to efficacy determinations confuse consumers, but inefficiencies in creating different labels for different states could delay access to critical over-the-counter drugs and increase prices.  *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 452 (2005) ("50 different labeling regimes . . . would create significant inefficiencies for manufacturers"); *Zogenix, Inc. v. Patrick*, 2014 WL 1454696, at *2-3 (D. Mass. Apr. 15, 2014) (preempting state law banning sale of FDA-approved medication because if states "were able to countermand the FDA's determinations and substitute [their] own requirements, it would undermine the FDA's ability to make drugs available to promote and protect the public health").  As Congress has observed, "[d]ifferent or additional requirements [at] the State or local level can work against our national marketplace, confuse consumers, raise prices, undermine public confidence in our regulatory system and in products important to the public health, and result in divergent public health protection throughout the country."  S. Rep. 105-43 at *64.  Allowing such a situation would "lead precisely to the patchwork of inconsistent packaging regulations that Congress sought to prevent" in passing Section 379r.  *Goldstein*, 637 F. Supp. 3d at 113.

*Second*, allowing Plaintiffs' claims to proceed would clear the way for juries to second-guess the FDA's efficacy judgments, which "would undermine the regulations and monographs promulgated by the FDA."  *Singo*, 2024 WL 196709, at *6.  If Plaintiffs' claims proceeded to trial,

a jury would be asked to determine whether phenylephrine is an effective treatment for nasal congestion—even though the FDA has said for decades that it is. "Because the FDA alone can balance the potentially competing concerns of safety and effectiveness, common law and state law liability that is also premised on a product's safety and effectiveness can only upset that balance." *Carter*, 582 F. Supp. 2d at 1281. To "permit a jury to second-guess" FDA approval decisions and determine that those decisions "were inadequate under state law would displace the FDA's exclusive role and expertise." *Gomez v. St. Jude Med. Daig Div. Inc.*, 442 F.3d 919, 930-31 (5th Cir. 2006). As a result, manufacturers and consumers would be unable to rely on the FDA's regulatory decisions, and instead would receive conflicting efficacy information across different states. The FDCA was intended to avoid this result.

## II.     The RICO Claim Fails for at Least Two Independent Reasons.

"Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device." *Gutterman v. Herzog*, 2020 WL 6728787, at *3 (E.D.N.Y. Nov. 16, 2020). For that reason, "courts have expressed skepticism toward civil RICO claims" because "plaintiffs wielding RICO almost always miss the mark." *Town of Islip v. Datre*, 245 F. Supp. 3d 397, 408 (E.D.N.Y. 2017). Plaintiffs' RICO claim here misses the mark for at least two reasons: (1) Plaintiffs did not directly purchase their products from any RICO Defendant, meaning the indirect purchaser rule bars their RICO claim, and (2) the FDCA precludes using RICO to collaterally attack the FDA's efficacy determination.

### A.     Plaintiffs Lack Statutory Standing to Assert the RICO Claim.

The indirect purchaser rule "leaves no question" that a RICO claim about retail purchases of over-the-counter products cannot be pursued against the manufacturers of those products. *In re Zantac (Ranitidine) Prods. Liability Litig.*, 546 F. Supp. 3d 1216, 1225 (S.D. Fla. 2021) (dismissing similar RICO claim). The RICO claim is only asserted against manufacturers, *see*

21

**NPSA-145**

Compl. ¶ 86, and Plaintiffs do not—and cannot—allege that they bought their products from any of these Defendants.  Plaintiffs' RICO claim therefore is barred by the indirect purchaser rule.

The Supreme Court has held that "indirect purchasers who are two or more steps removed" from the defendant "in a distribution chain may not sue." *Apple Inc. v. Pepper*, 587 U.S. 273, 280 (2019) (emphasis omitted).  A downstream (or "indirect") purchaser lacks standing to bring antitrust claims against manufacturers from whom they did not directly purchase.  *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 726, 735-36 (1977).  In other words, "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A." *Apple*, 587 U.S. at 280.

Although it originated in the antitrust context, the indirect purchaser rule applies to civil RICO claims.  *See Sperber v. Boesky*, 849 F.2d 60, 64-65 (2d Cir. 1988) (observing that indirect consumer purchasers "probably cannot recover under RICO, just as they cannot recover under the anti-trust laws").  That is because "[e]xtending liability to everyone to whom an illegal price is passed would extend the chain of liability indefinitely." *Id.*  Since "Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws," *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992), the limitations the Supreme Court has enforced on standing to assert Sherman Act claims apply equally to RICO claims, *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004) ("[I]ndirect purchasers lack standing under RICO."); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) (applying "antitrust standing principles" to RICO); *Carter v. Berger*, 777 F.2d 1173, 1177 (7th Cir. 1985) ("*Illinois Brick* rule . . . applies to RICO, too."); *Humana, Inc. v. Biogen, Inc.*, 666 F. Supp. 3d 135, 141 (D. Mass. 2023) ("Every circuit to have considered the issue has held that the rule also applies to civil RICO actions."); *Zantac*, 546 F. Supp. 3d at 1221-24 (collecting cases).

Plaintiffs admit that they did not purchase the products from any RICO Defendant. Plaintiffs concede that "wholesalers and retailers [] purchased oral phenylephrine products" and that Plaintiffs "are the end purchasers."  Compl. ¶ 521; *see also id.* ¶¶ 133, 150, 165, 172, 178, 184, 192, 199, 206, 224, 269, 293, 300, 306, 313, 319, 327 (alleging purchases from various retailers, none of which are "RICO Defendants").  As in *Zantac*, because Plaintiffs "purchased OTC [products] from various retailers, not directly from Defendants," "[t]he bright-line indirect purchaser rule . . . is an unsurmountable hurdle for Plaintiffs."  546 F. Supp. 3d at 1226; *see also In re Insulin Pricing Litig.*, 2019 WL 643709, at *8-13 (D.N.J. Feb. 15, 2019) (consumers who purchased insulin products lacked standing to bring RICO claim against manufacturers).

It makes no difference that Plaintiffs allege that they "are the only harmed individuals or entities, and there are no other plaintiffs better suited or able to seek a remedy for the economic harms at issue here."  Compl. ¶ 521.  Courts do "not resolve what party was a direct purchaser by calculating exactly where the harm lay."  *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 92 (3d Cir. 2011); *see also Zantac*, 546 F. Supp. 3d at 1226.  Just as in *Zantac*, the RICO claim here should be dismissed with prejudice for lack of standing.  *Id.* at 1227.

## B.    The RICO Claim Is Precluded by the FDCA.

The doctrine of preclusion "concerns the alleged preclusion of a cause of action under one federal statute"—here, RICO—"by the provisions of another federal statute"—here, the FDCA. *POM Wonderful v. Coca-Cola Co.*, 573 U.S. 102, 111 (2014).  Applying this doctrine, "[c]ourts in this Circuit have routinely precluded RICO claims where the alleged conduct is already covered by a more detailed federal statute."  *Palmer v. Trump Model Mgmt., LLC*, 175 F. Supp. 3d 103, 109 & n.14 (S.D.N.Y. 2016) (collecting cases); *see also Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 636 (2d Cir. 1989) (plaintiff could not sue under "ubiquitous RICO" because claims were "specifically covered within the confines of" another federal statute); *Poretsky v. Hirise*

23

*Eng'g, P.C.*, 2016 WL 5678880, at *3 (E.D.N.Y. Sept. 30, 2016) (federal statute "should apply to the preclusion of RICO, given that [it] is the more precisely drawn and detailed statute" (cleaned up)).  Because the FDCA and the FDA's monographs specifically cover—and permit—the alleged conduct, *see supra* at 4-5, and because the FDCA is the detailed statutory scheme for regulation of over-the-counter medicine, whereas RICO is a general statute designed to deter organized crime, Plaintiffs' RICO claim is precluded.

Plaintiffs' RICO claim also falls squarely within the category of claims that the Supreme Court and the Second Circuit have said are precluded by the FDCA.  *POM Wonderful* instructs that the FDCA precludes a claim under other federal statutes when the FDA has "made a policy judgment that is inconsistent with" the factual premise underlying the federal claim.  573 U.S. at 120.  The Court distinguished that situation from the Lanham Act case before it, which—unlike here—was "not a case where a lawsuit is undermining an agency judgment."  *Id*.  The Supreme Court specifically cited "drug labels" as an example of an FDA policy judgment that could preclude claims under another federal statute.  *Id.* at 116.  The Second Circuit has since held that federal claims challenging "representations commensurate with information in an FDA label" were barred.  *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63-64 (2d Cir. 2016).  That "rule reflects proper 'deference to the expertise' of the FDA as the regulatory agency responsible for issuing the label by respecting the exhaustive process preceding the issuance of a label."  *Id.* at 64; *see also Shepard v. Applebees's Int'l, Inc.*, 2010 WL 1418588, at *2 (D. Kan. Apr. 7, 2010) ("Where federal law preempts state common law claims, RICO claims which rely on the preempted state fraud claims to define predicate acts are similarly 'preempted' for lack of a better word."); *Jarman v. United Indus. Corp.*, 98 F. Supp. 2d 757, 766 (S.D. Miss. 2000) (dismissing RICO claim because "responsibility for regulating allowable representations by pesticide

24

**NPSA-148**

manufacturers . . . is placed within the exclusive province of the EPA," and allowing RICO claims challenging that advertising "would obviously undermine the regulatory structure constructed by Congress").

Under *POM Wonderful* and *Apotex*, Plaintiffs' RICO claim is precluded for the same reason their state-law claims are preempted: Plaintiffs seek to second-guess the FDA's longstanding conclusion that phenylephrine is effective, and to punish Defendants for making statements consistent with that conclusion. *See, e.g.*, Compl. ¶ 87 (RICO defendants "represent[ed] to consumers and regulators that PE Products are effective"). Plaintiffs cannot avoid preclusion by arguing that "the RICO Defendants" made "sham and fraudulent submissions" to the FDA, *id*. ¶ 501, because the Second Circuit has broadly rejected the use of RICO to allege federal regulators have been defrauded.[5] *See Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 21 (2d Cir. 1994) (dismissing RICO claims because "regulators who are intimately familiar with the industry," and not private parties, "are best situated to discover when regulated entities engage in fraud on the agency and to remedy the wrongdoing when the specter of fraud arises"); *see also Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 444 F. App'x 401, 410 n.4 (11th Cir. 2011) (Plaintiffs "may not rely on a . . . fraud-on-the-FDA theory of causation for [their] RICO claim").

## CONCLUSION

This Court should dismiss the Initial Streamlined Complaint with prejudice.

---

[5] Plaintiffs do not base their state-law claims on such a fraud-on-the-FDA theory, because any attempt to do so would be preempted by the principles in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 348 (2001) ("[T]he federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and that this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives.").

June 3, 2024

Respectfully Submitted,

*/s/ Andrew Soukup*
Andrew Soukup (*pro hac vice*)
Laura Flahive Wu
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
asoukup@cov.com
lflahivewu@cov.com

Cortlin H. Lannin (*pro hac vice*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-6000
clannin@cov.com

*Attorneys for Defendant The Procter & Gamble Company*

*/s/ Jay P. Lefkowitz*
Jay P. Lefkowitz. P.C.
Jacob M. Rae
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
lefkowitz@kirkland.com
jacob.rae@kirkland.com

Robyn E. Bladow (*pro hac vice*)
KIRKLAND & ELLIS LLP
555 S. Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

*Attorneys for Defendant Haleon US Holdings LLC*

**NPSA-150**

/s/ Hannah Y. Chanoine
Hannah Y. Chanoine
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
hchanoine@omm.com

Amy J. Laurendeau (*pro hac vice*)
Emilie W. Hamilton
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
alaurendeau@omm.com
ehamilton@omm.com

*Attorneys for Defendant Johnson & Johnson Consumer Inc.*

/s/ James L. Bernard
James L. Bernard
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3121
James.bernard@hoganlovells.com

Lauren S. Colton (*pro hac vice*)
HOGAN LOVELLS US LLP
100 International Drive, Suite 2000
Baltimore, MD 21202
Telephone: (410) 659-2733
Lauren.colton@hoganlovells.com

*Attorneys for Defendant RB Health (US) LLC*

/s/ Cara D. Edwards
Cara D. Edwards
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
Telephone: (212) 335-4714
cara.edwards@us.dlapiper.com

27

**NPSA-151**

Christopher G. Campbell
DLA PIPER LLP (US)
1201 West Peachtree Street, Suite 2800
Atlanta, GA 30309
Telephone: (404) 736-7800
christopher.campbell@us.dlapiper.com

Christopher Young (*pro hac vice*)
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, CA 92121
Telephone: (619) 699-4748
christopher.young@us.dlapiper.com

*Attorneys for Defendant Bayer HealthCare, LLC*

/s/ Mark J. Lesko
Mark J. Lesko
GREENBERG TRAURIG, LLP
900 Stewart Avenue, 5th Floor
Garden City, NY 11530
Telephone: (631) 994-2408
Mark.Lesko@gtlaw.com

Nilda Isidro
Dale Rose Goldstein
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Nilda.Isidro@gtlaw.com
GoldsteinD@gtlaw.com

Sara K. Thompson (*pro hac vice*)
GREENBERG TRAURIG, LLP
3333 Piedmont Rd NE
Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2392
Sara.Thompson@gtlaw.com

*Attorneys for Defendants CVS Pharmacy Inc., Target Corporation, Walgreen Co., and Walmart Inc.*

**NPSA-152**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                  :
                                  : 23-MD-03089 (BMC)
                                  :
IN RE:                            :
                                  :
ORAL PHENYLEPHRINE                : United States Courthouse
MARKETING AND SALES PRACTICES     : Brooklyn, New York
LITIGATION                        :
                                  :
                                  : Tuesday, June 11, 2024
                                  : 11:00 a.m.
                                  :
                                  :

- - - - - - - - - - - - - - - X


TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE VIA VIDEO
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:


PEC Members:            DOUGLAS & LONDON, P.C.
                            111 John Street, Suite 1400
                            New York, New York 10038
                        BY: MICHAEL A. LONDON, ESQ. (Chairperson)
                            VIRGINIA E. ANELLO, ESQ.

                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                            250 Hudson Street, 8th Floor
                            New York, NY 10013
                        BY: JONATHAN D. SELBIN, ESQ.

                        AYLSTOCK, WITKIN, KREIS & OVERHOLTZ
                            17 E Main Street, Suite 200
                            Pensacola, FL 32502
                        BY:BRYAN F. AYLSTOCK, ESQ.
                            JENNIFER M. HOEKSTRA, ESQ.


VB      OCR      CRR

PEC Members:
(Continued)

BERNSTEIN LIEBHARD LLP
    10 East 40th Street, 28th floor
    New York, NY 10017
BY:JEFFREY SCOTT GRAND, ESQ.

BRADLEY/GROMBACHER LLP
    31365 Oak Crest Drive, Suite 240
    Westlake Village, CA 91361
BY:KILEY L. GROMBACHER, ESQ.

CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.
    5 Becker Farm Road
    Roseland, NJ 07068
BY:JAMES E. CECCHI, ESQ.

DICELLO LEVITT GUTZLER LLC
Ten North Dearborn Street, Suite 6th Floor
Chicago, IL 60602
BY:ADAM J. LEVITT, ESQ.

FEGAN SCOTT LLC
150 S. Wacker Dr, Suite 24th Floor
Chicago, IL 60606
BY:ELIZABETH A. FEGAN, ESQ.

SEEGER WEISS LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
BY:CHRISTOPHER A. SEEGER, ESQ.

SULTZER & LIPARI, PLLC
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
BY:JASON P. SULTZER, ESQ.

WAGSTAFF & CARTMELL LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
BY:LINDSEY SCARCELLO, ESQ.

PSC Members:          BURSOR & FISHER P.A.
701 Brickell Avenue, Suite 1420
Miami, FL 33131
BY:SARAH WESTCOT, ESQ.


CIRESI CONLIN LLP
225 S. 6th Street, Suite 4600
Minneapolis, MN 55402
BY:MICHAEL A. SACCHET, ESQ.


CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265
BY:SHIREEN M. CLARKSON, ESQ.


COTCHETT PITRE & MCCARTHY
40 Worth Street, Suite 602
New York, NY 10013
BY:ALEXANDER E. BARNETT, ESQ.


KAPLAN GORE LLP
346 Westbury Ave, Suite 200
Carle Place, NY 11514
BY:DARREN T. KAPLAN, ESQ.


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
BY:CARI CAMPEN LAUFENBERG, ESQ.


KESSLER TOPAZ MELTZER CHECK LLP
280 King of Prussia Rd.
Radnor, PA 19087
BY:JORDAN JACOBSON, ESQ.


