# 24-3296-cv

## United States Court of Appeals

*for the*

## Second Circuit

SANDRA YOUSEFZADEH, *et al.*,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

JONATHAN D. SELBIN
LIEFF CABRASER HEIMANN
  & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
(212) 355-9500
jselbin@lchb.com
    – and –
ADAM J. LEVITT
DICELLO LEVITT LLP
Ten North Dearborn Street, 6th Floor
Chicago, Illinois 60602
(312) 214-7900
alevitt@dicellolevitt.com

SAMUEL ISSACHAROFF
*Counsel of Record*
40 Washington Square South 411J
New York, New York 10012
(212) 998-6580
si13@nyu.edu
    – and –
ELIZABETH A. FEGAN
FEGAN SCOTT LLC
150 South Wacker Drive, 24th Floor
Chicago, Illinois 60606
(630) 273-2625
beth@feganscott.com

*Attorneys for Plaintiffs-Appellants (Please See Inside Cover*
*for Full List of Plaintiffs-Appellants)*

*(For Continuation of Appearances See Inside Cover)*

GWEN THOMAS, RHONDA NITTO,

*Plaintiffs,*

– v. –

JOHNSON & JOHNSON CONSUMER INC., RB HEALTH (US) LLC, TARGET CORPORATION, BAYER HEALTHCARE, LLC, a Delaware limited liability corporation, WALMART INC., a Delaware corporation, CVS PHARMACY, INC., a Delaware corporation, WALGREEN CO., an Illinois corporation, THE PROCTER & GAMBLE COMPANY, HALEON US HOLDINGS LLC, PUBLIX SUPER MARKETS, INC., AMAZON.COM, INC., AMAZON.COM SERVICES LLC, KENVUE, INC., GLAXOSMITHKLINE LLC, RITE AID CORPORATION, ALBERTSONS COMPANIES, INC » COSTCO WHOLESALE CORP.,

*Defendants-Appellees,*

DOES 1-200, GLAXOSMITHKLINE CONSUMER HEALTHCARE HOLDINGS (US) LLC, RECKITT BENCKISER LLC, MERCK, MCNEIL CONSUMER HEALTHCARE, SANOFI-AVENTIS U.S. LLC, CHURCH & DWIGHT CO. INC., ASSOCIATED WHOLESALE GROCERS INC, VALU MERCHANDISERS CO., PFIZER INC., PERRIGO COMPANY PLC, HELEN OF TROY LIMITED, DIERBERGS MARKETS, INC., RECKITT BENCKISER PHARMACEUTICALS INC., THE KROGER CO., HARRIS TEETER, LLC, HARRIS TEETER SUPERMARKETS, INC., DOLGENCORP, INC., FAMILY DOLLAR, LLC.,

*Defendants.*

――――――――――――――――

*(Continued from Cover Page 1)*

JAMES E. CECCHI
CARELLA, BYRNE, CECCHI, BRODY
 & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700
jcecchi@carellabyrne.com
– and –
KILEY L. GROMBACHER
BRADLEY/GROMBACHER LLP
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
(866) 881-0403
kgrombacher@bradleygrombacher.com

CHRISTOPHER A. SEEGER
SEEGER WEISS LLP
55 Challenger Road
Ridgefield Park, New Jersey 07660
(973) 639-9100
cseeger@seegerweiss.com
– and –
JASON P. SULTZER
SULTZER & LIPARI, PLLC
85 Civic Center Plaza, Suite 200
Poughkeepsie, New York 1260l
(845) 483-7100
sultzerj@thesultzerlawgroup.com

– and –

LINDSEY N. SCARCELLO
WAGSTAFF & CARTMELL
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
(816) 701-1100
lscarcello@wcllp.com

– and –

BRYAN F. AYLSTOCK
AYLSTOCK, WITKIN, KREIS &
OVERHOLTZ, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
(850) 202-1010
baylstock@awkolaw.com

*Plaintiffs' Interim Class Counsel and Executive Committee*

*Attorneys for Plaintiffs-Appellants Sandra Yousefzadeh, Kaycie Coppock, Cody Morgan, Erin Barton, Hannah De Preist, Anthony DeRosa, John Coyle, individually and on behalf of all others similarly situated, Kimberly Buscaglia, Kamonica McWhite, Michael Walker, Eduardo Flores, Anntwanette Jones, Daniel Calzado, Keith Mortuiccio, Pedro Urena, Robyn Cronin, Timothy Butler 309172, Archanatep Boonparn, Chioma Ozuzu, Kenneth Levi Pack, Min Ji Jung, Steve Audelo, Natalie Juneau, Robert Fichera, Francis W Catanese, Samuel Gallo, Kristin DePaola, Cathy Kleiman, Richard Scoffier, Annette Striegel, Martha A. Page, Emily Cohen, Janet Jones, Lateef Murdock, Gwen Lewi, Marcel Perez Pirio, Lane Barter, Jose Cortez Hernandez, Robert Lundin, Jaedon Daniels, Mychael Willon, Amy Weinberg, Dimitri Lamdon, Elie El Rai, Tatyana Dekhtyar, Olivia Rodesta, Lauren DeBeliso, Lorette Kenney, Daniel Heaghney, Amanda Thorns, Scott Collier, Andrew Isom, John Jeffrey Bader, Brian Lloyd Fireng, Carrie Diane Huff, Joseph Samuel Sorge, Joshua Edward Sorge, Christine Ann Waters, Christopher McPhee, Justin Vorise, Krista Wright, Jordan Nelson, Regina Peralta, Randall Sygal, Regina Brookshier, Erzen Krica, Allison Sammarco, Hollie Verdi, Teary Travis, Millard Adkins, Rosalyn Anderson, Eli Erlick, Donna Bailey, Rosalie Jackson, Recoa Russell, Frank Anderson, Tina Haluszka, Heather Fong, Tatiana Benjamin, Christine Contreras, Natasha Freeman, Robin Glauser, Anthony Rogers, Jamieka Holmes, Mari Jones, Michele Kasparie, Kimberly James, Greg Enriquez, Rachel Parker, Darrell Wayne Grimsley, Jr., Krystal Rampalli, Daryl Means, Jacob Reinkraut, Michael Lee, Toni Heuchan, Jonathan Brandman, Michelle Garza, Cece Davenport, Claudette Sanes, Daniel Flick, Janis Zimmerman, Rose Riccio, Andrea Wilson, Richard Chavez, Kathleen Emmons, Nathan Jackson, James Hsieh, Dominic Rio, Mohammad Abdelkarim, Steven Checchia, Tamula Chamberlain, Stacy Rankin, Harold Nyanjom, Frizell Johnson, Ruben Varela, Joy Taylor, Anthony Coleman, Natasha Hernandez, Jessica Thompson, Emily Hansen, Sommer Milous, Andrew Gutierrez, Rebecca Lynn Reyes, Sierra Vent, Hector Valdes, Joanne Silva, Shelby Noviskis, James Carrigan, Shawn L. Thomas, Charles Geoffrey Woods, John Jeffrey Ward, Ruta Taito, Dr. Karen Schwartz, Thomas Lewis, Dena Fichot, Pamela Joyner, Sharon Rourk, Izabel Pena-Venegas, Beverly Ward, Abby Jergins, Bill Jergins, Archi Hipkins, Christine Harrison, Viva Cohen, Joey Cohen, William Bryan, Jack Hinsberger, Nancy Welharticky, Robert Housman, Jay Valinsky, Rethea Morris, Robert Haid, Michael Folks, Sharon Manier, Stan Szrajer, Achorea Tisdale, Marisol Scharon, Haley Hadden, Bonnie Van Noy, John Boswell, Mohamad Tlaib, Donald Krist, Tina Tuominen, Paul Mateer, William Mitchell and Bethany Childers*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