FLEMING, NOLEN & JEZ, LLP
2800 Post Oak Blvd., Suite 6000
Houston, TX 77056
BY:KELSEY L. STOKES, ESQ.

```
PSC Members:          LEVIN, PAPANTONIO, RAFFERTY, PROCTOR,
(Continued)           BUCHANAN, OBRIEN, BARR, MOUGEY, P.A.
                      316 S Baylen Street
                      Suite 600
                      Pensacola, FL 32502
                      BY:LAURA S DUNNING, ESQ.


                      LEVIN FISHBEIN SEDRAN & BERMAN
                      510 Walnut Street
                      Suite 500
                      Philadelphia, PA 19106
                      BY:FREDERICK S. LONGER, ESQ.


                      NIGH GOLDENBERG RASO & VAUGHN
                      14 Ridge Square NW
                      Third Floor
                      Washington, DC 20016
                      BY:MARLENE JAYE GOLDENBERG, ESQ.


                      PARKER WAICHMAN LLP
                      6 Harbor Park Drive
                      Port Washington, NY 11050
                      BY:MELANIE H. MUHLSTOCK, ESQ.


                      ROBBINS GELLER RUDMAN & DOWD LLP
                      225 NE Mizner Boulevard
                      Suite 720
                      Boca Raton, FL 33432
                      BY:STUART A. DAVIDSON, ESQ.




Court Reporter:       VICTORIA A. TORRES BUTLER, CRR
                      225 Cadman Plaza East / Brooklyn, NY 11201
                      VButlerRPR@aol.com

Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcription.
```

1          (Video teleconference call initiated.)

2          (Judge BRIAN M. COGAN is on the call.)

3          THE COURT:  Ms. Townsend, please call the case.

4          THE COURTROOM DEPUTY:  Good morning.

5          In Re:  Oral Phenylephrine Marketing and Sales

6    Practice Litigation.

7          Please state your appearance for the record for the

8    parties that are speaking.

9          THE COURT:  You know what?  I think we are going to

10   skip appearances.

11         THE COURTROOM DEPUTY:  Okay.

12         THE COURT:  Even with the parties who are just

13   speaking, it is a long list.

14         What has happened is that the parties have prepared

15   a list of those who are speaking and those who are attending,

16   and we will mark that as Court Exhibit 1 for purposes of this

17   hearing and file it.  Everybody's name is apparent on the

18   Zoom.  The court reporter has the list and she can also see

19   your names, so I think we will be able to proceed that way.

20         I think we have got just a couple of items that we

21   need to cover.

22         Let me start out with the discovery issue, which I

23   think is the big issue and it all stems, I think, from a

24   rather confusing comment that I made at our last session

25   together.  So not that I remember what I meant when I said it,

1   but let me try to clarify where I think we should be.

2          First, my experience in these cases is that

3   something is likely to survive the motion.  Obviously, I am

4   not going to prejudge it now because it is not fully briefed,

5   let alone my having had a chance to read it, but something is

6   likely to happen.  So I don't think we should sit and not do

7   anything.  I think the parties should be conferring, at least,

8   and talking about ESI protocols and how to get discovery

9   moving if, in fact, as I say seems likely to me, some portion

10  of the consolidated complaint survives the motion.

11         So that is my proposal.  I will hear from anyone who

12  has a different idea about it, but just to wait until

13  resolution of the motion, I do not really think that would be

14  productive.

15         Who wants to disagree with me?

16         Going once.

17         MR. SOUKUP:  Judge, this is Andrew Soukup.  I

18  represent the defendant Proctor & Gamble Company, but I am

19  speaking for the defendants on this issue.

20         Thank you for the Court's guidance.

21         I think that we agree.  It does make sense to be

22  preparing for a world in which, you know, in our view, the

23  unlikely event that some claims survive.  But what we don't

24  want to do is get too far apart from the ordinary course of

25  which litigation precedes.

1      I think if we remember, it was the plaintiffs's idea

2 here to start with what they called a skinny complaint or a

3 streamlined complaint.  We responded with a streamlined motion

4 to dismiss and the whole purpose of this exercise was so we

5 could make sure that we focused on these threshold legal

6 issues before we got bogged down into what is likely to be a

7 very burdensome and a very expensive process here.

8      When a motion to dismiss raises threshold issues,

9 like preemption and RICO standing like the ones we've made,

10 courts are quite clear that, you know, it's appropriate in

11 these instances to stay discovery.  But we hear the Court's

12 desire to make sure that the parties are preparing for a world

13 in which things do go forward and I think we're doing that.

14 We have exchanged some initial disclosures.  It sounds like

15 there are some disagreement over -- on both sides's ends about

16 whether the disclosures are adequate.  We can certainly meet

17 and confer about that.

18      We are making great progress on protective and on

19 ESI order.  We will continue to make progress on that and we

20 anticipate being able to submit, hopefully, brief versions,

21 but possibly competing versions next week, and then I think we

22 can meet and confer with the plaintiffs and see whether there

23 is anything else that makes sense to occur here.  But what

24 we're really resistant to doing, you know, we are in the

25 skinny phase of a case, and I think we want to make sure that

1    we avoid -- not going beyond that skinny phase of the case at

2    least until we address the threshold issues that the parties

3    and the Court thought it made sense to address at the outset.

4                    THE COURT:  Okay.

5                    Any other defendants need to be heard?

6                    Okay.  Let me hear from plaintiff.

7                    MR. LONDON:  Good morning, Your Honor.  Excuse me,

8    Michael London.  Hi.

9                    I think we heard the Court's guidance there and

10   clarification.  What concerns me again, from counsel's

11   statement, is the fact that we are, you know, talking.  What

12   we've seen so far through these meet-and-confer processes, why

13   we've had to write this letter about the discovery status, is

14   that the defendants have taken an absolute position that

15   discovery is stayed per the Court's foundational order.  I

16   understand the Court to say no, let's start.

17                   We can't, we'd like to, but we have been completely

18   blocked from beginning Rule 26(f) conferences.  That is

19   critical, in our view, to a better understanding ESI process

20   and ESI protocol.  So we ask what systems do you have?  We are

21   told we are not doing Rule 26(f) conferences yet.  We think,

22   hopefully, this guidance makes clear that that discovery can

23   start.

24                   We would also like to be serving our initial

25   discovery demands, our interrogatories, our documents.  We are

1    on a fast schedule.  This will be fully briefed by August.  I

2    have yet to see a defendant in a case like this answer in the

3    30 days provided by the Federal rules.  I frankly suspect my

4    colleagues and I can get together and say we've never seen

5    them answer in 60 days.

6           So getting this process started, which I believe the

7    Court was clear on, is important to us.  And we're going to

8    serve this discovery by the end of June.  We'd like to be able

9    to start scheduling our Rule 26 conferences with defendants,

10   not being told no, CMO 1 says you can't; no, discovery shield.

11   So we're hopeful that counsel heard that message and we'd like

12   to go forward.

13          We suspect this discovery won't become due until

14   after the motion to dismiss.  Again, it's fully briefed

15   August 5th, this summer.  Plaintiffs are on target for their

16   opposition date.  We're not looking for more time.

17          So that's all I have to add, Your Honor, thank you.

18          MR. SOUKUP:  Judge, may I respond very briefly to

19   that?

20          THE COURT:  Sure.

21          MR. SOUKUP:  I actually think we might be closer,

22   you know, than maybe the parties anticipated before we started

23   this conference.  What you hear Mr. London suggesting is let's

24   go forward and have Rule 26(f) conferences.

25          Sure, we can do that.  Let's have the parties go

1  ahead and consider whether there's some skinny discovery or

2  even whether written discovery responses -- written discovery

3  requests can be served.  Sure, I think we can do that as well.

4         The concern that we have is being, you know,

5  burdened with kind of the cost and the expense associated with

6  having to prepare to respond to that.  But I hear Mr. London

7  suggesting, well, you don't have to do that necessarily until

8  after the motion to dismiss is decided.  I think that's,

9  frankly, our primary concern.

10        You know, there's no prejudice to plaintiffs, I

11 think, from following this approach.  I think it's important

12 to understand they haven't gone to the trouble of preparing an

13 initial master complaint.  They haven't identified in their

14 initial disclosures a single document that they intend to rely

15 on.  All the discovery burden is going to be exclusively on

16 defendants, at least in the plaintiffs's view of the world.

17        What it is the plaintiffs are proposing is we want

18 to serve some discovery on you so we can prepare in case

19 anything survives, but you don't have to actually respond to

20 it until a time that the parties discuss after, you know, when

21 the Court issues its ruling.  That makes a ton of sense from

22 our perspective.

23        THE COURT:  All right.

24        MR. LONDON:  Your Honor, I'm not certain that's what

25 I said.  I mean, it's good that we intend to serve discovery,

1    and I'm glad they're acknowledging that.  This was our

2    position laid out in the May 22nd letter.  None of this is new

3    or a change of position.  We want to start.

4            What concerns me is what's written in their letter,

5    what counsel's now doubled down on or tripled down on about,

6    hey, it's only a skinny complaint.  Hey, it's only a skinny

7    complaint.

8            This general discovery, and what we need and what

9    they know we need, what the Court indicated at the last

10   conference, we all know what this case is about, we do.  The

11   first 37 pages are not a skinny complaint.  The first 37 pages

12   talk about what we believe they knew, when they knew it, their

13   conduct, their bad conduct, and, frankly, that's going to be

14   the basis of this discovery.

15           So hearing counsel say, hey, we don't have a master

16   complaint.  We're even now reading in their letter, the last

17   paragraph, when they say the schedule should be class

18   certification, master complaint, it's concerning that we

19   are -- our next discovery obstacle, and I hate to go down

20   there because I think we're starting discovery today, is that

21   we don't know enough because the master complaint is truly

22   what's going to frame this case.

23           The skinny complaint, the first 37 pages of this

24   document frame this case.  We all know what this case is

25   about.  This was a way to tee up what they thought was a

1   threshold issue, a kill-shot issue.  We suspect some of this

2   will survive.  We suspect most of it will survive.  My

3   colleague, Mr. Selbin is here, if the Court wanted a previous

4   of our arguments, and we'd like to begin.  We don't want to

5   hear that, well, we can start, we can think about it, but

6   really the master complaint is going to govern what this

7   discovery is, because we will a find ourselves in the end of

8   the summer or September saying, thank you for that discovery

9   but it's meaningless because we need the master complaint.

10          Maybe counsel's not saying that but I don't want to

11  hear that argument in August or September or October.

12          THE COURT:  Okay.

13          Here is my ruling.  Mr. Soukup, you are going to

14  have to do somewhat more than you want to do.  I understand

15  you do not want to open the floodgates and treat it is if this

16  is full merits discovery.

17          At the same time, like I said, it is likely that

18  some facet of the case is going to survive, and if we operate

19  on that basis, then you have to at least do the preliminary

20  leg work and, obviously, I am talking to all the defendants,

21  so that we are not starting from square one, if I issue a

22  ruling that says, yes, something survives.

23          So right now, obviously we are all agreed there can

24  be 26(f) conferences.  I think the plaintiffs can go ahead and

25  serve their discovery requests and I think the defendants have

1   to start looking for those documents, come to an ESI

2   agreement.  You do not have to produce anything yet, but I do

3   not want to be in a position where if there is a denial of the

4   motion on some claim, we then say, okay, now we will start

5   looking and it is going to take us 60, 90, 120 days to start

6   looking.

7          I want you to at least have the general parameters

8   of where you have got to look so that it can be done quickly

9   and efficiently in the event that I say, okay, here is where I

10  thought we would be; now go find it.  Find it in 30 days, just

11  for example, I am not binding myself to that.  You know, maybe

12  it will be 60 days.  But I do not want you to think that this

13  is something you can just wait for and see how the motion

14  goes.

15         So when you have your 26(f) conferences, have that

16  in mind.  I am going to let the plaintiffs serve their

17  requests so you know where to look or what you are going to

18  need to look for if you do need to look for it, okay?

19         I wish I could make it clearer than that.  I am not

20  sure I have made it clear enough.

21         Do you think you understand, Mr. Soukup?

22         MR. SOUKUP:  I do understand, Judge.  And this goes

23  both ways, right?  It's not just plaintiffs, it's discovery

24  for both sides.

25         THE COURT:  Both sides.

1          MR. SOUKUP:  Thank you.

2          THE COURT:  Both sides.

3          Okay.  Is there anything else we need to talk about

4    in this conference?

5          This is sure a lot better than I remember my first

6    MDL with Mr. London in 2006, and we had to have all the

7    lawyers come in from all over the country, and they came in

8    for a conference that was this long and I was thinking there

9    has got to be a better way to do this and here we are.  We

10   have found it.

11         Okay.  Thank you all for calling in.  We will set a

12   conference in 60 or 90 days or so.

13         ALL:  Thank you, Your Honor.

14         THE COURT:  We are adjourned.

15

16         (Matter concluded.)

17

18                        ooo0ooo

19

20

21

22

23

24

25

1

```
1                 UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - - - - X
                                    23-MD-03089(BMC)
4    In Re: Oral Phenylephrine
     Marketing and Sales
5    Practices Litigation           United States Courthouse
                                    Brooklyn, New York
6
                                    August 20, 2024
7                                   11:00 a.m.
     - - - - - - - - - - - - - X
8

9            TRANSCRIPT OF STATUS CONFERENCE BY VIDEO
               BEFORE THE HONORABLE BRIAN M. COGAN
10              UNITED STATES SENIOR DISTRICT JUDGE

11
     APPEARANCES:
12

13   For the Plaintiffs:    DOUGLAS & LONDON, P.C.
                            111 John Street
14                          Suite 1400
                            New York, NY 10038
15
                            BY:  MICHAEL A. LONDON, ESQ.
16                               VIRGINIA E. ANELLO, ESQ.

17
                            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
18                          250 Hudson Street
                            8th Floor
19                          New York, NY 10013

20                          BY:  JONATHAN D. SELBIN, ESQ.

21
                            AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLLC
22                          17 E. Main St
                            Ste 200
23                          Pensacola, FL 32502

24                          BY:  BRYAN F. AYLSTOCK, ESQ.

25
     (Continued on next page.)
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
 1   APPEARANCES:  (Continued)

 2
     For Defendant
 3   Haleon US Holdings:      KIRKLAND & ELLIS LLP
                              555 South Flower Street
 4                            Suite 3700
                              Los Angeles, CA 90071
 5
                             BY:  ROBYN E. BLADOW, ESQ.
 6

 7
     For Defendant
 8   The Procter & Gamble
     Company:                 COVINGTON & BURLING LLP
 9                            One City Center
                              850 Tenth Street, NW
10                            Washington, DC 20001

11                           BY:  LAURA FLAHIVE WU, ESQ.

12
     For Defendant
13   Johnson & Johnson
     Consumer Inc.            O'MELVENY & MYERS LLP
14                            1301 Avenue of the Americas
                              Suite 1700
15                            New York, NY 10019-6022

16                           BY:  JEFFREY A. N. KOPCZYNSKI, ESQ.

17

18   Court Reporter:          Andronikh M. Barna
                              225 Cadman Plaza East
19                            Brooklyn, New York
                              (718) 613-2178
20
     Proceedings recorded by mechanical stenography, transcript
21   produced by computer-aided transcription.

22

23

24

25
```

```
                    Proceedings                    3
```

1           THE COURTROOM DEPUTY:  Good morning.

2           Oral Phenylephrine Marketing and Sales Practice

3   Litigation.

4           The prime speakers for the plaintiff, please state

5   your appearance.

6           MR. LONDON:  Good morning, Your Honor.

7           Michael London for the plaintiffs.  Joining me with

8   potentially speaking on various issues will be Mr. Jonathan

9   Selbin, Ms. Virginia Anello and Mr. Bryan Aylstock.

10          MR. AYLSTOCK:  Good morning, Your Honor.

11          THE COURT:  Good morning.

12          MS. BLADOW:  Good morning, Your Honor.

13          Robyn Bladow for Haleon US Holdings.

14          I'm going to address some of the agenda items today

15  on behalf of the defendant group.

16          I will let the other folks introduce themselves.

17          MS. FLAHIVE-WU:  Good morning, Your Honor.

18          Laura Wu for Procter & Gamble Company.

19          MR. KOPCZYNSKI:  Good morning, Your Honor.

20          This is Jeff Kopczynski with O'Melveny for

21  J&J Consumer on behalf of defendants.

22          THE COURT:  Anyone else?

23          Okay, good.

24          Thank you for your agenda.  That is quite helpful.

25          Let's start going through this.

Proceedings                                              4

1          You have the ESI order, right?  I signed that

2    yesterday.  Everybody's got that.

3          MR. LONDON:  Thank you.

4          THE COURT:  As far as the schedule on the motion to

5    dismiss, here is what I am thinking, and tell me if this hits

6    you the right way or not.

7          I would like to have oral argument on September 23rd

8    and I would like to do that by video as well.

9          I will tell you; generally, I don't hold oral

10   arguments on motions because the papers really tell me

11   everything I need to know.  But I can tell you all want to do

12   it, so I'm not going to resist you.

13         If that is done on September 23rd, we would do it

14   at, let's see, noon.