ARGUMENT ........................................................................................1

    I.     CONGRESS PROHIBITS FALSE OR MISLEADING
           LABELS. ..................................................................................1

          A.     The FDCA Requires Truth in Labeling. ...................................5

          B.     Prior Preemption Cases Support the Misbranding Claim..........9

          C.     The District Court Mistakenly Applied Field Preemption. .....11

          D.     There Is No Conflict Preemption. ...........................................14

    II.    DISMISSAL OF THE RICO CLAIM MUST BE REVERSED. ......17

          A.     RICO Has No Privity Requirement. ........................................18

          B.     RICO Case Law Does Not Support a Privity
                 Requirement. ..........................................................................21

          C.     Proximate Cause Cabins RICO Standing. ...............................24

          D.     Neither the FDCA nor an Agency Ruling Precludes
                 RICO. ....................................................................................26

CONCLUSION....................................................................................30

CERTIFICATE OF COMPLIANCE.....................................................31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alix v. McKinsey & Co.*,
  23 F.4th 196 (2d Cir. 2022) .......................................................25, 26

*Apotex Inc. v. Acorda Therapeutics, Inc.*
  823 F.3d 51 (2d Cir. 2016) ...............................................................27

*Baisch v. Gallina*,
  346 F.3d 366 (2d Cir. 2003) ..............................................................24

*Bates v. Dow Agrosciences, LLC*,
  544 U.S. 431 (2005)...........................................................2, 9, 10

*Bell v. Publix Super Mkts., Inc.*,
  982 F.3d 468 (7th Cir. 2020) ............................................................17

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008)...................................................................21, 26

*Buckman v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001)...................................................................29, 30

*United States ex rel. Campie v. Gilead Scis., Inc.*,
  862 F.3d 890 (9th Cir. 2017) ............................................................29

*Castro v. QVC Network, Inc.*,
  139 F.3d 114 (2d Cir. 1998) ..............................................................12

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)............................................................................4

*Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics,*
  *GmbH,*
  843 F.3d 48 (2d Cir. 2016) ...........................................26, 27, 28, 29

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Ciena Corp. v. Oyster Optics, LLC,*
  958 F.3d 1157 (Fed. Cir. 2020) ...............................................................5

*Conlon v. InterVarsity Christian Fellowship,*
  777 F.3d 829 (6th Cir. 2015) .................................................................5

*Critcher v. L'Oreal USA Inc.,*
  959 F.3d 31 (2d Cir. 2010) ...................................................................6

*Desiano v. Warner-Lambert & Co.,*
  467 F.3d 85 (2d Cir. 2006), *aff'd sub nom. Warner-Lambert Co.,*
  *LLC v. Kent,* 552 U.S. 440 (2008) ................................................5, 30

*Geier v. American Honda Motor Co., Inc.,*
  529 U.S. 861 (2000)...............................................................11, 13, 14

*Glover v. Bausch & Lomb Inc.,*
  6 F.4th 229 (2d Cir. 2021) ...................................................................5

*Gray v. R.L. Best Co.,*
  910 N.Y.S.2d 307 (2010)....................................................................12

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
  392 U.S. 481 (1968)............................................................................23

*Holmes v. Secs. Inv. Prot. Corp.,*
  503 U.S. 258 (1992).............................................................19, 22, 23

*Horn v. Medical Marijuana, Inc.,*
  80 F.4th 130 (2d Cir. 2023) ...............................................................19

*Thornton v. Tyson Foods, Inc.,*
  28 F.4th 1016 (10th Cir. 2022), ..........................................................10

*Illinois Brick. California v. ARC Am. Corp.,*
  490 U.S. 93 (1989)......................................................................22, 23

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Kousisis v. U.S.*,
  145 S.Ct. 1382 (2025)................................................................*passim*

*Lerner v. Fleet Bank, N.A.*,
  318 F.3d 113 (2d Cir. 2003), *abrogated on other grounds by*, *Am. Psych. Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352 (2d Cir. 2016) ........................................................................................24

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)................................................................5, 10, 11

*Mangano v. Am. Radiator & Standard Sanitary Corp.*,
  438 F.2d 1187 (3d Cir. 1971) ...............................................24

*Marentette v. Abbott Lab'ys, Inc.*,
  886 F.3d 112 (2d Cir. 2018) ...................................................7

*In re Master Key Antitrust Litig.*,
  528 F.2d 5 (2d Cir. 1975) ........................................................24

*Medical Marijuana, Inc. et al. v. Horn*,
  145 S.Ct. 931 (2025)................................................................*passim*

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996)....................................................................1

*Mut. Pharm. Co. v. Bartlett*,
  570 U.S. 472 (2013)................................................................*passim*

*New York State Telecomms. Ass'n, Inc. v. James*,
  101 F.4th 135 (2d Cir. 2024) ............................................7, 13

*PLIVA, Inc. v. Mensing*,
  564 U.S. 604 (2011)................................................................14

*POM Wonderful LLC v. Coca-Cola Co.*,
  573 U.S. 102 (2014)..........................................................26, 27, 30

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Riegel v. Medtronic, Inc.*,
  552 U.S. 312 (2008) ................................................................. 10

*S. Pac. Co. v. Darnell-Taenzer Lumber Co.*,
  245 U.S. 531 (1918) ................................................................. 24

*Schaffner v. Monsanto Corp.*,
  113 F.4th 364 (3d Cir. 2024) ................................................. 10

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
  473 U.S. 479 (1985) ................................................. 19, 21, 25

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
  145 S.Ct. 1497 (2025) ........................................................ 4, 6

*Sperber v. Boesky*,
  849 F.2d 60 (2d Cir. 1988) ....................................... 24, 25, 26

*State of Ill. v. Ampress Brick Co.*,
  536 F.2d 1163 (7th Cir. 1976) ............................................... 23

*In re W. Liquid Asphalt Cases*,
  487 F.2d 191 (9th Cir. 1973) ................................................. 23

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ............................................................. 5, 9

*Wyeth v. Levine*,
  555 U.S. 555 (2009) ......................................................... 1, 6, 9