15         Is there anyone who needs to be present who can't be

16   present at that time?

17         Okay.  Is there anyone who thinks it should be

18   earlier or later than that?

19         Okay, we have a date.  That's fine.

20         Okay.  You have also asked to talk about the

21   privilege log order.  What do you want to talk about with

22   that?  Should there be any problem with that?

23         MR. LONDON:  Hi, Judge.  Michael London.

24         Probably not much to talk about.  It's on there as a

25   placeholder.

Proceedings                                5

1          There was a meet-and-confer regarding the proposed

2     privilege order yesterday.  The parties are making progress

3     based upon the call I was on yesterday.  I think it's just

4     moving a little bit slower than the plaintiffs would desire,

5     but progress is being made.  So beyond hopefully getting

6     something to the Court within two weeks -- well, two weeks is

7     probably Labor Day, but the next three weeks or so, I think

8     that's all there really is to report.

9          THE COURT:  Okay, that's good.

10         Who wants defense liaison counsel appointed if the

11    defendants don't want liaison counsel appointed?

12         MR. LONDON:  Michael London again, Your Honor.

13         I think that's actually -- it probably should have

14    come off the agenda, frankly.  I think for that it's something

15    perhaps aspirational in getting things scheduled and getting a

16    joint spokesperson, which has been challenging.  And so we can

17    take this off.  It has been challenging, but, you know, it's

18    getting blood from a stone or a rock up a hill, whatever

19    metaphor you want to use.  They don't want it.  Hopefully now

20    that the summer is over -- and I heard the summer was perhaps

21    challenging.  Hopefully it's not necessary because clearly

22    they don't want it.  But we'll take it off the agenda.

23         THE COURT:  Hasn't a de facto spokesperson emerged?

24    That is what usually happens.  I mean, do you really have to

25    call ten people to get an answer to a simple question?

Proceedings                                                    6

1          MR. KOPCZYNSKI:  Yes, Judge.  This is Jeff

2    Kopczynski with O'Melveny for defendants.

3          I think it's -- I'm happy to hear they're taking it

4    off.

5          I think to your point, plaintiff has -- a group of

6    individuals, a half or dozen or so.  We think it's working

7    very well.  We've collectively, between the 26(f) conferences

8    and the meet-and-confers on the different orders and various

9    schedules and everything else, we've had nearly two-dozen

10    meet-and-confers with plaintiffs for the last couple of months

11    and we think that's working just fine.  And so we're happy to

12    hear -- we don't think that a defense liaison is necessary nor

13    warranted here.  And, you know, we don't need to belabor this

14    point, but we think everything is going just fine.

15          THE COURT:  Okay.

16          So what is happening with Perrigo Haleon?

17          MR. LONDON:  There are two defendants here, Your

18    Honor.

19          Michael London again.  Hi.

20          So these are both foreign-entity defendants.

21    Perrigo is an Irish company.  Haleon PLC is a UK company.

22    I'll take them separately.

23          Perrigo we believe we served under the Hague

24    convention.  Their counsel has not appeared but communicated

25    with us that they have counsel.  We are discussing or -- we

Proceedings                                                7

1   are either going to seek a traverse hearing insomuch as

2   they're claiming nonservice or they'll move for default.  I

3   guess this is -- we haven't run it to ground.  So perhaps we

4   address this with the Court in the next three to four weeks in

5   a status or potentially a traverse hearing, which I can't

6   believe we would be having, or a motion for default.

7            THE COURT:  Yes, that would be unfortunate.  I mean,

8   obviously they can be served under the Hague convention, so

9   okay.  Tell them I would appreciate it if they don't put us

10  all to that trouble.

11           MR. LONDON:  I will communicate that to the lawyer

12  who has communicated to us, but she has not entered an

13  appearance yet.

14           THE COURT:  Okay.

15           MR. LONDON:  For Haleon PLC, this is different

16  obviously than the Haleon US entity that's in the case.  The

17  US lawyers are not representing this UK entity.  We believe

18  they were served.  Affidavits of service were filed,

19  obviously, on -- we believe they were served I think on

20  July 15th, affidavits of service were filed with the Court.

21           We are also trying to work, discuss with the US

22  entity who has reached out and said, asked us I think to

23  re-serve or to remove the affidavits of service.  Whether it's

24  a simple re-serving, we would like to work with the US entity,

25  appreciating that the US entity lawyer is not representing

Proceedings                                    8

1   them.  But this, too, may be a similar situation where if we

2   have to go to a traverse hearing on a motion for default, we

3   will and perhaps put this on a -- report back to the Court in

4   three to four weeks.

5              THE COURT:  Okay.  That sounds all good.

6              All right.  As far as our next conference, we will

7   do it after the argument on September 23rd.  Sounds like the

8   right time.

9              Anything else we need to talk about?

10             MR. LONDON:  Your Honor, probably not if you

11  anticipate us issuing scheduling orders following the hearing

12  and the ruling.  Because scheduling is obviously being held up

13  slightly due to that.

14             THE COURT:  Yes, well, you are being presumptuous.

15  I will issue a scheduling order to the extent that the case

16  remains alive, right?

17             MR. LONDON:  Oh, no, of course, Your Honor.

18             But I think one of the aspects of it is -- and we

19  don't need to take this up today, but I certainly want to flag

20  it insomuch as I think we are close in scheduling orders

21  agreements pending discovery, class cert experts, et cetera,

22  whether a master complaint needs to be done in order to

23  trigger a lot of those deadlines.  And that has really reared

24  its head again despite thinking we were going down the

25  New York complaint Delaware complaint road.

Proceedings                                                    9

1          And I actually pulled up oral arguments back from I

2    think when we heard the term "skinny complaint" months ago.

3    And not that we're not doing one, but it shouldn't be

4    tethered, the filing of that, tethered to other discovery in

5    other schedule.

6          So we can address that at a later date, but that is

7    certainly the master complaint's relevance, if you will.  And

8    we know it's relevant, but its timing of it is holding things

9    up, including even one defendant saying:  I'm not going to

10   respond to discovery until it's a master complaint.  That was,

11   you know...

12         And so it's out there again.  I don't know if we

13   need to address it today, but it's been impacting the ability

14   to schedule.

15         THE COURT:  Do any of the defendants need to be

16   heard on that now?

17         MS. BLADOW:  Your Honor, Robyn Bladow for Haleon US

18   Holdings.

19         I can tell you that we agree to the skinny complaint

20   process with the understanding and the promise from

21   plaintiff's counsel that there would be a master complaint

22   that followed.

23         To the extent anything survives the motion to

24   dismiss, I don't think this needs to be addressed now, but

25   that's our position.  That's why we agreed to the skinny

Proceedings                                          10

1   complaint process in the first place, with the understanding

2   that we would eventually see a master complaint next.  Again,

3   if the case survives the motion to dismiss.

4          But as Your Honor alluded to, we believe we should

5   proceed to the hearing, get a ruling on the motion to dismiss,

6   which we, of course, believe should be granted.

7          THE COURT:  All right.  Well, let's put it off.  I

8   mean, let's see what is there after the motion to dismiss.

9   And then if I have to decide whether we need a master

10  complaint, I will do it then.

11         Okay.  Anything else we need to cover?

12         MR. LONDON:  There is one other issue.  Sorry,

13  Your Honor.

14         It's Rule 26(f) conferences and some scope issues

15  and we have run up into some roadblocks here.  And again, I

16  don't want to necessarily take the Court's time, pending

17  likely a decision at some point that could moot this or could

18  advance this.  But we face some objections from defendants

19  upon -- based upon the scope of our meet-and-confers and the

20  discovery saying:  We don't want to address scope, i.e.,

21  timing of your discovery until we're serving objections to

22  your discovery.  And this has really proved quite difficult in

23  advancing, we think meaningfully, doing the meet-and-confers.

24         You know, for one example, defendants will not tell

25  us when they started producing their various products.  And

Proceedings                                                    11

1   we've asked, obviously, the scope of timing to go back to

2   1994, figure, because the monograph date is one of the earlier

3   published articles that came out in '94.  But obviously if the

4   defendant didn't make its product until 2005, we wouldn't go

5   back to '94, we would go back a few years before the product

6   was made.

7              But not having that agreement on scope or timing is

8   proving difficult.  They say:  Well, we'll address it in our

9   objections.  Again, this could be moot, but it has also made

10  the Rule 26(f) conferences, while they get scheduled and we do

11  engage in many of them, less fruitful than they are in other

12  cases.

13             THE COURT:  What is the defendant's hesitancy about

14  disclosing the timing?

15             MS. FLAHIVE-WU:  Good morning, Your Honor.  This is

16  Laura Wu for the Procter & Gamble Company and I'm pleased to

17  address this issue for defendants.

18             First of all, we don't believe that this is a ripe

19  dispute for the Court.

20             To answer your question more directly, the

21  plaintiffs have served discovery, seeking a vast amount of

22  information, including an index of products produced, which

23  include phenylephrine.  We anticipate that we will respond to

24  that written discovery once we serve our written responses and

25  objections.

12

1          In the meantime, we are working cooperatively with

2    the plaintiffs in order to scope the appropriate parameters

3    for discovery.  At this point, P&G has had one.  We were the

4    very first 26(f) conference with the plaintiffs.  We talked

5    about responsiveness period in very general cooperative terms.

6          We look forward to a followup meet-and-confer with

7    the plaintiffs next week where we may narrow the field of

8    potential dispute or friction.  It's very early days.  And

9    we're very optimistic that we'll be able to reach out some

10   scope parameters for discovery even before written responses

11   need to be served, if that is the case, Your Honor.

12         THE COURT:  Okay.  I mean, that sounds right.  It

13   seems to me you can agree on something before you do formal

14   responses, like when was the first product containing this

15   ingredient put to market, for example.  That will give some

16   date and plaintiff some idea to know what they are pursuing.

17   I am just offering that as an example.  It is not a ruling.

18   But it seems to me you should continue to have discussions

19   before I get involved because maybe I won't have to get

20   involved.  So try that.

21         MS. FLAHIVE-WU:  Thank you, Your Honor.  We'll do

22   that.

23         THE COURT:  All right.  Anything else?

24         Okay.  Thank you all for calling in.  See you in

25   September virtually.                    (Matter concluded.)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                       :
                       : 23-MD-03089 (BMC)
                       :
IN RE:                   :
                       :
ORAL PHENYLEPHRINE      : United States Courthouse
MARKETING AND SALES PRACTICES  : Brooklyn, New York
LITIGATION              :
                       :
                       : Monday, September 23, 2024
                       : 12:00 p.m.
                       :
                       :

- - - - - - - - - - - - - - - X


TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE VIA VIDEO
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE



A P P E A R A N C E S:


PEC Members:         DOUGLAS & LONDON, P.C.
                   111 John Street, Suite 1400
                   New York, New York 10038
                   BY: MICHAEL A. LONDON, ESQ. (Chairperson)
                   VIRGINIA E. ANELLO, ESQ.

                   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                   250 Hudson Street, 8th Floor
                   New York, NY 10013
                   BY: JONATHAN D. SELBIN, ESQ.

                   AYLSTOCK, WITKIN, KREIS & OVERHOLTZ
                   17 E Main Street, Suite 200
                   Pensacola, FL 32502
                   BY:BRYAN F. AYLSTOCK, ESQ.
                   JENNIFER M. HOEKSTRA, ESQ.

Court Reporter:  VICTORIA A. TORRES BUTLER, CRR
225 Cadman Plaza East / Brooklyn, NY 11201
VButlerRPR@aol.com
Proceedings recorded by mechanical stenography; transcript produced by Computer-Aided Transcription.

NPSA-179

PEC Members:          BERNSTEIN LIEBHARD LLP
(Continued)               10 East 40th Street, 28th floor
                          New York, NY 10017
                      BY:JEFFREY SCOTT GRAND, ESQ.


                      BRADLEY/GROMBACHER LLP
                          31365 Oak Crest Drive, Suite 240
                          Westlake Village, CA 91361
                      BY:KILEY L. GROMBACHER, ESQ.

                      CARELLA, BYRNE, CECCHI, OLSTEIN,
                      BRODY & AGNELLO, P.C.
                          5 Becker Farm Road
                          Roseland, NJ 07068
                      BY:JAMES E. CECCHI, ESQ.


                      DICELLO LEVITT GUTZLER LLC
                      Ten North Dearborn Street, Suite 6th Floor
                      Chicago, IL 60602
                      BY:ADAM J. LEVITT, ESQ.


                      FEGAN SCOTT LLC
                      150 S. Wacker Dr, Suite 24th Floor
                      Chicago, IL 60606
                      BY:ELIZABETH A. FEGAN, ESQ.


                      SEEGER WEISS LLP
                      55 Challenger Road, 6th Floor
                      Ridgefield Park, NJ 07660
                      BY:CHRISTOPHER A. SEEGER, ESQ.


                      SULTZER & LIPARI, PLLC
                      85 Civic Center Plaza, Suite 200
                      Poughkeepsie, NY 12601
                      BY:JASON P. SULTZER, ESQ.


                      WAGSTAFF & CARTMELL LLP
                      4740 Grand Avenue, Suite 300
                      Kansas City, MO 64112
                      BY:LINDSEY SCARCELLO, ESQ.

PSC Members:              BURSOR & FISHER P.A.
701 Brickell Avenue, Suite 1420
Miami, FL 33131
BY:SARAH WESTCOT, ESQ.

CIRESI CONLIN LLP
225 S. 6th Street, Suite 4600
Minneapolis, MN 55402
BY:MICHAEL A. SACCHET, ESQ.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265
BY:SHIREEN M. CLARKSON, ESQ.

COTCHETT PITRE & MCCARTHY
40 Worth Street, Suite 602
New York, NY 10013
BY:ALEXANDER E. BARNETT, ESQ.

KAPLAN GORE LLP
346 Westbury Ave, Suite 200
Carle Place, NY 11514
BY:DARREN T. KAPLAN, ESQ.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
BY:CARI CAMPEN LAUFENBERG, ESQ.

KESSLER TOPAZ MELTZER CHECK LLP
280 King of Prussia Rd.
Radnor, PA 19087
BY:JORDAN JACOBSON, ESQ.

FLEMING, NOLEN & JEZ, LLP
2800 Post Oak Blvd., Suite 6000
Houston, TX 77056
BY:KELSEY L. STOKES, ESQ.

```
PSC Members:          LEVIN, PAPANTONIO, RAFFERTY, PROCTOR,
(Continued)           BUCHANAN, OBRIEN, BARR, MOUGEY, P.A.
                      316 S Baylen Street
                      Suite 600
                      Pensacola, FL 32502
                      BY:LAURA S DUNNING, ESQ.

                      LEVIN FISHBEIN SEDRAN & BERMAN
                      510 Walnut Street
                      Suite 500
                      Philadelphia, PA 19106
                      BY:FREDERICK S. LONGER, ESQ.

                      NIGH GOLDENBERG RASO & VAUGHN
                      14 Ridge Square NW
                      Third Floor
                      Washington, DC 20016
                      BY:MARLENE JAYE GOLDENBERG, ESQ.

                      PARKER WAICHMAN LLP
                      6 Harbor Park Drive
                      Port Washington, NY 11050
                      BY:MELANIE H. MUHLSTOCK, ESQ.

                      ROBBINS GELLER RUDMAN & DOWD LLP
                      225 NE Mizner Boulevard
                      Suite 720
                      Boca Raton, FL 33432
                      BY:STUART A. DAVIDSON, ESQ.


                      ANDREW SOUKUP
                      COVINGTON & BURLING LLP
                      One Citycenter
                      850 Tenth Street Nw
                      Washington, DC 20001

                      ROBYN E. BLADOW
                      KIRKLAND & ELLIS LLP
                      555 South Flower Street
                      Suite 3700
                      Los Angeles, CA 90071

                      JAY P. LEFKOWITZ
                      KIRKLAND & ELLIS
                      601 Lexington Avenue
                      New York, NY 10022
```

1          (Video teleconference call initiated.)

2          (Judge BRIAN M. COGAN is on the call.)

3          THE COURT:  Okay.  Ms. Townsend, please call the

4    case.

5          THE COURTROOM DEPUTY:  Good morning.

6          In Re: Oral Phenylephrine Marketing and Sales

7    Practices Litigation.

8          Please state the speakers that will be speaking

9    during the oral argument.  Thank you.

10         MR. LONDON:  Good morning, Your Honor.

11         Michael London on behalf of the plaintiffs.  The

12   designated presenters for oral argument and to address any

13   questions by the Court, on behalf of the plaintiffs, will be

14   Michael Sacchet on screen on video and Jonathan Selbin who is

15   on screen and on video.

16         Thank you.

17         THE COURT:  Okay.

18         MR. SOUKUP:  Good morning, Your Honor.

19         This is Andrew Soukup on behalf of defendant

20   Procter & Gamble.

21         With the Court's permission, I will be prepared to

22   address why plaintiff's state law claims should be dismissed

23   on Federal preemption grounds, and Jay Lefkowitz who

24   represents Haleon will be prepared to address why the RICO

25   claims should be dismissed..