*Yegiazaryan v. Smagin*,
  599 U.S. 533 (2023) ................................................... 19, 20, 21

*Zyla Life Scis., L.L.C. v. Wells Pharma of Houston, L.L.C.*,
  134 F.4th 326 (5th Cir. 2025) ............................................... 30

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**Statutes**

7 U.S.C. § 136(q)(1)(A) ................................................................9

18 U.S.C. § 1964(c) ...................................................18, 19, 20

21 U.S.C. § 331 ..........................................................................3

21 U.S.C. § 352(a) ...........................................................1, 4, 7, 8

21 U.S.C. § 352(a)(1) .................................................................3

21 U.S.C. § 352(a)(l) ...............................................................15

21 U.S.C. § 352(j) ......................................................................3

N.Y. Educ. Law § 6815(f) ......................................................3, 8

**Regulations**

21 C.F.R. § 341.80 ...................................................................11

21 C.F.R. § 341.80(b) ..............................................................15

21 CFR § 330.1(c)(1) .................................................................8

**Other Authorities**

*Antitrust Federalism, Preemption, and Judge-Made Law*, 133 HARV.
 L. REV. 2557 (2020)..........................................................23

Black's Law Dictionary (12th ed. 2024) .................................12

**INTRODUCTION**

Defendants argue that because the FDA granted regulatory approval to Oral

PE as a decongestant some 40 years ago, they are wholly immunized from liability

for their fraud on consumers, and free to ignore their long-standing state law and

federal statutory duties to tell the truth about their product "in every particular."

That is not, and cannot be, the law. Regulatory approval is not a plenary

indulgence for future misconduct.

**ARGUMENT**

I.    **CONGRESS PROHIBITS FALSE OR MISLEADING LABELS.**

"The purpose of Congress is the ultimate touchstone in every preemption

case." *Wyeth v. Levine,* 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr,*

518 U.S. 470, 485 (1996)) (internal quotation marks omitted). In the Food Drug

and Cosmetic Act ("FDCA"), Congress set out to protect consumers by prohibiting

"labeling that is false or misleading in any particular …." 21 U.S.C. §352(a).

Two principles stand out from the statutory scheme. First, a drug may *be*

*rendered* misbranded where "liability is based on new and scientifically significant

information that was not before the FDA." *Mut. Pharm. Co. v. Bartlett,* 570 U.S.

472, 487 n.4 (2013). Second, "the manufacturer bears responsibility for the content

of its label at all times." *Wyeth,* 555 U.S. at 570-71.

The District Court truncated the statutory scheme to focus only on 21 U.S.C.

§379r(a)(2) and its aim of "[n]ational uniformity for nonprescription drugs." Its

1

ruling begins—and essentially ends—with the observation that the "Food and Drug Administration (the 'FDA') has approved PE as a 'safe and effective' nasal decongestant since 1985." (SPA-2).

But the statutory requirements are more nuanced. First, nothing prevents enforcement of state law that does not conflict with federal law, a basic principal of preemption jurisprudence, and evident from the express savings clause for a state-law defined category of consumer protection: the FDCA does not "modify or otherwise affect any action or the liability of any person under the product liability law of any State." 21 U.S.C. §379r(e). Second, the statute commands that states cannot "establish or continue in effect any requirement ... that is different from or in addition to, or that is otherwise not identical with, a requirement under" the FDCA. 21 U.S.C. §379r(a)(2). States *can* enact requirements identical to federal law: Congress authorized such enforcement because state law "[p]rivate remedies that enforce federal misbranding requirements would seem to aid, rather than hinder, the functioning of" federal statutes. *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 451 (2005).

Here, Defendants' statutory obligations include the federal Anti-Misbranding statute: "[a] drug or device shall be deemed to be misbranded ... [i]f its labeling is false or misleading in any particular." 21 U.S.C. §352(a)(1). A "misbranded" drug cannot be sold legally under federal or state law, 21 U.S.C.

2

§331; N.Y. Educ. Law §6815(f), and Plaintiffs' state law claims turn on an identical requirement: prohibition of false statements.

The District Court held, and Defendants claim, the FDCA expressly preempts the field, and read the statutory scheme to vest the FDA's regulatory process with full preemptive authority, such that monograph approval allows a manufacturer to make knowingly false statements on and even *around* its labels. The FDCA gets reduced to a guarantee of immunity in perpetuity for manufacturers, rather than a protection for consumers.

Further, the District Court read *one* express statutory requirement—a duty to update *safety*-related information, §352(j)—to somehow forbid updating *other* information, here *efficacy*:

> Of course, the FDCA imposes some duties on drug manufacturers that depend on newly acquired scientific information. For instance, the misbranding statute requires a manufacturer to "pull even an FDA-approved drug" from the market when the drug "is 'dangerous to health' even if 'used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof.'" *Bartlett*, 570 U.S. at 477 n.4 (quoting 21 U.S.C. §352(j)). There is no similar provision in §352 for ineffective drugs.

(SPA-11). The District Court was wrong. There *is* a "similar provision for ineffective drugs," to prevent selling them with false or misleading labels, §352(a). Misbranding is misbranding, and *both* commands must be followed.

3

Neither Defendants nor the District Court grapple with the language of the statute. Instead, both give express and exclusive preemptive authority to the FDA's monograph process, far beyond what the FDCA provides. Indeed, they extend field preemptive power so far that claims not subject to *any* regulatory review—the non-label advertisements and the "maximum strength" claims—are preempted.

This is legal error. Both the District Court and Defendants root the FDCA's preemptive reach in the regulatory commands of the FDA, rather than in the statute. But preemption is a matter of *statutory* construction and "when an agency interprets a statute, judicial review of the agency's interpretation is *de novo*." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado,* 145 S.Ct. 1497, 1511 (2025). Even under the now-overruled *Chevron* regime, where a statute is unambiguous—as with §352(a)'s prohibition against "false or misleading" statements—an agency exceeds its authority when acting contrary to it. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984) ("If the intent of Congress is clear, that is the end of the matter."). The scope of delegated agency power, as with the power to preempt longstanding state law, is a "major question." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). Statutory interpretation has been the province of

the courts and not agencies for over 200 years. *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 412 (2024).[1]

### A.     The FDCA Requires Truth in Labeling.

Below, as here, Plaintiffs argued that Congress's statutory command controls. Were there no FDCA, state consumer protection and common law fraud would prohibit the knowing sale of a product that does not work—the common law long has provided recourse against deceptive sales. *Cf. Desiano v. Warner-Lambert & Co.,* 467 F.3d 85, 95 (2d Cir. 2006) (no preemption because plaintiffs "asserting claims that sound in traditional state tort law"), *aff'd sub nom. Warner-Lambert Co., LLC v. Kent,* 552 U.S. 440 (2008); *Glover v. Bausch & Lomb Inc.*, 6 F.4th 229, 240 (2d Cir. 2021) (same).