1            THE COURT:  Okay.

2            Defendants's motion.  Let's start with the

3    defendants.  Let's start with preemption.

4            MR. SOUKUP:  Thank you, Your Honor.

5            Again, my name is is Andrew Soukup.

6            In a previous MDL involving a preemption defense,

7    this Court correctly observed that manufacturers, quote:  Can

8    rely on the FDA monograph, end quote, when it comes to making

9    marketing claims.  Now the plaintiffs are seeking to hold us

10   liable for doing exactly that.

11           The FDA has said for more than four decades that

12   Phenylephrine is an effective treatment for nasal congestion

13   and the plaintiffs here are effectively saying that we can't

14   sell medicine containing Phenylephrine or market it as a nasal

15   decongestant.  But the FDA says not only that we can sell it,

16   but if we do, it has to be marketed as a nasal decongestant.

17   So, preemption exists here for two reasons.

18           First, Congress enacted an express preemption

19   provision that prevents the plaintiffs from using state law to

20   impose a requirement that is different from or in addition to

21   or that is not otherwise identical with Federal law.  The

22   Second Circuit in the Critcher case held that this language

23   should be given broad effect.

24           THE COURT:  Can I ask you something?

25           MR. SOUKUP:  Yes.

1      THE COURT:  I am looking at the monograph, and it

2  seems to authorize you to say certain things.  I am not sure

3  it requires you to say certain things.  I am looking at the

4  regulation 21 C.F.R. § 341.80(a).  And it says -- it seems to

5  allow you to say the labeling of the product states under the

6  heading indications the phrase listed in paragraph (b)(1).

7  That, basically, is the effectiveness phrase.

8          But where does it say you must?

9      MR. SOUKUP:  For that, I would direct the Court to

10  21 C.F.R. § 330.1(c)(2).  And the language there, this is the

11  general provision of the general monograph language.  And this

12  says, quote:  The uses section of the label and labeling of

13  the product, quote, shall contain the labeling describing the

14  indications that have been established in an applicable OTC

15  drug monograph.

16          In addition, I would direct the Court to 21 C.F.R.

17  § 201.66, which is, again, a general requirement that requires

18  us to follow the uses information that appears in a monograph.

19      THE COURT:  Okay.

20      MR. SOUKUP:  And this matters because every court

21  that has considered the use -- let me, if I could, begin with

22  the express preemption.

23          Every court that has considered the use of state law

24  claims to challenge the effectiveness of drugs that the FDA

25  has found effective, has found preemption.  There's

1  Judge Castel's decision and many others in the <u>Lester</u> case

2  involving hydrogen peroxide.  There is the lice medicine cases

3  such as the <u>Mills</u> case that we cite.  And the <u>Carter</u> case, out

4  of California, found preemption to the challenge to the

5  effectiveness of medicine when it was used in children's

6  medicine.

7          What -- I think the plaintiffs appear to acknowledge

8  that for their claims to survive preemption, they need to find

9  some provision of Federal law that allows the label change

10 they're seeking to force us to make.  Again, this is not a

11 matter of question of choice, it's a matter of coercion.  Can

12 the plaintiffs find something that forces us to make the label

13 change, because otherwise, you can't use state law to make the

14 change.

15         What they have directed us to is the language in the

16 monograph which allows the use of alternative language, but

17 the fundamental problem with that is when the FDA first

18 implemented this regulation, it said it was intended to allow

19 for, quote, the same information to be communicated through

20 monograph -- through alternative means.  And it also said that

21 the monograph language was going to be FDA standard in terms

22 of determining what alternate statements are accurate or

23 require regulatory action.  And the critical language is it,

24 quote, cannot be inconsistent with the indications for use.

25         So we can say replace the phrase, temporarily

1   relieves nasal congestion, with the phrase like, temporarily

2   restores freer breathing through the nose, but we can't pick

3   language that's the exact opposite of what federal law

4   requires and that's what plaintiffs are trying to do.  And I

5   think we highlight in our reply brief the result they're

6   striving for would lead to a really absurd result.

7          They admit the regulations don't let us change the

8   statement of identity, which requires us to state that these

9   products are nasal decongestants, so it makes no sense that

10  the regulations would require us to update the indications for

11  use, which follows immediately thereafter in the drug facts

12  box, to say that this product doesn't actually treat nasal

13  congestion.  And if we do, as the Court alluded to earlier, we

14  would be in violation of Federal law which requires to us make

15  statements that are consistent with the monograph.  That's

16  what the general misbranding provision in 21 U.S.C. 352

17  requires us to do.

18         The plaintiffs then pivot, because the monograph

19  doesn't let them do it, and they rely on the general

20  misbranding statute, which they say can be used to override

21  the specific language in the monograph, but that's -- this is

22  kind of a strange argument because it just amounts to a

23  contention because we comply with one part of the FDCA, we

24  violate another part of the FDCA.  That can't be right and

25  that's why the Second Circuit rejected that reading of the

1    general misbranding statute in the <u>Critcher</u> case.

2          In the court there, I will concede, was interpreting

3    the cosmetics provision, but it's worded the exact same as the

4    over-the-counter preemption provision that we have here.

5          THE COURT:  Plaintiff's point, of course, is that

6    there was not an issue of new information in that case as

7    there is here.

8          MR. SOUKUP:  The new information case, I would, I

9    guess, reject the premise of the question here, and -- and

10   fall back on what does the actual statute require that the

11   express preemption statute requires something that is

12   different from, in addition to, or not otherwise identical

13   with Federal law here.  And the FDA, over a period of decades,

14   has consistently rejected the view that there's anything

15   ineffective about Phenylephrine.  In fact, it has continued to

16   find every decade since the '70s, that Phenylephrine is

17   effective.

18         It did so as recently as March 2024, when the head

19   of the FDA's nonprescription drug division said on an FDA

20   podcast, published on the FDA's website, that the current

21   status of Phenylephrine is unchanged.  It continues to be safe

22   and effective.  And it simply can't be the case that the

23   plaintiff can allege that medicine didn't work as to them, or

24   come forward with a study that purports to raise concerns

25   about the efficacy of medicine, and turn around and sue a

1   manufacturer for making statements consistent with the FDA's

2   judgment.  Otherwise, we wouldn't be able to rely on the

3   monograph in that situation.

4          THE COURT:  So what do you attribute J & J's

5   decision to cross-reference the NDAC's finding?  Why does it

6   do that?

7          MR. SOUKUP:  It's a difference between a choice

8   versus coercion.

9          There's no difference between a manufacturer

10  choosing to unilaterally publish information and, in fact,

11  what JJCI did on its website, all it did was it just linked to

12  the FDA press release.  And that FDA press release, while on

13  the one hand it acknowledged that the statement was -- it

14  acknowledged the results of the advisory committee's vote.

15  The FDA went on to say, the current status of Phenylephrine is

16  unchanged, and if it is going to being changed, we're going to

17  implement a rule-making process, or an administrative order

18  process, to change it.  And more than a year later the FDA has

19  not done so.

20         Now, manufacturers are free to add additional

21  language that is consistent with the monograph.  What they

22  can't be is forced to add this language to their labels or to

23  their websites or to their advertisement materials, because if

24  they are, that's a requirement that is different from, in

25  addition to, or not otherwise identical with, Federal law.

1   And that's the choice that is Congress has made.

2         I think -- the plaintiffs certainly here want to be

3   able to have a lay jury's judgment be substituted for the

4   decisions of the FDA's scientists, but that is not the process

5   that Congress set forth that should be followed.  And we know

6   from the recent CARES Act, that Congress again reaffirmed that

7   when it comes to questions of efficacy in making decisions

8   about whether medicine is effective, it empowered the FDA to

9   make those decisions.  That doesn't mean that there's no

10  vehicle here for the public to offer insight or perspective

11  about whether they feel medicine is effective or not.  They

12  can, through the citizen's petition process.

13        And that leaves the FDA open, if it agrees with the

14  outcome of that process, to follow an administrative order

15  process where it will solicit public comment and advice from

16  scientists and consider all the evidence in terms of making a

17  decision about whether Phenylephrine should continue to remain

18  effective, but the fact of the matter is it hasn't done so,

19  and -- and the plaintiffs cannot use state law to get ahead of

20  the FDA and force this -- this change to be made.

21        I think we simply -- we have spent a fair amount of

22  time addressing the express preemption provisions.  But I

23  think one thing that is important to note is the plaintiff's

24  point about new information really is something that comes up

25  in the context of safety-related cases.  And you see that

1   starting with the <u>Wyatt</u> case by the Supreme Court and other

2   decisions.

3              THE COURT:  What kind of basis did you say?

4              MR. SOUKUP:  Safety-related cases.

5              THE COURT:  Safety, all right.

6              MR. SOUKUP:  And it's completely understandable why

7   Congress is going to be concerned with treating safety-related

8   issues differently and then require people to update their

9   labels based on new information.

10             Congress carved out, you know, product liability

11  claims from the express preemption statute.  The FDA has

12  published different regulations that require manufacturers in

13  some instances to update, based on new warnings, and I think

14  you even see court decisions recognizing the role that tort

15  claims can play in protecting the public from safety.

16             None of those are at issue in an efficacy-related

17  case.  And that's why the plaintiffs can't cite a single

18  example of the situation where an FDA-approved efficacy

19  statement was -- was allowed to be revisited.

20             THE COURT:  I suppose you are right as a policy

21  matter, but why should it make any difference in analyzing it

22  legally?

23             MR. SOUKUP:  Well, as a -- as a legal matter, the

24  reason why it matters is you go back to the text of the

25  expressed preemption statute, which is looking for something

1   that is different from, in addition to, or not otherwise in

2   accordance -- or not otherwise required by Federal law.  And

3   that's why the plaintiffs spend so much time in their

4   opposition trying to dig through the relevant regulatory

5   background to find some provision that would allow them to

6   make the efficacy-related changes that they're seeking.

7           In all the cases they cite involving new

8   information, those -- the regulatory regimes in those cases

9   permitted changes to be made based on new information about

10  safety-related concerns.  There simply is no regulation that

11  the plaintiffs can point to, other than the alternative

12  language regulation and the general misbranding statute, which

13  I talked about earlier, that could conceivably allow us to

14  make the change that we made.

15          In Section 21 C.F.R. 330.1(c)(2) it's very clear on

16  this point.  It says:  We shall use the language that the FDA

17  has directed us to do.  It's not a discretionary choice.  And

18  if we don't follow it, we violated 21 U.S.C. 352(c) which

19  requires us to use the information that has -- that has been

20  set forth.

21          THE COURT:  Okay:  Got it.

22          MR. SOUKUP:  I think I will briefly touch on why

23  conflict preemption also exists here, too.

24          THE COURT:  Okay.

25          MR. SOUKUP:  What they're asking us to do is to

1  effectively change the language here.  It used language that

2  is somehow different from what -- what the FDA has required us

3  to do.

4          As I mentioned, we can't do it without violating

5  Federal law.  That's why, in addition to express preemption,

6  we also have conflict preemption that exists here.  And if the

7  only way that we can comply with Federal and state law is to

8  stop selling their medicine, well, that kind of runs squarely

9  into the stop selling point that the Supreme Court has

10  rejected.

11          We also have obstacle preemption here.  This can't

12  be a situation where the jury allowed to substitute its

13  judgment for the FDA scientists, especially given what

14  Congress did in the CARES Act, where it put the FDA in the

15  position of making decisions through an administrative order

16  process about what medicine should be deemed effective and

17  whether it should be included in the monograph.  It's plain

18  here that this is a situation where Congress wanted the FDA's

19  judgment to reign supreme.  That's why it titled the

20  preemption provision National Uniformity For Nonprescription

21  Drugs, and it's why it gave the FDA exclusive authority to

22  make decisions about efficacy determinations on monograph

23  products.

24          And if the Court has no more questions for me, I

25  will turn things over to either Mr. Selbin or to

1  Mr. Lefkowitz to -- Mr. Lefkowitz is prepared to address right

2  now the RICO arguments.

3          THE COURT:  I think I would rather hear from the

4  plaintiff first on the preemption points.

5          MR. SACCHET:  Good afternoon, Your Honor.

6          Michael Sacchet for plaintiffs of Ciresi Conlin LLP.

7          I want to drop right in and address defendants's

8  arguments that, A, the monograph shields them from all

9  liability and any claims, state or Federal, and at bottom,

10  their hands were basically tied, as they say, and they

11  couldn't change the label.

12          We've heard a lot about the regulations, but what I

13  didn't hear anything about was the 1986 final rule that puts

14  this to bed.

15          In the 1986 final rule, which is where the FDA

16  interpreted § 21 C.F.R. 330.1(c)(2), the FDA made clear,

17  quote, the agency does not believe it is necessary to require

18  manufacturers to notify the FDA by registered mail of any

19  intended changes --

20          THE COURT:  You need to slow down.  You need to slow

21  down for the court reporter.

22          MR. SACCHET:  Sure.

23          -- from any intended changes from the monograph

24  labeling.  A manufacturer may choose other truthful and

25  nonmisleading language to describe the indications for use.

1    THE COURT:  But that is what we are talking about

2  here, right?  We are not just talking about, like, in one of

3  the cases I read, Judge Cote's case, where you are further

4  refining advice on the label.  Here, you're talking about

5  negating the label.  You are wiping it out entirely.  The

6  label says effective.  You are saying ineffective.

7    MR. SACCHET:  Your Honor, I'll need to clarify that

8  point.

9    The final rule goes on to say, which again,

10  defendants make no mention of today, or in their papers,

11  quote, regardless of which alternative a manufacturer uses,

12  FDA regulations require, require, that OTC drug labeling be

13  clear and truthful in all respects, not false and misleading

14  in any particular.

15    That's what the FDA's interpretation of 330.1(c)(2).

16  And I understand that the Supreme Court's overruled Chevron

17  deference, but it has not overruled our deference, and this is

18  the FDA's own interpretation of § 330.1(c)(2).  That is what

19  it means s.  And that is what the FDA said it means in 1986.

20    THE COURT:  If that is true, then what is left of

21  express preemption?

22    MR. SACCHET:  This is a very unique circumstance,

23  Your Honor.  No case that defendants cite invoke §

24  330.1(c)(2).  To my knowledge, we're the only plaintiff that's

25  ever done so.  And 330.1(c)(2) is specific to indications.  It

1  doesn't address statements of identity, doesn't address

2  directions, doesn't address warnings, doesn't address anything

3  else but indications for use in the OTC drug context where, as

4  here, there is an exceptional circumstance where there's been

5  a C change in the scientific evidence.

6          The FDA's 1994 monograph was based on antediluvian

7  science dating back to the 1960s that do not meet modern day

8  standards for scientific evidence.  That is why the NDAC voted

9  unanimously, 16 to 0, not a single dispute that the evidence

10  proves that Phenylephrine is no more effective than placebo.

11  And not just that, defendants know it.

12          I'm also not aware of a circumstance where a

13  plaintiff can allege the defendant knows it and

14  notwithstanding, they continue to label their product and sell

15  it, based on only the (b)(1) indication in the 330.1(c)(2).

16          THE COURT:  If it is -- if it is as well-established

17  as you are suggesting, based on the NDAC's finding, why hasn't

18  the FDA gone ahead and revised its efficacy regulation?

19          MR. SACCHET:  Your Honor, the FDA is presumably in

20  the process of doing just that.  It's been only a year since

21  the unanimous vote.  Since then, the FDA did issue a public

22  press release touting the NDAC's 16 to 0 finding.  But in any

23  event, Federal appellate law is clear that there is no

24  precondition whatsoever for FDA action, either through a

25  finding or an enforcement action, to prohibit or stall a

1    plaintiff from bringing a parallel misbranding claim.  And I

2    believe that's presumptively why defendants here, although

3    they threaten the JPML and Your Honor, with a motion on

4    primary jurisdiction, didn't bring it, because they know,

5    based on the law that Your Honor can deny their motion for

6    preemption, notwithstanding the fact that the FDA is

7    simultaneously considering it.

8            So there's nothing that stands in the way here of

9    Your Honor denying preemption, letting the FDA move forward

10   based on 16 to 0 vote, and presumably pulling Phenylephrine

11   from the monograph, whenever that might happen..

12           But with respect to this particular case, in

13   Critcher in particular, we've heard over and over again that

14   Critcher precludes these claims.  It's simply not true, and it

15   doesn't so just because of new scientific evidence.

16           I'd like to make this point crystal clear for the

17   Court, because it wasn't made in the papers, but it's very

18   obvious.

19           In Critcher, the plaintiff brought a claim impacting

20   the cosmetic regulations.  The cosmetic regulations.  Not the

21   OTC drug regulations.  Although the express preemption

22   provision for cosmetics and drugs is substantively the same as

23   defendants's argument, 379(r) and 379(s), that is where the

24   analogy ends.  And the reason why is because the cosmetic

25   regulations, unlike 21 C.F.R. § 330.1(c)(1), unlike 21 C.F.R.