The District Court held, and Defendants argue, that the FDCA provides a safe haven for deception if the drug once went through regulatory approval, no matter what undisputed science later shows. That is, by enacting the FDCA,

---

[1] Defendants argue Plaintiffs waived reliance on *Loper Bright* because the case was issued shortly before briefing below, and was not briefed to the District Court. Courts may consider "a structural separation of powers issue" even "in the face of a clear waiver." *Ciena Corp. v. Oyster Optics, LLC*, 958 F.3d 1157, 1161 (Fed. Cir. 2020); *see also Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015) ("The ministerial exception is a structural limitation imposed on the government by the Religion Clauses, a limitation that can never be waived."). Further, despite *Loper Bright*'s undoubted broad significance, there was nothing "new" in its use here. Below, as here, Plaintiffs insisted that Congress's statutory command controls. *See* Dist.Ct.Dkt. 225 at 5, 16-17; (A-218-20 ¶¶361-74).

5

Congress intended to freeze the status quo upon regulatory approval—here, in 1985—and leave consumers forever *less* protected and *worse* off. That is not the law. *Wyeth,* 555 U.S. at 570-71; *Bartlett,* 570 U.S. at 477 n.4. Per *Seven Cnty.,* 145 S.Ct. at 1514, "common sense" must be brought to bear when analyzing such extraordinary statutory results; a statute prohibiting false statements cannot *require* them.

Defendants insist *Critcher v. L'Oreal USA Inc.*, 959 F.3d 31 (2d Cir. 2010) mandates otherwise. But there the question was whether the label included *enough* information "to avoid misleading consumers." *Id.* at 38. There was no claim the information was *false* and violated the Anti-Misbranding statute, only that *additional* information concerning the extractable amount of product was required. This Court ruled that a "general [Anti-Misbranding] requirement" could not be read to "impose the particular labeling additions" plaintiffs sought. *Id.*

Plaintiffs do not seek to add information. Instead, their claim is that Defendants may not make *false or misleading* statements on the box or in advertisements, for example that Oral PE is "maximum strength" when it is largely ineffective and comparatively less strong than another FDA-approved oral nasal decongestant. Put differently, unlike in *Critcher,* Plaintiffs take no issue with the FDA's determination of the *kinds* or even *amount* of information needed for an

accurate label, such as the chemical contents of the pharmaceutical. They instead argue §352(a) requires the statements made not be literally *false*.

By focusing on the Anti-Misbranding statutory obligation, Plaintiffs do not claim that the FDA made a mistake in its *original* regulatory approval, based on the science in 1985. Their claim is that by no later than 2016 the science was clear that Oral PE was ineffective and the approved label and unapproved statements around it were thereafter false in that particular. This distinguishes *Marentette v. Abbott Lab'ys, Inc.*, 886 F.3d 112, 118 (2d Cir. 2018), where this Court found plaintiffs' claims that the *original* FDA approval was erroneous at the time it was made were an obstacle to regulatory uniformity.[2]

No such obstacle exists here. Plaintiffs allege *new* scientific information came to light *after* the original FDA approval, rendering the labels and all surrounding advertising false and thus contrary to the Anti-Misbranding statute—a conclusion the FDA's advisory council and ultimately the FDA itself reached as well. *See* Dist.Ct.Dkt. 251 (linking FDA statement). The key inquiry, therefore, is whether Defendants are free to make deceptive efficacy claims based on decades-old regulatory approval when the science no longer supports it. On this score, there is no conflict between state and federal law. Under both §352(a) and New York

---

[2] Judge Cogan did not cite *Marentette* in his opinion below despite authoring it while sitting by designation.

7

Education Law §6815(f), a drug is misbranded if its labeling is "false or misleading in any particular." Plaintiffs' claims arise from Defendants' false or misleading statements about Oral PE's effectiveness and comparative strength versus other decongestants.[3] (A-221-23 ¶¶387-93 (GBL §349), A-225-27 ¶404-11 (GBL §350), A-227-29 ¶¶418-22 (express warranty), A-231 ¶434 (implied warranty), A-232-33 ¶¶440-41 (unjust enrichment), A-233-34 ¶447-49 (common law fraud)). Under the express statutory language, these state law obligations are "identical with[] a requirement under" the FDCA. 21 U.S.C. §379r(a)(2): tell the truth.

Finally, Defendants' insistence that a generalized federal interest—arising from FDA *regulation*, not congressional *statute*—mandates field preemption is directly at odds with the Supreme Court's recognition that a major question must be decided by Congress through statutory decree, not by a district court construing an agency's regulation. *West Virginia*, 597 U.S. at 721-24 (2022). In other words, such "implied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution." *Wyeth*, 555 U.S. at 583 (Thomas, J. concurring in judgment).

---

[3] The District Court accepted Defendants' contention that the "maximum strength" misbranding claim requires Oral PE to be wholly lacking in efficacy and is, therefore, derivative of the efficacy claims. (SPA-9 n.2). Not so, as discussed *infra*.

## B.  Prior Preemption Cases Support the Misbranding Claim.

Defendants' reliance on *Bates* is curious. There, tort plaintiffs argued that the FDA-approved label for pesticide was inaccurate because it stated it could be used "in all areas where peanuts are grown" when it could not under known soil conditions. 544 U.S. at 434. *Bates* is instructive because the at-issue statute, FIFRA, like the FDCA, preempts state law for some but not all matters: a pesticide is "misbranded" if its label contains a "false or misleading" statement, 7 U.S.C. §136(q)(1)(A), and a state cannot "impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under [FIFRA]," §136v(b).

*Bates* remanded state law fraud claims because they would *not* be "preempted [if] these common law duties are equivalent to FIFRA's requirements that a pesticide label not contain 'false or misleading' statements…." 544 U.S. at 447. The Court then cautioned states against imposing regulatory line-drawing, noting, e.g., that a state-law-based claim that a warning label should say "DANGER" instead of "CAUTION" would be preempted, while a state-law-based claim that a label is simply "false" would *not* be preempted. *Id*. at 453.

This distinction also explains *Schaffner v. Monsanto Corp.,* 113 F.4th 364, 382 (3d Cir. 2024), where whether a warning was "necessary" for public health protection presented an administrative line-drawing problem "about which

9

reasonable individuals may disagree." *Id*. at 392. The distinction between regulatory assessment and statutory obligations is consistent with *Bates* and *Riegel v. Medtronic,* Inc., 552 U.S. 312, 325 (2008) in which the Court found state tort law claims preempted if they invited revisiting the cost-benefit analysis necessary for regulatory approval. That trade-off was at the heart of the statutory purpose, and the Third Circuit in *Schaffner* found Congress purposefully left that gap-filling judgment call for the EPA. 113 F.4th at 381-82.[4] No such gaps exist here to be filled: literally false is literally false.

While the major questions doctrine and *Loper Bright* compel redoubled attention to statutory commands, even the FDA regulations do not purport to limit the Anti-Misbranding statute. Both the general regulation 21 C.F.R. §330.1, and the nasal decongestant-specific regulation 21 C.F.R. §341.80, explicitly *incorporate* the Anti-Misbranding statute.