1  § 330.1(c)(2), unlike 21 C.F.R. § 341.80, unlike any of the

2  regulations we cite, the cosmetic regulations do not

3  incorporate the Federal misbranding statute.

4          And for that reason, the plaintiffs's attempt to

5  invoke an etheric misbranding claim, unwedded, unhinged from

6  the regulation, of course with in addition to the Federal

7  regulations.

8          THE COURT:  I have to look at that.  I mean, I

9  understand what you are saying, I had not realized that

10 before.

11         If that is right, that is significant to me, because

12 I read the case as not all that different from that -- from

13 this one, in that in both cases, consumers were not getting

14 what they thought they were getting.  In that case, it was

15 they were not getting the quantity they thought they were

16 getting.  In this case, they were not getting the efficacy

17 they thought they were getting, but they were not -- in both

18 cases, I read it as they did not get what they thought they

19 were getting.

20         But you are saying that, in that case, there was no

21 anti-misbranding overlay?

22         MR. SACCHET:  Essentially yes, Your Honor.

23         So there's three reasons why Critcher is readily

24 distinguishable.  First and foremost there, the regulation

25 foreclosed the claim because the allegation that you needed to

1   add an accessible weight disclosure was in addition to the net

2   weight disclosure.  Essentially the plaintiff conceded that it

3   had complied with the regulation.

4           That's not the case here.  We're saying defendants

5   didn't comply with the regulation, so that's point of

6   distinction number one.

7           Two, the cosmetic regulations don't incorporate the

8   Federal misbranding statute, which is 362 in the context of

9   cosmetics, or it's 352 in the context of the drugs.  And I

10  looked at them in § 701.1 of the cosmetic regulations, which

11  is essentially the analog to 330.1, doesn't say anything about

12  it.  So, therefore, the plaintiff, on appeal, never cited a

13  regulation that incorporates the misbranding statute, nor did

14  the Second Circuit, because there isn't one.

15          But here, Your Honor, it does incorporate it.  And

16  the reason why, and I'm happy to get into the slides right

17  now, defendants predicate all of their briefing on the false

18  premise that the monograph controls this inquiry.  They elide

19  out 330.1 from their recitation of the rule when they cite it.

20  And I'm happy to share, Your Honor, the demonstrative that

21  illuminates this principle.  Why did they elide out 330.1 when

22  reciting that on page 16 of their brief when discussing

23  Critcher?  It's because 330.1(c)(1) incorporates the Federal

24  misbranding statute.  That's why.

25          THE COURT:  If you have slides, I am happy to look

1  at them.

2          MR. SACCHET:  Great.

3          I will share screen.  Your Honor, can you see the

4  screen share of the slides?

5          THE COURT:  Clearly.

6          MR. SACCHET:  Fantastic.

7          So one point that might be worth making at the

8  outset is, another common mantra that defendants make is you

9  simply can't challenge a one-time grace determination.  Once

10 the FDA said that this drug was generally safe and effective

11 in 1994, period, full stop, we can say what we want on the

12 label, as long as it complies with the monograph.

13         That's simply not true.  21 C.F.R. § 314.170 says

14 that all drugs, including an FDA-approved drug, is still

15 subject to the Federal misbranding statute, which is what

16 we're talking about here.

17         Moreover, that accords with the Supreme Court's

18 central principles in Wyatt, where Justice Stevens said on

19 behalf of majority, that it is a central premise of Federal

20 drug regulation, not certain kinds of regulation, but a

21 Federal drug regulation, that these defendants, in this case,

22 are responsible for their labels at all times, not just at the

23 time of a great determination in 1994, but at all times.

24         THE COURT:  It begs the question, though, doesn't

25 it?  You know, yes, they are responsible, but to whom?  You

1  know, if it is inaccurate, what is the remedy and what I think

2  they are saying is, it is the FDA that is -- that is

3  responsible for telling them to alter the label if it needs to

4  be altered.

5          MR. SACCHET:  That is what they are saying,

6  Your Honor, and in plaintiff's view, that turns Wyatt on its

7  head, because Wyatt makes clear that the FDA is not the one

8  responsible for monitoring the labels at all times.  It's the

9  defendants.  And that's what the Third Circuit made clear on

10  Friday in Fosamax.  Whether it's fair or not, whether it's

11  fair or not, the FDA can take its time, but Merck remains

12  responsible for its label at all times.  That's the quote from

13  Merck citing Albrecht citing Wyatt.

14          And here, even if for some reason Wyatt doesn't

15  control, which we think it does control, the plain language of

16  330.1(c)(1) and (c)(2) impose a truthfulness requirement,

17  vis-a-vis the misbranding statute, and the language that it

18  must be otherwise truthful and not misleading.

19          So, whether the Court were to rely on Wyatt's

20  central premise, or whether it relied on the regulations

21  themselves, there is a duty to maintain the label and make

22  sure it is truthful.

23          And there's no exception in the OTC context.

24  Judge Cote made that clear in acetaminophen where she said, as

25  you can see at the bottom of the slide, it's a foundational

1    principle for OTC drugs, not just NDA drugs, but all of them,

2    that a manufacturer's responsible for the adequacy of their

3    label at all times.

4              THE COURT:  Okay.

5              But you know, again, the label that Judge Cote was

6    dealing with was, check with your doctor before you take this

7    during pregnancy.  And the revision to that, that the

8    plaintiffs were seeking, was do not take too much of this,

9    take less of this.

10             It was not a complete negation of the label like you

11   are seeking here.  And that is why she held it was it was not

12   expressly preempted.

13             This is a -- this is a much more direct attack, and

14   you have avenue cited me several provisions of the regulations

15   and the case law, and I appreciate that, and you are right

16   about that, but I am not still not seeing how it jibes with

17   the express preemption clause.  That is my difficulty.

18             MR. SACCHET:  Well, maybe to go back to what Judge

19   Cote said in acetaminophen and what Justice Stevens stated in

20   Wyatt.  It would be difficult to accept that strengthening a

21   warning for consumers benefit would be misbrand a product.

22   That would be difficult to accept.  So too here it would be

23   extremely difficult to accept that diluting an efficacy

24   indication for consumers's benefit would misbrand the product,

25   and that is exactly why J & J did what it did, because they

1    know, J & J knows, that it can change its label and indeed,

2    must do so per the regulations, to conform with new and

3    significant scientific evidence.

4              So, the idea that defendants just said that changing

5    the label misbrands the product runs headlong into Wyatt.

6    Wyatt rejected that.  It depends on the change.  The substance

7    of the change, not the fact that it was merely changed.  The

8    substance of the change.

9              And now to get more into the regulations, because I

10   think that's where Your Honor's at.

11             Again, when defendants recite or purport to recite

12   what the rule here is, based on 330.1, they elide half of the

13   requirement.  Defendants argue that as long as their label

14   complies with the monograph, it is grays and not misbranded.

15             It's not what § 330.1 said at all.  § 330.1 said a

16   drug like Phenylephrine is generally recognized as safe and

17   effective, and is not misbranded if -- if, it meets each of

18   the continue conditions contained in this part, i.e., 330.1

19   and the conditions contained in the monograph.  It's a

20   conjunctive requirement that requires compliance with both,

21   not just monolithically the monograph, as defendants argue.

22   This was not some one-time, unfortunately, when they purport

23   to recite 341.1, which is the monograph governing all OTC

24   cold/cough drugs, they commit the same mistake.  They elide

25   out, make no mention of 330.1.  They simply just say a drug is

1    grays if it's in compliance with the monograph.  Not what

2    341.1 says again.  It goes through again when they purport to

3    cite the CARES Act in 2020 when the --

4                    THE COURT:  I have it.

5                    MR. SACCHET:  Okay.

6                    And the cases make it clear, Your Honor, not to

7    belabor the point, but the acetaminophen Carter/Seal, they all

8    say the same thing.  It's conjunctive.

9                    Now, why does it matter?  This is where the rubber

10   hits the road.  330.1, of course, includes 330.1(c)(1).  And

11   in 330.1(c)(1), the FDA says that a product must be labeled in

12   compliance with chapter 5 of the FDCA, unlike in Critcher.

13   What is title 5, chapter 5?  None other than the misbranding

14   statute, which is codified at 21 U.S.C. 352.  In § (a)(1) it

15   makes clear a drug is misbranded if its label is false or

16   misleading in any particular.  Not some particulars, not other

17   particulars.  Any particulars.  Including efficacy indications

18   for use.  And ultimately, the reason why they can't do it, the

19   reason why they're foreclosed from doing it, prohibited from

20   doing it, is 331.  It makes clear you cannot sell a misbranded

21   product in interstate commerce.  Full stop.  Period.  Over.

22                   If their label is false and misleading, which it is,

23   they cannot sell it.  And that is why stop selling is a viable

24   form of relief pursuant to a Federal requirement.  Unlike in

25   the conflict preemption circumstance where plaintiffs invoke

1  stop selling based on state law.  Totally different --

2          THE COURT:  Let me ask you this.  This question just

3  occurred to me.

4          If that is right, then -- and if we still have the

5  express preemption clause provision, then is it not the case

6  that the way to read that together is to say, all right,

7  21 U.S.C. 331 says there's a prohibition against selling a

8  misbranded production.  There is express preemption.  The

9  answer to that is not to determine whether state law allows a

10 suit for misbranding.  The answer to that is to determine

11 whether there is a private cause of action under § 331, which

12 I think we would agree the answer is no.  And therefore, the

13 way to vindicate the express preemption provision is to go

14 back to the FDA.

15         MR. SACCHET:  True.  But, respectfully, I'm not sure

16 that's totally right, Your Honor.

17         For example, in Zantac --

18         THE COURT:  I am not either, but I am just throwing

19 it out there.

20         MR. SACCHET:  Fair enough.

21         In Zantac, the issue there was exactly as here.

22 Defendants argued this drug is OTC grays.  Full stop.  You

23 can't do anything about it.  And Judge Rosenberg of the

24 Southern District of Florida rejected the argument that it's

25 impossible to bring a parallel misbranding claim under these

1    statutes and regulations because, and I think this is the

2    critical point, this isn't the run-of-the-mill case.  This is

3    an exceptional case where there's been a scientific sea change

4    in the evidence and it's new and significant.  So even

5    assuming for the sake of argument that defendants's labeling

6    complies with these regulations, it doesn't comply with the

7    misbranding statute because of that narrow exception that the

8    Supreme Court endorsed in _Bartlett_ footnote 4 based on the

9    FDA's own position.

10             So I think that is unique.  I don't think it's

11   limited to a right of action under the FDCA itself.  You can

12   bring a parallel misbranding claim under state law to enforce

13   their requirements of this Federal statute when there is new

14   and significant scientific evidence.  But we don't really have

15   to deal with that question here because 330.1(c)(2) makes

16   crystal clear that has for indications for use, again, not

17   directions, not warnings, even though Judge Cote determined

18   that even as to warnings, notwithstanding the exclusivity

19   policy, you still change the label, but that is beside the

20   point.  Here, per indications for use, the language is claim.

21   330.1(c)(2) imposes a truthfulness requirement in two

22   different ways.

23             First --

24             THE COURT:  Talk a little slower, please.  Have

25   mercy on the court reporter.

1       MR. SACCHET:  It's, unfortunately, my terrible

2   proclivity, so I will slow down.

3       There are two ways that 330.1(c)(2) imposes a

4   truthfulness requirement.  The first is the use of the

5   language alternative truthful non-misleading statements.  Now,

6   in order for the word alternative to have any weight, it has

7   to modify what precedes it.  So, therefore, regardless of

8   which one you use, whether you do use the indication in (b)(1)

9   of the monograph, or you use alternative language, it must be

10  truthful.

11      And if there's any doubt about that construction,

12  not only does 330.1(c)(2) incorporate § 502, which again is

13  the Federal misbranding statute, it would be a little silly to

14  suggest that the disjunction only modifies the alternative

15  truthful language and doesn't require the pre-set language to

16  be truthful, too.  I don't think that works.

17      And if there's any doubt, again, the FDA itself

18  interpreted what 330.1(c)(2) means in the 1986 final rule.

19  That's what the final rule did.  It essentially promulgated

20  that provision and the FDA said what it meant, which, for the

21  fundamental purpose of consumers's needs for accurate labeling

22  information, that's the underlying policy purpose of all of

23  this, to get consumers the right information so they can make

24  choices, is to tell the truth.  It's to tell the truth.

25      And that's why the FDA's final rule says:

1   Regardless of which alternative these defendants choose,

2   either the (b)(1) that says it temporarily relieves nasal

3   congestion, or an alternative, FDA regulations require that

4   the labeling of OTC drug products be clear and truthful in all

5   respects, not false or misleading in any particular mirroring

6   the language of the Federal misbranding statute.  The

7   defendants can't address this.  They don't say anything about

8   it in their brief, even though we cited it three times.  Just

9   ignore it.

10          THE COURT:  Look, I see the answer.  They might not

11  have said anything, but I see what they would say.  They would

12  say yes, that is what the FDA requires.  And the remedy for

13  the FDA -- for violating that FDA requirement is sanctions and

14  action by the FDA.  That is what they would say, right?  That

15  is the whole question here that we are talking about.

16          MR. SACCHET:  Your Honor, the express preemption

17  provision in 379(r)(f) preserves parallel claims.  They're

18  saved.  They're saved.  That's what the senate report says.

19  It allows states to vigorously enforce false and misleading

20  labeling if it is parallel to Federal requirements.

21          Our claims under state law, New York specifically,

22  are parallel to these regulations and the Federal misbranding

23  statute.  They are.  And therefore, we are allowed to proceed

24  regardless of whether the FDA, at some point institutes an

25  enforcement action or actually pulls Phenylephrine from the

1  monograph.

2      THE COURT:  I think the tension is between the

3  generality or the generalistness of the anti-branding statutes

4  and the specificity of the monograph here and what is allowed.

5      And again, you know, it is one thing to say, well,

6  yes, you can -- you can have parallel remedies when something

7  is very clear and the FDA is in one place and state law is in

8  the same place; no problem there.

9      When it is not as clear, then it is not as easy to

10 say, well, yeah, these are just parallel remedies.  We are

11 both on the same page, us and the FDA.

12     MR. SACCHET:  Yes, Your Honor.

13     THE COURT:  Do you think?

14     MR. SACCHET:  Perhaps, Your Honor, it would be

15 helpful then to go right to the monograph, because if there's

16 doubt about whether 330.1(c)(1) incorporating the Federal

17 misbranding statute, poses a question if there's doubt about

18 what 330.1(c)(2) stands for as well, the monograph really is

19 no different.  So I'll take this in turn.

20     341.1, again, imposes an injunctive requirement that

21 all OTC cold/cough drugs are not misbranded if they meet the

22 conditions in this part, so in this situation it would be the

23 monograph if 341 is that part with respect to monographs, and

24 each of the general conditions in 330.1.

25     So this isn't a situation where as defendants would

1  like to have it, the monograph somehow is swallowing the

2  general labeling rules in 330.1.  The general provision on

3  monographs makes that clear.  I mean, you've got to have both.

4          And if still, if there is any doubt, when you look

5  at 341.80(b), which are the labeling conditions for

6  Phenylephrine and other oral decongestants, there's three

7  reasons in the text of the regulation itself that plaintiffs

8  believe do require truthfulness in all respects, and the first

9  is the language that, yes, you can use (b)(1) temporarily

10 relieves nasal decongestion as appropriate.  It is not

11 appropriate to say that Phenylephrine relieves nasal

12 decongestant as a nasal decongestant when we've alleged that

13 they know it doesn't and there's been a scientific revolution

14 that the NDAC made clear doesn't show that anymore.  It's just

15 not appropriate.  That's what the plain language says.

16         In addition, just like 330.1(c)(2) instead of saying

17 alternative truthful and non-misleading statements, it says

18 other truthful and non-misleading statements, and for the word

19 "other" to have any weight, it has to modify what precedes it

20 to impose a general truthfulness requirement.  Even if it

21 didn't, the rest of the sentence goes on to incorporate

22 330.1(c)(2), the general conditions on labeling and

23 misbranding, as well as § 502, which is the Federal

24 misbranding statute.

25         So it is not our argument that there's tension here

1    between the monograph and 330.1.  Plaintiffs are arguing that

2    defendants violate the monograph because what they're saying

3    is not true and the monograph itself requires truthfulness,

4    which again, the 1986 final rule makes clear.

5                THE COURT:  I need you to wrap up.

6                MR. SACCHET:  Sounds good.

7                So, in closing, Your Honor, I would like to make the

8    final point that assuming arguendo that defendants's labeling

9    does comply with the regulations 330.1 and the monograph,

10   which plaintiffs dispute, they can still bring a parallel

11   misbranding claim to enforce misbranding statute itself.