Defendants insist the FDA only *partially* incorporated the statute, arguing the prohibition on falsity does not extend to the *entire* regulation. As they put it,

---

[4] Defendants' reliance on *Thornton v. Tyson Foods, Inc*., 28 F.4th 1016, 1025 (10th Cir. 2022), is similarly misplaced. The disputed issue there was whether beef packaged in the U.S. but slaughtered elsewhere could be labeled as a Product of the U.S.A. The Tenth Circuit found that the labeling demarcation was a matter of "permissive interpretation" and that Congress had acted to endorse the challenged interpretation by amending the underlying statute. *Id.* at 1022. Moreover, "Made in the U.S.A." is subject to competing reasonable interpretations. Not so whether a drug is effective: it is or is not.

"the use of the FDA-mandated statement of indications, contains no misbranding proviso." Defs.' Br. 31. This argument misreads the regulations themselves—§330.1, the general provision covering all OTC drugs, incorporates the Anti-Misbranding statute, full stop. Even taken as a correct reading of the regulations, Defendants would be claiming the FDA has assumed the power to *ignore* the statutory misbranding command. *Loper Bright*—like long-standing precedent before—confirms an agency overreaches when it overrides statutory mandates, and that courts have an *independent* obligation to ensure statutory compliance.

### C.     The District Court Mistakenly Applied Field Preemption.

The District Court's grant of field-clearing preemption cannot be reconciled with the express savings clause providing that the statute does not "modify or otherwise affect any action or the liability of any person under the product liability law of any State." 21 U.S.C. §379r(e). A "saving clause assumes that there are some significant number of common-law liability cases to save." *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 868 (2000). As in *Geier,* courts must reconcile the preemptive force of national regulation with the preservation of identified areas of state law.

Defendants' suggested off-ramp conflicts with statutory text and case law. They contend the phrase "under the product liability law of any state" must be restricted to claims for injury to person or property and cannot include money

11

spent on a non-performing product—in other words, a *subset* of product liability claims. Defs.' Br. 34-36. But Black's Law Dictionary defines "products liability" as the "theory by which liability is imposed on the manufacturer or seller of a *defective* product." Black's Law Dictionary (12th ed. 2024). *See also Gray v. R.L. Best Co.*, 910 N.Y.S.2d 307, 309 (2010) ("a claim will sound in products liability if a product placed into the stream of commerce … is defectively designed"). Under New York law, a product is "defective" if it is not "fit for the ordinary purpose for which such goods are used." *Castro v. QVC Network, Inc.,* 139 F.3d 114, 116 n.4 (2d Cir. 1998). Oral PE does not work; accordingly, under New York law, it is "defective" and within the ambit of product liability law.[5]The critical point, as developed in *Geier,* is that Congress made clear with the "product liability exception" that it was not preempting *the field* of OTC drug regulation. *New York State Telecomms. Ass'n, Inc. v. James,* 101 F.4th 135, 152-53 (2d Cir. 2024) (the "pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted").

---

[5] Defendants cite no state cases for their sweeping proposition that "product liability law excludes claims for pure economic loss." Defs.' Br. 35. The parties stipulated that the first legal test of claims would be brought under New York law. To the extent Defendants (incorrectly) rely on federal court interpretations of New York law to limit product liability claims, that cannot be imposed as the law of all other states.

The error below is most evident in the preemption of challenges to Defendants' advertising claims beyond just the label and their use of the "Maximum Strength" marketing gimmick. Because such claims were never subjected to *any* FDA review, claims challenging such advertisements cannot even arguably be expressly preempted. *Only* state-law "requirements" "different from or in addition to, or … otherwise not identical with," the FDCA, and "that relate[] to the regulation of a drug." 21 U.S.C. §379r(a)(2) are expressly prohibited. There can also be no implied or conflict preemption arguments against the non-label advertising or "Maximum Strength" claims; the only potential grounds for preemption would be if federal law occupied the entire field, something foreclosed by the savings clause, as in *Geier.*

Yet, Defendants argue exactly that: it "does not matter whether such a disclosure would take place on the labeling or off, as the applicable preemption provision is not limited to labeling requirements." Defs.' Br. 37; *see also id.* at 40 ("Maximum Strength" claims refer back to effectiveness and are therefore preempted).[6]  The result is a form of preemption that turns not on the statutory

---

[6] Defendants wrongly argue the "comparative strength claim was not made in the Complaint." Defs.' Br. 39. *See* (A-151 ¶68 (Defendant "goes so far as to call its product 'Maximum Strength,' despite the product having been proven by multiple studies … to have no efficacy greater than placebo (much less pseudoephedrine)"; *id.* n.18 ("the Final Monograph for OTC Nasal Decongestant Drug products does not include language that PE Products are 'extra strength.'"); A-152 n.19 (maximum strength claim "particularly absurd"; "other non-prescription

language, or even on the scope of FDA regulatory action, but on federal law occupying the entire field. It simply cannot be that an express savings clause has no meaning. Instead of field preemption, the inquiry must be whether state law "actually conflicts" with the federal goals, an as-applied conflict preemption inquiry. *Geier*, 529 U.S. at 874. As in *Bates,* this is a matter of fact not of law, and not resolvable on a motion to dismiss. 544 U.S. at 454.

### D.     There Is No Conflict Preemption.

The burden of establishing that federal and state law cannot be reconciled is on Defendants, and the "mere possibility of impossibility' [is] 'not enough," *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 624 n.8 (2011). Defendants do not meet their burden because they cannot. The conflict preemption argument rests on the claim that federal law compels them to deliberately mislead consumers regarding Oral PE efficacy despite undisputed science proving the falsehood of their representations. There is no conflict between the federal Anti-Misbranding statute and state law prohibiting false advertising.

Upon learning by no later than 2016 that their labels were false, Defendants could have petitioned the FDA to change them. *See generally* 21 C.F.R.

---

pseudoephedrine oral decongestants exist … products that unequivocally work better"); A-234 ¶448 (Defendants "falsely state that their products had properties such as 'maximum strength'")). *See also* (A-145 ¶50, A-148 ¶62 (alleging scientific literature comparing oral nasal decongestant active ingredients)).

§314.70(c)(6)(iii). Or, they could have included with every PE product a concise explanation that Oral PE was ineffective, similar to what J&J did in 2023 after the initial FDA action. (A-154-55). Or, they could have simply not sold misbranded Oral PE drugs—no one forced Defendants to keep selling Oral PE, and it is not some life-saving drug where the relevant benefits might outweigh a safety risk. *See Bartlett*, 570 U.S. at 487 n.4. Although *Bartlett* concerned new science showing a safety risk, nothing in the Anti-Misbranding statute distinguishes safety from "any [other] particular." 21 U.S.C. §352(a)(l).