12   That's what Bartlett stated in footnote 4.  That's exactly

13   what Judge Rosenberg allowed in Zantac.  Defendants tend to

14   quibble with the rule, but they have apparently forgotten that

15   their own cases that they cite endorse this role, such as us

16   from the Southern District of New York, and ultimately it's

17   crystal clear, as plaintiff pleaded in their complaint at

18   paragraph 30.  There is new evidence.  It is substantial and

19   it, quote, confirms that orally administered Phenylephrine is

20   not effective.  That is the NDAC's own language that we've

21   incorporated by reference and the Court can take judicial

22   notice of.

23               So, for all of these reasons, Your Honor, we believe

24   stridently that plaintiffs's claims are not expressly

25   preempted because they parallel Federal requirements.  And if

1    they parallel Federal requirements, they cannot either be

2    impliedly preempted.  So for all those reasons, the preemption

3    defense fails.

4            I will turn it over now to the Court and the RICO

5    argument.

6            Thank you very much.

7            THE COURT:  Well, I am going to give Mr. Soukup a

8    short opportunity for reply.

9            MR. SOUKUP:  It will be short, Your Honor.  Thank

10   you very much.

11           The Court has it right, I'm surprised to hear

12   counsel say we did not address the 1986 rule or 330.1.  We did

13   on page 2 of our reply.  And what the FDA said at the time it

14   promulgated that regulation is, quote, there may be many ways

15   of fairly and accurately stating the same information.

16           In other words, we can't turn around if FDA says you

17   have to say something is red and say actually it means green.

18   If we did, that would just completely create total and

19   complete chaos out here.  Manufacturers would no longer be

20   able to rely on the monograph.

21           And when the FDA, when Congress has wanted to give

22   manufacturers the freedom to make changes, it expressly does

23   so.  It comes out with clear and specific, concrete

24   requirements.  That's what we saw in the Wyatt case.  It was

25   not an express preemption case, that was an implied preemption

1   case, but the Supreme Court there found no preemption because

2   you had the changes being effective regulation, which

3   authorized manufacturers to make changes to that.

4         Likewise here, when Congress passed the CARES Act,

5   which said if you comply with the monograph, there's no

6   misbranding that's going on, and it gave manufacturers the

7   freedom to make small changes, for instance, to dosing.  If

8   Congress wanted to give manufacturers broad freedom to make

9   these changes, it would have done so expressly.  It didn't do

10  so.

11        The Court has it exactly right with what the

12  appropriate path is here.  This is a problem that Congress has

13  committed to the FDA to address, and if for some reason the

14  FDA says that there would be a misbranding violation, even

15  though you've complied with the express language of the

16  regulation, that's a matter for the FDA to determine.  It's

17  not a matter for private plaintiffs to seek to enforce through

18  litigation.

19        I heard a reference as to well to Judge Cote's

20  decision in the acetaminophen MDL.

21        What's interesting is that a few months after that

22  decision was issued, Judge Cote issued another preemption

23  decision in April of 2023, and there she actually found that

24  when personal injury cases were not at issue, Federal law and

25  this express preemption statute 379(r) did preempt claims for

1   economic loss damages.  That was a decision at 2023, WL

2   3045802.

3          THE COURT:  Was that in your brief?

4          MR. SOUKUP:  It is not in the brief, Your Honor,

5   because we did not have the space to address it within our

6   ten-page limit.

7          But given the intense focus on the acetaminophen

8   decision during the argument today, we wanted to make sure the

9   Court was aware of the full context of that case.

10          THE COURT:  The docket sheet in that case, and, you

11   know, I did not study it, but I did note their decision really

12   striking the plaintiffs's experts on the injury side, which

13   effectively was the end of the case.  I did not spot that one.

14          MR. SOUKUP:  April 21st, 2023, was the date of that

15   decision, Your Honor.

16          THE COURT:  Okay.

17          MR. SOUKUP:  In addition to that, I think that, you

18   know, what the plaintiffs's argument really is here, is a

19   circular argument.  It's an argument that says, look, even

20   though we recognize that Federal law requires you to do this,

21   if for some instance, some new development occurs, you are

22   required to take unilateral action to do that.

23          Whatever the case might be, such as in Zantac where

24   somebody might say, actually, in a non-monograph context, or

25   in a prescription drug context, or in a safety context, you

1   can make changes.  That flexibility does not exist here when

2   it comes to monograph drugs or efficacy concerns are at issue.

3          We're bound to follow the monograph and in 379(r)

4   makes absolutely clear that if the plaintiffs are seeking to

5   force us to do something different from, in addition to, or

6   not otherwise identical with Federal law, that claim is

7   expressly preempted, which is why all of the state law claims

8   here fail.

9          THE COURT:  Okay.  Got it, thank you.

10          All right.  Let's hear from defendants on the RICO

11  claim.

12          MR. LEFKOWITZ:  Thank you, Your Honor.

13          Jay Lefkowitz, and I'll try to be brief, given that

14  we've already indulged the Court quite a bit on the preemption

15  issue.

16          THE COURT:  You know, this thing about Federal

17  judges being too busy, that is really -- it is a Greek myth.

18  Take the time you need, really.

19          MR. LEFKOWITZ:  Great.  Great.

20          Well, then it's still early in the day.  Wonderful.

21  Thank you, Your Honor.

22          THE COURT:  Okay.

23          MR. LEFKOWITZ:  The plaintiffs concede that the

24  wholesalers and retailers purchase these oral PE products and

25  that the plaintiffs are end purchasers.  That's at their

1    complaint in 521.  And the indirect purchase rule dictates

2    that indirect incorrect purchasers who are two or more steps

3    removed from the defendant in the distribution chain, may not

4    sue.  That's a blackletter law and the Supreme Court

5    reiterated that in the <u>Apple v Pepper</u> case in 2019.

6          And interestingly, in that case, it actually cited

7    to another Supreme Court case, <u>Kansas v UtiliCorp</u>, and that

8    was a case where the Supreme Court actually said even in a

9    situation where the direct purchaser might have no incentive

10   to bring a lawsuit, in fact, not only no incentive, but in

11   that case the facts were that if they had made a recovery,

12   they would have had to pass on the recovery.  So there was

13   zero policy basis for the rule.  The Court said, it doesn't

14   matter.  Quote, even assuming that any economic assumption

15   underlying Illinois brick might be disproved in a specific

16   case, we think it is an unwarranted and counter-productive

17   exercise to change the policy rule.

18         Now, in this District Court, even Judge Weinstein

19   back in 2006, who basically fought with the policy and tried

20   to create a kind of cigarette litigation exception to this

21   rule, acknowledged in his opinion that the doctrine of the in

22   direct purchaser bar applied equally to RICO actions for

23   treble damages, and he cited the Second Circuit's decision in

24   <u>Sperber v Boesky</u>.  That's at 1051 of Judge Weinstein's opinion

25   citing <u>Sperber</u>, 849 F.2d 60 at page 65.

1          There is no circuit court in the country that has

2    considered the indirect purchaser rule's application and held

3    that it does not apply to RICO cases.

4          The Third Circuit said that in <u>McCarthy</u>.  The Sixth

5    Circuit said it <u>Trollinger</u> and just reiterated it about a

6    month ago in a case called <u>Duramax</u>.  And the Seventh Circuit

7    said it in <u>Carter</u>.

8          So, there's no question that the indirect purchaser

9    rule applies to RICO, and although the Second Circuit, in

10   fairness, has never had to issue an opinion that addresses it

11   as a matter of holding, it did say in Sperber that it appears

12   that that's the same policy.  Here in the Second Circuit and,

13   of course Judge Weinstein understood <u>Sperber</u>, as saying that,

14   indeed, it is binding.

15         THE COURT:  Let me ask you this:  Don't we have some

16   pharmacy distribution defendants in this case?

17         MR. LEFKOWITZ:  We -- we do not have any, put it

18   this way, the plaintiffs do not claim at all that they are not

19   the indirect purchasers.  They are not suing, for example,

20   retailers and manufacturers and alleging they are

21   coconspirators.  That's just not an issue in this case.

22         THE COURT:  Okay.

23         MR. LEFKOWITZ:  And essentially what the plaintiffs

24   do, because I think they kind of acknowledge the rule, it's

25   hard to read <u>Apple v Pepper</u> and not acknowledge the rule, and

1  it's hard to read the Supreme Court's decision in <u>Holmes</u> and

2  not recognize what the Supreme Court said very, very

3  explicitly in <u>Holmes</u>, which -- which is that the language that

4  Congress used to model the private right of action under RICO,

5  1964(c), was modelled exactly on the civil action provision of

6  the Federal antitrust laws, which is the reason that all of

7  the Circuits that looked at this have applied the indirect

8  purchaser rule to RICO.

9        So they focus, instead, on a different strand of

10  RICO jurisprudence.  They look at the <u>Sedima</u> case, the <u>Bridge</u>

11  case.  They look <u>Anza</u>, all of these are proximate cause cases.

12  And it is certainly true that there is a different standard

13  for proximate cause or there is a proximate cause requirement

14  in all RICO cases.  And we're not disputing that.

15        THE COURT:  Right.

16        MR. LEFKOWITZ:  The issue is that we have an

17  indirect purchaser situation here, so beyond just looking at

18  general proximate cause jurisprudence, we also have to satisfy

19  the indirect purchaser rule.

20        And so I just don't think there's any basis

21  whatsoever for this Court to go out and adopt a rule that,

22  essentially, no one else has adopted.  I think there's one

23  district court within the Tenth Circuit that has fought with

24  the principle of <u>Apple v Pepper,</u> but no other court has

25  addressed this.  And the most recent court to address it was

1   the Sixth Circuit just about a month ago.  And Judge Moore in

2   an opinion where she was clearly unhappy with the rule, still

3   acknowledged that:  I don't have a choice because the Supreme

4   Court has made this absolutely clear.

5          If the Court has any questions, I'm happy to address

6   the secondary point that the plaintiffs make in response,

7   which has to do with preclusion, but I'm also happy just to

8   address that in my few minutes of rebuttal time.

9          THE COURT:  No, save it for rebuttal, if you need

10  it.

11         Let me hear from the plaintiffs on this.

12         MR. SELBIN:  Thank you, Your Honor.

13         Jonathan Selbin.  May it please the Court.

14         THE COURT:  Mr. Selbin, I will say, I did, I mean,

15  it rang true with me counsel's point that you have kind of

16  conflated proximate cause or maybe even causation, in fact,

17  with the indirect purchaser rule, which is a whole different

18  RICO antitrust separate rule, right?

19         I mean, I am assuming for this that you can easily

20  show proximate cause, okay?  You can do that.  You know, it

21  was the that manufacturer made the product.  It was sold to a

22  wholesaler.  It was bought at Walgreens or wherever it was

23  bought, and then your guy bought it and lost money, done.

24         That still makes him an indirect purchaser.

25         MR. SELBIN:  That's correct, Your Honor.  We don't

1   dispute that we're an indirect purchaser.  The problem that

2   defendants have, with all due respect, is that there is no

3   Supreme Court case and no Second Circuit case that holds that

4   the indirect purchaser rule applies to RICO.  They cite the

5   Apple case a bunch of times.  That was an antitrust case.

6           Proximate cause is the test that the Second Circuit

7   has used again and again and again, and the Supreme Court has

8   used again and again and again, in Holmes and Bridge and Hemi.

9   In every Second Circuit case, proximate cause is the way you

10  test RICO standing, in all of those cases.  And in all of

11  those cases they talk about a connection between the RICO

12  violation, which here is the fraud, and the injury, which here

13  is the overpayment by consumers.  There is not a single case

14  from the Supreme Court, there is not a single case from the

15  Second Circuit that says there's a privity requirement, or a

16  requirement of a direct transaction.

17          If you look at Holmes at 271, Bridge at 654, Hemi

18  at 9, all of them use the same language about the required

19  connection being between the RICO violation, the fraud here,

20  and the injury, not a direct purchase.

21          And in Bridge, Bridge really is the controlling case

22  here.  I don't understand why defendants think it's not on

23  point.

24          Bridge comes as close to the holding there's no

25  indirect purchaser rule in RICO as it possibly could without

1    doing so, because that specific issue wasn't in front of it.

2    So I want to talk, with Your Honor's permission, for a minute

3    about <u>Bridge</u> and why we think it's controlling.

4           First of all, in <u>Bridge</u>, the Supreme Court said that

5    the any person language in RICO suggests a breadth of coverage

6    that is not easily reconciled with an implicit requirement

7    that the plaintiff show reliance in addition to injury.  The

8    same is true here.  It's inconsistent with the breadth of

9    coverage of RICO to read into it a rule that's not found

10   anywhere in the statute.

11          And that was true in <u>Bridge</u>, too.  In <u>Bridge</u>, the

12   Court said, the Supreme Court said, that the first party

13   reliance requirement came out of nowhere.  It's not in the

14   statute.  Well, the same is true with the indirect purchaser

15   rule.  It comes out of nowhere.  It's nowhere to be found in

16   the RICO statute.

17          THE COURT:  But you know, like counsel said, RICO is

18   generally construed in pari materia with the antitrust laws.

19   It is phrased as a standing requirement under Illinois brick,

20   but it's also a credential rule that simply says, we do not

21   want this thing to get out of control, so we are just going to

22   kind of arbitrarily cut it off and not let people sue when

23   they are two or more steps down the line.  And if you treat

24   RICO like you treat antitrust, the same arguments would really

25   apply.

1        MR. SELBIN:  The same arguments would apply if

2   you're supposed to treat RICO just like antitrust.  But both

3   the Supreme Court and the Second Circuit have expressly said

4   that's not what you're supposed to do.  In both _Sedima_, the

5   Supreme Court and in _Horn_, the Second Circuit has said you're

6   not supposed to import RICO barriers to standing that are

7   appropriate in a purely antitrust context.  They couldn't be

8   clearer.  We don't just, simply because it's modelled, simply

9   because some aspects of RICO are modelled on the antitrust

10  laws, doesn't mean that you import barriers to standing that

11  don't otherwise apply.  And then they go on to say, both

12  _Sedima_ and _Horn_, that you are supposed to liberally construe

13  the statutes to -- the statute to effectuate its remedial

14  purpose.

15        So in this context, simply importing antitrust

16  doctrines, and that's all Illinois brick is; it's just a

17  policy decision.  It's a bright-line policy rule, and I heard

18  my colleague use the term bright-line, you're not supposed to

19  apply bright-line rules in the context of proximate cause.

20  The Supreme Court said that in _Holmes_.  It said it in _Bridge_.

21  It's not a bright-line rule.  You're supposed to look at the

22  facts of the situation and determine whether you can establish

23  the requisite connection again between the violation and the

24  injury; not between the parties.

25        It's completely nonsensical to think that RICO

1   limits all claims to direct transactions.  If that's the case,

2   the Bridge case goes away.  If that's the case, the Alix case

3   goes away.  All sorts of RICO cases involve claims where

4   there's no direct purchase and there's no direct connection.

5   And, in fact, the Metallics case --

6            THE COURT:  There is usually -- there is some kind

7   of aiding and abetting or knowledge of the scheme or something

8   that puts the first party in line in a relationship with the

9   party up the chain that involves some wrongdoing in that

10  connection.

11           MR. SELBIN:  That's correct.  That's correct,

12  Your Honor.  We have that connection.  We have the wrongdoing

13  by the defendants which, for purposes of the RICO claim is

14  defrauding the FDA, very similar to the Alix case.

15           THE COURT:  Yes.

16           MR. SELBIN:  Where it's a bankruptcy court fraud,

17  basically.  And all the harm flows to our consumers.  So you

18  have a connection.

19           THE COURT:  But what is the wrongdoing by Walgreens?

20           MR. SELBIN:  Well, that's the point.  There's not --

21  there's no wrongdoing, Walgreens, as it relates to pure

22  retailer.  There is -- some of those entities also were

23  manufacturers.

24           But if you're talking about the intermediaries,

25  there's no wrongdoing here by the intermediaries.  But there

1  doesn't have to be.  In fact, _Alix_ says the existence of

2  intervening decision-makers is not dispositive and proximate

3  cause -- I'm quoting here, proximate cause is generous enough

4  to include the harms that flow from or are derivative of each

5  other.  And that's from the _Horn_ case.  I'm sorry I said _Alix_,

6  it's from _Horn_.  But the existence of intervening

7  decision-makers not being dispositive is from the _Alix_ case at

8  206.

9         So the Supreme Court and Second Circuit have both

10 held the connection is the wrongdoing and the harm.  We have

11 that connection.  They lied to the FDA.  They lied to

12 consumers.  Consumers, although they don't have to rely on

13 those lies, because that's what _Bridge_ says.  _Bridge_ says

14 there's no first party reliance requirement.  The consumers

15 here actually know about the lies.  It's the very reason they

16 buy the product.

17        If defendants here had not defrauded the FDA, if

18 they had not lied to consumers and the public at large about

19 the efficacy of oral PE, then plaintiffs wouldn't have been

20 harmed.  And the only way we can recover -- and this circles

21 back to a question Your Honor had on the last section -- the

22 only way consumers can be compensated is through litigation.