Nor does this case stand as an "obstacle" to federal interests. Defendants mischaracterize Plaintiffs' claim as a criticism of an FDA decision, claiming it would create state-led adjudication of OTC efficacy "separate and apart from the scheme Congress laid out in the law." Defs.' Br. 44. Not so: Plaintiffs do *not* argue the FDA wrongly approved Oral PE in 1985; they allege Defendants wrongfully continued to market its efficacy once new scientific information demonstrated it was ineffective. Banning such misrepresentations *furthers* federal interests under the Anti-Misbranding statute, the general regulation governing OTC drugs, 21 C.F.R. §330.1 (incorporating the Anti-Misbranding statute), and under the OTC drug regulation itself, 21 C.F.R. §341.80(b) (same).

Defendants are left insisting that the regulations *require* them to make false statements to consumers. Defs.' Br. 23-24. That because their label is so utterly

15

inaccurate—and because an accurate label would appear absurd—the *in*accurate label must carry the day. That is absurd. No statute—federal or state—requires a manufacturer to lie to consumers. At minimum, no federal policy prohibits states from acting to prevent the *addition* of deceptive content like the non-label advertising and Maximum Strength claims alleged here, even if the false FDA-approved label itself is otherwise permissible. Such advertising—none of it reviewed or approved by the FDA—is all over Oral PE packaging, as exemplified by J&J's product:



(A-151 ¶68, A-259). No claims based upon these statements could be preempted under even the broadest reading of the FDCA. As the Seventh Circuit wrote regarding the addition of modifiers to FDA-approved food labels, "[p]laintiffs are

not seeking to *add* labeling requirements. They seek only to stop defendants from voluntarily adding deceptive language to the federally permitted labels." *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 484-85 (7th Cir. 2020). Just so here.

## II.    DISMISSAL OF THE RICO CLAIM MUST BE REVERSED.

Defendants' persistent disregard of statutory text is even more manifest with respect to RICO, both as it relates to standing and preclusion.

Imposition of a privity requirement for RICO standing contravenes well-established case law, including two Supreme Court cases from this past Term, *Medical Marijuana, Inc. et al. v. Horn*, 145 S.Ct. 931 (2025), and *Kousisis v. U.S.*, 145 S.Ct. 1382 (2025). The District Court's ruling cannot survive these two cases.

For the court below, the dispositive question under RICO was "whether the direct-purchaser rule applies to civil RICO claims," and the categorical answer was that "the same standing requirements established in antitrust cases apply to RICO cases." (SPA-15). *Horn* categorically rejects the importation of antitrust rules to RICO: "the Clayton Act and § 1964(c) are not interchangeable." 145 S.Ct. at 942-43 (cleaned up). *Nothing* in RICO's statutory language limits RICO standing to those in privity with defendants "[n]o matter how long [one] stare[s] at it." *Kousisis*, 145 S.Ct. at 1391. "Any person injured" means any person injured.

17

Defendants trivialize *Horn* as limited to the definition of antitrust injury, Defs.' Br. 53, and disregard its affirmance of this Court's opinion. They ignore *Kousisis* altogether.[7]

Instead, they double down on an argument the District Court never reached: that RICO is precluded by the FDCA—indeed, merely by reason of FDA approval of their labels—even though controlling law from the Supreme Court and this Court is squarely to the contrary.[8]

## A.    RICO Has No Privity Requirement.

The rule in statutory interpretation is plain: "[s]tart with the statute." *Kousisis*, 145 S.Ct. at 1391. The at-issue language of RICO is simple: "[a]ny person injured in his business or property by reason of a [RICO] violation … may sue …." 18 U.S.C. §1964(c). In *Horn*, this Court gave the terms "business or property" their full and ordinary meaning, following the Supreme Court's "express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'" *Horn v. Medical Marijuana, Inc.,* 80 F.4th 130, 136 (2d Cir. 2023) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497-98 (1985) (further citations omitted)).

---

[7] Both cases came down prior to Defendants' brief, and Plaintiffs submitted both to the Court. Dkts. 105.1, 114.1.

[8] Defendants' argument that the RICO claim here was an afterthought is bizarre: it was asserted pursuant to a *stipulated* order in the *first* complaint following JPML transfer. Dist.Ct.Dkt. 204 ¶¶3-4; (A-155, beginning ¶85).

18

Plaintiffs relied heavily on this Court's reasoning in *Horn* in their opening brief despite certiorari having been granted, to argue that the same principle of statutory construction must apply to the phrase "any person ... may sue" as it does to "business or property." The Supreme Court upheld this Court in its entirety.

First, the Court rejected the notion that RICO's language is cabined by reference to the antitrust laws: "the Clayton Act and § 1964(c) are not interchangeable." *Horn*, 145 S.Ct. at 943 (citing *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 269 n.15 (1992), and *Sedima*, 473 U.S. at 495).

Second, *Horn* reiterates that RICO standing is based on a direct-relationship requirement: "[t]ime and again, we have reiterated that §1964(c)'s 'by reason of' language demands some direct relation between the injury asserted and the injurious conduct alleged." 145 S.Ct. at 945 (cleaned up).[9] That is, a direct relation *between the injury and conduct*, not preexisting privity of the *parties*.

Third, *Horn* bolsters the point that the direct relation proximate cause test does much of the work of the direct purchaser rule to prevent duplicative

---

[9] Under that test, the "focus is on the injury, not in isolation, but as the product of racketeering activity." *Yegiazaryan v. Smagin*, 599 U.S. 533, 545 (2023). That requires "a case-specific inquiry that considers the particular facts surrounding the alleged injury. Petitioners' bright-line rule, in contrast, dispenses with any such subtlety." *Id.* at 544.

19

recoveries or problems of allocation without imposing an improper bright line rule. *Horn*, 145 S.Ct. at 945; Pls.' Br. 48.[10]

Finally, *Horn* "reject[ed] the petitioner's appeal to the common law, deeming it inconsistent with the thrust of § 1964(c)." *Horn*, 145 S.Ct. at 942 (cleaned up). It explained that "bright-line" common law rules defining injury are not germane to RICO; to the contrary, evaluating RICO's scope requires "a contextual, fact-intensive inquiry that accounts for the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." *Id.* at 941 (cleaned up).