23 The FDA can't compensate them.  That's not within its purview.

24 The only way anybody can get compensated for having been

25 defrauded, and they're the only victims here, are the

1  consumers, is through private litigation.

2       Now, whether there's through state law claims or

3  RICO, We think it should be both.  It's the only way they get

4  compensated.

5       So defendants get to lie about their products to

6  FDA, to the consuming public, to the specific consumers, and

7  the only remedy is that the FDA may or may not force them to

8  change the label years later?  They've taken in tens of

9  billions of dollars based on this fraud.  And the connection

10  is there.  But for -- and I realize I'm using causation, in

11  fact, language here for just a moment -- but for their fraud,

12  our consumers wouldn't have been harmed.  So we have the

13  connection, the factual connection, between the conduct that

14  violates RICO and the injury.

15       And if you look at the cases I invite Your Honor to

16  look through each of these cases, every time causation fails,

17  causation fails for very specific reasons.  There's not a

18  connection between the RICO violation and the injury.  Not

19  once does a court articulate an indirect purchaser rule or a

20  privity requirement.  Here I'm talking about the Supreme Court

21  and the Second Circuit.

22       If you look at Sperber, Sperber actually supports

23  this.  Sperber says you can recover both direct and indirect

24  injuries.  That's direct language out of Sperber.  You can

25  recover for both direct and indirect injuries, as long as you

1  can make the causal link between the wrongful conduct and the

2  harm that you've suffered.

3       THE COURT:  Is this another way of saying that if

4  you have direct, you can also recover for indirect?

5       MR. SELBIN:  No.  That's not how I read Sperber.

6  Sperber says you can recover for direct and indirect damages.

7  It doesn't limit it.  They analyze them separately in the

8  opinion.

9       There's two separate sections that was opinion; one

10 on direct injuries and one on indirect injuries.  They

11 ultimately conclude on those facts, the indirect purchasers

12 there couldn't establish the requisite connection.  Now that's

13 the language that the defendants seize on.

14      They're not articulating some more general indirect

15 purchaser rule.  It doesn't say that in Sperber.  It says, in

16 the right circumstances, you can recover for indirect

17 injuries.  Here, there's a unique set of facts that it just

18 doesn't make sense.  This was the Ivan Boesky case.  This was

19 the case where the plaintiffs claimed that he was manipulating

20 stocks of a specific kind, and they bought other ones that

21 weren't related to the ones that he was manipulating, but that

22 the market, as a whole, was reacting.  And the Court said

23 that's just too attenuated.  There's no connection between the

24 specific wrongdoing you allege by him and your purchases.

25      Here, that's all we have.  We have a direct

1    connection between the wrongful conduct and the injury.  And

2    that's the test, as you work through each of these cases.  So

3    if you look at the ones where it fails, <u>Sperber</u>, <u>Hemi</u>,

4    <u>Holmes</u>, <u>Empire Machine</u>, in each one the Court is talking about

5    there not being a close enough connection between the RICO

6    violation and the injury.  They never articulate a direct

7    purchaser rule or a privity requirement.

8              And I would say about the out-of-circuit cases, none

9    of them talks about <u>Bridge</u>.  I don't know why.  It's hard to

10   understand, frankly, when <u>Bridge</u> is so close on point as to so

11   many of these issues and warns against exactly this, importing

12   in/out antitrust requirements into RICO.  The most recent

13   <u>Duramax</u> decision, that court acknowledged it was bound by the

14   trial in your case from the same circuit, which pre-dated

15   <u>Bridge</u>.  Most of these cases pre-dated <u>Bridge</u>, the circuit

16   cases.

17             But I think it's fair to say that when you look at

18   the requirement of connection, it's what's required that

19   matters, and we meet it.  It's not direct interaction.  It's

20   not privity.  It's a connection between the misconduct and the

21   injury.

22             THE COURT:  Okay.

23             Let me ask Mr. Lefkowitz a few more questions about

24   that.

25             MR. LEFKOWITZ:  Sure, Your Honor.

1      THE COURT:  Mr. Lefkowitz, if we were analyzing this

2  solely on the basis of proximate cause, if there was no

3  indirect purchaser prohibition in RICO, you would concede,

4  would you not, that there is enough for proximate cause.

5      MR. LEFKOWITZ:  I -- I think -- look, I might not

6  concede just because I'm a lawyer, but I would acknowledge,

7  Your Honor, that I think there is --

8      THE COURT:  There is a strong argument in favor of

9  proximate cause.

10      MR. LEFKOWITZ:  Certainly a strong argument that if

11  the only test here were proximate cause, under the general

12  rubric of proximate cause, you could satisfy that here.  But

13  again, that's not the issue.

14      And again, the question is really a policy question.

15  They're fighting the policy and Judge Weinstein, who certainly

16  was no fan of the policy, because he actually tried to carve

17  out an exception to it, read Sperber and then said:  The

18  doctrine equally applies to RICO claims.  And no court has

19  come out differently, both before and after Bridge.  And the

20  reason is Bridge is not an indirect purchaser case.  Bridge is

21  a competitor case.  It was a case where you had fraudulent

22  liens for auction bids, and there was a challenge under RICO.

23  And so the only question to establish standing was proximate

24  cause.

25      Here, we do have this extra layer.  And the extra

1    layer is based on policy and people can agree or disagree with

2    the policy.  The Supreme Court, though, has made clear in

3    Kansas v UtiliCorp cited with approval just recently in Apple,

4    that even when the policy justifications don't necessarily

5    make sense in a particular case, the policy is still there

6    because otherwise, as Sperber itself noted, extending

7    liability to everyone to whom an illegal price is passed on

8    would extend the chain of liability indefinitely.

9             THE COURT:  So what about Mr. Selbin's point that

10   there are cases saying that you ought to be cautious about

11   extending antitrust concepts into the RICO area?

12            MR. LEFKOWITZ:  The -- the Supreme Court has made

13   clear in Holmes and all of the circuit courts, too, have

14   addressed this specific question of the indirect purchaser

15   rule since then, have agreed that because Congress chose the

16   identical language for the RICO provision that came from the

17   antitrust provision, that the Illinois brick rule does apply

18   and should apply as a matter of blackletter law, recognizing

19   that there are clearly policy tensions.

20            So the Court is not fighting the fact that there

21   could be policy tensions, even economic situations where it

22   might not make sense.  But the law is the law, and as

23   Judge Moore just acknowledged until the Supreme Court changes

24   it, that's the way the circuits are coming in.

25            THE COURT:  Okay.

1          MR. SACCHET:  Your Honor, could I just address the

2   policy point for one second?

3          THE COURT:  Very briefly.

4          MR. SELBIN:  Very briefly, two points.

5          First, Holmes was not in direct purchaser case.

6   That's not -- that's not articulated in that case at all.  But

7   as a policy matter, Bridge says this, and I'm just going to

8   read Your Honor one quote and I'll be done.

9          Bridge says, quote:  Whatever the merits of

10  petitioner's arguments, as a policy matter, we are not at

11  liberty to rewrite RICO to reflect their or our views of good

12  policy.  We have repeatedly refused to adopt narrowing

13  constructions of RICO in order to make it conform to a

14  preconceived notion of what Congress intended to prescribe.

15         That's 553 U.S. at 660.  We respectfully submit this

16  Court should not rewrite RICO either.

17         THE COURT:  Okay.

18         The question is, of course, has RICO been written in

19  a way that carries with it the policy?

20         But I understand the arguments.  They have been

21  excellent.  I thank you all.  I assure you, I am going to read

22  everything again, even more carefully than I have, and I hope

23  to get you a decision as soon as possible.

24         Let's talk about a few more open issues since we are

25  here anyway as far as the status of the case goes.

1      First, without intending in any way to preview how I

2  am going to come out on the motion, because honestly, I do not

3  know, I think we probably ought to have a deadline for a

4  master consolidated complaint in the event I do not totally

5  dismiss.  And I think that ought to be, like, 30 days after

6  decision on this motion so that no one does work unnecessarily

7  if it becomes unnecessarily.

8      Does that sound reasonable?

9      MR. LONDON:  Your Honor, Michael London, on behalf

10  of the plaintiff group.

11      I think, you know, a position -- we would like some

12  more time to do that and, frankly, we've been operating under

13  the presumption of, maybe not presumption, but understanding,

14  at least from a bunch of these status conferences, that

15  following this motion, we would begin in earnest discovery

16  based upon the New York complaint, the skinny complaint,

17  whatever we're calling it, the Bellwether complaint, with the

18  time to then ramp-up the master complaint

19      We understand the defendants want the master

20  complaint as soon as possible following a decision.  There's a

21  lot that's going to go into this master complaint and we

22  understand that they want it as a means to just file another

23  motion to dismiss.  And of course, that's their right, but we

24  went down this road with a skinny complaint that's going to

25  be, to the extent it survives, served and certainly to the

1    extent RICO survives, it will -- it will capture the

2    overwhelming majority of discovery.

3           So this has a hard-fought case to date; certainly

4    engaging in Rule 26(f) conferences, getting automatic

5    disclosures, we think discovery is going to, as well, be a

6    herculean effort from the plaintiffs to get what we can from

7    defendants.

8           So I can go into a little bit of detail why I think

9    the master complaint is going to take time, and we're happy to

10   meet and confer with defendants and to discuss a schedule, but

11   we think 30 days, respectfully, Your Honor, is going to be

12   tight, very tight, to prepare a master complaint of this

13   nature, particularly given what we suspect --

14          THE COURT:  Well, the timing to me does not suggest

15   really, you know, 30 days or 60 days or 90 days.  That is not

16   really the issue.  The issue is going to be discovery pending

17   the master complaint, right?  I mean, is that what you are

18   saying?

19          MR. LONDON:  It is and it isn't.  I don't think the

20   master complaint is going to shed much more light on the

21   discovery needed in this case, and we all know what this case

22   is about.  It's what defendants knew and when they knew it.

23          THE COURT:  Right.

24          MR. LONDON:  If the skinny complaint survives, it's

25   going to help us with general discovery, it's going to help us

1   moving towards the Bellwether process, the legal issues.  It's

2   going to help test the legal defenses.  It's going to help

3   test expert reports and experts defending their thesis.  It's

4   going to help test the class certification issues.  That's

5   what we're moving forward with.

6           The master complaint indicates adding additional

7   states, adding more products, adding more plaintiffs, is going

8   to be a lot of work and it's going to be more motions to

9   dismiss, but the two should be working, both discovery on the

10  skinny complaint, the Bellwether complaints, as well as us

11  putting together this master complaint, and then the motion

12  practice.  They can be parallel tracked, is what we're

13  suggesting.

14          THE COURT:  Let me hear from the defendant on that.

15          MS. BLADOW:  Your Honor, Robin Bladow.

16          I'm prepared to speak on behalf of the defendants.

17          THE COURT:  You need to speak a little louder.  Your

18  microphone is weak.

19          MS. BLADOW:  Sorry about that.  Is that better?

20          THE COURT:  A little bit.

21          MS. BLADOW:  Okay.

22          You know, we were promised back in April when we

23  agreed to even proceed with this skinny complaint process,

24  that we were get a master consolidated complaint next.  The

25  skinny complaint was incentive to raise solely the preemption

1    issue and then when they added the RICO claims, some initial

2    RICO arguments, but we reserved the remainder of the arguments

3    so that they could be directed at master consolidated

4    complaint and plaintiffs told us that's what would be coming

5    next.  The Court, obviously, had that in mind as well.

6            We believe the defendants have a -- they have a due

7    process, right?  It's a right under Federal Rule 8 to know

8    what claims are going to be presented, what plaintiffs are

9    going to be involved in this case, what products are going to

10   be involved in this case going forward as we proceed with

11   discovery.

12           Plaintiffs keep referring to this skinny complaint

13   as a Bellwether complaint that can be used for discovery

14   purposes, but that's not really fair.  They're unilaterally

15   calling this a Bellwether complaint because they've decided

16   what claims they want to bring, and what state law claims they

17   want to prioritize, and which plaintiffs they want to

18   prioritize, but we have a right to know which plaintiffs are

19   going to be involved in this case, which claims, which

20   products and discovery is a two-way street.  We need to be

21   able to take discovery of all of those plaintiffs and all of

22   those claims as well.

23           So we would ask, just as has been anticipated this

24   entire time, that plaintiffs proceed with filing the master

25   consolidated complaint.  If any claims survive, if they need

1   more than 30 days, we anticipated 30 days as well, Your Honor,

2   but if they need more than 30 days, that's fine.  But

3   launching into discovery, based on a complaint that they

4   created as their, you know, best case scenario it's is just

5   not.  It's not an appropriate Bellwether process at all.

6          I mean, to the extent a Bellwether process would

7   even be appropriate, that comes much further along after all

8   of the parties have had a chance to evaluate the various

9   plaintiffs involved.  This is a multi-district litigation with

10  80 complaints.  So many plaintiffs with so many claims, we

11  have a right to know what we're facing in this lawsuit.

12         THE COURT:  I got you.  I got you.

13         Mr. London, typically a Bellwether is last, not

14  first.  The idea was to tee-up the threshold issues here that

15  might convince the parties the case is going forward or not

16  going forward.  So I do not want to think of it as a

17  Bellwether.

18         On the other hand, what you are suggesting is that,

19  to the extent that the skinny complaint -- excuse me.  Give me

20  just a second, please.

21         (Pause in the proceedings.)

22         THE COURT:  What Mr. London is saying is that to the

23  extent the skinny complaint survives, it will largely define

24  the issues for discovery for whatever the master complaint

25  turns out to be.

1       So what I want to do right now is not set any dates.

2  Let me get a decision out on the pending motions, and once I

3  get that out, we will talk again and we will see how broad

4  discovery would be under a surviving skinny complaint, if

5  there is a surviving skinny complaint, and we'll see how much

6  discovery we can do under that, or whether it would make sense

7  at that point not to do any, and get a master complaint

8  instead, okay?  Because I just feel like there is too many

9  variables and we do not know what we are dealing with at this

10 point.

11      Objections?

12      MR. SELBIN:  Your Honor, just one thought.  I don't

13 want to hide the ball here.

14      As defendants know, we proposed to them as part of

15 these discussions that we were going to come to the Court with

16 a proposal that is similar to what was done in the Jovel

17 litigation, similar to what was done in the old Whirlpool

18 washer litigation, which was to proceed with a Bellwether

19 complaint through motions practice beyond just the motion to

20 dismiss, through class certification, through trial.

21      In the class context, unlike in many of the mass

22 tort contexts, Bellwethers have not been used just as an after

23 thought or late in the game.  They're often used as a way of

24 streamlining things up front.

25      If we're going to have depositions of thousands of

1   plaintiffs, because the defendants are going to take the

2   position we have too have a plaintiff for every state, for

3   every defendant for every product, we're all going to spend a

4   lot of time on things that are not going to be particularly

5   useful to the Court or the parties.  And so I know we're not

6   there today, but I just didn't want to hide the ball from the

7   Court that our proposal is going to be that we push through

8   with the New York complaint as a Bellwether complaint.  We'll

9   negotiate with the defendants whether it makes sense to have

10  other states as well, maybe they get to pick one, but we think

11  that's going do make a lot more sense.

12          And we will, of course, file a master complaint in

13  due course.  We're not going to ask for an endless open

14  calendar on that, but we would like the parties to focus on

15  what matters.

16          THE COURT:  Okay.

17          It is reasonable to focus on that, but let's do it

18  when I decide the pending motion.

19          MR. SELBIN:  Understood.

20          THE COURT:  Okay.

21          Thank you, all, for calling in.  I will get you a

22  decision as soon as I possibly can.

23          ALL:  Thank you, Your Honor.

24          THE COURT:  Thank you.

25

1      (Matter concluded.)

2

3                        ooo0ooo

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

601 Lexington Avenue
New York, NY 10022
United States

Jay P. Lefkowitz, P.C.
To Call Writer Directly:
+1 212 446 4970
lefkowitz@kirkland.com

+1 212 446 4800

Facsimile:
+1 212 446 4900

www.kirkland.com

November 6, 2024

**Via ECF**

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     *In re Oral Phenylephrine Marketing and Sales Practices Litigation*,
        **1:23-md-3089-BMC**

Dear Judge Cogan:

The Defendants in the above litigation, with the consent of Plaintiffs' Executive Committee, write to advise the Court that the parties have met-and-conferred and reached agreement, subject to the approval of the Court, on a proposed order governing the disposition of the cases consolidated in this MDL pursuant to the Court's October 29 Memorandum Decision & Order (ECF No. 249).  The parties also propose that the Court adjourn the Status Conference currently scheduled for November 21, 2024, in light of the parties' agreement on the disposition of all cases in this MDL. The parties, of course, remain available at the Court's convenience.

The parties respectfully request that the Court enter the proposed order attached as Exhibit 1, which reflects the parties' agreement.