*Kousisis* confirms each of these points, where, even in the more exacting context of a criminal prosecution for wire fraud under 18 U.S.C. §1343, the Court declined to narrow the statute's reach. At issue was whether the statute required pecuniary loss or if it was sufficient to prove the defendant fraudulently induced the contract. The Court noted that "[n]o matter how long we stare at it, the broad, generic language of §1343 leaves us struggling to see any basis for excluding a fraudulent-inducement scheme" even absent economic loss. *Kousisis*, 145 S.Ct. at1391. Just so here: "the broad, generic language" at issue—any person injured— provides no basis for excluding indirect purchaser victims. Just as "the [wire fraud]

---

[10] "While a bright-line rule would no doubt be easier to apply, fealty to the statute's focus requires a more nuanced approach." *Yegiazaryan*, 599 U.S. at 545.

statute does not so much as mention loss, let alone require it," RICO does not so much as mention privity, let alone require it. *Id.* at 1391-92. The Court also declined to read restrictive requirements into §1343 based on the common law, noting the "expansive reach" of such RICO claims historically. *Id.*

## B.     RICO Case Law Does Not Support a Privity Requirement.

*Horn* is just the latest in a string of cases dating back decades in which the Supreme Court expressly rejected attempts, like here, to limit the scope of RICO by grafting onto it a-textual requirements imported from antitrust or the common law. *Sedima,* 473 U.S. at 495 (no RICO racketeering injury requirement); *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639 (2008) (no RICO first party reliance requirement); *Yegiazaryan,* 599 U.S. at 545 (no "bright line" RICO domestic injury rule). Not one of these cases reflexively applied antitrust doctrines to RICO simply because they share language, as the District Court did here.

Instead, in each, the Court started with the statutory language, and then evaluated whether that language was somehow modified by settled usage: "[w]hen Congress uses a term with origins in the common law, we generally presume that the term brings the old soil with it." *Kousisis*, 145 S.Ct. at 1392 (cleaned up). But "old soil" is a tool of statutory construction only "to the extent that a common-law term has accumulated a settled meaning" *Id.* (cleaned up); *see also id.* at 1395.

21

The Circuit court cases Defendants rely upon that applied the antitrust direct purchaser rule to RICO all predate *Horn*, and, like the District Court here, apparently were confused by language in *Holmes.* There, the Supreme Court instructed that statutory language be interpreted consistent with legal usage at the time of statutory enactment. When RICO was enacted, it used injury language identical to the Clayton Act, which courts had interpreted to require a showing of proximate cause which provided the "judicial gloss" for applying the same causation standard for the newer statute. *Holmes*, 503 U.S. at 268. The Court thus "credit[ed] the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used" in the antitrust context. *Id.* Proximate cause is the oldest of old soil. But there is no "judicial gloss" in rules that were not and could not have been known by Congress when it enacted RICO. The antitrust direct purchaser rule was not a part of the judicial soil in which Congress toiled. RICO was enacted in 1970, and *Illinois Brick* did not establish the direct purchaser rule until seven years later. *Horn* puts any lingering confusion about the meaning of *Holmes* to rest: Congress borrowed *only* the concept of proximate cause from antitrust law. Indeed, *Horn* cites *Holmes* itself to cabin any further incorporation of antitrust doctrines. *Horn,* 145 S.Ct. at 943 (quoting *Holmes*, 503 U.S. at 269 n.15 ("'[A]ntitrust injury' has no analogue in the RICO setting")).

22

Defendants now claim for the first time that the real wellspring of the direct purchaser rule is not *Illinois Bri*ck but *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968), decided two years prior to RICO's enactment. This will come as a shock to the Supreme Court, which roots the direct purchaser requirement in *Illinois Brick. California v. ARC Am. Corp.*, 490 U.S. 93, 97 (1989) (upholding *Illinois Brick* repeal against preemption challenge). And the 26 states that enacted "*Illinois Brick* repealer" statutes.[11]

Even on its own terms, this hastily contrived argument is preposterous. First, *Hanover Shoe* is not about indirect purchaser standing but whether a defendant can assert a pass-through defense against direct purchaser claims. 392 U.S. at 488. The Supreme Court took up *Illinois Brick* to resolve a post-*Hanover* circuit split over whether indirect purchasers had standing as a result of the prohibition on the pass-through defense against direct purchasers, a question not settled until *Illinois Brick. See State of Ill. v. Ampress Brick Co.*, 536 F.2d 1163 (7th Cir. 1976); *In re W. Liquid Asphalt Cases*, 487 F.2d 191, 196-200 (9th Cir. 1973); *Mangano v. Am. Radiator & Standard Sanitary Corp.*, 438 F.2d 1187, 1188 (3d Cir. 1971).[12]

---

[11] Note, *Antitrust Federalism, Preemption, and Judge-Made Law*, 133 HARV. L. REV. 2557, 2563 (2020).

[12] This Court declined to take a position. *See In re Master Key Antitrust Litig.*, 528 F.2d 5, 12 n.11 (2d Cir. 1975).

No more persuasive is Defendants' first time cite to *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531 (1918), a case that did not interpret the Clayton Act or involve antitrust standing, but rates approved by the Interstate Rate Commission. The Court affirmed judgment for the direct purchaser over an argument that recovery was precluded because it passed on the overcharge. *Id.* at 534. This was simply another rejection of the pass-on *defense*. It had nothing to do with indirect purchaser standing to sue affirmatively. In any event, *Horn* presciently warned against importing antitrust limitations into RICO based "on a single sentence from a century-old case about rate fixing." *Horn*, 145 S.Ct. at 942 n.7.

### C.     Proximate Cause Cabins RICO Standing.

This Court has never applied a bright line standing rule to RICO, and the District Court and Defendants cite no case so holding. Instead, this Court has always applied a flexible, fact-specific *proximate cause* test. *See Sperber v. Boesky*, 849 F.2d 60, 64-65 (2d Cir. 1988); *Baisch v. Gallina*, 346 F.3d 366, 372 (2d Cir. 2003); *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003), *abrogated on other grounds by*, *Am. Psych. Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352 (2d Cir. 2016); *Alix v. McKinsey & Co.*, 23 F.4th 196 (2d Cir. 2022).

For Defendants, *Sperber* mandates "that purchasers who allegedly suffered indirect injuries 'probably cannot recover under RICO, just as they cannot recover

under the antitrust laws.'" Defs.' Br. 48. But *Sperber* did not use the phrase "indirect purchasers" and did not adopt a standing rule based on privity. Indeed, this Court cautioned *against* "set[ting] out a rule that will mechanically generate a solution to all RICO causality problems. Too many competing policies are gathered under the label 'proximate cause' to make a simple rule possible." *Sperber*, 849 F.2d at 66 (cleaned up). Instead, RICO answers to "what justice demands in each case." *Id.*

*Sperber* held that a specific group of stock purchasers—who had no connection to fraudster Ivan Boesky, had not purchased any stocks he manipulated, or lost any money as a direct result of anything he did—could not establish *causation* because "[i]t is clear that both direct and indirect injuries must be proximately caused." *Id.* at 64.[13] In the spirit of *Palsgraf,* this Court affirmed dismissal because the plaintiffs were simply too far down the causal chain to satisfy *proximate cause*. *Id.* at 64-65. It concluded on "the unique facts of this case … not to extend recovery to these plaintiffs." *Id.* at 65.

Similarly, *Alix v. McKinsey & Co.*, 23 F.4th 196, 203, 208 (2d Cir. 2022), applied a "direct relationship" test. Despite the fact that the parties there had no contractual interactions, as with the rival sets of potential auction bidders in

---

[13] Notably, *Sperber* expressly acknowledged that "at least some kinds of indirect injury are recoverable" under RICO. *Id.* at 63 (discussing *Sedima*).

*Bridge*, the plaintiff satisfied proximate cause because the loss "flow[ed] directly from McKinsey's fraud on the bankruptcy Court." *Id.* at 205-06. Here, proximate cause is even more clear: Plaintiffs' losses flow directly from Defendants' fraudulent statements *to them*. *Alix* also held that "the existence of an intervening decision-maker"—while relevant to the proximate cause analysis—"is not in and of itself dispositive." *Id*. at 206 (cleaned up) (citing *Bridge*, 553 U.S. at 654, 659). Again, the same is true here: the presence of intervening decision-makers like retailers is not dispositive, but just an element of the proximate cause inquiry.

### D. Neither the FDCA nor an Agency Ruling Precludes RICO.

Defendants' preclusion argument cannot be reconciled with basic principles of statutory construction or controlling decisions in *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014), and *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmbH*, 843 F.3d 48 (2d Cir. 2016). Together, those cases hold that even where the FDA acts "pursuant to its more proactive, extensive, and focused role in drug regulation," as here, its "requirements are a floor, not a ceiling," and neither the FDCA nor FDA regulations preclude federal false advertising claims. *Church & Dwight*, 843 F.3d at 64 (citing *POM Wonderful*).

Defendants do not cite any cases holding that the FDCA precludes RICO (or similar federal statutes), because there are none. The lone case they cite—*Apotex Inc. v. Acorda Therapeutics, Inc.* 823 F.3d 51 (2d Cir. 2016)—was not about

preclusion at all. It did not cite *POM Wonderful* or even use the word "preclusion," much less hold the FDCA precludes federal false advertising claims.

The question in *Apotex* was whether a competitor challenging FDA approval of a rival drug made out a *prima facie* case of false advertising. 823 F.3d at 55. *Church & Dwight* noted that *Apotex* left *open* the potential for Lanham Act liability where the at-issue language is "literally or implicitly false":

> In *Apotex*, the … issue was whether aspects of the defendant's advertising incorporating FDA-approved factual assertions about pharmacological effects of its product were nonetheless false. Here, in contrast, the question is whether the court may even entertain a claim of falsity relating to FDA approved messaging, or whether such a claim is legally *precluded*, so that a court may not even consider the claim but must dismiss it without consideration of whether the advertising or labeling in fact misleads. As explained above, the question was answered by the Supreme Court in *POM Wonderful*, which clearly held that a Lanham Act claim is not precluded by FDA approval because the Lanham Act and the FDCA serve distinct purposes. The *Apotex* decision contained no suggestion that a court is precluded by law from entertaining such a claim of falsity.

843 F.3d at 73, n.13 (quoting *Apotex*, 823 F.3d at 64 n.10) (emphasis in original). So, too, here: Plaintiffs' claim is based on literal falsity in (and around) FDA-approved labels and direct-to-consumer advertising. Such claims are not precluded.

Moreover, these preclusion arguments are fundamentally irrelevant here. Plaintiffs are not second-guessing the FDA's approval of Oral PE. Instead, they allege that the science was undisputed no later than 2016 that Oral PE is

27

ineffective, and that once Defendants knew that, they had options. They could have been honest with the FDA, and approval would have been withdrawn or the label changed. Or they could have stopped selling Oral PE with literally false representations. Instead, they banded together to maintain FDA approval that was no longer warranted and continued to falsely advertise Oral PE to consumers.

Defendants cannot hide behind the monograph to immunize themselves from RICO liability, particularly where the monograph would have changed but for their conspiracy. *Church & Dwight* is directly on point. "It is true that Defendant here … could have marketed the Product under a label that differed from the label approved by the FDA only by obtaining permission of the FDA." 843 F.3d at 64. However, "because this dispute does not involve the question whether a *state law is preempted* by a federal agency's regulation [but] rather, … the question whether the application of a federal agency's regulation, promulgated under one federal statute, *precludes* a private action under *another federal statute*," the outcome is different. *Id.* (emphasis added). "In a preemption case, concerns about the primacy of federal law and the state-federal balance frame the inquiry, but that is not so in a preclusion case," and "[t]he uniformity concerns that drive preemption doctrine are not necessarily applicable when two federal statutes overlap." *Id.*

Simply put, even where a defendant would have to return to an agency for approval to change its label, where "the two statutes serve distinct and

28

complementary purposes," as here, there is no preclusion. *Id.* at 64-65; *see also, e.g.*, *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 905 (9th Cir. 2017) ("[m]ere FDA approval cannot preclude False Claims Act liability, especially where, as here, the alleged false claims procured certain approvals in the first instance"); *cf. Bartlett*, 570 U.S. at 487 n.4.

Defendants' invocation of *Buckman v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) is off point. *Buckman* is about efforts to use state law to challenge fraud on a federal agency. This implicates federalism and preemption of *state* law claims, not preclusion of federal claims: "Policing fraud against federal agencies is hardly a field which the States have traditionally occupied…. To the contrary, the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Id.* at 347 (cleaned up).

Defendants cite no case applying *Buckman* to preclude a *federal* statutory claim because there is none. Indeed, even with respect to *state* law claims, *Buckman* does not bar *all* claims, where such claims are based on existing legal theories, even if they touch on deceptions to the FDA. *See Desiano,* 467 F.3d at 87.

And, as the Fifth Circuit explained earlier this year, "the problem in *Buckman* was that the claim involved a uniquely federal area of regulation, since it alleged *only* fraud on a federal agency. In other words, the plaintiffs in *Buckman*

29

sought to wield *state law* to vindicate a wrong committed against the Federal Government." *Zyla Life Scis., L.L.C. v. Wells Pharma of Houston, L.L.C.*, 134 F.4th 326, 337 (5th Cir. 2025) (cleaned up) (emphasis supplied). Here, by contrast, Plaintiffs bring a *federal* statutory claim alleging Defendants engaged in a RICO conspiracy to deceive *consumers*.

*        *        *

In sum: nothing "preclude[s] private parties from availing themselves of a well-established federal remedy because an agency enacted regulations that touch on similar subject matter but do not purport to displace that remedy or even implement the statute that is its source." *POM Wonderful*, 573 U.S. at 120. Simply put, "[a]n agency may not [so] reorder federal statutory rights without congressional authorization." *Id.*

## CONCLUSION

For the foregoing reasons, the opinion below should be reversed.

Dated:  June 30, 2025                 /s/ *Samuel Issacharoff*
                                      Samuel Issacharoff
                                      *Counsel of Record*
                                      40 Washington Square South 411J
                                      New York, New York 10012
                                      (212) 998-6580
                                      si13@ nyu.edu

30

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. 32(a)(7)(B) because, excluding the parts of the documents exempted by Fed. R. App. P. 32(f), it contains 6,992 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2016 in 14-point Times New Roman.

*/s/ Jonathan D. Selbin*
Jonathan D. Selbin