Austin   Bay Area   Beijing   Boston   Brussels   Chicago   Dallas   Hong Kong   Houston   London   Los Angeles   Miami   Munich   Paris   Salt Lake City   Shanghai   Washington, D.C.

## KIRKLAND & ELLIS LLP

The Hon. Brian M. Cogan
November 6, 2024
Page 2


Dated: November 6, 2024

Respectfully Submitted:

/s/ *Jay P. Lefkowitz*
Jay P. Lefkowitz, P.C.
Jacob M. Rae
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-6460
lefkowitz@kirkland.com
jacob.rae@kirkland.com

Robyn E. Bladow (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
555 S. Flower Street Los Angeles, CA 90071
Telephone: (213) 680-8400
robyn.bladow@kirkland.com

*Counsel for Defendant Haleon US Holdings LLC*

# KIRKLAND & ELLIS LLP

The Hon. Brian M. Cogan
November 6, 2024
Page 3

/s/ *Andrew Soukup*
Andrew Soukup (*pro hac vice*)
Laura Flahive Wu
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-5066
asoukup@cov.com
lflahivewu@cov.com

Cortlin H. Lannin (*pro hac vice*)
**COVINGTON & BURLING LLP**
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-7078
clannin@cov.com

*Attorneys for Defendant The Procter & Gamble Company*

## KIRKLAND & ELLIS LLP

The Hon. Brian M. Cogan
November 6, 2024
Page 4

/s/ *Hannah Y. Chanoine*
Hannah Y. Chanoine
**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
hchanoine@omm.com

Amy J. Laurendeau (*pro hac vice*)
Emilie W. Hamilton
**O'MELVENY & MYERS LLP**
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
alaurendeau@omm.com
ehamilton@omm.com

*Attorneys for Defendant Johnson & Johnson
Consumer Inc.*

/s/ *Robert W. Sparkes, III*
Robert W. Sparkes, III (*pro hac vice*)
Jennifer Janiera Nagle (*pro hac vice*)
**K&L GATES LLP**
1 Congress Street, Suite 2900
Boston, MA 02114
Telephone: (617) 261-3100
robert.sparkes@klgates.com
jennifer.nagle@klgates.com

Ruby A. Nagamine (*pro hac vice*)
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Telephone: (206) 623-7580
ruby.nagamine@klgates.com

*Attorneys for Defendants Amazon.com, Inc. and*

# KIRKLAND & ELLIS LLP

The Hon. Brian M. Cogan
November 6, 2024
Page 5

*Amazon.com Services LLC*

/s/ *E. Paige Sensenbrenner*
E. Paige Sensenbrenner (*pro hac vice*)
Diana Cole Suprenant (*pro hac vice*)
**ADAMS AND REESE, LLP**
701 Poydras Street, Suite 4500
New Orleans, LA 70139
Telephone: (504) 581-3234
paige.sensenbrenner@arlaw.com
diana.suprenant@arlaw.com

*Attorneys for Defendants Associated Wholesale
Grocers, Inc. and Valu Merchandisers Co.*

/s/ *Michael Klebanov*
Michael Klebanov (*pro hac vice*)
**HUSCH BLACKWELL LLP**
1801 Pennsylvania Avenue, NW, Suite 1000
Washington, DC 20006
Telephone: (202) 378-2363
michael.klebanov@huschblackwell.com

Tanner Cook (*pro hac vice*)
**HUSCH BLACKWELL LLP**
8001 Forsyth Boulevard, Suite 1500
St. Louis, MO 63105
Telephone: (314) 480-1500
Tanner.cook@huschblackwell.com

*Attorneys for Defendant Dierbergs Markets, Inc.*

## KIRKLAND & ELLIS LLP

The Hon. Brian M. Cogan
November 6, 2024
Page 6

/s/ *Michael F. Healy*
Michael F. Healy (*pro hac vice*)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 544-1900
mfhealy@shb.com

Daniel B. Rogers (*pro hac vice*)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Boulevard Suite 3200
Miami, FL 33131
Telephone: (305) 358-5171
drogers@shb.com

*Attorneys for Defendant Publix Super Markets, Inc.*

/s/ *James L. Bernard*
James L. Bernard
**HOGAN LOVELLS US LLP**
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3121
James.bernard@hoganlovells.com

Lauren S. Colton (*pro hac vice*)
**HOGAN LOVELLS US LLP**
100 International Drive, Suite 2000
Baltimore, MD 21202
Telephone: (410) 659-2733
Lauren.colton@hoganlovells.com

*Attorneys for Defendant RB Health (US) LLC*

# KIRKLAND & ELLIS LLP

The Hon. Brian M. Cogan
November 6, 2024
Page 7

/s/ *Cara D. Edwards*
Cara D. Edwards
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
Telephone: (212) 335-4714
cara.edwards@us.dlapiper.com

Christopher G. Campbell
**DLA PIPER LLP (US)**
1201 West Peachtree Street, Suite 2800
Atlanta, GA 30309
Telephone: (404) 736-7800
christopher.campbell@us.dlapiper.com

Christopher Young (*pro hac vice*)
**DLA PIPER LLP (US)**
4365 Executive Drive, Suite 1100
San Diego, CA 92121
Telephone: (619) 699-4748
christopher.young@us.dlapiper.com

*Attorneys for Defendant Bayer HealthCare, LLC*

# KIRKLAND & ELLIS LLP

The Hon. Brian M. Cogan
November 6, 2024
Page 8

/s/ *Richard Fama*
Richard Fama
**COZEN O'CONNOR**
3 WTC, 175 Greenwich Street, 55th Floor
New York, NY 10007
Telephone: (212) 509-9400
rfama@cozen.com

Karl Riley (*pro hac vice*)
**COZEN O'CONNOR**
Southeast Financial Center, Suite 3000
200 South Biscayne Blvd.
Miami, FL 33130
Telephone: (305) 704-5940
koriley@cozen.com

*Attorneys for The Kroger Co., Harris Teeter, LLC,*
*and Harris Teeter Supermarkets, Inc.*

# KIRKLAND & ELLIS LLP

The Hon. Brian M. Cogan
November 6, 2024
Page 9

/s/ *Mark J. Lesko*
Mark J. Lesko
**GREENBERG TRAURIG, LLP**
900 Stewart Avenue, 5th Floor
Garden City, NY 11530
Telephone: (631) 994-2408
Mark.Lesko@gtlaw.com

Nilda Isidro
Dale Rose Goldstein
**GREENBERG TRAURIG, LLP**
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Nilda.Isidro@gtlaw.com
GoldsteinD@gtlaw.com

*Attorneys for Defendants Albertsons Companies,*
*Inc., Costco Wholesale Corporation, CVS*
*Pharmacy Inc., Rite Aid Corporation, Target*
*Corporation, Walgreen Co., Walmart Inc., and*
*Wal-Mart Stores East, LP*

/s/ *Michael A. London*
Michael A. London (ML-7510)
**DOUGLAS & LONDON P.C.**
59 Maiden Lane – 6th Floor
New York, New York 10038
Tel: 212-566-7500
mlondon@douglasandlondon.com

*Chairperson of the Plaintiffs' Executive Committee*

Bryan F. Aylstock
**AYLSTOCK WITKIN KREIS OVERHOLTZ**
**PLLC**
17 East Main Street, Suite 200
Pensacola, Florida 32502
Tel: 850-202-1010

## KIRKLAND & ELLIS LLP

The Hon. Brian M. Cogan
November 6, 2024
Page 10

baylstock@awkolaw.com

Kiley L. Grombacher
**BRADLEY/GROMBACHER LLP**
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Tel: 866-881-0403
kgrombacher@bradleygrombacher.com

James E. Cecchi
**CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: 973-994-1700
jcecchi@carellabyrne.com

Adam J. Levitt
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: 312-214-7900
alevitt@dicellolevitt.com

Elizabeth A. Fegan
**FEGAN SCOTT LLC**
150 South Wacker Drive, 24th Floor
Chicago, Illinois 60606
Tel: 630-273-2625
beth@feganscott.com

Jonathan D. Selbin
**LIEFF CABRASER HEIMANN & BERNSTEIN LLP**
250 Hudson Street, 8th Floor
New York, New York 10013
Tel: 212-355-9500
jselbin@lchb.com

## KIRKLAND & ELLIS LLP

The Hon. Brian M. Cogan
November 6, 2024
Page 11

Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road
Ridgefield Park, New Jersey 07660
Tel: 888-546-8799
cseeger@seegerweiss.com

Jason P. Sultzer
**THE SULTZER LAW GROUP P.C.**
85 Civic Center Plaza Ste. 200
Poughkeepsie, New York 12601
Tel: 845-244-5595
sultzerj@thesultzerlawgroup.com

Lindsey N. Scarcello
**WAGSTAFF & CARTMELL**
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Tel: 816-701-1102
lscarcello@wcllp.com

*Plaintiffs' Executive Committee and Interim Class Counsel*

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Oral Phenylephrine Marketing and Sales Practices Litigation<br><br>This document relates to:<br><br>All actions. | Case No. 1:23-md-03089-BMC<br><br>Hon. Brian M. Cogan |

### [PROPOSED] ORDER ENTERING JUDGMENT

**WHEREAS,** on May 3, 2024, Interim Class Counsel filed "an Initial Streamlined Consolidated Complaint under New York law alleging representative examples of the conduct and claims they allege to be at issue in this Multidistrict Litigation relating, among other things, to the marketing and labeling of oral phenylephrine products." ECF No. 197 at 1.

**WHEREAS,** the parties agreed and the Court ordered "that to the extent the Court grants or denies Defendants' motion to dismiss based on preemption and/or primary jurisdiction and/or any initial RICO argument(s) raised, the order will apply to all cases in this multidistrict litigation or otherwise subject to transfer into this multidistrict litigation." ECF No. 204 at 2.

**WHEREAS,** Plaintiffs also "represent[ed] that they have filed sufficient representative examples of the conduct and claims that they allege to be wrongful that a motion to dismiss based on preemption and/or primary jurisdiction and/or initial RICO arguments will, if such arguments prevail, resolve this litigation in its entirety, regardless of additional specific examples of wrongful conduct, additional products named, additional Plaintiff-related allegations, or additional state-law claims that are pled or could be pled in a future Full Master Consolidated Complaint." ECF No. 204 at 3.

**WHEREAS,** on June 3, 2024, Defendants moved to dismiss Plaintiffs' Initial Streamlined Consolidated Class Action Complaint based on arguments that (i) Plaintiffs' state claims are

1

**NPSA-250**

preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA"), (ii) Plaintiffs lack standing to assert the RICO claim, and (iii) Plaintiffs' RICO claim is precluded by the FDCA.  ECF No. 212.

**WHEREAS,** on July 15, 2024, Plaintiffs filed their Opposition to Defendants' Motion to Dismiss.  ECF No. 225.

**WHEREAS,** on August 5, 2024, Defendants filed their Reply Memorandum in support of their Motion to Dismiss.  ECF No. 232.

**WHEREAS,** on September 23, 2024, the Court held oral argument on Defendants' Motion to Dismiss.  9/26/24 Minute Entry.

**WHEREAS,** on October 29, 2024, the Court issued a Memorandum Decision and Order, granting Defendants' Motion to Dismiss the Streamlined Complaint.  ECF No. 249.

**THEREFORE, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:**

1.      All claims in the complaints transferred into the above-captioned master docket are dismissed with prejudice.

2.      The Clerk is instructed to enter JUDGMENT dismissing all claims in any complaint in this multidistrict litigation.

3.      This is a final, appealable judgment that resolves all of the claims in all of the cases in this multidistrict litigation.[1]

4.      The in-person Status Conference currently scheduled for 1:00 p.m. ET on November 21, 2024, is hereby adjourned.

---

[1]    The Court has not decided, and Defendants have expressly preserved, any issues related to "any Defendants' personal jurisdiction defense."  ECF No. 204 at 3.

NPSA-251

**SO ORDERED.**

Dated: _____

_____
THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE

**NPSA-252**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *IN RE: ORAL PHENYLEPHRINE MARKETING AND SALES PRACTICES LITIGATION* | **MDL No. 3089**<br>**Case No. 1:23-md-03089-BMC** |
| **THIS DOCUMENT APPLIES TO:** | |
| *Newton's Pharmacy, Inc. v. Proctor & Gamble Company, et al.*<br>**CASE NO. 1:23-CV-09307-BMC** | |

**PLAINTIFF NEWTON'S PHARMACY, INC.'S MOTION FOR PARTIAL RELIEF FROM THIS COURT'S NOVEMBER 12, 2024 ORDER ENTERING JUDGMENT PURSUANT TO FED. R. CIV. P. 60(B) AND FOR REMAND OF ITS LANHAM ACT CLAIM TO THE SOUTHERN DISTRICT OF OHIO**

COMES NOW, plaintiff Newton's Pharmacy, Inc., ("NPI") by and through its undersigned counsel and files this Motion pursuant to Federal Rule of Civil Procedure 60(b), for Partial Relief from the Order Entering Judgment (Dkt. 252) ("Final Judgment") entered by this Court on November 12, 2024, and for Remand of its individual lawsuit to the Federal District Court for the Southern District of Ohio. Fed. R. Civ. Pro. 60(b) allows for a party to seek relief from a final order for a reason of "mistake, inadvertence, surprise, or excusable neglect," or because applying the judgment prospectively "is no longer equitable; or ... any other reason that justifies relief."

NPI filed its original complaint against these Defendants in the Federal District Court for the Southern District of Ohio on September 28, 2023, asserting a number of state law claims which overlapped with those advanced by the individual consumer plaintiffs in this MDL (said common claims being the basis for the original consolidation of NPI's Complaint into this MDL for initial consolidated proceedings), along with a count for under the federal Lanham Act, 15 U.S.C. §

1125(A), based on NPI's distinct status and distinct claims as a pharmacy plaintiff. After transfer and centralization before this Court, Interim Class Counsel for plaintiffs filed a "Streamlined Complaint" alleging representative examples of the conduct and claims allegedly at issue in the MDL related in the marketing and labeling of oral phenylephrine products. The Court granted Defendants' motion to dismiss the Streamlined Complaint on October 29, 2024 (Dkt. 249), and on November 12, 2024, entered Final Judgment in favor of Defendants on all state statutory, common law, and RICO claims by individual consumer plaintiffs which the Court found to be preempted by the Federal Food, Drug, and Cosmetic Act (the "FDCA") (Dkt. 252). The Final Judgment also dismissed with prejudice "[a]ll claims in the complaints transferred into the above-captioned master docket," which includes NPI's Lanham Act claim from its original complaint. *Id.*

While NPI does not challenge that portion of the Final Judgment which dismissed with prejudice its claims arising under state law, the Court should not have dismissed with prejudice NPI's federal Lanham Act claim because this claim was not included in the Streamlined Complaint, was not subject of the motion to dismiss, and is not preempted by the FDCA under United States Supreme Court precedent. As the Court's dismissal of NPI's Lanham Act claim appears to have resulted from mistake and/or inadvertence under these circumstances, Plaintiff NPI is entitled to partial relief from the Court's Final Judgment under Fed. R. Civ. P. 60(b). Additionally, with the issuance of Final Judgment, pretrial proceedings in this transferee court are effectively concluded, and thus it is appropriate to remand this action back to the Federal District Court for the Southern District of Ohio where it was originally filed, so that the district court there can adjudicate the remaining federal Lanham Act claim.

For the foregoing reasons, and for the reasons stated in NPI's Memorandum in Support of its Motion filed contemporaneously herewith, Plaintiff NPI respectfully requests that: (1) the Court

enter an order pursuant to Fed. R. Civ. P. 61(b), clarifying that NPI's federal Lanham Act claim has not been dismissed by the Court's Order and Memorandum and Final Judgment, and therefore remains unadjudicated and pending; and (2) order that NPI's remaining cause of action under the Lanham Act be remanded to the Federal District Court for the Southern District of Ohio for further proceedings on its remaining claim.

DATE: November 15, 2024                    Respectfully submitted,

_/s/ Alyson S. Beridon_____
Alyson S. Beridon, Trial Attorney (#87496)
**HERZFELD, SUETHOLZ, GASTEL, LENISKI**
**& WALL, PLLC**
600 Vine St., Suite 2720
Cincinnati, OH 45202
Ph: (513) 381-2224
Fax: (615) 994-8625
alyson@hsglawgroup.com

James A. Streett* (ABA #2007092)
**STREETT LAW FIRM, P.A.**
107 West Main
Russellville, AR 72801
Ph: 479-968-2030
Fax: 479-968-6253
james@streettlaw.com

*Attorneys for Plaintiff Newton's Pharmacy, Inc.*

*\*Pro Hac Vice Admitted*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 15, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

*<u>/s/ Alyson S. Beridon</u>*
Alyson S. Beridon

**NPSA-256**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed with the Clerk using the appellate ACMS system on June 2, 2025. All counsel of record are registered ACMS users, and service will be accomplished by the ACMS system.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth